F I L E D

02 2013

SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

**IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**

| | |
|---|---|
| JAMES S. ALLEN, JR. | |
| Plaintiff, | |
| vs. | Case No. 13AE-CV000C |
| PIA ASSETS, LLC, RP GOLF, LLC, | Division No. II |
| Defendants. | |

## PETITION

Plaintiff James S. Allen, Jr., through his undersigned counsel, states as follows:

## INTRODUCTION

1.    Plaintiff James S. Allen, Jr. ("Allen"), along with other partners, held a majority interest in companies (including Defendant RP Golf, LLC) that owned large-scale investment properties, including the golf courses, residential lots and country clubs at the National and Loch Lloyd, as well as several commercial properties.   Allen oversaw the operations of these properties.

2.    In October 2006, there was a sale and restructuring of these companies and Neal Patterson and Cliff Illig became majority owners.  Specifically, the parties created PIA Assets, LLC as a new holding company of the investment properties.  After the transaction, Patterson and Illig were majority Class A shareholders.  Allen remained as a minority Class A shareholder and president of Defendant PIA Assets, LLC. Allen's former partners became Class B shareholders with no role in the operation of the properties.

3.    Leading up to the restructuring, Plaintiff loaned money to RP Golf to fund the day-to-day operations of the entities that were eventually consolidated under PIA.

EXHIBIT

1

4.     It was agreed that these loans would be repaid as a part of the October 6, 2006 transaction. But the loans were not repaid at the closing of the transaction and the parties agreed that the loans would be repaid at a later date.

5.     These loans were authorized by RP Golf's Board of Managers.

6.     Prior to January 1, 2008, these loans were on the balance sheets of RP Golf with accruing interest.

7.     In 2008, PIA created loans in favor of Allen in the principal amount of $817,585.

8.     PIA's financial statements reflect the liability with a twenty percent internal rate of return with a maturity date of February 2012.

9.     The loans have never been repaid.

## PARTIES

10.     Plaintiff James S. Allen, Jr. is a resident of Parkville, Missouri.  Allen owns 13.5% of the Class A shares of Defendant PIA Assets, LLC.

11.     Defendant PIA Assets, LLC ("PIA") is a Missouri limited liability company with its principal place of business at 8878 NW 63rd Street, Parkville, Platte County, Missouri. PIA owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, Parkville Commons shopping district and Loch Lloyd Country Club, among other properties.  PIA may be served with process by serving its Registered Agent in Kansas City, Jackson County, Missouri.

12.     Defendant RP Golf, LLC is a Missouri limited liability company with its principal place of business at 8878 NW 63rd Street, Parkville, Platte County, Missouri. RP Golf holds 100% of the interests in clubs, golf courses and developments at the National. PIA owns RP Golf. RP Golf may be served with process by serving its Registered Agent in Kansas City, Missouri.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendants pursuant to Missouri Revised Statutes Sections 506.500(1) and/or 506.500(3) because the cause of action herein asserted arises from Defendants' transaction of business within the State of Missouri and/or Defendants' making of a contract within the State of Missouri.

14.     Venue is proper in this county pursuant to Missouri Revised Statutes Section 508.010 because PIA has at all times material and presently does maintain and keep an office and agent for transaction of its usual and customary business in Platte County, Missouri and the cause of action accrued, at least in part, in Platte County, Missouri.

## FACTS

15.     In 2006, Plaintiff Allen, along with two partners Jim Watson and Jack Manning, controlled multiple large scale real-estate investment properties, including Parkville Commons, the National (including residential lots, the golf courses ("The National" and "The Deuce") and the country club), and Loch Lloyd (including residential lots, the golf course, and the country club).

16.     In October 2006, Allen, Watson and Manning entered into an agreement with two of their investors, Neal Patterson and Cliff Illig, to restructure the management and control of these significant assets.

17.     Under the terms of their agreement, Manning and Watson gave up their majority shares and all rights to control the assets to Patterson, Illig, and Allen in exchange for a regular stream of payments. Manning and Watson became "Class B" shareholders of the newly-formed PIA Assets, LLC.

18.     PIA Assets, LLC (named for Patterson, Illig and Allen), was formed to own and manage the investment properties.

19.     PIA is a holding company. Its primary assets are ownership interests in the assets previously held by PANDI Development LLC, Allen, and Watson and Manning.

20.     Since the formation of PIA, Patterson and Illig, along with Allen, were elected and have served as the Managing Members of PIA. Patterson and Illig were replaced as managing members in December 2012. The three were and are Class A shareholders of PIA. Patterson and Illig share 86.5% of the Class A shares; Jim Allen holds 13.5%.

21.     Patterson and Illig's interests in PIA are held by PANDI Development, LLC.

22.     Allen signed an employment agreement in 2006 to serve as President of PIA.

23.     Prior to October 2006, when Watson, Manning, Allen, Illig and Patterson were negotiating the terms of the transaction, Plaintiff made loans to entities that controlled the investment properties involved in the transaction. These loans were necessary to fund day-to-day operations of the entities, such as utilities, payroll and tax payments.

24.     All loans were approved by RP Golf's board of managers.

25.     At the closing of the transaction in October 2006, PIA took over RP Golf and all of its assets.

**Plaintiff's Loans Were Reflected on the Balance Sheets of PIA**

26.     Plaintiff's loans were then reflected on the balance sheets of Defendant RP Golf, LLC from 2006 to 2008. The loans were accruing interest.

27.     In 2008, PIA transferred the balance of the debts to PIA's books.

28.     The December 31, 2008, Balance Sheet of PIA Assets, LLC reflects Plaintiff's loans as four Notes Payable to Plaintiff. These Notes are categorized as "Long Term Liabilities."

29.     One Note Payable is reflected as payable to Jim and Nancy Allen for $173,118.42.

30.     A second Note Payable is labeled "JSA #1" and reflected as payable to Jim Allen for $301,024.22.

31.     A third Note Payable is labeled "JSA #2" and reflected as payable to Jim Allen for $127,007.37.

32.     A fourth Note Payable is labeled "JSA #3" and reflected as payable to Jim Allen for $216,435.79.

33.     All four of these notes to Plaintiff remained on PIA's balance sheets through 2011 for the same amounts as they appeared on the December 31, 2008 Balance Sheet.

34.     Upon information and belief, all four of the notes are currently on PIA's balance sheet.

### Plaintiff's Loans are Reflected in Other PIA Company Documents

35.     In a PIA document labeled "Notes Receivable Reconciliation as of December 31, 2011," the four notes payable to Plaintiff are consolidated as one note payable in the amount of $817,585.00. This amount matches the total amount of the four notes payable that appeared on PIA's balance sheets from 2008-2011.

36.     PIA is listed as the borrower on the note payable to Allen for $817,585.00. The Note has a maturity date of February 2012 at a 20% internal rate of return.

37.     Plaintiff's loans are also reflected in a document titled "Amended and Restated Employment Agreement" dated January 1, 2010.

38.     In March 2012, counsel for Plaintiff sent a letter to counsel for PIA demanding repayment of Plaintiff's loans in full.

39.     In response, counsel for Defendants produced a document titled "Amended and Restated Employment Agreement that referenced a note in favor of Jim Allen in the amount of $900,000.

40. Additionally, counsel for Defendants produced a note signed by Cliff Illig in the amount of $817,585.00 with a 20% internal rate of return and a maturity date of January 1, 2013.

41. As of the date of this Petition, Plaintiff's loans have not been repaid.

## COUNT I
## ACTION TO COLLECT ON PROMISSORY NOTE

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

42. Defendants are in default to Plaintiff under the terms and conditions of the loan from Plaintiff as reflected in the financial statements of PIA Assets, LLC.

43. The loan is in the principal amount of $817,585.00 with a 20% rate of return.

44. The amount is due and owing.

45. Defendants have failed to make any payments despite the demand to do so by Plaintiff.

46. Defendants have refused to make any payments, refused to cure the default and remain in material breach of their obligations.

WHEREFORE, Plaintiff prays for judgment against Defendants in the amount of $817,585.00 plus interest at the contractual return rate of 20%, for interest on such judgment, including pre- and post-judgment interest, for his costs and expenses incurred herein, attorneys' fees, and for such other and further relief as the Court may deem just and equitable.

## COUNT II
## BREACH OF CONTRACT

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

47. PIA and RP Golf agreed with Plaintiff that Plaintiff would loan Defendant RP Golf, LLC money to fund RP Golf's operations.

48.     Plaintiff made the loans to RP Golf.

49.     Defendants agreed to repay Plaintiff's loans in 2006 during the transaction that resulted in PIA's formation and acquisition of RP Golf.

50.     When Defendants did not repay Plaintiff's loans in 2006, Defendants agreed with Plaintiff to repay the loans at a later date with interest.

51.     A balance of $817,585.00 remained on Plaintiff's loans in 2008. The parties agreed that this amount would be paid back at a 20% rate of return.

52.     Defendants have not repaid the $817,585.00 remaining balance, which is due and owing.

53.     Plaintiff has met all conditions precedent and Defendants remain in breach of their agreement to repay Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendants in the amount of $817,585.00 plus interest at the contractual return rate of 20%, for interest on such judgment, including pre- and post-judgment interest, for his costs and expenses incurred herein, attorneys' fees, and for such other and further relief as the Court may deem just and equitable.

## COUNT III
## UNJUST ENRICHMENT / QUANTUM MERUIT

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

54.     PIA and RP Golf agreed with Plaintiff that Plaintiff would loan Defendant RP Golf, LLC money to fund RP Golf's operations.

55.     Plaintiff made the loans to RP Golf.

56.     Defendants agreed to repay Plaintiff's loans in 2006 during the transaction that resulted in PIA's formation and acquisition of RP Golf.

57.     When Defendants did not repay Plaintiff's loans in 2006, Defendants agreed with Plaintiff to repay the loans at a later date with interest.

58.     A balance of $817,585.00 remains on Plaintiff's loans.

59.     Defendants have retained the $817,585.00 remaining balance on the loans.

60.     The full amount of the loans, plus interest, is due and owing.

61.     Despite Plaintiff's demands for Defendants to repay the loans, Defendants have failed and refused to pay Plaintiff the remaining balance of the loans or accrued interest thereon.

WHEREFORE, Plaintiff prays for judgment against Defendants in the amount of $817,585.00 plus interest at the contractual return rate of 20%, for interest on such judgment, including pre- and post-judgment interest, for his costs and expenses incurred herein, attorneys' fees, and for such other and further relief as the Court may deem just and equitable.

By: _____

Patrick J. Stueve, MO Bar # 37682
stueve@stuevesiegel.com
Andrew W. Funk, MO Bar # 59977
funk@stuevesiegel.com
Stueve Siegel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 714-7100
(816) 714-7101 Facsimile

Virginia S. Crimmins MO Bar # 53139
Crimmins Law Firm, LLC,
v.crimmins@crimminslawfirm.com
201 N. Forest Ave., Suite 213
Independence, MO 64050
(816) 974-7220

**ATTORNEYS FOR PLAINTIFFS**

IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

F I L E
FEB 2013
SANDRA McDOWELL
Clerk of the Circuit Court Platte County

JAMES S. ALLEN, JR.,              )
                                  )
              Plaintiff,          )        Case No. 13AE-CV00013
                                  )
v.                                )
                                  )        Division No. 2
PIA ASSETS, LLC and               )
RP GOLF, LLC,                     )
                                  )
              Defendants.         )

## ANSWER OF DEFENDANTS PIA ASSETS, LLC AND RP GOLF, LLC

COME NOW Defendants PIA Assets, LLC ("PIA") and RP Golf, LLC ("RP Golf"), by and through their attorneys, McDowell, Rice, Smith & Buchanan, P.C., and for their Answer to Plaintiff's Petition, state as follows:

### INTRODUCTION

1.     Defendants admit the allegations contained in paragraph 1 of the Petition.

2.     Defendants admit that in October 2006 there was a restructuring, that PIA was created by Allen and others, that after the transaction Allen remained as a minority Class A shareholder and president of PIA and that Allen's former partners became Class B shareholders with no role in the operation of the properties. Defendants deny that there was a sale, deny that after the restructuring Neal Patterson ("Patterson") and Cliff Illig ("Illig") were majority owners, and deny that after the transaction Patterson and Illig were majority Class A shareholders. Plaintiff's allegations in this paragraph and in the subsequent paragraphs that Patterson and Illig were owners or Class A shareholders are false, and those allegations are made in bad faith in an attempt to sensationalize this matter and to cause Patterson and Illig damages. Defendants deny all other allegations contained in paragraph 2 of the Petition.

3.     Defendants admit the allegations contained in paragraph 3 of the Petition.

EXHIBIT

2

4.      Defendants deny the allegations contained in paragraph 4 of the Petition.

5.      Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in paragraph 5 of the Petition, which are therefore denied.

6.      Defendants admit the allegations contained in paragraph 6 of the Petition.

7.      Defendants deny that in 2008 PIA created loans in favor of Plaintiff and further deny all other allegations contained in paragraph 7 of the Petition.

8.      Defendants admit that PIA's financial statements reflect the liability of $817,585 to Allen but deny that the financial statements reflect a liability of twenty percent internal rate of return with a maturity date of February 2012 and deny all other allegations contained in paragraph 8 of the Petition.

9.      Defendants admit the allegations contained in paragraph 9 of the Petition, but further answering Defendants deny the loan balance is as alleged by Plaintiff and further aver that Plaintiff is claiming more interest due on the obligation than is due.

## PARTIES

10.     Defendants admit the allegations contained in paragraph 10 of the Petition.

11.     Defendants deny the allegation that PIA manages the entities listed in paragraph 11 of the Petition, but admit the remainder of the allegations contained in paragraph 11 of the Petition.

12.     Defendants admit the allegations contained in paragraph 12 of the Petition, except that Defendants expressly deny that the percentage of ownership by RP Golf is 100%.

2

## JURISDICTION AND VENUE

13.     Defendants admit the allegations contained in paragraphs 13 and 14 of the Petition.

## FACTUAL ALLEGATIONS

14.     Defendants admit the allegations contained in paragraph 15 of the Petition.

15.     Defendants deny that Patterson and Illig were investors who entered into an agreement with Allen, Watson and Manning, and Plaintiff's allegations that Patterson and Illig were personally parties to any such agreement is known by Plaintiff to be false and is alleged by Plaintiff in bad faith. Defendants deny all other allegations contained in paragraph 16 of the Petition.

16.     Defendants admit that Manning and Watson gave up their majority shares and became "Class B" shareholders of the newly-formed PIA Assets, LLC. Defendants deny that Manning and Watson gave up their majority shares and control to Patterson and Illig, and Plaintiff's allegation that Patterson and Illig had majority shares is false, known by Plaintiff to be false and is alleged by Plaintiff in bad faith. Defendants deny all other allegations contained in paragraph 17 of the Petition.

17.     Defendants admit the allegations contained in paragraph 18 of the Petition, except that Defendants deny that PIA was formed to manage the investment properties and, further answering, state that Five Star Lifestyles, LLC was formed to manage the properties.

18.     Defendants admit the allegations contained in paragraph 19 of the Petition, except Defendants deny that Allen, Watson and Manning personally held ownership interests in such entities.

19. Defendants admit the allegations in paragraph 20 of the Petition, but deny that the named individuals were "Managing Members," deny that Patterson and Illig were ever members, deny that Patterson and Illig were replaced as managing members in December 2012, and deny that Patterson and Illig are shareholders of PIA or own any Class A shares. Plaintiff knows that Patterson and Illig are not members of PIA and he has made such allegations in bad faith in order to cause Patterson and Illig damage.

20. Defendants deny that Patterson and Illig hold an interest in PIA as alleged in paragraph 21 of the Petition, but admit that PANDI Development, LLC holds an interest in PIA.

21. Defendants admit the allegations contained in paragraph 22 of the Petition.

22. Defendants admit that prior to 2006 Plaintiff made loans to RP Golf, LLC for its day-to-day operations but deny that Illig or Patterson negotiated any terms relating thereto. Defendants deny all other allegations contained in paragraph 23 of the Petition.

23. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in paragraph 24 of the Petition, which are therefore denied.

24. Defendants admit that in October 2006, PIA acquired a percentage interest in RP Golf, LLC but deny the remaining allegations contained in paragraph 25 of the Petition.

25. Defendants admit the allegations contained in paragraph 26 of the Petition.

4

26. Defendants admit that in 2008 the liability to Plaintiff was recorded on the books of PIA as well as RP Golf, LLC, but deny the remaining allegations contained in paragraph 27 of the Petition.

27. Defendants admit the allegations contained in paragraphs 28 through 32 of the Petition.

28. Defendants admit that the obligation remained on the PIA balance sheet, but deny that the obligation is represented by four notes at present and deny all other allegations contained in paragraphs 33 and 34 of the Petition.

29. Defendants admit the allegations contained in paragraph 35 of the Petition.

30. Defendants admit that PIA is the maker of the note payable to Allen for $817,585 carrying an internal rate of return accruing after January 1, 2010, but deny the remaining allegations contained in paragraph 36 of the Petition.

31. Defendants admit that the obligation and note are reflected in the Amended and Restated Employment Agreement dated January 1, 2010, but deny the remaining obligations contained in paragraph 37 of the Petition.

32. Defendants admit that one of Plaintiff's lawyers sent a letter in March 2012 but deny that the demand was for what was owed to Plaintiff and deny all other allegations contained in paragraph 38 of the Petition.

33. Defendants admit that counsel for Defendants produced such document, which speaks for itself, among other documents. Defendants deny all other allegations contained in paragraph 39 of the Petition.

34.    Defendants admit that counsel produced a note for $817,585 signed by Cliff Illig in his representative capacity as an authorized signer of PIA, but Defendants deny all other allegations contained in paragraph 40 of the Petition.

35.    Defendants admit that the promissory note which embodies the obligation to Plaintiff has not been paid, but deny the remaining allegations contained in paragraph 41 of the Petition.

## COUNT I
## ACTION TO COLLECT ON PROMISSORY NOTE

36.    Defendants incorporate herein by reference their answer to the statements and allegations contained in paragraphs 1 through 41 of the Petition as though more fully and completely set forth herein.

37.    Defendants deny the allegations contained in paragraph 42 of the Petition.

38.    Defendants admit the principal balance alleged but lack sufficient knowledge information and belief to admit or deny the remaining allegations contained in paragraph 43 of the Petition, which are therefore denied.

39.    Defendants deny the allegations contained in paragraph 44 of the Petition.

40.    Defendants admit the allegations contained in paragraph 45 of the Petition.

41.    Defendants admit that Defendants have not made any payments, but deny the remaining obligations contained in paragraph 46 of the Petition.

## COUNT II
## BREACH OF CONTRACT

42.    Defendants incorporate herein by reference their answer to the statements and allegations contained in paragraphs 1 through 46 of the Petition as though more fully and completely set forth herein.

6

43. Defendants admit that Plaintiff loaned money to RP Golf, deny that PIA was any part of the agreement, and lack sufficient knowledge information and belief to admit or deny the remaining allegations contained in paragraph 47 of the Petition, which are therefore denied.

44. Defendants admit the allegations contained in paragraph 48 of the Petition.

45. Defendants deny the allegations contained in paragraph 49 of the Petition.

46. Defendants lack sufficient knowledge information and belief to admit or deny the allegations contained in paragraph 50 of the Petition, which are therefore denied.

47. Defendants admit the balance of $817,585 remains unpaid, but lack sufficient knowledge information and belief to admit or deny the remaining allegations contained in paragraph 51 of the Petition, which are therefore denied.

48. Defendants admit the allegations contained in paragraph 52 of the Petition.

49. Defendants lack sufficient knowledge information and belief to admit or deny the allegations contained in paragraph 53 of the Petition, which are therefore denied.

## COUNT III
## UNJUST ENRICHMENT / QUANTUM MERUIT

50. Defendants incorporate herein by reference their answer to the statements and allegations contained in paragraphs 1 through 53 of the Petition as though more fully and completely set forth herein.

7

51. Defendants admit that Plaintiff loaned money to RP Golf, deny that PIA was any part of the agreement, and lack sufficient knowledge information and belief to admit or deny the remaining allegations contained in paragraph 54 of the Petition, which are therefore denied.

52. Defendants admit the allegations contained in paragraph 55 of the Petition.

53. Defendants deny the allegations contained in paragraph 56 of the Petition.

54. Defendants lack sufficient knowledge information and belief to admit or deny the allegations contained in paragraph 57 of the Petition, which are therefore denied.

55. Defendants admit the allegations contained in paragraph 58 of the Petition.

56. Defendants deny the allegations contained in paragraph 59 of the Petition.

57. Defendants admit that the principal balance is due, but Defendants dispute the amount and accrual date for interest due and therefore, deny the remaining allegations contained in paragraph 60 of the Petition.

58. Defendants admit that the $817,585 has not been paid, but deny the remaining allegations contained in paragraph 61 of the Petition.

59. Defendants deny all allegations not specifically admitted herein.

## AFFIRMATIVE DEFENSES

60. Plaintiff's Petition fails to state a claim upon which relief may be granted.

61. By virtue of multiple subordination agreements executed by Plaintiff in favor of third party bank lenders, Plaintiff is not the real party in interest.

8

62.     By virtue of one or more subordination agreements executed by Plaintiff in favor of third party bank lenders, Plaintiff is prohibited from enforcing his claim for payment against Defendants.

63.     Defendants reserve the right to assert additional affirmative defenses as this litigation continues.

WHEREFORE, Defendants pray that that Plaintiff's Petition be held for naught, that judgment be entered in their favor and against Plaintiff for the costs of this action and reasonable attorneys' fees incurred, and for such other relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

**McDOWELL, RICE, SMITH & BUCHANAN,**
*a Professional Corporation*

By: _____

R. Pete Smith              #35408
Kristie Remster Orme       #48685
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
Telephone:   (816) 753-5400
Facsimile:    (816) 753-9996
Email: petesmith@mcdowellrice.com
Email: korme@mcdowellrice.com
ATTORNEYS FOR DEFENDANTS

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served via U.S. Mail, this 5th day of February, 2013, to:

Patrick J. Stueve
Andrew W. Funk
Stueve Sigel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:    (816) 714-7100
Facsimile:     (816) 714-7101
Email: stueve@stuevesiegel.com
Email: funk@stuevesiegel.com

and

Virginia S. Crimmins
Crimmins Law Firm, LLC
201 N. Forest Avenue, Suite 213
Independence, MO 64050
Telephone:    (816) 974-7220
Email: v.crimmins@crimminslawfirm.com

ATTORNEYS FOR PLAINTIFF

_____
Attorney for Defendants



# McDowell, Rice, Smith & Buchanan

**A PROFESSIONAL CORPORATION**

ATTORNEYS AT LAW

SKELLY BUILDING
SUITE 350
605 WEST 47ᵀᴴ STREET
KANSAS CITY, MISSOURI 64112
(816) 753-5400      FAX (816) 753-9996



SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## TELECOPY COVER SHEET

### PLEASE DELIVER PROMPTLY

DATE:       February 5, 2013

NUMBER OF PAGES (including this cover page):  11

TO:   Platte County Circuit Clerk

TELECOPIER NO.:  (816) 858-3392

FROM:     Kristie Remster Orme

RE:   *James S. Allen, Jr. v. PIA Assets, LLC, et al.* / Case No. 13AE-CV00013

OUR FILE NO.:    C12871.003

MESSAGE:   Please file the attached Answer in the above-referenced matter.

---

PLEASE CONTACT **Cindy Rook** at **(816) 960-7332** IF YOU EXPERIENCE ANY PROBLEMS RECEIVING THE ATTACHED DOCUMENT(S).

CONFIDENTIALITY NOTICE:
The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient or addressee, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.

CIRCULAR 230 DISCLOSURE:
In compliance with requirements imposed by the IRS pursuant to IRS Circular 230, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding penalties under the Internal Revenue Code; or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

4435030v1

**IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**

F I L E D
MAR 1 4 2013
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

|  |  |
|---|---|
| JAMES S. ALLEN, JR. | |
| Plaintiff, | |
| vs. | Case No. 13AE-CV00013 |
| PIA ASSETS, LLC, and RP GOLF, LLC, | Division No. 2 |
| Defendants. | |

## ORDER

Upon Motion to this Court and pursuant to Missouri Rule of Civil Procedure 55.03(b), it is hereby ORDERED that Virginia Stevens Crimmins is granted permission to withdraw as counsel for Plaintiff in the above-captioned matter.

IT IS SO ORDERED.

Dated: _3 -14 -2013_

_____
Circuit Court Judge

**EXHIBIT**

**3**

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR.,                )
                                    )
                    Plaintiff,      )      Case No. 13AE-CV00013
v.                                  )
                                    )      Division No. 2
PIA ASSETS, LLC, and                )
RP GOLF, LLC,                       )
                                    )
                    Defendants.     )

**F I L E D**
MAR 2 1 2013
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## ORDER GRANTING UNOPPOSED EXTENSION OF TIME

COMES NOW for consideration Defendants' Unopposed Motion for Extension of Time, through and including April 8, 2013, within which to serve their responses to Plaintiff's First Set of Interrogatories and First Set of Requests for Production. The Court is informed that counsel for Plaintiff does not oppose the requested extension. Upon consideration of the Motion,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendants, and each of them, be and hereby are granted an extension of time, through and including April 8, 2013, within which to serve their responses to Plaintiff's First Set of Interrogatories and First Set of Requests for Production.

IT IS SO ORDERED.

Date: 3-21-2013

Hon. Owens Lee Hull, Jr.
Circuit Court Judge, Div. II

**EXHIBIT**

**4**

Submitted by:

**McDOWELL, RICE, SMITH & BUCHANAN,**
*A Professional Corporation*

By:_____
      Kristie Remster Orme, MO Bar #48685
605 West 47th Street, Suite 350
Kansas City, MO 64112
Telephone: (816) 753-5400
Facsimile: (816) 753-9996
Email: **korme@mcdowellrice.com**
**ATTORNEYS FOR DEFENDANTS**

With a copy by email to:

Patrick J. Stueve
Andrew W. Funk
Stueve Siegel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
Email: stueve@stuevesiegel.com
Email: funk@stuevesiegel.com
**ATTORNEYS FOR PLAINTIFF**

2

IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI
AT PLATTE CITY, MISSOURI

FILED
SEP 10 2013
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

| | | |
|---|---|---|
| JAMES S. ALLEN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13AE-CV00013 |
| | ) | Division II |
| | ) | |
| PIA ASSETS, LLC, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On the 6th day of September, 2013, Plaintiff appeared by counsel, Patrick Stueve, Robert Shaw, and Andrew Funk, and Defendants appeared by counsel, Kristie Orme; the Court heard statements and arguments of counsel on Defendants' Motion for Enforcement of Discovery and Suggestions in Support filed September 3, 2013, and on Defendants' Motion to Stay and/or for Continuance of Trial Setting and Motion for Protective Order filed August 29, 2013, and the matters were taken under advisement.

Now on this _10th_ day of September, 2013, the Court having considered the pleadings on file and the statements of counsel finds and

IT IS ORDERED AND ADJUDGED:

1. That portion of Defendants' Motion to Stay and/or for Continuance of Trial Setting and Motion for Protective Order filed August 29, 2013, that requests a "stay" (emphasis added by the Court) of these proceedings is denied.

That portion of Defendants' Motion which requests a continuance of the trial date which is presently set for October 7, 2013, is granted.

EXHIBIT

5

That portion of Defendants' Motion which requests a protective order is denied.

2. That Defendants' Motion for Enforcement of Discovery filed September 3, 2013, is granted in that Defendants' Request for Production No. 12 which requests "all financial documents and tax returns of Plaintiff during the time period of March 1, 2005, through the present" should be granted, and Plaintiff's objection thereto is overruled. Said documentation and material shall be provided within 15 days of the date of this Order.

Upon appropriate request by counsel, the Court will consider a motion or request for an appropriate protective order with regard to these discovery documents and materials.

OWENS LEE HULL, JR.
PRESIDING CIRCUIT JUDGE

SO ORDERED: Sept 10, 2013

STATE OF MISSOURI, COUNTY OF PLATTE
This is to certify that the foregoing is a true and exact copy of the documents on file in my office.
Witness my hand and official seal this 10TH
day of SEPTEMBER 20 13
Clerk of Circuit Court        SANDRA L. DOWD
By _____ D.C.

2

IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI
AT PLATTE CITY, MISSOURI

FILED

OCT 2 1 2013

SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

JAMES S. ALLEN, JR.,                    )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )        Case No. 13AE-CV00013
                                        )        Division II
                                        )
PIA ASSETS, LLC, ET AL.,                )
                                        )
                    Defendants.         )

## ORDER

On the 4th day of October, 2013, Plaintiff appeared by counsel, Patrick Stueve, Andrew

Funk, and Robert Shaw, and Defendants appeared by counsel, Kristie Orme. The Court took up

Defendants' Motion for Leave to File Amended Answer filed September 17, 2013, Defendants'

Amended Cross-Motion for Protective Orders filed September 18, 2013, Plaintiff's Motion to

Enforce Court's Order and for Sanctions for Failure to Attend Deposition filed September 27,

2013, and Plaintiff's Motion to Compel Document Production filed September 27, 2013; the

Court took the matters under advisement.

Now on this __21st__ day of October, 2013, the Court having considered the pleadings

on file and the statements of counsel finds and

IT IS ORDERED AND ADJUDGED:

1. That Defendants' Motion for Leave to File Amended Answer filed September 17,

2013, is denied.

2. That Defendants' Amended Cross-Motion for Protective Orders filed September 18,

2013, is granted regarding "financial information"; in other respects, it is denied. The Court

EXHIBIT

6

previously granted Plaintiff's request for a protective order on September 20, 2013. It is ordered that the parties submit a jointly agreed to protective order to the Court; if no agreement can be reached, the Court should be so informed.

3. That Plaintiff's Motion to Enforce Court's Order and for Sanctions for Failure to Attend Deposition filed September 27, 2013, is granted. It is ordered that Dale Brouk is to appear for a deposition within 20 days of the date of this Order. It is further ordered that sanctions should be imposed pursuant to Missouri Supreme Court Rule 57.03, and Plaintiff is awarded attorney fees in the amount of $488.00 and costs of the untaken deposition in the amount of $119.50 and shall have a judgment against the Defendants in the total amount of $607.50.

4. That Plaintiff's Motion to Compel Document Production filed September 30, 2013, is granted. It is ordered that Defendants are to provide documents responsive to Plaintiff's requests set forth in the First Request for Production Nos. 2 and 4 within 20 days of the date of this Order.

5. The Court defers ruling on any request for trial setting.

OWENS LEE HULL, JR.
CIRCUIT JUDGE

SO ORDERED: _Oct 21, 2013_

STATE OF MISSOURI, COUNTY OF PLATTE
This is to certify that the foregoing is a true and exact copy of the documents on file in my office.
Witness my hand and official seal this 21st
day of _OCTOBER_, 20_13_
Clerk of Circuit Court, SANDRA L. DOWD
By_____ D.C.

2

IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI
AT PLATTE CITY, MISSOURI

FILED
NOV 1 5 2013
SANDRA L. DOWD
Clerk of the Circuit Court, Platte County, MO

JAMES S. ALLEN, JR., )
)
Plaintiff, )
)
vs. )  Case No. 13AE-CV00013
)  Division II
)
PIA ASSETS, LLC, ET AL., )
)
Defendants. )

## ORDER

On the 15th day of November, 2013, Plaintiff James S. Allen, Jr., was present in person and with counsel, Patrick J. Stueve, Robert Shaw, and Andrew Funk, Defendant PIA Assets, LLC, and RP Golf, LLC, were represented by counsel, Kristie R. Orme, proposed intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig appeared by counsel, Kirk May, and proposed intervenor Pandi Capital, LLC, appeared by counsel, Douglas Weems; the Court heard statements and arguments of counsel on Pandi Capital, LLC's Motion to Intervene and Pandi Development, Neal Patterson, and Clifford Illig's Motion to Intervene, both of which were filed on October 3, 2013. The motions were taken under advisement.

Now on this _15-M_ day of November, 2013, the Court having heard the statements of counsel and considered the pleadings on file finds and

IT IS ORDERED AND ADJUDGED:

1. That Pandi Development, Neal Patterson, and Clifford Illig's Motion to Intervene filed October 3, 2013, is granted.

**EXHIBIT**

**7**

2. That Pandi Capital, LLC's Motion to Intervene filed October 3, 2013, is granted.

OWENS LEE HULL, JR.
CIRCUIT JUDGE

SO ORDERED: Nov 15, 2013

F I L E D
DEC 0 4 2013
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

| | |
|---|---|
| JAMES S. ALLEN, JR., ) | |
| ) | |
| Plaintiff, ) | Case No. 13AE-CV00013 |
| v. ) | |
| ) | Division No. 2 |
| PIA ASSETS, LLC, and ) | |
| RP GOLF, LLC, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| PANDI CAPITAL, LLC, ) | |
| PANDI DEVELOPMENT, LLC, ) | |
| NEAL L. PATTERSON, and ) | |
| CLIFFORD W. ILLIG, ) | |
| ) | |
| Intervenor-Defendants ) | |
| and Counterclaimants. ) | |

## ANSWER OF INTERVENORS PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG

COME NOW Intervenors Pandi Development, LLC ("Pandi Development"), Neal L. Patterson ("Patterson"), and Clifford W. Illig ("Illig"), and for their Answer to Plaintiff's Petition state as follows:

### INTRODUCTION

1.       Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 1 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 1 of the Petition.

2.       Intervenors deny the averments contained in paragraph 2 of the Petition.

EXHIBIT

8

3. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 3 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 3 of the Petition.

4. Intervenors deny the averments contained in paragraph 4 of the Petition.

5. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 5 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 5 of the Petition.

6. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 6 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 6 of the Petition.

7. Intervenors deny the averments contained in paragraph 7 of the Petition.

8. Intervenors deny the averments contained in paragraph 8 of the Petition.

9. Intervenors deny the averments contained in paragraph 9 of the Petition.

## PARTIES

10. Intervenors admit the averments contained in paragraph 10 of the Petition.

11. Intervenors deny the averment that PIA manages the entities listed in paragraph 11 of the Petition, but admit the remainder of the averments contained in paragraph 11 of the Petition.

12. Intervenors admit the averments contained in paragraph 12 of the Petition.

## JURISDICTION AND VENUE

13. Intervenors state that the averments contained in paragraph 13 of the Petition are legal conclusions to which no response is required.

14.     Intervenors admit that PIA maintains an office in Platte County, Missouri. Intervenors deny the remaining averments contained in paragraph 14 of the Petition.

## FACTUAL ALLEGATIONS

15.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 15 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 15 of the Petition.

16.     Intervenors deny the averments contained in paragraph 16 of the Petition.

17.     Intervenors deny the averments contained in paragraph 17 of the Petition.

18.     Intervenors deny the averments contained in paragraph 18 of the Petition.

19.     Intervenors admit the averments contained in paragraph 19 of the Petition, except Intervenors deny that Allen, Watson, and Manning personally held ownership interests in such entities.

20.     Intervenors deny the averments contained in paragraph 20 of the Petition.

21.     Intervenors deny the averments contained in paragraph 21 of the Petition.

22.     Intervenors admit the averments contained in paragraph 22 of the Petition.

23.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 23 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 23 of the Petition.

24.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 24 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 24 of the Petition.

25.     Intervenors admit that in October 2006, PIA acquired a percentage interest in RP Golf, LLC but deny the remaining allegations contained in paragraph 25 of the Petition.

26. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 26 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 26 of the Petition.

27. Intervenors deny the averments contained in paragraph 27 of the Petition.

28. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 28 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 28 of the Petition.

29. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 29 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 29 of the Petition.

30. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 30 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 30 of the Petition.

31. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 31 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 31 of the Petition.

32. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 32 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 32 of the Petition.

33. Intervenors deny the averments contained in paragraph 33 of the Petition.

34. Intervenors deny the averments contained in paragraph 34 of the Petition.

35.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 35 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 35 of the Petition.

36.     Intervenors deny the averments contained in paragraph 36 of the Petition.

37.     Intervenors admit the terms of the Amended and Restated Employment Agreement dated January 1, 2010, but deny the remaining averments contained in paragraph 37 of the Petition.

38.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 38 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 38 of the Petition.

39.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 39 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 39 of the Petition.

40.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 40 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 40 of the Petition.

41.     Intervenors admit that Defendants have not made any payments, but deny the remaining averments contained in paragraph 41 of the Petition.

**COUNT I**
**ACTION TO COLLECT ON PROMISSORY NOTE**

Intervenors incorporate herein by reference their answer to the statements and averments contained in paragraphs 1 through 41 of the Petition as though more fully and completely set forth herein.

42.     Intervenors deny the averments contained in paragraph 42 of the Petition.

5

43.     Intervenors deny the averments contained in paragraph 43 of the Petition.

44.     Intervenors deny the averments contained in paragraph 44 of the Petition.

45.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 45 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 45 of the Petition.

46.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 46 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 46 of the Petition.

## COUNT II
## BREACH OF CONTRACT

Intervenors incorporate herein by reference their answer to the statements and averments contained in paragraphs 1 through 46 of the Petition as though more fully and completely set forth herein.

47.     Intervenors deny the averments contained in paragraph 47 of the Petition.

48.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 48 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 48 of the Petition.

49.     Intervenors deny the averments contained in paragraph 49 of the Petition.

50.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 50 of the Petition.  Intervenors, therefore, deny the averments contained in paragraph 50 of the Petition.

51.     Intervenors deny the averments contained in paragraph 51 of the Petition.

52.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 52 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 52 of the Petition.

53.     Intervenors deny the averments contained in paragraph 53 of the Petition.

**COUNT III**
**UNJUST ENRICHMENT / QUANTUM MERUIT**

Intervenors incorporate herein by reference their answer to the statements and averments contained in paragraphs 1 through 53 of the Petition as though more fully and completely set forth herein.

54.     Intervenors deny the averments contained in paragraph 54 of the Petition.

55.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 55 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 55 of the Petition.

56.     Intervenors deny the averments contained in paragraph 56 of the Petition.

57.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 57 of the Petition.  Intervenors, therefore, deny the averments contained in paragraph 57 of the Petition.

58.     Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 58 of the Petition.  Intervenors, therefore, deny the averments contained in paragraph 58 of the Petition.

59.     Intervenors deny the averments contained in paragraph 59 of the Petition.

60.     Intervenors deny the averments contained in paragraph 60 of the Petition.

61. Intervenors lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 61 of the Petition. Intervenors, therefore, deny the averments contained in paragraph 61 of the Petition.

62. Intervenors deny all averments not specifically admitted herein.

## AFFIRMATIVE DEFENSES

63. Plaintiff's Petition fails to state a claim upon which relief may be granted.

64. Plaintiff's claims against Defendant PIA Assets, LLC are barred by lack of consideration in that Plaintiff provided and Defendant PIA Assets, LLC received nothing of value or consideration in exchange for the alleged note(s).

65. By virtue of multiple subordination agreements executed by Plaintiff in favor of third party bank lenders, Plaintiff is not the real party in interest.

66. Plaintiff's claims against Defendant PIA Assets, LLC are barred in that the terms set forth in the various instruments and documents alleged by Plaintiff in Plaintiff's Petition are unconscionable and unenforceable.

67. Plaintiff's claims are barred by the agreements between the parties, including but not limited to the Operating Agreement of PIA Assets, LLC.

68. Plaintiff does not have standing to assert his claims because he has assigned those claims to third parties.

69. Plaintiff does not have standing to assert his claims because, by virtue of the sale of PIA's loan and J-3 Pandi's loan from Missouri Bank and Trust Co. of Kansas City to Pandi Capital, Pandi Development, Patterson, and Illig, Allen has assigned his claims to Pandi Capital, Pandi Development, Patterson, and Illig.

8

70. By virtue of one or more subordination and/or assignment agreements executed by Plaintiff in favor of third party bank lenders, Plaintiff is prohibited from enforcing his claim for payment against Defendants.

71. Plaintiff has failed to name a real party in interest – Nancy Allen.

72. Plaintiff's claims are barred by waiver, laches and/or estoppel as a result of Plaintiff's conduct as a member and former president of Defendant PIA Assets, LLC, including but not limited to the following particulars:

      a. The "Note" alleged by Plaintiff was not provided to the board of managers of PIA Assets for approval as required by the Operating Agreement of Defendant PIA Assets, LLC;

      b. There were no meetings of the board of managers of Defendant PIA Assets, LLC or resolutions approving the "Note";

      c. As the then-President of Defendant PIA Assets, LLC, Plaintiff directed how the alleged "Note" would be reflected on the financial statements of Defendants;

      d. The alleged 2010 "Note" was negotiated in the context of a broader agreement among the parties and Plaintiff now appears to be attempting to disavow other portions of the 2010 agreements among the parties.

73. Plaintiff's claims against Defendant PIA Assets, LLC are barred by unjust enrichment.

74. Plaintiff's claims against Defendant PIA Assets, LLC are barred by Plaintiff's breach of his duty of good faith and fair dealing.

75. Intervenors reserve the right to assert additional affirmative defenses as this litigation continues.

## PANDI DEVELOPMENT, PATTERSON, AND ILLIG'S COUNTERCLAIMS

## ALLEGATIONS COMMON TO ALL COUNTS

### Jurisdiction and Venue

1.     Jurisdiction is proper in Missouri as all parties maintain a principal place of business in Missouri or are residents of Missouri. In addition, the Court has jurisdiction pursuant to MO. REV. STAT. § 506.500(1) and § 506.500(3) in that the claims asserted arise out of business transactions in the State of Missouri and the making of contracts in the State of Missouri.

2.     Venue is proper in Platte County, Missouri, pursuant to MO. REV. STAT. § 508.010, as the causes of action accrued, at least in part, in said county.

### Parties

3.     PIA Assets, LLC ("PIA") is a holding company that owns a controlling interest in five (5) other entities, all of which are engaged in the ownership and development of real estate, including golf courses and residential real estate developments in Kansas City, Missouri.

4.     PIA owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, the Parkville Commons shopping district, and Loch Lloyd Country Club. PIA owns RP Golf, which holds 100% of the interests in the clubs, golf courses, and other developments at the National.

5.     James S. Allen ("Allen") is a member of PIA and owns 13.5% of PIA's Class A interests.

6.     Pandi Development, LLC ("Pandi Development") is also a member of PIA and owns the remaining 86.5% of PIA's Class A interests.

7.     Pandi Development is owned by Clifford Illig ("Illig") and Neal Patterson ("Patterson").

10

8.      Subject to certain other provisions of the Operating Agreement, the business and affairs of PIA are managed by a Board of Managers consisting of three managers appointed by the members.

9.      From its inception to December 21, 2012, Patterson, Illig, and Allen were the managers of PIA.

10.      On December 21, 2012, Patterson and Illig resigned as managers and Pandi Development appointed Randall M. Nay and Dale W. Brouk to act as independent managers of PIA. Allen remained a manager and is still a manager today.

11.      Pandi Capital, LLC ("Pandi Capital") is owned by Patterson and Illig. Pandi Capital has loaned approximately $100,000,000 to PIA to fund PIA's operations.

### Pandi Capital's Loans to PIA

12.      Revenues generated by PIA's operating subsidiaries have been and are insufficient to pay PIA's expenses, including loans secured by such subsidiaries' assets (the "Secured Loans") in the millions of dollars, other non-member related unsecured indebtedness, and other operating expenses of the subsidiaries.

13.      During this period, Pandi Capital made loans to PIA to cover these ongoing obligations.

14.      From December 31, 2008, through December 31, 2012, Pandi Capital loaned PIA approximately $100,000,000.00, excluding interest, on an unsecured basis (the "Pandi Capital Debt"), part of which has matured and is due and payable in the amount of at least $22,085,185.00.

15.      At all times, Allen knew the Pandi Capital Debt were loans and not equity contributions. In fact, Allen specifically approved loans to PIA by Pandi Capital.

16.     Allen, as a member and manager of PIA, accepted the benefits of the Pandi Capital Debt by receipt of salary, benefits, payments on the Secured Loans, capital expenditures, and operations, which has allowed PIA to continue to operate. Without the Pandi Capital Debt, PIA would have been forced to close and liquidate long ago.

## Allen's Loan

17.     As alleged by Allen in this lawsuit, prior to 2006 Allen loaned the sum of $817,585 to RP Golf, LLC on an unsecured basis for which PIA is supposedly now responsible (the "Allen Debt"). Allen requests interest at a 20% internal rate of return and attorneys' fees.

## Jackson County Litigation

18.     Solely to defend its interests, Pandi Capital brought suit in the Circuit Court of Jackson County, Missouri, to collect on the Pandi Capital Debt in a case styled *Pandi Capital, LLC v. PIA Assets, LLC*, Case No. 1316-cv10936 (the "Jackson County Case"). *See* Pandi Capital's Jackson County Petition, attached as Exhibit A.

19.     Allen filed a Motion to Intervene in the Jackson County Case to assert supposed defenses and counterclaims against Pandi Capital, Pandi Development, Patterson, and Illig that include claims based on breach of fiduciary duty and fraudulent transfer arising out of allegations that Patterson and Illig have taken actions to undermine PIA's ability to repay amounts allegedly owed by PIA to Allen. Allen also alleges Pandi Development, Patterson, and Illig have fraudulently transferred property by re-characterizing equity as debt to defraud creditors. Allen further seeks a declaratory judgment that the funds contributed by Pandi Capital to PIA should be considered equity and not debt. Finally, Allen seeks to pierce the corporate veil to hold Pandi Development, Patterson, and Illig liable for his Platte County claims against PIA.

20.     Allen's Motion to Intervene was granted, and his claims against Pandi Capital, Pandi Development, Patterson, and Illig were filed.

### PIA and Its Affiliates Default on Bank Loans

21. PIA and its subsidiaries have also obtained funding through loans from third-party banks ("Bank Loans").

22. One such Bank Loan is a $5,000,000 loan from Missouri Bank & Trust Co. of Kansas City ("Missouri Bank") to PIA.

23. Allen signed a personal guaranty guarantying PIA's indebtedness to Missouri Bank for 5%.

24. On or about August 28, 2013, Missouri Bank sent a Notice of Default and Demand for Payment to PIA, Patterson, Illig, and Allen.

25. In response, on September 18, 2013, Pandi Capital, Pandi Development, Patterson, and Illig purchased the note to Missouri Bank, jointly and severally, and are now the holder of said note and all related documents, including Allen's guaranty.

26. By virtue of the sale of the note, Pandi Capital, Pandi Development, Patterson, and Illig have succeeded to all of the rights, title, and interest of Missouri Bank under the promissory note.

27. Another such Bank Loan is a loan from Missouri Bank to J-3 Pandi, LLC ("J-3 Pandi"), an affiliate of PIA, in the amount of $1,208,230.00.

28. Allen signed a personal guaranty guarantying J-3 Pandi's indebtedness to Missouri Bank for 5%.

29. On or about August 28, 2013, Missouri Bank sent a Notice of Maturity and Demand for Payment to PIA, Patterson, Illig, and Allen.

30. In response, on September 18, 2013, Pandi Capital, Pandi Development, Patterson, and Illig purchased the note to Missouri Bank, jointly and severally, and are now the holders of said note and all related documents, including Allen's guaranty.

31. By virtue of the sale of the note, Pandi Capital, Pandi Development, Patterson, and Illig have succeeded to all of the rights, title, and interest of Missouri Bank under the promissory note.

## COUNT I – RECOVERY ON GUARANTY OF DEBT

### (PIA-Missouri Bank Note)

32. Pandi Development, Patterson, and Illig incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

33. Allen executed a personal guaranty guarantying a portion of PIA's indebtedness to Missouri Bank.

34. Allen unconditionally delivered the guaranty to Missouri Bank.

35. Before Missouri Bank extended credit to PIA, it required the guaranty from Allen.

36. Missouri Bank extended credit to PIA.

37. The note is currently due and owing.

38. Allen's guaranty covers a portion of the amount due and owing.

39. Pandi Capital, Pandi Development, Patterson, and Illig purchased the note and the guaranty, and are entitled to all amounts due under the guaranty. In addition, pursuant to the guaranty, Allen has assigned all claims he may have against PIA and is required, upon request, to deliver any notes or other evidence of indebtedness to Pandi Development, Patterson, and Illig.

WHEREFORE, Pandi Development, Patterson, and Illig pray for judgment in an amount to be determined at trial; for their costs incurred herein; for pre-judgment and post-judgment interest; for attorneys' fees; and for such other and further relief as the Court deems just and proper.

## COUNT II– RECOVERY ON GUARANTY OF DEBT

### (J-3 Pandi-Missouri Bank Note)

40.     Pandi Development, Patterson, and Illig incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

41.     Allen executed a personal guaranty guarantying a portion of J-3 Pandi's indebtedness to Missouri Bank.

42.     Allen unconditionally delivered the guaranty to Missouri Bank.

43.     Before Missouri Bank extended credit to J-3 Pandi, it required the guaranty from Allen.

44.     Missouri Bank extended credit to J-3 Pandi.

45.     The note is currently due and owing.

46.     Allen's guaranty covers a portion of the amount due and owing.

47.     Pandi Capital, Pandi Development, Patterson, and Illig purchased the note and the guaranty, and are entitled to all amounts due under the guaranty. In addition, pursuant to the guaranty, Allen has assigned all claims he may have against PIA and is required, upon request, to deliver any notes or other evidence of indebtedness to Pandi Development, Patterson, and Illig.

WHEREFORE, Pandi Development, Patterson, and Illig pray for judgment in an amount to be determined at trial; for their costs incurred herein; for pre-judgment and post-judgment

interest; for attorneys' fees; and for such other and further relief as the Court deems just and proper.

## COUNT III – ALTERNATIVE CLAIM FOR DECLARATORY JUDGMENT

48.     Pandi Development, Patterson, and Illig incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

49.     In the event the Court finds the Pandi Capital Debt was in fact "equity contributions", which Pandi Development, Patterson, and Illig deny, a justiciable controversy regarding the characterization of the Allen Debt exists, in that Allen's claims to collect on his promissory note and breach of contract are really actions to collect equity contributions, not loans.

50.     In the event the Court finds the Pandi Capital Debt was in fact "equity contributions", which Pandi Development, Patterson, and Illig deny, the Allen Debt is not a contractual obligation owed by PIA Assets to Allen, but is also an equity contribution made by him that must be re-characterized.

51.     Pandi Development, Patterson, and Illig therefore ask this Court for a declaration that the Allen Debt described in paragraphs 29 through 32 of Allen's Petition was in fact an equity contribution to PIA Assets.

WHEREFORE, Pandi Development, Patterson, and Illig pray for a declaration of rights as described above; for their costs incurred herein; for attorneys' fees; and for such other and further relief as the Court deems just and proper.

## COUNT IV – RECOUPMENT AND / OR SET-OFF

**(Recoupment and / or Set-off on behalf of Pandi Development, Patterson, and Illig)**

52.     Pandi Development, Patterson, and Illig incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

53.     To the extent that Pandi Development, Patterson, and / or Illig owe any debts or obligations to Allen, which Pandi Development, Patterson, and Illig deny, they are entitled to recoup and / or set-off the repayment of any such debt against amounts adjudged to be owed by Allen to Pandi Development, Patterson and / or Illig.

WHEREFORE, Pandi Development, Patterson, and Illig pray that the Court order the set-off or recoupment in an amount to be proven at trial.

Dated: December 4, 2013          Respectfully submitted,

ROUSE HENDRICKS GERMAN MAY PC

_____/s/ Kirk T. May_____
Kirk T. May                    MO Bar #31657
F. Ryan Van Pelt               MO Bar #64208
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
Tele:   (816) 471-7700
Fax:    (816) 471-2221
Email: kirkm@rhgm.com
Email: ryanv@rhgm.com
*Attorneys for Defendants Pandi Development, LLC,
Neal Patterson, and Clifford Illig*

17

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above anf foregoing were e-mailed and served by U.S. Mail, first-class mail, postage paid on this 4th Day of December, 2013 to:

Patrick J. Stueve
Andrew W. Funk
Stueve Siegel Hanson, LLP
460 Nichols Road, Ste. 200
Kansas City, MO 64112
ATTORNEYS FOR PLAINTIFF

R. Pete Smith
Kristie Remster Orme
McDowell, Rice, Smith & Buchanan
605 W. 74th Street, Ste. 350
Kansas City, MO 64112
ATTORNEYS FOR DEFENDANT

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
Spencer Fane Britt & Browne LLP
1000 Walnut, Ste. 1400
Kansas City, MO 64106
ATTORNEYS FOR DEFENDANT

/s/Kirk T. May
Attorney for Defendants

JAMES S. ALLEN, JR.,      )
                                     )

      Plaintiff,         )
                                     )

      v.                   )      **Case No. 13AE-CV00013**
                                     )      **Division II**

PIA ASSETS, LLC,      )
RP GOLF, LLC,        )
                                     )

      Defendants,       )
                                     )

and                   )
                                     )

PANDI CAPITAL, LLC,      )
PANDI DEVELOPMENT, LLC,     )
NEAL L. PATTERSON, and     )
CLIFFORD W. ILLIG,      )
                                     )

      Intervenors-Defendants,   )
      Counterclaimants, and Crossclaimants.  )

**F I L E D**

DEC 1 0 2013

SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## ANSWER-IN-INTERVENTION AND COUNTERCLAIMS OF PANDI CAPITAL, LLC

COMES NOW Intervenor-Defendant Pandi Capital, LLC ("Pandi Capital"), by and through its attorneys, and for its Answer to Plaintiff's Petition, states as follows:

## INTRODUCTION

1.    Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 1 of the Petition and, therefore, denies the same.

2.    Pandi Capital admits that, in October 2006, PIA Assets, LLC was created as a holding company and that Allen was a minority Class A shareholder and president of PIA Assets, LLC ("PIA Assets"). Pandi Capital denies that Illig and Patterson owned Class A shares. With respect to the remaining allegations in paragraph 2 of the Petition, Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments and, therefore, denies the same.

EXHIBIT

9

3. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 3 of the Petition and, therefore, denies the same.

4. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 4 of the Petition and, therefore, denies the same.

5. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 5 of the Petition and, therefore, denies the same.

6. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 6 of the Petition and, therefore, denies the same.

7. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 7 of the Petition and, therefore, denies the same.

8. Pandi Capital denies the averments in paragraph 8 of the Petition.

9. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 9 of the Petition and, therefore, denies the same.

## PARTIES

10. Pandi Capital admits the averments in paragraph 10 of the Petition.

11. Pandi Capital denies that PIA manages the entities listed in paragraph 11 of the Petition, but admits the remainder of the averments therein.

12. Pandi Capital admits the averments in paragraph 12 of the Petition.

## JURISDICTION AND VENUE

13. Pandi Capital states that the averments in paragraph 13 of the Petition are legal conclusions to which no response is required. Insofar as a factual response is required, Pandi Capital denies the same.

WA 4703137.1

14. Pandi Capital states that the averments in paragraph 14 of the Petition are legal conclusions to which no response is required. Insofar as a factual response is required, Pandi Capital denies the same.

## FACTS

15. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 15 of the Petition and, therefore, denies the same.

16. Pandi Capital denies the averments in paragraph 16 of the Petition.

17. Pandi Capital denies the averments in paragraph 17 of the Petition.

18. Pandi Capital denies the averments in paragraph 18 of the Petition.

19. Pandi Capital admits the averments in paragraph 19 of the Petition, except that Pandi Capital denies that Allen, Watson, and Manning personally held ownership interests in such entities.

20. Pandi Capital denies the averments in paragraph 20 of the Petition.

21. With respect to the allegations in paragraph 21, Pandi Capital admits that Pandi Development, LLC owns interests in PIA Assets. Pandi Capital denies the remaining allegations in Paragraph 21.

22. Pandi Capital admits the averments in paragraph 22 of the Petition.

23. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 23 of the Petition and, therefore, denies the same.

24. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 24 of the Petition and, therefore, denies the same.

25. Pandi Capital admits that, in October 2006, PIA acquired a percentage interest in RP Golf, LLC, but denies the remaining averments contained in paragraph 25 of the Petition.

WA 4703137.1

26. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 26 of the Petition and, therefore, denies the same.

27. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 27 of the Petition and, therefore, denies the same.

28. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 28 of the Petition and, therefore, denies the same.

29. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 29 of the Petition and, therefore, denies the same.

30. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 30 of the Petition and, therefore, denies the same.

31. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 31 of the Petition and, therefore, denies the same.

32. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 32 of the Petition and, therefore, denies the same.

33. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 33 of the Petition and, therefore, denies the same.

34. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 34 of the Petition and, therefore, denies the same.

35. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 35 of the Petition and, therefore, denies the same.

36. Pandi Capital denies the averments in paragraph 36.

37. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 37 of the Petition and, therefore, denies the same.

WA 4703137.1

38. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 38 of the Petition and, therefore, denies the same.

39. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 39 of the Petition and, therefore, denies the same.

40. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 40 of the Petition and, therefore, denies the same.

41. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 41 of the Petition and, therefore, denies the same.

## COUNT I
## ACTION TO COLLECT ON PROMISSORY NOTE

Pandi Capital incorporates herein by reference its answers to the statements and averments contained in paragraphs 1 through 41 of the Petition as though more fully and completely set forth herein.

42. Pandi Capital denies the averments in paragraph 42 of the Petition.

43. Pandi Capital denies the averments in paragraph 43 of the Petition.

44. Pandi Capital denies the averments in paragraph 44 of the Petition.

45. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 45 of the Petition and, therefore, denies the same.

46. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 46 of the Petition and, therefore, denies the same.

## COUNT II
## BREACH OF CONTRACT

Pandi Capital incorporates herein by reference its answers to the statements and averments contained in paragraphs 1 through 46 of the Petition as though more fully and completely set forth herein.

WA 4703137.1

47. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 47 of the Petition and, therefore, denies the same.

48. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 48 of the Petition and, therefore, denies the same.

49. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 49 of the Petition and, therefore, denies the same.

50. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 50 of the Petition and, therefore, denies the same.

51. Pandi Capital denies the averments in paragraph 51 of the Petition.

52. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 52 of the Petition and, therefore, denies the same.

53. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 53 of the Petition and, therefore, denies the same.

## COUNT III
## UNJUST ENRICHMENT / QUANTUM MERUIT

Pandi Capital incorporates herein by reference its answers to the statements and averments contained in paragraphs 1 through 53 of the Petition as though more fully and completely set forth herein.

54. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 54 of the Petition and, therefore, denies the same.

55. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 55 of the Petition and, therefore, denies the same.

56. Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 56 of the Petition and, therefore, denies the same.

WA 4703137.1

57.     Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 57 of the Petition and, therefore, denies the same.

58.     Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 58 of the Petition and, therefore, denies the same.

59.     Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 59 of the Petition and, therefore, denies the same.

60.     Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 60 of the Petition and, therefore, denies the same.

61.     Pandi Capital is without sufficient information, knowledge, or belief to admit or deny the averments in paragraph 61 of the Petition and, therefore, denies the same.

62.     Pandi Capital denies all averments not specifically admitted herein.

## AFFIRMATIVE DEFENSES

63.     Plaintiff's Petition fails to state a claim upon which relief may be granted.

64.     Plaintiff's claims against PIA Assets are barred by lack of consideration in that Plaintiff provided and PIA Assets received nothing of value or consideration in exchange for the alleged note(s).

65.     By virtue of multiple subordination agreements executed by Plaintiff in favor of third-party bank lenders, Plaintiff is not the real party in interest.

66.     By virtue of multiple subordination agreements executed by Plaintiff in favor of third-party bank lenders, Plaintiff is prohibited from enforcing his claim for payment against Defendants.

67.     Plaintiff's claims against PIA Assets, LLC are barred in that the terms set forth in the various instruments and documents alleged by Plaintiff in Plaintiff's Petition are unconscionable and unenforceable.

7

68.     Plaintiff's claims are barred by the agreements between the parties, including but not limited to the Operating Agreement of PIA Assets.

69.     Plaintiff does not have standing to assert his claims because he has assigned those claims to third parties.

70.     Plaintiff does not have standing to assert his claims because, by virtue of the sale of PIA's loan and J-3 Pandi's loan from Missouri Bank and Trust Co. of Kansas City to Pandi Capital, Pandi Development, Neal Patterson, and Cliff Illig, Allen has assigned his claims to Pandi Capital, Pandi Development, Neal Patterson, and Cliff Illig.

71.     By virtue of one or more subordination and/or assignment agreements executed by Plaintiff in favor of third-party bank lenders, Plaintiff is prohibited from enforcing his claim for payment against Defendants.

72.     Plaintiff has failed to name a real party in interest, Nancy Allen.

73.     Plaintiff's claims are barred by waiver, laches, and/or estoppel as a result of Plaintiff's conduct as a member and former president of PIA Assets, including but not limited to the following particulars:

     a.    The "Note" alleged by Plaintiff was not provided to the board of managers of PIA Assets for approval as required by the Operating Agreement of that entity

     b.    There were no meetings of the board of managers of PIA Assets or resolutions approving the "Note";

     c.    As the then-President of PIA Assets, Plaintiff directed how the alleged "Note" would be reflected on the financial statements of Defendants;

     d.    The alleged 2010 "Note" was negotiated in the context of a broader agreement among the parties and Plaintiff now appears to be attempting to disavow other portions of the 2010 agreement among the parties;

74.     Plaintiff's claims against PIA Assets are barred by unjust enrichment.

WA 4703137.1

75.     Plaintiff's claims against PIA Assets are barred by Plaintiff's duty of good faith and fair dealing.

76.     Pandi Capital reserves the right to assert additional affirmative defenses as this litigation continues.

## PANDI CAPITAL, LLC'S COUNTERCLAIMS AND CROSSCLAIMS

## ALLEGATIONS COMMON TO ALL COUNTS

### Jurisdiction and Venue

1.     Jurisdiction is proper in Missouri as all parties maintain a principal place of business in Missouri or are residents of Missouri.   In addition, this Court has jurisdiction pursuant to RSMo § 506.500(1) in that the claims asserted herein arise out of business transactions in the State of Missouri and the making of contracts in the State of Missouri.

2.     Venue is proper in Platte County, Missouri, pursuant to RSMo § 508.010, as the causes of action accrued, at least in part, in Platte County.

### Parties

3.     PIA Assets, LLC ("PIA Assets") is a holding company that owns a controlling interest in five (5) other entities, all of which are engaged in the ownership and development of real estate, including golf courses and residential real estate developments in Kansas City, Missouri.

4.     PIA Assets owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, the Parkville Commons shopping district, and Loch Lloyd Country Club.  PIA Assets owns RP Golf, which holds 100% of the interests in the clubs, golf courses, and other developments at the National.

5.     Allen is a member of PIA Assets and owns 13.5% of PIA Assets' Class A interests.

WA 4703137.1

6.    Pandi Development, LLC ("Pandi Development") is also a member of PIA Assets and owns the remaining 86.5% of PIA Assets' Class A interests.

7.    Pandi Development is owned by Clifford Illig ("Illig") and Neal Patterson ("Patterson").

8.    Subject to certain other provisions of the Operating Agreement, the business and affairs of PIA Assets are managed by a Board of Managers consisting of three managers appointed by the Members.

9.    From its inception to December 21, 2012, Illig, Patterson, and Allen were the managers of PIA.

10.    On December 21, 2012, the Pandi Development owners resigned as managers, and Pandi Development appointed Randall M. Nay and Dale W. Brouk to act as independent managers of PIA Assets. Allen remained a manager, and is still a manager today.

11.    Pandi Capital, LLC ("Pandi Capital") is owned by Patterson and Illig. Pandi Capital has loaned over $100,000,000 to PIA Assets to fund PIA Assets' operations.

### Pandi Capital's Loans to PIA Assets

12.    Revenues generated by PIA Assets' operating subsidiaries have been and are insufficient to pay PIA Assets' expenses, including loans secured by such subsidiaries' assets (the "Secured Loans") in the millions of dollars, and other non-member related unsecured indebtedness and other operating expenses of the subsidiaries.

13.    During this period, Pandi Capital made loans to PIA Assets to cover these ongoing obligations.

### The Notes

14.    On or about December 31, 2008, Cliff Illig and Neal Patterson (the "Members") made a loan to PIA Assets in the principal amount of $300,000. Upon organization of Pandi

10

WA 4703137.1

Capital, the Members assigned all right and title in the loan to Pandi Capital. In consideration thereof, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing, dated December 31, 2008, and by the terms of which PIA Assets promised and agreed to pay the principal amount of $300,000, together with interest and fees as set forth therein on the maturity date of December 31, 2011 ("Note 1"). A true and correct copy of Note 1, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 1** and is incorporated by reference.

15.     On or about March 31, 2009, the Members made a loan to PIA Assets in the principal amount of $9,220,000. Upon organization of Pandi Capital, the Members assigned all right and title in the loan to Pandi Capital. In consideration thereof, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing, dated March 31, 2009, and by the terms of which PIA Assets promised and agreed to pay the principal amount of $9,220,000, together with interest and fees as set forth therein on the maturity date of March 31, 2012 ("Note 2"). A true and correct copy of Note 2, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 2** and is incorporated by reference.

16.     On or about June 30, 2009, the Members made a loan to PIA Assets in the principal amount of $2,000,000. Upon organization of Pandi Capital, the Members assigned all right and title in the loan to Pandi Capital. In consideration thereof, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing, dated June 30, 2009, and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,000,000, together with interest and fees as set forth therein on the maturity date of June 30, 2012 ("Note 3"). A true and correct copy of Note 3, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 3** and is incorporated by reference.

WA 4703137.1

17.     On or about September 30, 2009, the Members made a loan to PIA Assets in the principal amount of $2,742,996. Upon organization of Pandi Capital, the Members assigned all right and title in the loan to Pandi Capital. In consideration thereof, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing, dated September 30, 2009, and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,742,996, together with interest and fees as set forth therein on the maturity date of September 30, 2012 ("Note 4"). A true and correct copy of Note 4, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 4** and is incorporated by reference.

18.     On or about December 31, 2009, for value received and in consideration of an actual loan in the principal amount of $7,822,189 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $7,822,189, together with interest and fees as set forth therein on the maturity date of December 31, 2012 ("Note 5"). A true and correct copy of Note 5, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 5** and is incorporated by reference.

19.     On or about March 31, 2010, for value received and in consideration of an actual loan in the principal amount of $7,800,000 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $7,800,000, together with interest and fees as set forth therein on the maturity date of March 31, 2013 ("Note 6"). A true and correct copy of Note 6, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 6** and is incorporated by reference.

WA 4703137.1

20.    On or about June 30, 2010, for value received and in consideration of an actual loan in the principal amount of $5,784,206 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $5,784,206, together with interest and fees as set forth therein on the maturity date of June 30, 2013 ("Note 7"). A true and correct copy of Note 7, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 7** and is incorporated by reference.

21.    On or about September 30, 2010, for value received and in consideration of an actual loan in the principal amount of $2,310,500 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,310,500, together with interest and fees as set forth therein on the maturity date of September 30, 2013 ("Note 8"). A true and correct copy of Note 8, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 8** and is incorporated by reference.

22.    On or about December 31, 2010, for value received and in consideration of an actual loan in the principal amount of $19,432,606.49 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $19,432,606.49, together with interest and fees as set forth therein on the maturity date of December 30, 2013 ("Note 9"). A true and correct copy of Note 9, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 9** and is incorporated by reference.

23.    On or about March 31, 2011, for value received and in consideration of an actual loan in the principal amount of $14,363,437.38 made by Pandi Capital, PIA Assets made,

executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $14,363,437.38, together with interest and fees as set forth therein on the maturity date of March 31, 2014 ("Note 10"). A true and correct copy of Note 10, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 10** and is incorporated by reference.

24. On or about June 30, 2011, for value received and in consideration of an actual loan in the principal amount of $2,630,000 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,630,000, together with interest and fees as set forth therein on the maturity date of June 30, 2014 ("Note 11"). A true and correct copy of Note 11, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 11** and is incorporated by reference.

25. On or about September 30, 2011, for value received and in consideration of an actual loan in the principal amount of $5,467,500 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $5,467,500, together with interest and fees as set forth therein on the maturity date of September 30, 2014 ("Note 12"). A true and correct copy of Note 12, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 12** and is incorporated by reference.

26. On or about December 31, 2011, for value received and in consideration of an actual loan in the principal amount of $5,030,000 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $5,030,000, together with

WA 4703137.1

interest and fees as set forth therein on the maturity date of December 31, 2014 ("Note 13"). A true and correct copy of Note 13, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 13** and is incorporated by reference.

27.    On or about March 31, 2012, for value received and in consideration of an actual loan in the principal amount of $5,055,146 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $5,055,146, together with interest and fees as set forth therein on the maturity date of March 31, 2015 ("Note 14"). A true and correct copy of Note 14, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 14** and is incorporated by reference.

28.    On or about June 30, 2012, for value received and in consideration of an actual loan in the principal amount of $2,859,632 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,859,632, together with interest and fees as set forth therein on the maturity date of June 30, 2015 ("Note 15"). A true and correct copy of Note 15, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 15** and is incorporated by reference.

29.    On or about September 30, 2012, for value received and in consideration of an actual loan in the principal amount of $2,740,850 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,740,850, together with interest and fees as set forth therein on the maturity date of September 30, 2015 ("Note 16"). A

WA 4703137.1

true and correct copy of Note 16, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 16** and is incorporated by reference.

30.    On or about December 31, 2012, for value received and in consideration of an actual loan in the principal amount of $2,638,008 made by Pandi Capital, PIA Assets made, executed and delivered to Pandi Capital a promissory note in writing and by the terms of which PIA Assets promised and agreed to pay the principal amount of $2,638,008, together with interest and fees as set forth therein on the maturity date of December 31, 2015 ("Note 17," collectively with Notes 1 through 16, the "Notes").  A true and correct copy of Note 17, containing the signature of Dale W. Brouk on behalf of PIA Assets, is attached as **Exhibit 17** and is incorporated by reference.

31.    On or about January 2, 2013, for value received and in consideration of an actual loan in the principal amount of $1,750,000 made by Pandi Capital, PIA Assets orally promised and agreed to pay to Pandi Capital the principal amount of $1,750,000 on demand ("Loan A").

32.    On or about January 9, 2013, for value received and in consideration of an actual loan in the principal amount of $356,275 made by Pandi Capital, PIA Assets orally promised and agreed to pay to Pandi Capital the principal amount of $356,275 upon demand ("Loan B").

33.    On or about February 7, 2013, for value received and in consideration of an actual loan in the principal amount of $323,553 made by Pandi Capital, PIA Assets orally promised and agreed to pay to Pandi Capital the principal amount of $323,553 upon demand ("Loan C").

34.    On or about February 27, 2013, for value received and in consideration of an actual loan in the principal amount of $610,518.83 made by Pandi Capital, PIA Assets orally promised and agreed to pay to Pandi Capital the principal amount of $610,518.83 upon demand ("Loan D").

WA 4703137.1

35.    On or about March 5, 2013, for value received and in consideration of an actual loan in the principal amount of $50,497 made by Pandi Capital, PIA Assets orally promised and agreed to pay to Pandi Capital the principal amount of $50,497 upon demand ("Loan E").

36.    On or about March 5, 2013, for value received and in consideration of an actual loan in the principal amount of $44,786.29 made by Pandi Capital, PIA Assets orally promised and agreed to pay to Pandi Capital the principal amount of $44,786.29 upon demand ("Loan F," collectively with Loans A-E, the "Loans").

37.    By their terms, the Loans were capable of being fully and completely performed within one year.

38.    Pandi Capital has fully performed with respect to its obligations under the Loans.

39.    Each of the Notes contains a provision 8(b) which provides that, "upon the occurrence of an Event of Default described in Section 8(a)(iv) or (v), the debt shall be immediately due and payable automatically without presentment, demand, protect or notice of any kind." See Exhibits 1-17 at Section 8(b). Section 8(a)(iv) of each of the Notes provides that an Event of Default occurs where "[PIA Assets] breaches any other agreement with [Pandi Capital] or fails or neglects to timely perform, keep, or observe any other term, provision, condition, covenant, or agreement contained therein." Section 8(a)(v) of each of the Notes provides that an Event of Default occurs where "[PIA Assets] defaults in any material respect on any other indebtedness of [PIA Assets.]"

40.    On or about March 7, 2013, Pandi Capital agreed, unilaterally and retroactively, to reduce the interest rate on all of the Notes to the Wall Street Journal Prime rate plus one-half of one percent.

WA 4703137.1

41.   PIA Assets ratified its obligations under the Notes and the Loans by its acceptance and retention of the funds loaned thereunder.

42.   In total, from December 31, 2008 through December 31, 2012, Pandi Capital loaned PIA Assets approximately $100,000,000.00, excluding interest, on an unsecured basis (the "Pandi Capital Debt"), part of which has matured and is due and payable in the amount of at least $22,085,185.00.   Pandi Capital continues to loan money to PIA Assets to fund its operations, while Allen refuses to do so.

43.   At all times, Allen knew the Pandi Capital Debt consisted of loans and not equity contributions.  In fact, Allen specifically approved loans to PIA Assets by Pandi Capital.

44.   Allen, as a member and manager of PIA Assets, accepted the benefits of the Pandi Capital Debt, by receipt of salary, benefits, and payments on the Secured Loans, capital expenditures and operations, which has allowed PIA Assets to continue to operate.  Without the Pandi Capital Debt, PIA Assets would have been forced to close and liquidate long ago.

### Allen's Loan

45.   Allen alleges in this lawsuit that, prior to 2006, Allen loaned the sum of $817,585 to RP Golf, LLC on an unsecured basis for which PIA Assets is supposedly now responsible (the "Allen Debt").  Allen alleges he is owed interest on the Allen Debt at a twenty percent (20%) internal rate of return and attorney's fees.

### Jackson County Litigation

46.   Solely to defend its interests, Pandi Capital brought suit in the Circuit Court of Jackson County, Missouri, to collect on the Pandi Capital Debt in a case styled *Pandi Capital, LLC v. PIA Assets, LLC*, Case No. 1316-cv-10936 (the "Jackson County Case").

47.   Allen filed a Motion to Intervene in the Jackson County Case, to assert supposed defenses and counterclaims against Pandi Capital that include claims based on breach of

18

fiduciary duty and fraudulent transfer arising out of allegations that Illig and Patterson have taken actions to undermine PIA Assets' ability to repay amounts allegedly owed by PIA Assets to Allen. Allen also alleges Illig, Patterson, Pandi Development and Pandi Capital have fraudulently transferred property by re-characterizing equity as debt to defraud creditors. Allen further seeks a declaratory judgment that the funds contributed by Pandi Capital to PIA Assets should be considered equity and not debt. Finally, Allen seeks to pierce the corporate veil to hold Pandi Development, Patterson, Illig, and Pandi Capital liable for his Platte County claims.

48.    Allen's Motion to Intervene in the Jackson County Case was granted, and his claims against Pandi Capital, Pandi Development, Patterson, and Illig were filed.

49.    Pandi Capital has filed a Motion to Stay the Jackson County Case pending the resolution of this action.

## PIA Assets and Its Affiliates Default on Bank Loans

50.    PIA Assets and its subsidiaries have also obtained funding through loans from third-party banks ("Bank Loans").

51.    One such Bank Loan is a $5,000,000 loan from Missouri Bank & Trust Co. of Kansas City ("Missouri Bank") to PIA Assets.

52.    Allen signed a personal guaranty guarantying PIA Assets' indebtedness to Missouri Bank for five percent (5%).

53.    On or about August 28, 2013, Missouri Bank sent a Notice of Default and Demand for Payment to PIA Assets, Illig, Patterson, and Allen.

54.    In response, on September 18, 2013, Pandi Capital, Pandi Development, Patterson, and Illig purchased the note to Missouri Bank, jointly and severally and are now the holders of said note and all related documents, including Allen's guaranty.

19

55.     By virtue of the sale of the note, Pandi Capital, Pandi Development, Patterson and Illig have succeeded to all of the rights, title, and interest of Missouri Bank under the promissory note.

56.     Another such Bank Loan is a loan from Missouri Bank to J-3 Pandi, LLC ("J-3 Pandi"), an affiliate of PIA Assets, in the amount of $1,208,230.00.

57.     Allen signed a personal guaranty guarantying J-3 Pandi's indebtedness to Missouri Bank for five percent (5%).

58.     On or about August 28, 2013, Missouri Bank sent a Notice of Maturity and Demand for Payment relating to J-3 Pandi to PIA Assets, Illig, Patterson, and Allen.

59.     In response, on September 18, 2013, Pandi Capital, Pandi Development, Patterson, and Illig purchased the Bank Loan relating to Missouri Bank, jointly and severally, and are now the holders of said note and all related documents, including Allen's guaranty.

60.     By virtue of the sale of the note, Pandi Capital, Pandi Development, Patterson and Illig have succeeded to all of the rights, title, and interest of Missouri Bank under the promissory note relating to J-3 Pandi. These parties may purchase additional Bank Loans and will provide updated information at the time of trial.

## COUNTERCLAIMS
## COUNT I – RECOVERY ON GUARANTY OF DEBT
### (Against Allen on the PIA Assets-Missouri Bank Note)

61.     Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

62.     Allen executed a personal guaranty guarantying a portion of PIA Assets' indebtedness to Missouri Bank.

63.     Allen unconditionally delivered the guaranty to Missouri Bank.

20

WA 4703137.1

64. Before Missouri Bank extended credit to PIA Assets, it required the guaranty from Allen.

65. Missouri Bank extended credit to PIA Assets.

66. The note is currently due and owing.

67. Allen's guaranty covers a portion of the amount due and owing.

68. Pandi Capital, Pandi Development, Patterson, and Illig purchased the note and the guaranty, and are entitled to all amounts due under the guaranty. In addition, pursuant to the guaranty, Allen has assigned all claims he may have against PIA Assets and is required, upon request, to deliver any notes or other evidence of indebtedness to Pandi Capital.

WHEREFORE, Pandi Capital prays for judgment in an amount to be determined at trial, for its costs incurred herein; for pre-judgment and post-judgment interest; for attorneys' fees; and for such other and further relief as the Court deems just and proper.

## COUNT II– RECOVERY ON GUARANTY OF DEBT
### (Against Allen on the J-3 Pandi-Missouri Bank Note)

69. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

70. Allen executed a personal guaranty guarantying a portion of J-3 Pandi's indebtedness to Missouri Bank.

71. Allen unconditionally delivered the guaranty to Missouri Bank.

72. Before Missouri Bank extended credit to J-3 Pandi, it required the guaranty from Allen.

73. Missouri Bank extended credit to J-3 Pandi.

74. The note is currently due and owing.

75. Allen's guaranty covers a portion of the amount due and owing.

21

76.  Pandi Capital, Pandi Development, Patterson, and Illig purchased the note and the guaranty, and are entitled to all amounts due under the guaranty. In addition, pursuant to the guaranty, Allen has assigned all claims he may have against PIA Assets and is required, upon request, to deliver any notes or other evidence of indebtedness to Pandi Capital.

WHEREFORE, Pandi Capital prays for judgment in an amount to be determined at trial, for its costs incurred herein; for pre-judgment and post-judgment interest; for attorneys' fees; and for such other and further relief as the Court deems just and proper.

## COUNT III -- ALTERNATIVE CLAIM FOR DECLARATORY JUDGMENT
### (Against Allen)

77.  Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

78.  In the event the Court finds the Pandi Capital Debt was in fact "equity contributions", which Pandi Capital denies, a justiciable controversy regarding the characterization of the Allen Debt exists, in that Allen's claims to collect on his promissory note and breach of contract are really actions to collect equity contributions, not loans.

79.  In the event the Court finds the Pandi Capital Debt was in fact "equity contributions", which Pandi Capital denies, the Allen Debt is not a contractual obligation owed by PIA Assets to Allen, but is also an equity contribution made by him that must be re-characterized.

80.  Pandi Capital, therefore, asks this Court for a declaration that the Allen Debt described in paragraphs 29 through 32 of Allen's Petition in this case was, in fact, an equity contribution to PIA Assets.

WA 4703137.1

WHEREFORE, Pandi Capital prays for a declaration of rights as described above, for its costs and fees incurred herein; for attorneys' fees; and for further relief as the Court deems just and proper.

## COUNT IV – RECOUPMENT AND / OR SET-OFF
### (Against Allen - Recoupment and/or Set-Off on behalf of Pandi Capital)

81.     Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

82.     To the extent that Pandi Capital owes any debts or obligations to Allen, which Pandi Capital denies, it is entitled to recoup and / or set-off the repayment of any such debt against amounts adjudged to be owed by Allen to PIA Assets and / or Pandi Capital.

WHEREFORE, Pandi Capital prays that the Court order the set-off or recoupment in an amount to be proven at trial.

## CROSSCLAIMS
## COUNT V – BREACH OF CONTRACT – Note 1
### (Against PIA Assets)

83.     Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

84.     As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 1) supported by sufficient consideration.

85.     PIA Assets materially breached the Note by failing to pay all sums due under Note 1, specifically including the failure to pay principal and interest upon maturity of Note 1.

86.     On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 1.

87.     Pandi Capital has been damaged by PIA Assets' breach of Note 1.

WA 4703137.1

88.     Presently, under Note 1 the following amounts remain due, owing and unpaid: (a) principal in the sum of $300,000; (b) accrued interest, as of April 29, 2013, in the sum of $49,375.00; (c) interest accruing at a per diem rate of $31.25 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 1.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $300,00.00, accrued interest as of April 29, 2013 in the sum of $49,375.00, plus interest accruing on the principal at a per diem rate of $31.25 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT VI – BREACH OF CONTRACT – Note 2
### (Against PIA Assets)

89.     Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

90.     As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 2) supported by sufficient consideration.

91.     PIA Assets materially breached the Note by failing to pay all sums due under Note 2, specifically including the failure to pay principal and interest upon maturity of Note 2.

92.     On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 2.

93.     Pandi Capital has been damaged by PIA Assets' breach of Note 2.

94.     Presently, under Note 2 the following amounts remain due, owing and unpaid: (a) principal in the sum of $9,220,000; (b) accrued interest, as of April 29, 2013, in the sum of

24

$1,431,020.83; (c) interest accruing at a per diem rate of $960.42 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 2.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $9,220,000, accrued interest as of April 29, 2013 in the sum of $1,431,020.83, plus interest accruing on the principal at a per diem rate of $960.42 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT VII – BREACH OF CONTRACT – Note 3
### (Against PIA Assets)

95.    Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

96.    As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 3) supported by sufficient consideration.

97.    PIA Assets materially breached the Note by failing to pay all sums due under Note 3, specifically including the failure to pay principal and interest upon maturity of Note 3.

98.    On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 3.

99.    Pandi Capital has been damaged by PIA Assets' breach of Note 3.

100.    Presently, under Note 3 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,000,000; (b) accrued interest, as of April 29, 2013, in the sum of $291,458.33; (c) interest accruing at a per diem rate of $208.33 per day from and after April 29,

25

2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 3.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,000,000, accrued interest as of April 29, 2013 in the sum of $291,458.33, plus interest accruing on the principal at a per diem rate of $208.33 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT VIII – BREACH OF CONTRACT – Note 4
### (Against PIA Assets)

101.    Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

102.    As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 4) supported by sufficient consideration.

103.    PIA Assets materially breached the Note by failing to pay all sums due under Note 4, specifically including the failure to pay principal and interest upon maturity of Note 4.

104.    On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 4.

105.    Pandi Capital has been damaged by PIA Assets' breach of Note 4.

106.    Presently, under Note 4 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,742,996; (b) accrued interest, as of April 29, 2013, in the sum of $373,447.48; (c) interest accruing at a per diem rate of $285.73 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 4.

26

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,742,996, accrued interest as of April 29, 2013 in the sum of $373,447.48, plus interest accruing on the principal at a per diem rate of $285.73 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT IX – BREACH OF CONTRACT – Note 5
### (Against PIA Assets)

107.  Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

108.  As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 5) supported by sufficient consideration.

109.  PIA Assets materially breached the Note by failing to pay all sums due under Note 5, specifically including the failure to pay principal and interest upon maturity of Note 5.

110.  On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 5.

111.  Pandi Capital has been damaged by PIA Assets' breach of Note 5.

112.  Presently, under Note 5 the following amounts remain due, owing and unpaid: (a) principal in the sum of $7,822,189; (b) accrued interest, as of April 29, 2013, in the sum of $989,995.80; (c) interest accruing at a per diem rate of $814.81 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 5.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $7,822,189, accrued interest as of

27

WA 4703137.1

April 29, 2013 in the sum of $989,995.80, plus interest accruing on the principal at a per diem rate of $814.8 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

**COUNT X – BREACH OF CONTRACT – Note 6**
**(Against PIA Assets)**

113.    Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

114.    As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 6) supported by sufficient consideration.

115.    PIA Assets materially breached the Note by failing to pay all sums due under Note 6, specifically including the failure to pay principal and interest upon maturity of Note 6.

116.    On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 6.

117.    Pandi Capital has been damaged by PIA Assets' breach of Note 6.

118.    Presently, under Note 6 the following amounts remain due, owing and unpaid: (a) principal in the sum of $7,800,000; (b) accrued interest, as of April 29, 2013, in the sum of $914,062.50; (c) interest accruing at a per diem rate of $812.50 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 6.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $7,800,000, accrued interest as of April 29, 2013 in the sum of $914,062.50, plus interest accruing on the principal at a per diem rate of $812.50 per day from and after April 29, 2013, until paid; the costs of this action,

WA 4703137.1

including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XI – BREACH OF CONTRACT – Note 7
### (Against PIA Assets)

119. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

120. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 7) supported by sufficient consideration.

121. An Event of Default, as defined in Section 8(iv) and (v) of Note 7, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 7, Note 7 automatically became due and payable.

122. PIA Assets materially breached Note 7 by failing to pay all sums due under Note 7.

123. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 7.

124. Pandi Capital has been damaged by PIA Assets' breach of Note 7.

125. Presently, under Note 7 the following amounts remain due, owing and unpaid: (a) principal in the sum of $5,784,206; (b) accrued interest, as of April 29, 2013, in the sum of $623,007.19; (c) interest accruing at a per diem rate of $602.52 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 7.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $5,784,206, accrued interest as of April 29, 2013 in the sum of $623,007.19, plus interest accruing on the principal at a per diem

WA 4703137.1

rate of $602.52 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XII – BREACH OF CONTRACT – Note 8
### (Against PIA Assets)

126.   Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

127.   As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 8) supported by sufficient consideration.

128.   An Event of Default, as defined in Section 8(iv) and (v) of Note 8, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 8, Note 8 automatically became due and payable.

129.   PIA Assets materially breached Note 8 by failing to pay all sums due under Note 8.

130.   On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 8.

131.   Pandi Capital has been damaged by PIA Assets' breach of Note 8.

132.   Presently, under Note 8 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,310,500; (b) accrued interest, as of April 29, 2013, in the sum of $226,717.81; (c) interest accruing at a per diem rate of $240.68 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 8.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,310,500, accrued interest as of

30

WA 4703137.1

April 29, 2013 in the sum of $226,717.81, plus interest accruing on the principal at a per diem rate of $240.68 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XIII – BREACH OF CONTRACT – Note 9
### (Against PIA Assets)

133.    Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

134.    As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 9) supported by sufficient consideration.

135.    An Event of Default, as defined in Section 8(iv) and (v) of Note 9, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 9, Note 9 automatically became due and payable.

136.    PIA Assets materially breached Note 9 by failing to pay all sums due under Note 9.

137.    On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 9.

138.    Pandi Capital has been damaged by PIA Assets' breach of Note 9.

139.    Presently, under Note 9 the following amounts remain due, owing and unpaid: (a) principal in the sum of $19,432,606.49; (b) accrued interest, as of April 29, 2013, in the sum of $1,720,595.37; (c) interest accruing at a per diem rate of $2,024.23 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 9.

WA 4703137.1

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $19,432,606.49, accrued interest as of April 29, 2013 in the sum of $1,720,595.37, plus interest accruing on the principal at a per diem rate of $2,024.23 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XIV – BREACH OF CONTRACT – Note 10
### (Against PIA Assets)

140.   Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

141.   As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 10) supported by sufficient consideration.

142.   An Event of Default, as defined in Section 8(iv) and (v) of Note 10, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 10, Note 10 automatically became due and payable.

143.   PIA Assets materially breached Note 10 by failing to pay all sums due under Note 10.

144.   On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 10.

145.   Pandi Capital has been damaged by PIA Assets' breach of Note 10.

146.   Presently, under Note 10 the following amounts remain due, owing and unpaid: (a) principal in the sum of $14,363,437.38; (b) accrued interest, as of April 29, 2013, in the sum of $1,137,105.46; (c) interest accruing at a per diem rate of $1,496.19 per day from and after

32

WA 4703137.1

April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 10.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $14,363,437.38, accrued interest as of April 29, 2013 in the sum of $1,137,105.46, plus interest accruing on the principal at a per diem rate of $1,496.19 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XV – BREACH OF CONTRACT – Note 11
### (Against PIA Assets)

147. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

148. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 11) supported by sufficient consideration.

149. An Event of Default, as defined in Section 8(iv) and (v) of Note 11, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 11, Note 11 automatically became due and payable.

150. PIA Assets materially breached Note 11 by failing to pay all sums due under Note 11.

151. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 11.

152. Pandi Capital has been damaged by PIA Assets' breach of Note 11.

153. Presently, under Note 11 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,630,000; (b) accrued interest, as of April 29, 2013, in the sum of

33

$183,278.13; (c) interest accruing at a per diem rate of $273.96 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 11.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,630,000, accrued interest as of April 29, 2013 in the sum of $183,278.13, plus interest accruing on the principal at a per diem rate of $273.96 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XVI – BREACH OF CONTRACT – Note 12
### (Against PIA Assets)

154.     Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

155.     As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 12) supported by sufficient consideration.

156.     An Event of Default, as defined in Section 8(iv) and (v) of Note 12, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 12, Note 12 automatically became due and payable.

157.     PIA Assets materially breached Note 12 by failing to pay all sums due under Note 12.

158.     On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 12.

159.     Pandi Capital has been damaged by PIA Assets' breach of Note 12.

34

WA 4703137.1

160. Presently, under Note 12 the following amounts remain due, owing and unpaid: (a) principal in the sum of $3,467,500; (b) accrued interest, as of April 29, 2013, in the sum of $328,619.53; (c) interest accruing at a per diem rate of $569.53 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 12.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $3,467,500, accrued interest as of April 29, 2013 in the sum of $328,619.53, plus interest accruing on the principal at a per diem rate of $569.53 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XVII – BREACH OF CONTRACT – Note 13
### (Against PIA Assets)

161. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

162. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 13) supported by sufficient consideration.

163. An Event of Default, as defined in Section 8(iv) and (v) of Note 13, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 13, Note 13 automatically became due and payable.

164. PIA Assets materially breached Note 13 by failing to pay all sums due under Note 13.

165. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 13.

35

166. Pandi Capital has been damaged by PIA Assets' breach of Note 13.

167. Presently, under Note 13 the following amounts remain due, owing and unpaid: (a) principal in the sum of $5,030,000; (b) accrued interest, as of April 29, 2013, in the sum of $254,119.79; (c) interest accruing at a per diem rate of $523.96 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 13.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $5,030,000, accrued interest as of April 29, 2013 in the sum of $254,119.79, plus interest accruing on the principal at a per diem rate of $523.96 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XVIII – BREACH OF CONTRACT – Note 14
### (Against PIA Assets)

168. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

169. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 14) supported by sufficient consideration.

170. An Event of Default, as defined in Section 8(iv) and (v) of Note 14, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 14, Note 14 automatically became due and payable.

171. PIA Assets materially breached Note 14 by failing to pay all sums due under Note 14.

36

WA 4703137.1

172. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 14.

173. Pandi Capital has been damaged by PIA Assets' breach of Note 14.

174. Presently, under Note 14 the following amounts remain due, owing and unpaid: (a) principal in the sum of $5,055,146; (b) accrued interest, as of April 29, 2013, in the sum of $207,471.62; (c) interest accruing at a per diem rate of $526.58 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 14.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $5,055,146, accrued interest as of April 29, 2013 in the sum of $207,471.62, plus interest accruing on the principal at a per diem rate of $526.58 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

### COUNT XIX – BREACH OF CONTRACT – Note 15
### (Against PIA Assets)

175. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

176. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 15) supported by sufficient consideration.

177. An Event of Default, as defined in Section 8(iv) and (v) of Note 15, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 15, Note 15 automatically became due and payable.

WA 4703137.1

178. PIA Assets materially breached Note 15 by failing to pay all sums due under Note 15.

179. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 15.

180. Pandi Capital has been damaged by PIA Assets' breach of Note 15.

181. Presently, under Note 15 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,859,632; (b) accrued interest, as of April 29, 2013, in the sum of $90,257.14; (c) interest accruing at a per diem rate of $297.88 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 15.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,859,632, accrued interest as of April 29, 2013 in the sum of $90,257.14, plus interest accruing on the principal at a per diem rate of $297.88 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XX – BREACH OF CONTRACT – Note 16
### (Against PIA Assets)

182. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

183. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 16) supported by sufficient consideration.

38

WA 4703137.1

184.   An Event of Default, as defined in Section 8(iv) and (v) of Note 16, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 16, Note 16 automatically became due and payable.

185.   PIA Assets materially breached Note 16 by failing to pay all sums due under Note 16.

186.   On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 16.

187.   Pandi Capital has been damaged by PIA Assets' breach of Note 16.

188.   Presently, under Note 16 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,740,850; (b) accrued interest, as of April 29, 2013, in the sum of $60,241.60; (c) interest accruing at a per diem rate of $285.51 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 16.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,740,850, accrued interest as of April 29, 2013 in the sum of $60,241.60, plus interest accruing on the principal at a per diem rate of $285.51 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

## COUNT XXI – BREACH OF CONTRACT – Note 17
### (Against PIA Assets)

189.   Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

WA 4703137.1

190.    As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Note 17) supported by sufficient consideration.

191.    An Event of Default, as defined in Section 8(iv) and (v) of Note 17, occurred upon PIA Assets' default under Notes 1-6 as set forth in Counts V-X. Under Section 8(b) of Note 17, Note 17 automatically became due and payable.

192.    PIA Assets materially breached Note 17 by failing to pay all sums due under Note 17.

193.    On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Note 17.

194.    Pandi Capital has been damaged by PIA Assets' breach of Note 17.

195.    Presently, under Note 17 the following amounts remain due, owing and unpaid: (a) principal in the sum of $2,671,453; (b) accrued interest, as of April 29, 2013, in the sum of $33,114.89; (c) interest accruing at a per diem rate of $278.28 per day from and after April 29, 2013; and (d) the costs of this action, including reasonable attorney fees as provided for in Note 17.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $2,671,453, accrued interest as of April 29, 2013 in the sum of $33,114.89, plus interest accruing on the principal at a per diem rate of $278.28 per day from and after April 29, 2013, until paid; the costs of this action, including reasonable attorney fees; and for such other and further relief as this Court deems just and proper.

WA 4703137.1

## COUNT XXII – BREACH OF CONTRACT – Loan A
### (Against PIA Assets)

196.  Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

197.  As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Loan A) supported by sufficient consideration.

198.  PIA Assets materially breached Loan A by failing to pay all sums due under Loan A when declared due and payable by Pandi Capital.

199.  On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Loan A.

200.  Pandi Capital has been damaged by PIA Assets' breach of Loan A.

201.  Presently, under Loan A the following principal amount remains due, owing and unpaid: $1,750,000.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $1,750,000.00, and for such other and further relief as this Court deems just and proper.

## COUNT XXIII – BREACH OF CONTRACT – Loan B
### (Against PIA Assets)

202.  Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

203.  As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Loan B) supported by sufficient consideration.

204.  PIA Assets materially breached Loan B by failing to pay all sums due under Loan B when declared due and payable by Pandi Capital.

41

205. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Loan B.

206. Pandi Capital has been damaged by PIA Assets' breach of Loan B.

207. Presently, under Loan B the following principal amount remains due, owing and unpaid: $346,275.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $346,275, and for such other and further relief as this Court deems just and proper.

## COUNT XXIV – BREACH OF CONTRACT – Loan C
### (Against PIA Assets)

208. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

209. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Loan C) supported by sufficient consideration.

210. PIA Assets materially breached Loan C by failing to pay all sums due under Loan C when declared due and payable by Pandi Capital.

211. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Loan C.

212. Pandi Capital has been damaged by PIA Assets' breach of Loan C.

213. Presently, under Loan C the following principal amount remains due, owing and unpaid: $323,553.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $323,553, and for such other and further relief as this Court deems just and proper.

WA 4703137.1

## COUNT XXV – BREACH OF CONTRACT – Loan D
### (Against PIA Assets)

214.   Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

215.   As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Loan D) supported by sufficient consideration.

216.   PIA Assets materially breached Loan D by failing to pay all sums due under Loan D when declared due and payable by Pandi Capital.

217.   On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Loan D.

218.   Pandi Capital has been damaged by PIA Assets' breach of Loan D.

219.   Presently, under Loan D the following principal amount remains due, owing and unpaid: $610,518.83.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $610,518.83, and for such other and further relief as this Court deems just and proper.

## COUNT XXVI – BREACH OF CONTRACT – Loan E
### (Against PIA Assets)

220.   Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

221.   As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Loan E) supported by sufficient consideration.

222.   PIA Assets materially breached Loan E by failing to pay all sums due under Loan E when declared due and payable by Pandi Capital.

WA 4703137.1

223. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Loan E.

224. Pandi Capital has been damaged by PIA Assets' breach of Loan E.

225. Presently, under Loan E the following principal amount remains due, owing and unpaid: $50,497.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $50,497, and for such other and further relief as this Court deems just and proper.

## COUNT XXVII – BREACH OF CONTRACT – Loan F
### (Against PIA Assets)

226. Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

227. As set forth above, Pandi Capital and PIA Assets entered into a valid and enforceable contract (Loan F) supported by sufficient consideration.

228. PIA Assets materially breached Loan F by failing to pay all sums due under Loan F when declared due and payable by Pandi Capital.

229. On April 16, 2013, Pandi Capital made formal demand upon PIA Assets for performance of its obligations under Loan F.

230. Pandi Capital has been damaged by PIA Assets' breach of Loan F.

231. Presently, under Loan F the following principal amount remains due, owing and unpaid: $44,786.29.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the principal amount of $44,786.29, and for such other and further relief as this Court deems just and proper.

WA 4703137.1

## COUNT XXVIII– IN THE ALTERNATIVE-UNJUST ENRICHMENT
### (Against PIA Assets)

232.    Pandi Capital incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

233.    As set forth above, PIA Assets was enriched by accepting and retaining the total sum of $3,125,630.12 received from Pandi Capital, described above as the Loans.  Pandi Capital continues to provide additional monies to PIA Assets, and the amounts will be updated at the time of trial.

234.    PIA Assets had knowledge and appreciation of the benefit.

235.    The enrichment of PIA Assets by the receipt of such funds was at the expense of Pandi Capital. Pandi Capital has made demand for payment, but PIA Assets has failed and refused to make payment.

236.    It would be unjust to allow PIA Assets to retain the benefit of such funds at the expense of Pandi Capital.

WHEREFORE, Pandi Capital prays for judgment in its favor and against PIA Assets on this Count, for an award of damages in the amount of at least $3,125,630.12, and for such other and further relief as this Court deems just and proper.

WA 4703137.1

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP

_____

Douglas M. Weems     MO Bar #41165
Scott J. Goldstein     MO Bar #28698
Bradley S. Dixon     MO Bar #62846
1000 Walnut, Suite 1400
Kansas City, Missouri 64106
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
dweems@spencerfane.com
sgoldstein@spencerfane.com
bdixon@spencerfane.com
ATTORNEYS FOR PANDI CAPITAL, LLC

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and foregoing were e-mailed and served by U.S. Mail, first-class mail, postage paid, this _10th_ day of December, 2013, to:

Patrick J. Stueve
Andrew W. Funk
Stueve Sigel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
ATTORNEYS FOR PLAINTIFF

R. Pete Smith
Kristie Remster Orme
McDowell, Rice, Smith & Buchanan
605 W. 74th Street, Suite 350
Kansas City, MO 64112
ATTORNEYS FOR DEFENDANTS

Kirk T. May
F. Ryan Van Pelt
Rouse Hendricks German May PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
ATTORNEYS FOR INTERVENORS
PANDI DEVELOPMENT, LLC, NEAL
PATTERSON, AND CLIFFORD ILLIG

_____
An Attorney for Pandi Capital, LLC

46

WA 4703137.1

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI



| | |
|---|---|
| JAMES S. ALLEN, JR., AND<br>NANCY T. ALLEN<br><br>               Plaintiffs,<br><br>    v.<br><br>PIA ASSETS, LLC,<br>RP GOLF, LLC,<br>AND<br>FIVESTAR LIFESTYLES, LLC<br><br>            Defendants,<br><br>and<br><br>PANDI CAPITAL, LLC<br>PANDI DEVELOPMENT, LLC,<br>NEAL L. PATTERSON, and<br>CLIFFORD W. ILLIG,<br><br>            Intervenor-Defendants<br>            and Counterclaimants. | Case No.  13AE-CV00013<br><br>Division No. 2 |

## PLAINTIFF JAMES S. ALLEN'S ANSWER TO AND COUNTERCLAIMS AGAINST INTERVENORS PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG AND PLAINTIFF NANCY ALLEN'S CLAIMS AGAINST DEFENDANTS AND INTERVENOR-DEFENDANTS

Plaintiffs James S. Allen, Jr. and Nancy Allen (together, "the Allens"), through their

undersigned counsel, submit their answer to Intervenor-Defendants and Counterclaimants Pandi

Development LLC, Neal L. Patterson, and Clifford W. Illig's counterclaims and crossclaims and

submits their counterclaims as follows:

1

EXHIBIT

10

# ALLEGATIONS COMMON TO ALL COUNTS

## Jurisdiction and Venue

1.     Allen admits the allegations in paragraph 1.

2.     Allen admits the allegations in paragraph 2.

## Parties

3.     Allen admits the allegations in paragraph 3.

4.     Allen admits that PIA Assets owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, the Parkville Commons shopping district, and Loch Lloyd Country Club. PIA Assets owns RP Golf, which holds 100% of the interests in the clubs and golf courses. Allen denies all other allegations in paragraph 4.

5.     Allen admits the allegations in paragraph 5.

6.     Allen admits the allegations in paragraph 6.

7.     Allen admits the allegations in paragraph 7.

8.     Allen denies the allegations in paragraph 8.

9.     Allen admits the allegations in paragraph 9.

10.     Allen admits that on December 21, 2012, Patterson and Illig resigned as managers and appointed Randall Nay and Dale Brouk to act on their behalf as managers of PIA Assets. Allen admits that he remains a manager of PIA Assets. Allen denies all other allegations and characterizations in paragraph 10.

11.     Allen admits that Pandi Capital is owned by Patterson and Illig. Allen denies all other allegations and characterizations in paragraph 11.

### Pandi Capital's Loans to PIA Assets

12.     Allen denies the allegations in paragraph 12.

13.     Allen denies the allegations in paragraph 13.

14.     Allen denies the allegations in paragraph 14.

15.     Allen denies the allegations in paragraph 15.

16.     Allen denies the allegations in paragraph 16.

### Allen's Loan

17.     Allen admits that he filed a lawsuit against PIA Assets on January 2, 2013, styled *James S. Allen, Jr. v. PIA Assets LLC and RP Golf, LLC,* Case No. 13AE-CV00013 in the Circuit Court of Platte County, Missouri, and that the Petition sets for the basis of that lawsuit. Allen denies all other allegations in paragraph 17.

### Jackson County Litigation

18.     Allen denies the allegations in paragraph 18.

19.     Allen admits that he filed a Motion to Intervene in the Jackson County case and that the Motion sets forth the basis to intervene which was granted by the Jackson County Circuit Court. Plaintiff denies all remaining allegations in paragraph 19.

20.     Allen admits the allegations in paragraph 20.

21.     Allen admits that the allegations in paragraph 21.

22.     Allen admits the allegations in paragraph 22.

23.     Allen is without sufficient information to admit or deny the allegations in paragraph 23, and therefore denies the allegations.

24.     Allen admits the allegations in paragraph 24.

25.     Allen is without sufficient information to admit or deny the allegations in paragraph 25, and therefore denies the allegations.

26.     Allen is without sufficient information to admit or deny the allegations in paragraph 26, and therefore denies the allegations.

27.     Allen is without sufficient information to admit or deny the allegations in paragraph 27, and therefore denies the allegations.

28.     Allen is without sufficient information to admit or deny the allegations in paragraph 28, and therefore denies the allegations.

29.     Allen is without sufficient information to admit or deny the allegations in paragraph 29, and therefore denies the allegations.

30.     Allen is without sufficient information to admit or deny the allegations in paragraph 30, and therefore denies the allegations.

31.     Allen denies the allegations in paragraph 31.

**Count I – Recovery on Guaranty of Bank Debt**

32.     In response to the allegations in paragraph 32, Allen incorporates his responses contained in the paragraphs above.

33.     Allen is without sufficient information to admit or deny the allegations in paragraph 33, and therefore denies the allegations.

34.     Paragraph 34 is a legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 34.

35.     Allen denies the allegations in paragraph 35.

36.     Allen denies the allegations in paragraph 36.

37.     Allen is without sufficient information to admit or deny the allegations in paragraph 37, and therefore denies the allegations.

38.     Allen is without sufficient information to admit or deny the allegations in paragraph 38, and therefore denies the allegations.

39.     Allen denies the allegations in paragraph 39.

## Count II – Recovery on Guaranty of Debt

40.     In response to the allegations in paragraph 40, Allen incorporates his responses contained in the paragraphs above.

41.     Allen is without sufficient information to admit or deny the allegations in paragraph 41, and therefore denies the allegations.

42.     Paragraph 42 is a legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 42.

43.     Allen denies the allegations in paragraph 43.

44.     Allen denies the allegations in paragraph 44.

45.     Allen is without sufficient information to admit or deny the allegations in paragraph 45, and therefore denies the allegations.

46.     Allen is without sufficient information to admit or deny the allegations in paragraph 46, and therefore denies the allegations.

47.     Allen denies the allegations in paragraph 47.

## Count III – Alternative Claim for Declaratory Judgment

48.     In response to the allegations in paragraph 48, Allen incorporates his responses contained in the paragraphs above.

49.      Paragraph 49 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 49.

50.      Paragraph 50 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 50.

51.      Paragraph 51 states legal conclusions to which no response is required, but to the extent a response could be required, Plaintiff denies the allegations in paragraph 51.

## Count IV – Recoupment and/or Set-off

52.      In response to the allegations in paragraph 52, Allen incorporates his responses contained in the paragraphs above.

53.      Paragraph 53 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 53.

## Allen's Affirmative Defenses to Pandi Development, Neal Patterson and Clifford Illig's Counterclaims

54.      Pursuant to his employment agreement with Defendants and Counterclaimants, Allen is to be held harmless and/or indemnified on any guaranties or other obligations pertaining debts of PIA or its subsidiaries or affiliates.

55.      Count I fails to state a claim on which relief can be granted.

56.      Count II fails to state a claim on which relief can be granted.

57.      Counterclaimants are not holders in due course of the debts purchased from Missouri Bank, and therefore cannot enforce Allen's conditional guaranties.

58.      The alleged purchase of the loans from Missouri Bank, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets was not commercially reasonable.

6

59.     The alleged purchase of the loans from Missouri Bank, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets violates the duty of good faith and fair dealing inherent in contracts subject to the Uniform Commercial Code as adopted in Missouri.

60.     Allen's guaranty on the loan from Missouri Bank to PIA Assets was conditioned upon Allen receiving an indemnification agreement from PIA.

61.     The debts of PIA and J-3 Pandi have been satisfied, extinguishing Allen's guaranties.

62.     Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support a conclusion that Allen's Debt could be considered equity contributions.

63.     Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that Allen's claims to collect on his Note to PIA Assets, which is not pending in this lawsuit, is an action to collect on an equity contribution.

64.     Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that the Allen Debt, which is not an issue in this lawsuit, must be re-characterized.

65.     Count III fails to state a claim on which relief can be granted, in that the characterization of Allen's Debt is not a controversy before this Court.

66.     Count III fails to state a claim on which relief can be granted, in that no justiciable controversy exists regarding to collection or characterization of Allen's Debt.

67.     Count III fails to state a claim on which relief can be granted, in that the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding.

7

68.     Count III fails to state a claim on which relief can be granted because Counterclaimants have an adequate remedy at law.

69.     Count III fails to state a claim on which relief can be granted because Counterclaimants have not plead any controversy ripe for judicial determination.

70.     Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a legally protectable interest in the characterization of Allen's Debt as an equity contributions.

71.     Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead the existence of a controversy ripe for judicial determination.

72.     Count IV fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a breach of contract by Allen, and Allen has not breached any contract with Counterclaimants.

73.     Count IV fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead facts sufficient for an affirmative defense of recoupment/set-off.

74.     Allen reserves the right to add additional affirmative defenses as additional facts are revealed through discovery.

## ALLEGATIONS SUPPORTING ALLEN'S COUNTERCLAIMS

Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

### Additional Parties

75.     Plaintiff Nancy Allen is a Missouri resident residing at 7001 Waters Edge, Parkville, Missouri 54152.

76.     Defendant Neal L. Patterson is a Missouri resident residing at 20 E Dundy Circle, Belton, Missouri 64012. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

77.     Defendant Clifford W. Illig is a Kansas resident residing at 11504 Pawnee Circle, Leawood, Kansas 66211. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

78.     Defendant FiveStar Lifestyles, LLC ("FiveStar") is a Missouri limited liability company with its principal place of business at 8878 NW 63rd St, Parkville, Platte County Missouri.

### Jurisdiction and Venue

79.     This Court has personal jurisdiction over the counterclaim Defendants Illig, Patterson, Pandi Capital, Pandi Development, and Five Star pursuant to Missouri Revised Statutes Sections 506.500(1) and/or 506.500(3) because the cause of action herein asserted arises from their transaction of business within the State of Missouri and/or their making of a contract within the State of Missouri.

9

80.     Venue is proper in this county pursuant to Missouri Revised Statutes Section 508.010 because counterclaim Defendants transact usual and customary business in Platte County, and the cause of action accrued, at least in part, in Platte County, Missouri.

**Additional Facts Supporting Counterclaims**

81.     Illig and Patterson are the sole members and owners of Pandi Capital, LLC.

82.     Illig and Patterson are the sole members and owners of Pandi Development, LLC.

83.     FiveStar is a wholly-owned subsidiary of J3-Pandi, LLC (which itself is a wholly-owned subsidiary of PIA Assets) and an affiliate of PIA Assets.

84.     Pandi Development controls 86.5% of the interest in PIA Assets and appoints two of the three managers of PIA Assets.

85.     Pandi Capital is the alleged owner of the "Notes" and "Loans" purportedly representing the monies advanced to PIA Assets and has made member contributions on behalf of Pandi Development to fund the operation of PIA Assets.

86.     Through Pandi Capital and Pandi Development, Patterson and Illig have completely dominated the finances, policy and business practices of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets.

87.     PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets have no existence of their own, but have functioned as the alter ego and instruments of Illig and Patterson.

88.     Patterson and Illig have treated the assets of PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets as their own personal assets in complete disregard for the rights and interests of the minority members.

10

89.     As more fully described below, Patterson and Illig have used their control of PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets to commit unjust acts in contravention of the rights of true creditors of PIA Assets.

90.     Through their control of PIA Assets, RP Golf, Five Star, and other subsidiaries and affiliates of PIA Assets, Patterson and Illig proximately caused the injuries to the Allens and PIA such that the Allens should be allowed to pierce the corporate veil and hold Patterson and Illig personally liable for the obligations of PIA Assets, RP Golf, Five Star, and other subsidiaries and affiliates of PIA Assets.

91.     Patterson and Illig have taken an active role in the management and operations of PIA Assets and its subsidiaries.

92.     In an interview published in the June/July 2013 issue of *North* magazine, Dale Brouk, the COO/CFO of PIA, is quoted as saying, "'What they [Neil and Cliff] did to make SportingKC the best soccer venue in the country, they're now doing with the golf clubs. They are making us implement all of the things they believe in, the little things that help us differentiate our club from every other club,' says Dale."

93.     Patterson and Illig have repeatedly been mentioned as members of and assets to the development team in public advertisements for the sale of residential developments owned by PIA's subsidiaries and affiliates.

94.     As described below, Patterson and Illig have used their control of PIA Assets and its subsidiaries and affiliates to strip the assets of PIA by reclassifying equity contributions as debt, making PIA Assets insolvent with the intent of avoiding creditors.

95.     For the period of time during which the alleged "Notes" were signed, Patterson and Illig were members and managers of PIA Assets, but failed to call required members or

managers' meetings and maintain required records, including the records related to the alleged "Notes" and "Loans" which are the subject of Pandi's counterclaims.

96.    By PIA's Operating Agreement, to which Illig and Patterson are parties through their ownership of Pandi Development, any indebtedness in excess of $50,000 must be approved by the members of PIA Assets. Jim Allen, a member of PIA Assets, was not asked to and did not approve any of the "Notes" or "Loans" which are the subject of Pandi's counterclaims.

97.    Upon information and belief, Patterson and Illig have made decisions regarding the non-renewal of certain loans to PIA and its subsidiaries from third-party creditors without consultation of the other members of PIA, in violation of the Operating Agreement of PIA.

98.    Upon information and belief, Patterson and Illig have refused proposals from third-party creditors that would have resulted in releases for Jim Allen from guaranties to those creditors. PIA, RP Golf, FiveStar and their subsidiaries and affiliates are contractually obligated to provide those releases.

99.    Patterson and Illig have made unilateral decisions to cease both required payments to both Class B shareholders and tax payments to Platte County.

100.    Patterson and Illig have made unilateral decisions to fund PIA's legal defense while claiming that PIA is insolvent.

101.    Patterson and Illig have unnecessarily encumbered assets to prevent recovery by the Allens and other minority shareholders.

**Illig and Patterson Reclassify Equity Contributions as Debt, Making PIA Assets Insolvent**

102.    As individuals and/or through Pandi Capital, Patterson and Illig have allegedly contributed large sums of money to PIA. Then, as managers of PIA, Patterson and Illig guaranteed themselves a large internal rate of return on their equity contributions to PIA.

103. Allen was advised by Patterson and Illig that the contributions by Patterson and Illig would be considered equity. Allen's understanding is in accordance with PIA's contemporaneous financial records which state the following:

    a. The December 31, 2009 Balance Sheet identifies an equity contribution from Neal Patterson for $13,135,092.50 and an equity contribution from Cliff Illig for $12,950,092.50. These equity contributions are categorized as "Equity" on PIA's balance sheet.

    b. The January 31, 2010 Balance Sheet also reflected the same equity contributions from Illig and Patterson that appeared on the December 31, 2009 Balance Sheet. Those equity contributions were similarly categorized as "Equity" on the balance sheet.

104. Beginning in 2010, Patterson and Illig began using their position as managers of PIA to implement a conspiracy to prioritize their equity contributions over the amounts PIA owed to other members, and to further dilute the value of shares held by the minority PIA Members. This scheme was in violation of the Operating Agreement and in breach of their fiduciary duties to the minority shareholders.

105. Upon information and belief, this conspiracy was implemented at least in part as a response to a lawsuit filed by Class B shareholders of PIA Assets regarding Illig's and Patterson's unilateral decision to cease required payments to those shareholders. The conspiracy was designed to re-prioritize their equity contributions above the required payments to the Class B shareholders and to make PIA appear insolvent.

106. In implementing this scheme, upon information and belief Patterson and Illig instructed Dale Brouk, CFO of PIA Assets, to re-categorize their capital contributions as debt or "Long-term liabilities" on the balance sheet.

107. Patterson and Illig did this despite contemporaneously representing to third-party lenders that their contributions to PIA were equity, and not debt.

108. On PIA's February 28, 2010 Balance Sheet, Patterson's and Illig's capital contributions in the total amount of $26,085,185.00 had been moved from the "Equity" category on the Balance Sheet and re-categorized as Long-term Liabilities.

109. Allen did not approve the decision to "reclassify" Patterson and Illig's capital contribution into debt. Accordingly, this unilateral decision on the part of Patterson and Illig was in direct violation of the Operating Agreement which required unanimous approval of the Class A Members before PIA could "incur indebtedness in excess of $50,000" or "knowingly do any Act which would make it impossible to carry on the ordinary business of the Company..."

110. The amount of Long-term Liabilities to Patterson and Illig as reflected on PIA's balance sheets as of February 28, 2010 does not match the amounts Pandi Capital now claims it loaned to PIA Assets as of February 28, 2010. There were no loans from Pandi Capital reflected on PIA's balance sheets in 2010.

111. Since 2010, in furtherance of their scheme to prioritize their capital contributions over the amounts owed to other shareholders, Patterson and Illig are incurring additional indebtedness on behalf of PIA by "refinancing" PIA's loans or paying off third-party loans before the maturity date. Upon information and belief, Patterson and Illig are funding these refinancing and pay-downs through their own personal lines of credit with banks at interest rates between 1 and 4 percent.

14

112.    Upon information and belief, Patterson and Illig are funding these refinancing and paydowns of true third party obligations through personal lines of credit and Pandi Capital, LLC.

113.    Patterson and Illig are being charged an interest rate on this line of credit that is far lower than the 20% internal rate of return that they have promised themselves in their capacity as managers of PIA.

114.    By January 2011, the "Notes Payable" to Illig and Patterson had increased substantially. On the January 31, 2011 Balance Sheet, the "Note Payable" to Illig was $30,791,548.74. The "Note Payable" to Patterson was $30,976,548.75.

115.    The amounts of the "Notes Payable" reflected on PIA's balance sheets as of January 2011 do not match the amounts Pandi Capital now asserts it had lent to PIA Assets of as January 2011. There are no loans to Pandi Capital reflected on PIA's balance sheets.

116.    In violation of the Operating Agreement, Allen was not asked to consent to and did not agree that PIA could incur indebtedness in excess of $80 million dollars to Patterson and Illig at a 20 percent internal rate of return.

117.    Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based, and no Members or Managers meetings of PIA Assets were held to discuss or ratify any notes from Patterson, Illig, or Pandi Capital.

118.    Even if the equity contributions from Patterson and Illig were characterized now as loans, these "loans" violate the Operating Agreement which states in relevant part: "if a Manager . . . is the lending Member, the rate of interest shall be determined by the Board of Managers taking into consideration, without limitation, prevailing interest rates and the interest rates the lender is required to pay in the event such lender has itself borrowed funds to loan or advance to the Company and the terms and conditions of such loan, including the rate of interest,

15

shall be no less favorable to the Company than if the lender had been an independent third party." The interest rate being charged by Patterson and Illig exceeds the permissible amount, especially when Patterson and Illig borrowed this money at low interest rates, and this rate was not approved by a legitimate vote of the Board of Managers.

119.    To further their intentional and deceptive scheme of prioritizing their capital contributions above the amounts owed by PIA to Allen, in December 2011, Patterson and Illig further re-characterized their capital contributions as debt from PANDI Capital, LLC in excess of $80 million.

120.    These self-serving "loans" only benefit Patterson, Illig and PANDI Capital as they allow Patterson and Illig to take personal tax losses thereby significantly offsetting their other income sources, including income from their company Cerner. These self-serving "loans" also effectively dilute Allen's shares or interest in PIA.

121.    If Patterson and Illig's contributions to PIA were properly characterized on PIA's financial statements as "Equity", upon information and belief PIA would have a substantial net worth with balance sheet solvency.

122.    Patterson and Illig through Pandi Capital have now brought counterclaims in this lawsuit seeking to collect on the alleged notes from Pandi Capital to PIA Assets.

123.    Those claims were originally asserted by Pandi Capital against PIA Assets in the Sixteenth Judicial Circuit in Jackson County.

124.    In that action, PIA was represented by a law firm that had previously represented Illig and Patterson personally and had served as the registered agent for Pandi Capital.

125.    Pandi Capital's petition in Jackson County asserted twenty-four claims; the firm representing PIA Assets answered the lengthy petition only three days after it was filed.

126. PIA's answer made multiple admissions that were contrary to facts and documents in PIA's possession.

127. The circumstances surrounding the filing and the admissions made by PIA necessitated Allen's intervention in that lawsuit.

**A.    Breach of Agreements with Allen.**

128. Prior to October 2006, when Jim Watson, Jack Manning, Allen, Illig and Patterson were negotiating the terms of the deal, Jim and Nancy Allen made loans to entities that controlled the investment properties involved in the transaction.

129. These loans were necessary to fund day-to-day operations of the entities, such as utilities, payroll and tax payments.

130. The Allens received notes from RP Golf, LLC documenting some of the loans and the terms of repayment.

131. The parties to the formation of PIA had an agreement that the Allens' loans would be repaid at or near the time of the closing of the transaction in October 2006.

132. However, at closing Brouk advised Allen that there were insufficient funds to repay the Allens, and no payments were made.

133. In 2008, PIA paid some of the accrued amounts on the loans from Jim and Nancy Allen and created new loans in favor of the Allens in the principal amount of $817,585. PIA's 2012 financial planning documents reflect the liability with a twenty percent internal rate of return with a maturity date of February 2012.

134. Additionally, at the time of the closing, Allen entered into a 10 year employment agreement with PIA. In consideration for Allen leaving his long-term job and providing his exclusive development knowledge to PIA as President, Allen was to be paid a salary of $325,000 per year, plus a yearly increase based upon the Consumer Price Index.

17

135.    Also, per the term of Allen's contract, Allen was to receive, an agreed-upon buy-out of his Class A shares at the time of his termination.

136.    At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, reduce his salary.

137.    Patterson and Illig agreed that the in exchange for the reduced salary, PIA would offer Allen performance incentives based on sales of homes.

138.    Based upon Patterson and Illig's representations that they would make additional equity contributions to PIA and offer incentives if Allen modified his employment agreement, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement under which Allen would become an employee of FiveStar Lifestyles. The agreement contained the following material terms: (a) reduction of his annual salary; (b) a performance incentives; (c) car allowance; (d) a note for the aforementioned loans from the Allens with terms satisfactory to Allen; and (e) release from guaranties on any debts related to PIA or any of its subsidiaries and/or an obligation for PIA, FiveStar, RP Golf and all other subsidiaries of PIA to indemnify and hold Allen harmless upon termination of Allen's employment.

139.    The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

140.    PIA has never signed the Agreement nor delivered a note acceptable to Allen.

18

141.    In fact, Illig instructed employees of PIA Assets and Pandi not to deliver the note to the Allens.

142.    Rather it appears that Patterson and Illig never intended to execute on the agreement. Patterson and Illig induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement or to make future equity contributions.

143.    In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a sign copy or the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records. In response, Allen was presented with a copy of a "Note" purportedly signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

144.    These loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

145.    Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, PIA has breached Allen's employment agreement, including but not limited to by failing to provide Allen with his contractual raises and other benefits pursuant to the agreement.

146.    Also, shortly after the parties agreed to the 2010 Agreement in principle, Patterson and Illig, without consent or discussion with Allen, nixed the various homebuilding projects which were to generate the performance incentives under Allen's agreement. As a result Allen has never received any of the bonuses provided for in the contract.

19

147.    Patterson and Illig also have attempted to recharacterize their "equity contributions" as debt, suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

148.    Allen never would have agreed to modify the terms of his employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to defraud Allen out of money he and his wife loaned to the company and to decrease the value of his shares.

149.    Despite these breaches, and Patterson and Illig's claims that PIA is having financial problems, employees of PIA received bonuses for PIA's financial performance and operating results in 2010. And, in 2011, PIA has provided pay raises to many of its high level employees and hired additional, unnecessary staff at the National in 2012.

150.    PIA, by and through its managing members, is also obligated to furnish to Allen the annual reports within 180 days after the end of each fiscal year and additional reports within 30 days after the end of each calendar quarter, which quarterly reports are to consist of unaudited financial statements prepared by PIA in the ordinary course of business for the preceding quarter.

151.    These reports have not been provided at all for certain quarters and untimely provided for others.

**Patterson and Illig Use Their Control of PIA Assets to Avoid Obligations to Jim Allen**

152.    In November 2012, Jim Allen, Chief Executive Officer and a minority member of PIA Assets, submitted his resignation, triggering a contractual duty for PIA Assets, FiveStar

20

Lifestyles, and PIA's subsidiaries and affiliates to seek releases from guaranties that Allen provided on several third-party loans to PIA Assets.

153.    Until releases were obtained, FiveStar Lifestyles, PIA Assets, its subsidiaries and affiliated entities had a contractual duty to indemnify and hold Allen harmless with respect to his guaranties.

154.    Allen's resignation triggered a contractual duty for PIA Assets to buy out Allen's interest in PIA Assets for $6 million.

155.    In January 2013, Allen filed a lawsuit to collect on the Allens' loans to PIA which had never been repaid. Allen had been in discussions with counsel for PIA for much of 2012 regarding satisfaction of the Allens' loan, either through cash or through alternative means.

156.    In response, Illig and Patterson have sought to avoid repaying the Allens and have taken affirmative steps to prevent PIA and its affiliated companies from satisfying their obligations to the Allens.

157.    Though there has been no substantial change in PIA's financial condition from 2010 to the present, shortly before Allen filed his lawsuit, Pandi and the managers of PIA appointed by Patterson and Illig have now begun to claim that PIA is insolvent and unable to repay its debts.

158.    Patterson and Illig appointed Dale Brouk and Randall Nay to PIA's board of managers to represent them and Pandi Development.

159.    Brouk and Nay began calling for regular managers and members meetings, which had not occurred since 2010.

160.    The managers appointed by Pandi began demanding large financial contributions from Allen to fund the operations of PIA and its subsidiaries.

161.    After appointing Brouk and Nay, Patterson and Illig through Pandi Capital stated that it was unwilling to continue funding PIA unless Allen agreed to relinquish his rights to repayment of his loans and the buyout of his interests in PIA and its subsidiaries.

162.    Pandi Capital also stated that it would not continue funding PIA unless the board of managers agreed to amend the operating agreements of PIA's subsidiaries to allow Pandi Capital to loan money directly to PIA's subsidiaries.

163.    The managers appointed by Patterson and Illig through Pandi approved the amended operating agreements over Allen's objection.

164.    Under PIA's Operating Agreement, any decisions regarding incurring indebtness or bankruptcy must be made by a unanimous vote of the board of managers.

165.    Under the new operating agreements for PIA subsidiaries required by Pandi Capital, decisions regarding incurring indebtedness and/or bankruptcy only require a majority vote of the board of managers.

166.    The amended operating agreements are also designed to allow the managers to put certain subsidiaries into bankruptcy.

167.    Upon information and belief, the goal of the actions taken by Patterson and Illig through Pandi and the managers appointed by Pandi are to make PIA's balance sheet show insolvency.

168.    Upon information and belief, the purpose of the amended operating agreements was to allow Illig and Patterson to encumber PIA's underlying entities through purported "loans" from Pandi Capital in such a way that would interfere with the rights of potential creditors by loading the subsidiaries up with debt owed to Pandi.

169.    Beginning in 2013, Pandi demanded security for its recent contributions to PIA.

170.    The only ostensible purpose for the actions described above is to make it impractical or impossible for PIA to repay its debts to Allen and to honor its obligations to indemnify and hold Allen harmless.

171.    Illig and Patterson have rejected proposals from third-party lenders, including Missouri Bank, which would have released Allen from his guaranties on loans from third-party lenders, a clear violation of the Operating Agreement and contractual duties owed to Allen by PIA, FiveStar and the subsidiaries of PIA.

172.    The managers appointed by Illig and Patterson have rejected proposals from Allen to indemnify and hold him harmless on his guaranty on a loan using unencumbered assets of PIA and its affiliates. The failure to accept Allen's proposal was a violation of the Operating Agreement and contractual duties owed to Allen by PIA, FiveStar and subsidiaries and affiliates of PIA.

173.    Patterson and Illig caused PIA to default on its loans from Missouri Bank.

174.    Patterson and Illig's attempt to collect the "Notes" and "Loans" from Pandi Capital through this lawsuit will cause irreparable harm absent relief from this Court.

175.    Patterson and Illig's continued attempts to categorize equity contributions as loans to PIA Assets or its underlying entities will further encumber the assets of PIA Assets and increase PIA's insolvency.

176.    There is no adequate remedy at law, as Patterson and Illig continue to encumber the assets of PIA Assets by characterizing equity contributions from Pandi Development and debt owed to PANDI Capital.

23

## COUNT I -- BREACH OF THE IMPLIED DUTY OF GOOD FAITH
## AND FAIR DEALING
(Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

177.     Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

178.     Entering into the operating agreements with Pandi Development, Patterson and Illig, and based upon the intertwined relationship of the parties including their corporate positions and ownership as well as their course of dealing, among other things, required that:

     a. Pandi, Patterson, and Illig, would act with good faith and fairness toward Allen on all matters concerning corporate affairs.

     b. Neither Pandi, Patterson nor Illig would take any action to unfairly prevent Allen from obtaining the benefits of his corporate position, his compensation, his employment agreement, or his rights under the Operating Agreement.

     c. Pandi, Patterson and Illig would comply with their own rules, policies and procedures with respect to providing and making financial information available to Allen and consulting with him on corporate matters.

179.     Pandi, Patterson or Illig's conduct as set forth above was conducted in bad faith and done with the purpose and intention of avoiding or diminishing payments owed to Allen for compensation and the value of his shares in PIA and to impair indemnity and hold harmless obligations owed to Allen.

180.     Pandi, Patterson and/or Illig breached their covenant of good faith and fair dealing in one or more of the respects set forth herein:

24

a.   Pandi, Patterson or Illig purposefully and wrongfully failed and refused to pay Allen for the sums due him under the terms of the employment agreement;

b.   Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement made unauthorized corporate decisions to the detriment of Allen, and PIA.

c.   Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement re-characterized their equity contributions as debt and imposed unreasonable repayment terms and conditions.

d.   Pandi, Patterson or Illig did the other wrongful acts described herein.

181.   Such breaches were performed by Pandi, Patterson or Illig to exploit economic conditions to their own benefit, and to intentionally undermine the fulfillment of PIA's and FiveStar's contractual obligations to Allen.

182.   Pandi, Patterson or Illig's breach of the covenant of good faith and fair dealing was a substantial factor in causing damage and injury to Allen.

183.   As a direct and proximate result of Pandi, Patterson or Illig's unlawful conduct alleged in this Petition, Allen has lost substantial compensation and other benefits. Allen has further suffered extreme anguish and emotional distress due to such conduct in an amount to be determined at trial.

184.   Because of the irreparable harm that would result from Illig, Patterson and Pandi's collection of the "Notes" and "Loans" and/or from a judgment characterizing the equity contributions as debt, Allen prays for an injunction from this Court:

25

a. Enjoining further "loans" made pursuant to the amended operating agreements adopted by PIA's board of managers in 2013;

b. Commanding the managers of PIA to satisfy PIA's debts with unencumbered assets, as required by PIA's Operating Agreement;

c. Enjoining the managers of PIA and Pandi from characterizing future contributions from Pandi as third party debt.

WHEREFORE, Allen prays for judgment in an amount to be determined at trial, for his costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages; for an injunction as described above, and for such other and further legal and equitable relief as the Court deems just and proper.

**COUNT II – VIOLATION OF MISSOURI FRAUDULENT TRANSFER ACT**
(Jim and Nancy Allen v. Illig, Patterson, PANDI Development, and PANDI Capital, LLC)

185. Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

186. As described above, the Allens took steps to collect loans made to PIA and asserted Jim Allen's right to certain contractual obligations owed by PIA, FiveStar and PIA's subsidiaries.

187. In anticipation of and response to Allen's suit and demand, Patterson and Illig through Pandi Development began taking the actions described in more detail above, including appointing new managers, calling for meetings, claiming that PIA was in financial crisis, demanding large capital contributions from Allen, refusing to continue making contributions to PIA through Pandi Capital as they had for years before Allen made his demands unless Allen abandoned his demands, and filing their counterclaims in this lawsuit.

26

188.　Patterson and Illig's pursuit of their counterclaims through Pandi Capital to recharacterize equity contributions as debt is an attempt to hinder, delay or defraud creditors of PIA, including the Allens.

189.　Patterson and Illig made the alleged "loans" and "notes" from one company they owned, Pandi Capital, to another company they controlled, PIA Assets.

190.　Patterson and Illig made the alleged "loans" and "notes" in anticipation of a substantial long-term gain, as the prospects of short-term repayment at substantial interest on unsecured notes from PIA was low.

191.　Pandi received inadequate consideration for its "Loans" or "Notes," in that it would have had no reasonable expectation of repayment given short maturity terms of the alleged loans combined with the large principal amounts, high interest rates.

192.　The "Notes" were not made in the usual method of transacting business, in that the "Notes" and "Loans" were made without the approval of the members of PIA as required by the Operating Agreement, and no copies of the "Notes" were provided to PIA.

193.　Pandi has begun demanding security on its alleged loans.

194.　The amount of the "Loans" and "Notes" is such that demanding repayment from PIA is in effect a transfer of all or nearly all of PIA's property.

195.　Repayment of the "Loans" and "Notes" would cause PIA's insolvency.

196.　The circumstances surrounding the execution and delivery of the "Notes" and "loans" are suspicious as described above, in that the amounts claimed do not match the amounts on PIA's books, PIA did not have copies of the "Notes" or "Loans," and several of the Notes reflected a debt owed to a Pandi Capital before Pandi Capital existed.

27

WHEREFORE, the Allens pray for judgment in an amount to be determined at trial, for their costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages; for an injunction, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT
(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, LLC and PANDI Capital, LLC)

197.    Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

198.    A justiciable controversy regarding the characterization of contributions made by Illig and Patterson through Pandi Capital exists in that Pandi Capital's counterclaims for breach of contract are based on "Notes" described in Pandi Capital's counterclaims.

199.    For the reasons described above, the contributions made by Patterson and Illig through Pandi Capital were not contractual obligations owed by PIA to Pandi Capital, but were equity contributions made by Illig and Patterson that have been re-characterized as loans in order to re-prioritize repayment.

200.    If Patterson and Illig through Pandi Capital are successful through their lawsuit in converting their equity contributions into debts, PIA and its subsidiaries will be perpetually insolvent, rendering it unable to repay debts or satisfy its contractual duties to third-party creditors like Allen.

201.    The disposition of Illig and Patterson's claims in this suit will impair or impede Allen's ability to protect both his interest as a Member of PIA in protecting PIA's financial solvency, and Jim and Nancy Allens' personal interests in protecting the priority of their loans made in 2006 over Illig and Patterson's equity contributions made from 2009-13.

202.    Allen therefore asks this Court for a declaration that the "Notes" described in Pandi Capital's counterclaims were in fact equity contributions to PIA Assets.

28

WHEREFORE, the Allens pray for a declaration of rights as described above, for their costs and fees incurred herein; and further legal and equitable relief as the Court deems just and proper.

## COUNT IV—FRAUDULENT INDUCEMENT
### (Jim Allen v. Patterson, Illig, and Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

203. At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

204. Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement that contained the following material terms: (a) reduction of his annual salary; (b) an incentive provision; (c) car allowance; (d) a note for the aforementioned loans from Jim and Nancy Allen under terms satisfactory to Allen; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

205. The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

29

206.   PIA has never signed the revised agreement nor delivered a Note acceptable to Allen.

207.   Unbeknownst to Allen, Illig directed that a note for Allen's debt not be delivered to Allen.

208.   Shortly after the parties agreed to the revised agreement in principle, and before any signatures of the parties, Allen began receiving a reduced salary.

209.   Additionally, Patterson and Illig, without consent or discussion with Allen, nixed a townhome project which was to generate a significant portion of the bonuses under Allen's modified employment agreement. Allen has never received any of the bonuses provided for in the revised employment agreement.

210.   Allen also never received any drafts of a note as was contemplated by the modified employment agreement.

211.   In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a sign copy or the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records. In response, Allen was presented with a "Note" signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

212.   Illig had previously directed that the Note not be delivered to Allen.

213.   The Allens' loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

214.    It further appears that Patterson and Illig through Pandi Development induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement.

215.    Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, Patterson and Illig through Pandi Development and Pandi Capital also have attempted to recharacterize their "capital contributions" as debt suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

216.    Patterson and Illig's failure to disclose that they did not consider their capital contributions as such, and rather considered them as loans which would take priority above other payments was willful misconduct or was made with reckless indifference to the rights of Allen and was done with the intent to induce Allen to enter into a modified employment agreement.

217.    Allen did not have any independent knowledge of Patterson and Illig's misrepresentations or intent to defraud him at the time.

218.    In entering into the modified employment agreement, which increased cash flow to PIA without any ability by Allen to benefit from that increased cash flow, Patterson and Illig intended Allen to rely on their representations.

219.    Allen never would have agreed to modify the terms of his original employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to defraud the Allens out of money they loaned to the company and to decrease the value of Allen's shares.

220.     As a result of these fraudulent inducements, Allen gave up rights and benefits granted to him by his original agreement, including but not limited to a higher base salary and a six million dollar buyout provision of his Class A shares.

WHEREFORE, Plaintiff prays for judgment against Defendants Pandi Capital, Pandi Development, Patterson and Illig, jointly and severally, for fraudulent inducement through misrepresentations, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, and for such other and further relief as the Court may deem just and equitable.

## COUNT V—BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS ON GUARANTIES

### (Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

221.     At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

222.     Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement that contained the following material terms:  (a) reduction of his annual salary; (b) an incentive provision; (c) car

allowance; (d) a note for the Allens' aforementioned loans; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

223.    Per the revised agreement, within one year of Allen's resignation from his employment, FiveStar and "the other PIA Companies" were obligated to obtain releases on personal guaranties Allen had signed on debt obligations of PIA, Five Star, and other subsidiaries of PIA.

224.    If releases were not immediately obtained, FiveStar and the other PIA Companies were obligated to indemnify and hold Allen harmless.

225.    Releases were not obtained on the conditional guaranties Allen signed on PIA loans from Missouri Bank.

226.    If those guaranties were or are effective, FiveStar and the PIA Companies had an obligation to indemnify or hold Allen harmless with respect to those loans.

227.    Allen has not received any indemnification or hold harmless agreement from FiveStar or any of the PIA Companies.

228.    After causing PIA to default on the loans from Missouri Bank, Pandi, Illig and Patterson now claim to have purchased the Missouri Bank loans and seek to enforce Allen's guaranties.

229.    Pandi, Illig and Patterson, as the alter egos of PIA, FiveStar and the PIA Companies, have an affirmative obligation to release, indemnify and hold Allen harmless on those guaranties.

230.    Defendants now seek to insulate themselves from liability for the wrongful acts described above, from their obligation to repay Allen's loans, and from their obligations to

indemnify, hold harmless and/or release Allen from the very guaranties Defendants now seek to enforce through a purported foreclosure "sale" of Allen's claims against PIA.

231.    Defendants have breached their duty to release and/or indemnify and hold Allen harmless on not only the loans from Missouri Bank, but also several other loans third parties made to PIA, FiveStar and the PIA Companies.

232.    As a result, Allen has been damaged.

WHEREFORE, Plaintiff prays for judgment against Defendants jointly and severally for breach of Plaintiff's employment agreement, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## COUNT VI—CIVIL CONSPIRACY
### (Jim and Nancy Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiffs incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

233.    As described above, Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development had an agreement and meeting of the minds to defraud Jim Allen out of the benefits of his employment contract, to defraud and prevent Jim and Nancy Allen from being repaid on their loan, and to insulate themselves from liability.

234.    Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development took the affirmative steps described above in furtherance of their conspiracy.

235.    Defendants' conspiracy and the actions taken in furtherance of that conspiracy have damaged Plaintiffs by delaying and frustrating repayment of their loan and defrauding Jim Allen out of the benefit of his employment contract.

34

WHEREFORE, the Allens pray for judgment against Defendants jointly and severally for the conspiracy, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

The Allens hereby requests a trial by jury of all issues triable by jury.

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By:   /s/ Patrick J. Stueve
        Patrick J. Stueve, MO Bar # 37682
        stueve@stuevesiegel.com
        Andrew W. Funk, MO Bar # 59977
        funk@stuevesiegel.com
        460 Nichols Road, Suite 200
        Kansas City, MO 64112
        (816) 714-7100
        (816) 714-7101 Facsimile

**ATTORNEYS FOR PLAINTIFFS AND
COUNTERCLAIM-DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via email and First-Class U.S. Mail this 3rd

day of January, 2014 to the following:

R. Pete Smith
Kristie Orme
petesmith@mcdowellrice.com
korme@mcdowellrice.com
**MCDOWELL RICE SMITH & BUCHANAN**
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
**Attorneys for Defendant**

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
**SPENCER FANE BRITT & BROWNE, LLP**
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
dweems@spencerfane.com
sgoldstein@spencerfane.com
bdixon@spencerfane.com
**Attorneys for Pandi Capital, LLC**

Kirk T. May
F. Ryan Van Pelt
**ROUSE HENDRICKS GERMAN MAY, PC**
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
kirkm@rhgm.com
ryanv@rhgm.com
**Attorneys for Defendants Pandi Development, LLC,
Neal Patterson, and Clifford Illig**

/s/ Patrick J. Stueve

36





**LLP**



# Fax Cover

### January 6, 2014

PLEASE DELIVER TO:        Platte County Circuit Court Clerk

FACSIMILE #:        816-858-3392

FROM:        Andrew W. Funk
Patrick J. Stueve

SUBJECT:        James S. Allen, Jr. v. PIA Assets, LLC and RP Golf, LLC, Case No.
13AE-CV00013

## TOTAL NO. OF PAGES, INCLUDING COVER SHEET: _____ 37

*Please file attached Plaintiff James S. Allen's Answer to and Counterclaims Against Intervenors Pandi Development, LLC., Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims Against Defendants and Intervenor-Defendants*

Thank you.

## CONFIDENTIALITY NOTE

The documents accompanying this facsimile transmission contain information from the law firm of Stueve Siegel Hanson LLP which is confidential and/or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES INDICATED ABOVE, PLEASE CALL (816) 714-7100.**

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI



JAMES S. ALLEN, JR., AND
NANCY T. ALLEN

        Plaintiffs,

  v.

PIA ASSETS, LLC,
RP GOLF, LLC,
AND
FIVESTAR LIFESTYLES, LLC

        Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

        Intervenor-Defendants
        and Counterclaimants.

Case No.  13AE-CV00013

Division No. 2

## PLAINTIFF JAMES S. ALLEN'S ANSWER TO AND COUNTERCLAIMS AGAINST INTERVENOR PANDI CAPITAL, LLC, AND PLAINTIFF NANCY ALLEN'S CLAIMS AGAINST DEFENDANTS AND INTERVENOR-DEFENDANTS

Plaintiff and Counterclaim Defendant James S. Allen, Jr., through his undersigned counsel, submits his answer to Defendant and Counterclaimant Pandi Capital LLC's counterclaims.

### ALLEGATIONS COMMON TO ALL COUNTS

#### Jurisdiction and Venue

1.      Allen admits the allegations in paragraph 1.

```
EXHIBIT

11
```

2.     Allen admits the allegations in paragraph 2.

### Parties

3.     Allen admits the allegations in paragraph 3.

4.     Allen admits that PIA Assets owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, the Parkville Commons shopping district, and Loch Lloyd Country Club. PIA Assets owns RP Golf, which holds 100% of the interests in the clubs and golf courses. Allen denies all other allegations in paragraph 4.

5.     Allen admits the allegations in paragraph 5.

6.     Allen admits the allegations in paragraph 6.

7.     Allen admits the allegations in paragraph 7.

8.     Allen denies the allegations in paragraph 8.

9.     Allen admits the allegations in paragraph 9.

10.     Allen admits that on December 21, 2012, Patterson and Illig resigned as managers and appointed Randall Nay and Dale Brouk to act on their behalf as managers of PIA Assets. Allen admits that he remains a manager of PIA Assets. Allen denies all other allegations and characterizations in paragraph 10.

11.     Allen admits that Pandi Capital is owned by Patterson and Illig. Allen denies all other allegations and characterizations in paragraph 11.

12.     Allen denies the allegations in paragraph 12.

13.     Allen denies the allegations in paragraph 13.

## "The Notes"

14.    Allen is without sufficient information to admit or deny the allegations paragraph 14.

15.    Allen is without sufficient information to admit or deny the allegations paragraph 15.

16.    Allen is without sufficient information to admit or deny the allegations paragraph 16.

17.    Allen is without sufficient information to admit or deny the allegations paragraph 17.

18.    Allen denies the allegations in paragraph 18.

19.    Allen denies the allegations in paragraph 19.

20.    Allen denies the allegations in paragraph 20.

21.    Allen denies the allegations in paragraph 21.

22.    Allen denies the allegations in paragraph 22.

23.    Allen denies the allegations in paragraph 23.

24.    Allen denies the allegations in paragraph 24.

25.    Allen denies the allegations in paragraph 25.

26.    Allen denies the allegations in paragraph 26.

27.    Allen denies the allegations in paragraph 27.

28.    Allen denies the allegations in paragraph 28.

29.    Allen denies the allegations in paragraph 29.

30.    Allen denies the allegations in paragraph 30.

31.    Allen denies the allegations in paragraph 31.

32.     Allen denies the allegations in paragraph 32.

33.     Allen denies the allegations in paragraph 33.

34.     Allen denies the allegations in paragraph 34.

35.     Allen denies the allegations in paragraph 35.

36.     Allen denies the allegations in paragraph 36.

37.     Allen denies the allegations in paragraph 37.

38.     Allen denies the allegations in paragraph 38.

39.     Allen admits that Exhibits 1-17 attached to Plaintiff's Petition contain a provision 8(b), 8(a)(iv) and 8(a)(v), which are partially described in paragraph 30. Allen denies the remaining allegations in paragraph 39.

40.     Allen is without sufficient information to admit or deny the allegations in paragraph 40.

41.     Allen denies the allegations in paragraph 41.

42.     Allen denies the allegations in paragraph 42.

43.     Allen denies the allegations in paragraph 43.

44.     Allen denies the allegations in paragraph 44.

### Allen's Loan

45.     Allen admits that he filed a lawsuit against PIA Assets on January 2, 2013, styled *James S. Allen, Jr. v. PIA Assets LLC and RP Golf, LLC,* Case No. 13AE-CV00013 in the Circuit Court of Platte County, Missouri, and that the Petition sets for the basis of that lawsuit. Allen denies all other allegations in paragraph 45.

### Jackson County Litigation

46.     Allen denies the allegations in paragraph 46.

4

47.     Allen admits that he filed a Motion to Intervene in the Jackson County case and that the Motion sets forth the basis to intervene which was granted by the Jackson County Circuit Court. Plaintiff denies all remaining allegations in paragraph 47.

48.     Allen admits the allegations in paragraph 48.

49.     Allen admits the allegations in paragraph 49.

50.     Allen admits the allegations in paragraph 50.

51.     Allen admits the allegations in paragraph 51.

52.     Allen is without sufficient information to admit or deny the allegations in paragraph 52, and therefore denies the allegations.

53.     Allen admits the allegations in paragraph 53.

54.     Allen is without sufficient information to admit or deny the allegations in paragraph 54, and therefore denies the allegations.

55.     Allen is without sufficient information to admit or deny the allegations in paragraph 55, and therefore denies the allegations.

56.     Allen admits the allegations in paragraph 56.

57.     Allen is without sufficient information to admit or deny the allegations in paragraph 57, and therefore denies the allegations.

58.     Allen is without sufficient information to admit or deny the allegations in paragraph 58, and therefore denies the allegations.

59.     Allen is without sufficient information to admit or deny the allegations in paragraph 59, and therefore denies the allegations.

60.     Allen is without sufficient information to admit or deny the allegations in paragraph 60, and therefore denies the allegations.

## Count I – Recovery on Guaranty of Bank Debt

61.     In response to the allegations in paragraph 61, Allen incorporates his responses contained in the paragraphs above.

62.     Allen is without sufficient information to admit or deny the allegations in paragraph 62, and therefore denies the allegations.

63.     Paragraph 63 contains legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 63.

64.     Allen denies the allegations in paragraph 64.

65.     Allen denies the allegations in paragraph 65.

66.     Allen is without sufficient information to admit or deny the allegations in paragraph 66, and therefore denies the allegations.

67.     Allen is without sufficient information to admit or deny the allegations in paragraph 67, and therefore denies the allegations.

68.     Allen denies the allegations in paragraph 68.

## Count II – Recovery on Guaranty of Debt

69.     In response to the allegations in paragraph 69, Allen incorporates his responses contained in the paragraphs above.

70.     Allen is without sufficient information to admit or deny the allegations in paragraph 70, and therefore denies the allegations.

71.     Paragraph 71 contains legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 71.

72.     Allen denies the allegations in paragraph 72.

73.     Allen denies the allegations in paragraph 73.

74.     Allen is without sufficient information to admit or deny the allegations in paragraph 74, and therefore denies the allegations.

75.     Allen is without sufficient information to admit or deny the allegations in paragraph 75, and therefore denies the allegations.

76.     Allen denies the allegations in paragraph 76.

## Count III – Alternative Claim for Declaratory Judgment

77.     In response to the allegations in paragraph 77, Allen incorporates his responses contained in the paragraphs above.

78.     Paragraph 78 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 78.

79.     Paragraph 79 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 79.

80.     Paragraph 80 states legal conclusions to which no response is required, but to the extent a response could be required, Plaintiff denies the allegations in paragraph 80.

## Count IV – Recoupment and/or Set-off

81.     In response to the allegations in paragraph 81, Allen incorporates his responses contained in the paragraphs above.

82.     Paragraph 82 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 82.

## CROSSCLAIMS

### COUNT V –BREACH OF CONTRACT – NOTE 1

83.     Allen restates and incorporates his responses to paragraphs 1-82 as if set forth herein.

7

84.    Allen denies the allegations in paragraph 84.

85.    Allen denies the allegations in paragraph 85.

86.    Allen admits the allegations in paragraph 86.

87.    Allen is without sufficient information to admit or deny the allegations in paragraph 87.

88.    Allen is without sufficient information to admit or deny the allegations in paragraph 88.

## COUNT II –BREACH OF CONTRACT – NOTE 2

89.    Allen restates and incorporates his responses to paragraphs 1-88 as if set forth herein.

90.    Allen denies the allegations in paragraph 90.

91.    Allen denies the allegations in paragraph 91.

92.    Allen admits the allegations in paragraph 92.

93.    Allen is without sufficient information to admit or deny the allegations in paragraph 93.

94.    Allen is without sufficient information to admit or deny the allegations in paragraph 94.

## COUNT III –BREACH OF CONTRACT – NOTE 3

95.    Allen restates and incorporates his responses to paragraphs 1-94 as if set forth herein.

96.    Allen denies the allegations in paragraph 96.

97.    Allen denies the allegations in paragraph 97.

98.    Allen admits the allegations in paragraph 98.

99.    Allen is without sufficient information to admit or deny the allegations in paragraph 99.

100.    Allen is without sufficient information to admit or deny the allegations in paragraph 100.

## COUNT IV – BREACH OF CONTRACT – NOTE 4

101.    Allen restates and incorporates his responses to paragraphs 1-100 as if set forth herein.

102.    Allen denies the allegations in paragraph 102.

103.    Allen denies the allegations in paragraph 103.

104.    Allen admits the allegations in paragraph 104.

105.    Allen is without sufficient information to admit or deny the allegations in paragraph 105.

106.    Allen is without sufficient information to admit or deny the allegations in paragraph 106.

## COUNT V – BREACH OF CONTRACT – NOTE 5

107.    Allen restates and incorporates his responses to paragraphs 1-106 as if set forth herein.

108.    Allen denies the allegations in paragraph 108.

109.    Allen denies the allegations in paragraph 109.

110.    Allen admits the allegations in paragraph 110.

111.    Allen is without sufficient information to admit or deny the allegations in paragraph 111.

112. Allen is without sufficient information to admit or deny the allegations in paragraph 112.

## COUNT VI –BREACH OF CONTRACT – NOTE 6

113. Allen restates and incorporates his responses to paragraphs 1-112 as if set forth herein.

114. Allen denies the allegations in paragraph 114.

115. Allen denies the allegations in paragraph 115.

116. Allen admits the allegations in paragraph 116.

117. Allen is without sufficient information to admit or deny the allegations in paragraph 117.

118. Allen is without sufficient information to admit or deny the allegations in paragraph 118.

## COUNT VII –BREACH OF CONTRACT – NOTE 7

119. Allen restates and incorporates his responses to paragraphs 1-118 as if set forth herein.

120. Allen denies the allegations in paragraph 120.

121. Allen denies the allegations in paragraph 121.

122. Allen denies the allegations in paragraph 122.

123. Allen admits the allegations in paragraph 123.

124. Allen is without sufficient information to admit or deny the allegations in paragraph 124.

125. Allen is without sufficient information to admit or deny the allegations in paragraph 125.

## COUNT VIII –BREACH OF CONTRACT – NOTE 8

126.    Allen restates and incorporates his responses to paragraphs 1-125 as if set forth herein.

127.    Allen denies the allegations in paragraph 127.

128.    Allen denies the allegations in paragraph 128.

129.    Allen denies the allegations in paragraph 129.

130.    Allen admits the allegations in paragraph 120.

131.    Allen is without sufficient information to admit or deny the allegations in paragraph 131.

132.    Allen is without sufficient information to admit or deny the allegations in paragraph 132.

## COUNT IX –BREACH OF CONTRACT – NOTE 9

133.    Allen restates and incorporates his responses to paragraphs 1-132 as if set forth herein.

134.    Allen denies the allegations in paragraph 134.

135.    Allen denies the allegations in paragraph 135.

136.    Allen denies the allegations in paragraph 136.

137.    Allen admits the allegations in paragraph 137.

138.    Allen is without sufficient information to admit or deny the allegations in paragraph 138.

139.    Allen is without sufficient information to admit or deny the allegations in paragraph 139.

## COUNT X –BREACH OF CONTRACT – NOTE 10

140.    Allen restates and incorporates his responses to paragraphs 1-139 as if set forth herein.

141.    Allen denies the allegations in paragraph 141.

142.    Allen denies the allegations in paragraph 142.

143.    Allen denies the allegations in paragraph 143.

144.    Allen admits the allegations in paragraph 144.

145.    Allen is without sufficient information to admit or deny the allegations in paragraph 145.

146.    Allen is without sufficient information to admit or deny the allegations in paragraph 146.

## COUNT XI –BREACH OF CONTRACT – NOTE 11

147.    Allen restates and incorporates his responses to paragraphs 1-146 as if set forth herein.

148.    Allen denies the allegations in paragraph 148.

149.    Allen denies the allegations in paragraph 149.

150.    Allen denies the allegations in paragraph 150.

151.    Allen admits the allegations in paragraph 151.

152.    Allen is without sufficient information to admit or deny the allegations in paragraph 152.

153.    Allen is without sufficient information to admit or deny the allegations in paragraph 153.

## COUNT XII –BREACH OF CONTRACT – NOTE 12

154. Allen restates and incorporates his responses to paragraphs 1-153 as if set forth herein.

155. Allen denies the allegations in paragraph 155.

156. Allen denies the allegations in paragraph 156.

157. Allen denies the allegations in paragraph 157.

158. Allen admits the allegations in paragraph 158.

159. Allen is without sufficient information to admit or deny the allegations in paragraph 159.

160. Allen is without sufficient information to admit or deny the allegations in paragraph 160.

## COUNT XIII –BREACH OF CONTRACT – NOTE 13

161. Allen restates and incorporates his responses to paragraphs 1-160 as if set forth herein.

162. Allen denies the allegations in paragraph 162.

163. Allen denies the allegations in paragraph 163.

164. Allen denies the allegations in paragraph 164.

165. Allen admits the allegations in paragraph 165.

166. Allen is without sufficient information to admit or deny the allegations in paragraph 166.

167. Allen is without sufficient information to admit or deny the allegations in paragraph 167.

## COUNT XIV –BREACH OF CONTRACT – NOTE 14

168.     Allen restates and incorporates his responses to paragraphs 1-167 as if set forth herein.

169.     Allen denies the allegations in paragraph 169.

170.     Allen denies the allegations in paragraph 170.

171.     Allen denies the allegations in paragraph 171.

172.     Allen admits the allegations in paragraph 172.

173.     Allen is without sufficient information to admit or deny the allegations in paragraph 173.

174.     Allen is without sufficient information to admit or deny the allegations in paragraph 174.

## COUNT XV –BREACH OF CONTRACT – NOTE 15

175.     Allen restates and incorporates his responses to paragraphs 1-174 as if set forth herein.

176.     Allen denies the allegations in paragraph 176.

177.     Allen denies the allegations in paragraph 177.

178.     Allen denies the allegations in paragraph 178.

179.     Allen admits the allegations in paragraph 179.

180.     Allen is without sufficient information to admit or deny the allegations in paragraph 180.

181.     Allen is without sufficient information to admit or deny the allegations in paragraph 181.

## COUNT XVI –BREACH OF CONTRACT – NOTE 16

182.    Allen restates and incorporates his responses to paragraphs 1-181 as if set forth herein.

183.    Allen denies the allegations in paragraph 183.

184.    Allen denies the allegations in paragraph 184.

185.    Allen denies the allegations in paragraph 185.

186.    Allen admits the allegations in paragraph 186.

187.    Allen is without sufficient information to admit or deny the allegations in paragraph 187.

188.    Allen is without sufficient information to admit or deny the allegations in paragraph 188.

## COUNT XVII –BREACH OF CONTRACT – NOTE 17

189.    Allen restates and incorporates his responses to paragraphs 1-188 as if set forth herein.

190.    Allen denies the allegations in paragraph 190.

191.    Allen denies the allegations in paragraph 191.

192.    Allen denies the allegations in paragraph 192.

193.    Allen admits the allegations in paragraph 193.

194.    Allen is without sufficient information to admit or deny the allegations in paragraph 194.

195.    Allen is without sufficient information to admit or deny the allegations in paragraph 195.

## COUNT XVIII –BREACH OF CONTRACT – LOAN A

196.    Allen restates and incorporates his responses to paragraphs 1-195 as if set forth herein.

197.    Allen denies the allegations in paragraph 197.

198.    Allen denies the allegations in paragraph 198.

199.    Allen admits the allegations in paragraph 199.

200.    Allen is without sufficient information to admit or deny the allegations in paragraph 200.

201.    Allen is without sufficient information to admit or deny the allegations in paragraph 201.

## COUNT XIX –BREACH OF CONTRACT – LOAN B

202.    Allen restates and incorporates his responses to paragraphs 1-201 as if set forth herein.

203.    Allen denies the allegations in paragraph 203.

204.    Allen denies the allegations in paragraph 204.

205.    Allen admits the allegations in paragraph 205.

206.    Allen is without sufficient information to admit or deny the allegations in paragraph 206.

207.    Allen is without sufficient information to admit or deny the allegations in paragraph 207.

## COUNT XX –BREACH OF CONTRACT – LOAN C

208.    Allen restates and incorporates his responses to paragraphs 1-207 as if set forth herein.

209.     Allen denies the allegations in paragraph 209.

210.     Allen denies the allegations in paragraph 210.

211.     Allen admits the allegations in paragraph 211.

212.     Allen is without sufficient information to admit or deny the allegations in paragraph 212.

213.     Allen is without sufficient information to admit or deny the allegations in paragraph 213.

### COUNT XXI –BREACH OF CONTRACT – LOAN D

214.     Allen restates and incorporates his responses to paragraphs 1-213 as if set forth herein.

215.     Allen denies the allegations in paragraph 215.

216.     Allen denies the allegations in paragraph 216.

217.     Allen admits the allegations in paragraph 217.

218.     Allen is without sufficient information to admit or deny the allegations in paragraph 218.

219.     Allen is without sufficient information to admit or deny the allegations in paragraph 219.

### COUNT XXII –BREACH OF CONTRACT – LOAN E

220.     Allen restates and incorporates his responses to paragraphs 1-219 as if set forth herein.

221.     Allen denies the allegations in paragraph 221.

222.     Allen denies the allegations in paragraph 222.

223.     Allen admits the allegations in paragraph 223.

224.     Allen is without sufficient information to admit or deny the allegations in paragraph 224.

225.     Allen is without sufficient information to admit or deny the allegations in paragraph 225.

### COUNT XXIII –BREACH OF CONTRACT – LOAN F

226.     Allen restates and incorporates his responses to paragraphs 1-225 as if set forth herein.

227.     Allen denies the allegations in paragraph 227.

228.     Allen denies the allegations in paragraph 228.

229.     Allen admits the allegations in paragraph 229.

230.     Allen is without sufficient information to admit or deny the allegations in paragraph 230.

231.     Allen is without sufficient information to admit or deny the allegations in paragraph 231.

### COUNT XXIV –UNJUST ENRICHMENT

232.     Allen restates and incorporates his responses to paragraphs 1-231 as if set forth herein.

233.     Allen is without sufficient information to admit or deny the allegations in paragraph 233.

234.     Allen denies the allegations in paragraph 234.

235.     Allen denies the allegations in paragraph 235.

236.     Allen denies the allegations in paragraph 236

## AFFIRMATIVE DEFENSES

237.    The transactions as described in Plaintiff's Petition would violate the Operating Agreement of PIA Assets.

238.    Plaintiff is equitably estopped from asserting that "Notes" 1-5 are loans. Patterson and Illig made affirmative representations as managers and members of Defendant PIA Assets on the financial statements of PIA Assets that the monies advanced were not loans but were equity contributions with no repayment terms and no interest rate. Plaintiff took no steps to enforce "Notes" 1-5 after those "Notes" had allegedly matured. Allen and PIA Assets relied on these representations in accepting and spending the money contributed by Illig and Patterson. Now Plaintiff is asserting that the monies contributed have been accruing interest at between seven and twenty percent, severely damaging PIA's financial condition and decreasing the value of Allen's equity in PIA.

239.    Plaintiff is equitably estopped from asserting that "Notes" 1-17 and "Loans" A-F are loans. Illig and Patterson made representations as Managers of Defendant PIA Assets on the financial statements of PIA Assets and took actions consistent with the position that the transactions described in Plaintiff's Petition were equity contributions with no repayment terms and no interest rate as opposed to loans from Plaintiff. For instance:

    a.  Upon information and belief, no "Notes" were ever provided to Allen or the board of managers of PIA Assets for approval as required by the Operating Agreement of PIA at the time of signing;

    b.  There were no meetings of the board of managers of PIA Assets or resolutions approving the "Notes;"

c. Any transactions between Illig and Patterson and PIA Assets were either listed as "Capital Contributed" on PIA's financial statements or as notes payable to the Illig and Patterson, not to Plaintiff directly;

d. PIA's financial statements never indicated maturity dates for Pandi Capital's contributions;

e. Documents from Plaintiff list notes to Illig and Patterson as "pending" and not signed;

f. Plaintiff has repeatedly stated that it was making contributions "on behalf" of PIA Member PANDI Development, an entity owned by the owners of Plaintiff;

g. There is no security for any of the loans, again indicating that the loans were equity contributions;

h. Illig and Patterson have stated that at the time the contributions were made, no true third-party lender would have made loans to PIA Assets;

i. The contributions from Plaintiff were used to fund the operations of PIA Assets;

j. Plaintiff had no reason to expect repayment unless PIA was successful;

k. As a matter of substantial economic reality, the contributions by Plaintiff were placed at the risk of the business of PIA Assets, and constituted risk capital.

PIA Assets relied on these representation and actions in accepting and spending the money contributed by the Owners of Plaintiff. Now Plaintiff is asserting that the monies contributed have been accruing interest at between seven and twenty percent, severely damaging PIA's financial condition, its ability to conduct its business, and decreasing the value of Allen's equity in PIA.

240. Pursuant to his employment agreement with PIA and FiveStar Lifestyles, Allen is to be held harmless and/or indemnified on any guaranties or obligations regarding debts of PIA or its subsidiaries.

241. Count I fails to state a claim on which relief can be granted.

242. Count II fails to state a claim on which relief can be granted.

243. Counterclaimants are not holders in due course of the debts purchased from Missouri Bank, and therefore cannot enforce Allen's conditional guaranties.

244. The alleged purchase of the loans from Missouri Bank, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets violates the duty of good faith and fair dealing inherent in contracts subject to the Uniform Commercial Code as adopted in Missouri.

245. The alleged purchase of the loans from Missouri Bank, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets was not commercially reasonable.

246. Allen's guaranty on the loan from Missouri Bank to PIA Assets was conditioned upon Allen receiving an indemnification agreement from PIA.

247. The debts of PIA and J-3 Pandi have been satisfied, extinguishing Allen's guaranties.

248. Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support a conclusion that Allen's Debt could be considered equity contributions.

249. Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that Allen's claims to collect on his Note to PIA Assets, which is not pending in this lawsuit, is an action to collect on an equity contribution.

250. Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that the Allen Debt must be re-characterized.

251. Count III fails to state a claim on which relief can be granted, in that the characterization of Allen's Debt is not a controversy before this Court.

252. Count III fails to state a claim on which relief can be granted, in that no justiciable controversy exists regarding to collection or characterization of Allen's Debt.

253. Count III fails to state a claim on which relief can be granted, in that the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding.

254. Count III fails to state a claim on which relief can be granted because Counterclaimants have an adequate remedy at law.

255. Count III fails to state a claim on which relief can be granted because Counterclaimants have not plead any controversy ripe for judicial determination.

256. Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a legally protectable interest in the characterization of Allen's Debt as an equity contributions.

257. Count III fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead the existence of a controversy ripe for judicial determination.

258. Count IV fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a breach of contract by Allen, and Allen has not breached any contract with Counterclaimants.

259.    Count IV fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead facts sufficient for an affirmative defense of recoupment/set-off.

260.    Allen reserves the right to add additional affirmative defenses as additional facts are revealed through discovery.

### ALLEGATIONS SUPPORTING ALLEN'S COUNTERCLAIMS

Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

### Additional Parties

261.    Plaintiff Nancy Allen is a Missouri resident residing at 7001 Waters Edge, Parkville, Missouri 54152.

262.    Defendant Neal L. Patterson is a Missouri resident residing at 20 E Dundy Circle, Belton, Missouri 64012. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

263.    Defendant Clifford W. Illig is a Kansas resident residing at 11504 Pawnee Circle, Leawood, Kansas 66211. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

264.    Defendant FiveStar Lifestyles, LLC ("FiveStar") is a Missouri limited liability company with its principal place of business at 8878 NW 63rd St, Parkville, Platte County Missouri.

### Jurisdiction and Venue

265.    This Court has personal jurisdiction over the counterclaim Defendants Illig, Patterson, Pandi Capital, Pandi Development, and Five Star pursuant to Missouri Revised

Statutes Sections 506.500(1) and/or 506.500(3) because the cause of action herein asserted arises from their transaction of business within the State of Missouri and/or their making of a contract within the State of Missouri.

266.    Venue is proper in this county pursuant to Missouri Revised Statutes Section 508.010 because counterclaim Defendants transact usual and customary business in Platte County, and the cause of action accrued, at least in part, in Platte County, Missouri.

### Additional Facts Supporting Counterclaims

267.    Illig and Patterson are the sole members and owners of Pandi Capital, LLC.

268.    Illig and Patterson are the sole members and owners of Pandi Development, LLC.

269.    FiveStar is a wholly-owned subsidiary of J3-Pandi, LLC (which itself is a wholly-owned subsidiary of PIA Assets) and an affiliate of PIA Assets.

270.    Pandi Development controls 86.5% of the interest in PIA Assets and appoints two of the three managers of PIA Assets.

271.    Pandi Capital is the alleged owner of the "Notes" and "Loans" purportedly representing the monies advanced to PIA Assets and has made member contributions on behalf of Pandi Development to fund the operation of PIA Assets.

272.    Through Pandi Capital and Pandi Development, Patterson and Illig have completely dominated the finances, policy and business practices of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets.

273.    PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets have no existence of their own, but have functioned as the alter ego and instruments of Illig and Patterson.

274.     Patterson and Illig have treated the assets of PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets as their own personal assets in complete disregard for the rights and interests of the minority members.

275.     As more fully described below, Patterson and Illig have used their control of PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets to commit unjust acts in contravention of the rights of true creditors of PIA Assets.

276.     Through their control of PIA Assets, RP Golf, Five Star, and other subsidiaries and affiliates of PIA Assets, Patterson and Illig proximately caused the injuries to the Allens and PIA such that the Allens should be allowed to pierce the corporate veil and hold Patterson and Illig personally liable for the obligations of PIA Assets, RP Golf, Five Star, and other subsidiaries and affiliates of PIA Assets.

277.     Patterson and Illig have taken an active role in the management and operations of PIA Assets and its subsidiaries.

278.     In an interview published in the June/July 2013 issue of *North* magazine, Dale Brouk, the COO/CFO of PIA, is quoted as saying, "'What they [Neil and Cliff] did to make SportingKC the best soccer venue in the country, they're now doing with the golf clubs. They are making us implement all of the things they believe in, the little things that help us differentiate our club from every other club,' says Dale."

279.     Patterson and Illig have repeatedly been mentioned as members of and assets to the development team in public advertisements for the sale of residential developments owned by PIA's subsidiaries and affiliates.

280. As described below, Patterson and Illig have used their control of PIA Assets and its subsidiaries and affiliates to strip the assets of PIA by reclassifying equity contributions as debt, making PIA Assets insolvent with the intent of avoiding creditors.

281. For the period of time during which the alleged "Notes" were signed, Patterson and Illig were members and managers of PIA Assets, but failed to call required members or managers' meetings and maintain required records, including the records related to the alleged "Notes" and "Loans" which are the subject of Pandi's counterclaims.

282. By PIA's Operating Agreement, to which Illig and Patterson are parties through their ownership of Pandi Development, any indebtedness in excess of $50,000 must be approved by the members of PIA Assets. Jim Allen, a member of PIA Assets, was not asked to and did not approve any of the "Notes" or "Loans" which are the subject of Pandi's counterclaims.

283. Upon information and belief, Patterson and Illig have made decisions regarding the non-renewal of certain loans to PIA and its subsidiaries from third-party creditors without consultation of the other members of PIA, in violation of the Operating Agreement of PIA.

284. Upon information and belief, Patterson and Illig have refused proposals from third-party creditors that would have resulted in releases for Jim Allen from guaranties to those creditors. PIA, RP Golf, FiveStar and their subsidiaries and affiliates are contractually obligated to provide those releases.

285. Patterson and Illig have made unilateral decisions to cease both required payments to both Class B shareholders and tax payments to Platte County.

286. Patterson and Illig have made unilateral decisions to fund PIA's legal defense while claiming that PIA is insolvent.

26

287. Patterson and Illig have unnecessarily encumbered assets to prevent recovery by the Allens and other minority shareholders.

**Illig and Patterson Reclassify Equity Contributions as Debt, Making PIA Assets Insolvent**

288. As individuals and/or through Pandi Capital, Patterson and Illig have allegedly contributed large sums of money to PIA. Then, as managers of PIA, Patterson and Illig guaranteed themselves a large internal rate of return on their equity contributions to PIA.

289. Allen was advised by Patterson and Illig that the contributions by Patterson and Illig would be considered equity. Allen's understanding is in accordance with PIA's contemporaneous financial records which state the following:

  a. The December 31, 2009 Balance Sheet identifies an equity contribution from Neal Patterson for $13,135,092.50 and an equity contribution from Cliff Illig for $12,950,092.50. These equity contributions are categorized as "Equity" on PIA's balance sheet.

  b. The January 31, 2010 Balance Sheet also reflected the same equity contributions from Illig and Patterson that appeared on the December 31, 2009 Balance Sheet. Those equity contributions were similarly categorized as "Equity" on the balance sheet.

290. Beginning in 2010, Patterson and Illig began using their position as managers of PIA to implement a conspiracy to prioritize their equity contributions over the amounts PIA owed to other members, and to further dilute the value of shares held by the minority PIA Members. This scheme was in violation of the Operating Agreement and in breach of their fiduciary duties to the minority shareholders.

291.  Upon information and belief, this conspiracy was implemented at least in part as a response to a lawsuit filed by Class B shareholders of PIA Assets regarding Illig's and Patterson's unilateral decision to cease required payments to those shareholders. The conspiracy was designed to re-prioritize their equity contributions above the required payments to the Class B shareholders and to make PIA appear insolvent.

292.  In implementing this scheme, upon information and belief Patterson and Illig instructed Dale Brouk, CFO of PIA Assets, to re-categorize their capital contributions as debt or "Long-term liabilities" on the balance sheet.

293.  Patterson and Illig did this despite contemporaneously representing to third-party lenders that their contributions to PIA were equity, and not debt.

294.  On PIA's February 28, 2010 Balance Sheet, Patterson's and Illig's capital contributions in the total amount of $26,085,185.00 had been moved from the "Equity" category on the Balance Sheet and re-categorized as Long-term Liabilities.

295.  Allen did not approve the decision to "reclassify" Patterson and Illig's capital contribution into debt. Accordingly, this unilateral decision on the part of Patterson and Illig was in direct violation of the Operating Agreement which required unanimous approval of the Class A Members before PIA could "incur indebtedness in excess of $50,000" or "knowingly do any Act which would make it impossible to carry on the ordinary business of the Company…"

296.  The amount of Long-term Liabilities to Patterson and Illig as reflected on PIA's balance sheets as of February 28, 2010 does not match the amounts Pandi Capital now claims it loaned to PIA Assets as of February 28, 2010. There were no loans from Pandi Capital reflected on PIA's balance sheets in 2010.

297. Since 2010, in furtherance of their scheme to prioritize their capital contributions over the amounts owed to other shareholders, Patterson and Illig are incurring additional indebtedness on behalf of PIA by "refinancing" PIA's loans or paying off third-party loans before the maturity date. Upon information and belief, Patterson and Illig are funding these refinancing and pay-downs through their own personal lines of credit with banks at interest rates between 1 and 4 percent.

298. Upon information and belief, Patterson and Illig are funding these refinancing and paydowns of true third party obligations through personal lines of credit and Pandi Capital, LLC.

299. Patterson and Illig are being charged an interest rate on this line of credit that is far lower than the 20% internal rate of return that they have promised themselves in their capacity as managers of PIA.

300. By January 2011, the "Notes Payable" to Illig and Patterson had increased substantially. On the January 31, 2011 Balance Sheet, the "Note Payable" to Illig was $30,791,548.74. The "Note Payable" to Patterson was $30,976,548.75.

301. The amounts of the "Notes Payable" reflected on PIA's balance sheets as of January 2011 do not match the amounts Pandi Capital now asserts it had lent to PIA Assets of as January 2011. There are no loans to Pandi Capital reflected on PIA's balance sheets.

302. In violation of the Operating Agreement, Allen was not asked to consent to and did not agree that PIA could incur indebtedness in excess of $80 million dollars to Patterson and Illig at a 20 percent internal rate of return.

303. Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based, and no Members or Managers meetings of PIA Assets were held to discuss or ratify any notes from Patterson, Illig, or Pandi Capital.

29

304.     Even if the equity contributions from Patterson and Illig were characterized now as loans, these "loans" violate the Operating Agreement which states in relevant part: "if a Manager . . . is the lending Member, the rate of interest shall be determined by the Board of Managers taking into consideration, without limitation, prevailing interest rates and the interest rates the lender is required to pay in the event such lender has itself borrowed funds to loan or advance to the Company and the terms and conditions of such loan, including the rate of interest, shall be no less favorable to the Company than if the lender had been an independent third party." The interest rate being charged by Patterson and Illig exceeds the permissible amount, especially when Patterson and Illig borrowed this money at low interest rates, and this rate was not approved by a legitimate vote of the Board of Managers.

305.     To further their intentional and deceptive scheme of prioritizing their capital contributions above the amounts owed by PIA to Allen, in December 2011, Patterson and Illig further re-characterized their capital contributions as debt from PANDI Capital, LLC in excess of $80 million.

306.     These self-serving "loans" only benefit Patterson, Illig and PANDI Capital as they allow Patterson and Illig to take personal tax losses thereby significantly offsetting their other income sources, including income from their company Cerner. These self-serving "loans" also effectively dilute Allen's shares or interest in PIA.

307.     If Patterson and Illig's contributions to PIA were properly characterized on PIA's financial statements as "Equity", upon information and belief PIA would have a substantial net worth with balance sheet solvency.

308.     Patterson and Illig through Pandi Capital have now brought counterclaims in this lawsuit seeking to collect on the alleged notes from Pandi Capital to PIA Assets.

309. Those claims were originally asserted by Pandi Capital against PIA Assets in the Sixteenth Judicial Circuit in Jackson County.

310. In that action, PIA was represented by a law firm that had previously represented Illig and Patterson personally and had served as the registered agent for Pandi Capital.

311. Pandi Capital's petition in Jackson County asserted twenty-four claims; the firm representing PIA Assets answered the lengthy petition only three days after it was filed.

312. PIA's answer made multiple admissions that were contrary to facts and documents in PIA's possession.

313. The circumstances surrounding the filing and the admissions made by PIA necessitated Allen's intervention in that lawsuit.

### Breach of Agreements with Allen.

314. Prior to October 2006, when Jim Watson, Jack Manning, Allen, Illig and Patterson were negotiating the terms of the deal, Jim and Nancy Allen made loans to entities that controlled the investment properties involved in the transaction.

315. These loans were necessary to fund day-to-day operations of the entities, such as utilities, payroll and tax payments.

316. The Allens received notes from RP Golf, LLC documenting some of the loans and the terms of repayment.

317. The parties to the formation of PIA had an agreement that the Allens' loans would be repaid at or near the time of the closing of the transaction in October 2006.

318. However, at closing Brouk advised Allen that there were insufficient funds to repay the Allens, and no payments were made.

319. In 2008, PIA paid some of the accrued amounts on the loans from Jim and Nancy Allen and created new loans in favor of the Allens in the principal amount of $817,585. PIA's

31

2012 financial planning documents reflect the liability with a twenty percent internal rate of return with a maturity date of February 2012.

320.     Additionally, at the time of the closing, Allen entered into a 10 year employment agreement with PIA. In consideration for Allen leaving his long-term job and providing his exclusive development knowledge to PIA as President, Allen was to be paid a salary of $325,000 per year, plus a yearly increase based upon the Consumer Price Index.

321.     Also, per the term of Allen's contract, Allen was to receive, an agreed-upon buy-out of his Class A shares at the time of his termination.

322.     At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, reduce his salary.

323.     Patterson and Illig agreed that the in exchange for the reduced salary, PIA would offer Allen performance incentives based on sales of homes.

324.     Based upon Patterson and Illig's representations that they would make additional equity contributions to PIA and offer incentives if Allen modified his employment agreement, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement under which Allen would become an employee of FiveStar Lifestyles. The agreement contained the following material terms:  (a) reduction of his annual salary; (b) a performance incentives; (c) car allowance; (d) a note for the aforementioned loans from the Allens with terms satisfactory to Allen; and (e) release from guaranties on any debts related to PIA or any of its subsidiaries and/or an obligation for PIA, FiveStar, RP Golf and all other

32

subsidiaries of PIA to indemnify and hold Allen harmless upon termination of Allen's employment.

325.    The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

326.    PIA has never signed the Agreement nor delivered a note acceptable to Allen.

327.    In fact, Illig instructed employees of PIA Assets and Pandi not to deliver the note to the Allens.

328.    Rather it appears that Patterson and Illig never intended to execute on the agreement. Patterson and Illig induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement or to make future equity contributions.

329.    In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a sign copy or the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records.  In response, Allen was presented with a copy of a "Note" purportedly signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

330.    These loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

331. Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, PIA has breached Allen's employment agreement, including but not limited to by failing to provide Allen with his contractual raises and other benefits pursuant to the agreement.

332. Also, shortly after the parties agreed to the 2010 Agreement in principle, Patterson and Illig, without consent or discussion with Allen, nixed the various homebuilding projects which were to generate the performance incentives under Allen's agreement. As a result Allen has never received any of the bonuses provided for in the contract.

333. Patterson and Illig also have attempted to recharacterize their "equity contributions" as debt, suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

334. Allen never would have agreed to modify the terms of his employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to defraud Allen out of money he and his wife loaned to the company and to decrease the value of his shares.

335. Despite these breaches, and Patterson and Illig's claims that PIA is having financial problems, employees of PIA received bonuses for PIA's financial performance and operating results in 2010. And, in 2011, PIA has provided pay raises to many of its high level employees and hired additional, unnecessary staff at the National in 2012.

336. PIA, by and through its managing members, is also obligated to furnish to Allen the annual reports within 180 days after the end of each fiscal year and additional reports within

34

30 days after the end of each calendar quarter, which quarterly reports are to consist of unaudited financial statements prepared by PIA in the ordinary course of business for the preceding quarter.

337.    These reports have not been provided at all for certain quarters and untimely provided for others.

**Patterson and Illig Use Their Control of PIA Assets to Avoid Obligations to Jim Allen**

338.    In November 2012, Jim Allen, Chief Executive Officer and a minority member of PIA Assets, submitted his resignation, triggering a contractual duty for PIA Assets, FiveStar Lifestyles, and PIA's subsidiaries and affiliates to seek releases from guaranties that Allen provided on several third-party loans to PIA Assets.

339.    Until releases were obtained, FiveStar Lifestyles, PIA Assets, its subsidiaries and affiliated entities had a contractual duty to indemnify and hold Allen harmless with respect to his guaranties.

340.    Allen's resignation triggered a contractual duty for PIA Assets to buy out Allen's interest in PIA Assets for $6 million.

341.    In January 2013, Allen filed a lawsuit to collect on the Allens' loans to PIA which had never been repaid. Allen had been in discussions with counsel for PIA for much of 2012 regarding satisfaction of the Allens' loan, either through cash or through alternative means.

342.    In response, Illig and Patterson have sought to avoid repaying the Allens and have taken affirmative steps to prevent PIA and its affiliated companies from satisfying their obligations to the Allens.

343.    Though there has been no substantial change in PIA's financial condition from 2010 to the present, shortly before Allen filed his lawsuit, Pandi and the managers of PIA

appointed by Patterson and Illig have now begun to claim that PIA is insolvent and unable to repay its debts.

344.    Patterson and Illig appointed Dale Brouk and Randall Nay to PIA's board of managers to represent them and Pandi Development.

345.    Brouk and Nay began calling for regular managers and members meetings, which had not occurred since 2010.

346.    The managers appointed by Pandi began demanding large financial contributions from Allen to fund the operations of PIA and its subsidiaries.

347.    After appointing Brouk and Nay, Patterson and Illig through Pandi Capital stated that it was unwilling to continue funding PIA unless Allen agreed to relinquish his rights to repayment of his loans and the buyout of his interests in PIA and its subsidiaries.

348.    Pandi Capital also stated that it would not continue funding PIA unless the board of managers agreed to amend the operating agreements of PIA's subsidiaries to allow Pandi Capital to loan money directly to PIA's subsidiaries.

349.    The managers appointed by Patterson and Illig through Pandi approved the amended operating agreements over Allen's objection.

350.    Under PIA's Operating Agreement, any decisions regarding incurring indebtness or bankruptcy must be made by a unanimous vote of the board of managers.

351.    Under the new operating agreements for PIA subsidiaries required by Pandi Capital, decisions regarding incurring indebtedness and/or bankruptcy only require a majority vote of the board of managers.

352.    The amended operating agreements are also designed to allow the managers to put certain subsidiaries into bankruptcy.

36

353. Upon information and belief, the goal of the actions taken by Patterson and Illig through Pandi and the managers appointed by Pandi are to make PIA's balance sheet show insolvency.

354. Upon information and belief, the purpose of the amended operating agreements was to allow Illig and Patterson to encumber PIA's underlying entities through purported "loans" from Pandi Capital in such a way that would interfere with the rights of potential creditors by loading the subsidiaries up with debt owed to Pandi.

355. Beginning in 2013, Pandi demanded security for its recent contributions to PIA.

356. The only ostensible purpose for the actions described above is to make it impractical or impossible for PIA to repay its debts to Allen and to honor its obligations to indemnify and hold Allen harmless.

357. Illig and Patterson have rejected proposals from third-party lenders, including Missouri Bank, which would have released Allen from his guaranties on loans from third-party lenders, a clear violation of the Operating Agreement and contractual duties owed to Allen by PIA, FiveStar and the subsidiaries of PIA.

358. The managers appointed by Illig and Patterson have rejected proposals from Allen to indemnify and hold him harmless on his guaranty on a loan using unencumbered assets of PIA and its affiliates. The failure to accept Allen's proposal was a violation of the Operating Agreement and contractual duties owed to Allen by PIA, FiveStar and subsidiaries and affiliates of PIA.

359. Patterson and Illig caused PIA to default on its loans from Missouri Bank.

360. Patterson and Illig's attempt to collect the "Notes" and "Loans" from Pandi Capital through this lawsuit will cause irreparable harm absent relief from this Court.

37

361. Patterson and Illig's continued attempts to categorize equity contributions as loans to PIA Assets or its underlying entities will further encumber the assets of PIA Assets and increase PIA's insolvency.

362. There is no adequate remedy at law, as Patterson and Illig continue to encumber the assets of PIA Assets by characterizing equity contributions from Pandi Development and debt owed to PANDI Capital.

**COUNT I -- BREACH OF THE IMPLIED DUTY OF GOOD FAITH
AND FAIR DEALING**
(Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

363. Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

364. Entering into the operating agreements with Pandi Development, Patterson and Illig, and based upon the intertwined relationship of the parties including their corporate positions and ownership as well as their course of dealing, among other things, required that:

  a. Pandi, Patterson, and Illig, would act with good faith and fairness toward Allen on all matters concerning corporate affairs.

  b. Neither Pandi, Patterson nor Illig would take any action to unfairly prevent Allen from obtaining the benefits of his corporate position, his compensation, his employment agreement, or his rights under the Operating Agreement.

  c. Pandi, Patterson and Illig would comply with their own rules, policies and procedures with respect to providing and making financial information available to Allen and consulting with him on corporate matters.

365. Pandi, Patterson or Illig's conduct as set forth above was conducted in bad faith and done with the purpose and intention of avoiding or diminishing payments owed to Allen for

38

compensation and the value of his shares in PIA and to impair indemnity and hold harmless obligations owed to Allen.

366.     Pandi, Patterson and/or Illig breached their covenant of good faith and fair dealing in one or more of the respects set forth herein:

> a.     Pandi, Patterson or Illig purposefully and wrongfully failed and refused to pay Allen for the sums due him under the terms of the employment agreement;

> b.     Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement made unauthorized corporate decisions to the detriment of Allen, and PIA.

> c.     Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement re-characterized their equity contributions as debt and imposed unreasonable repayment terms and conditions.

> d.     Pandi, Patterson or Illig did the other wrongful acts described herein.

367.     Such breaches were performed by Pandi, Patterson or Illig to exploit economic conditions to their own benefit, and to intentionally undermine the fulfillment of PIA's and FiveStar's contractual obligations to Allen.

368.     Pandi, Patterson or Illig's breach of the covenant of good faith and fair dealing was a substantial factor in causing damage and injury to Allen.

369.     As a direct and proximate result of Pandi, Patterson or Illig's unlawful conduct alleged in this Petition, Allen has lost substantial compensation and other benefits. Allen has further suffered extreme anguish and emotional distress due to such conduct in an amount to be determined at trial.

370.    Because of the irreparable harm that would result from Illig, Patterson and Pandi's collection of the "Notes" and "Loans" and/or from a judgment characterizing the equity contributions as debt, Allen prays for an injunction from this Court:

a.  Enjoining further "loans" made pursuant to the amended operating agreements adopted by PIA's board of managers in 2013;

b.  Commanding the managers of PIA to satisfy PIA's debts with unencumbered assets, as required by PIA's Operating Agreement;

c.  Enjoining the managers of PIA and Pandi from characterizing future contributions from Pandi as third party debt.

WHEREFORE, Allen prays for judgment in an amount to be determined at trial, for his costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages; for an injunction as described above, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT II – VIOLATION OF MISSOURI FRAUDULENT TRANSFER ACT
(Jim and Nancy Allen v. Illig, Patterson, PANDI Development, and PANDI Capital, LLC)

371.    Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

372.    As described above, the Allens took steps to collect loans made to PIA and asserted Jim Allen's right to certain contractual obligations owed by PIA, FiveStar and PIA's subsidiaries.

373.    In anticipation of and response to Allen's suit and demand, Patterson and Illig through Pandi Development began taking the actions described in more detail above, including appointing new managers, calling for meetings, claiming that PIA was in financial crisis, demanding large capital contributions from Allen, refusing to continue making contributions to

40

PIA through Pandi Capital as they had for years before Allen made his demands unless Allen abandoned his demands, and filing their counterclaims in this lawsuit.

374. Patterson and Illig's pursuit of their counterclaims through Pandi Capital to recharacterize equity contributions as debt is an attempt to hinder, delay or defraud creditors of PIA, including the Allens.

375. Patterson and Illig made the alleged "loans" and "notes" from one company they owned, Pandi Capital, to another company they controlled, PIA Assets.

376. Patterson and Illig made the alleged "loans" and "notes" in anticipation of a substantial long-term gain, as the prospects of short-term repayment at substantial interest on unsecured notes from PIA was low.

377. Pandi received inadequate consideration for its "Loans" or "Notes," in that it would have had no reasonable expectation of repayment given short maturity terms of the alleged loans combined with the large principal amounts, high interest rates.

378. The "Notes" were not made in the usual method of transacting business, in that the "Notes" and "Loans" were made without the approval of the members of PIA as required by the Operating Agreement, and no copies of the "Notes" were provided to PIA.

379. Pandi has begun demanding security on its alleged loans.

380. The amount of the "Loans" and "Notes" is such that demanding repayment from PIA is in effect a transfer of all or nearly all of PIA's property.

381. Repayment of the "Loans" and "Notes" would cause PIA's insolvency.

382. The circumstances surrounding the execution and delivery of the "Notes" and "loans" are suspicious as described above, in that the amounts claimed do not match the amounts

on PIA's books, PIA did not have copies of the "Notes" or "Loans," and several of the Notes reflected a debt owed to a Pandi Capital before Pandi Capital existed.

WHEREFORE, the Allens pray for judgment in an amount to be determined at trial, for their costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages; for an injunction, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT
(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, LLC and PANDI Capital, LLC)

383.    Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

384.    A justiciable controversy regarding the characterization of contributions made by Illig and Patterson through Pandi Capital exists in that Pandi Capital's counterclaims for breach of contract are based on "Notes" described in Pandi Capital's counterclaims.

385.    For the reasons described above, the contributions made by Patterson and Illig through Pandi Capital were not contractual obligations owed by PIA to Pandi Capital, but were equity contributions made by Illig and Patterson that have been re-characterized as loans in order to re-prioritize repayment.

386.    If Patterson and Illig through Pandi Capital are successful through their lawsuit in converting their equity contributions into debts, PIA and its subsidiaries will be perpetually insolvent, rendering it unable to repay debts or satisfy its contractual duties to third-party creditors like Allen.

387.    The disposition of Illig and Patterson's claims in this suit will impair or impede Allen's ability to protect both his interest as a Member of PIA in protecting PIA's financial solvency, and Jim and Nancy Allens' personal interests in protecting the priority of their loans made in 2006 over Illig and Patterson's equity contributions made from 2009-13.

388.    Allen therefore asks this Court for a declaration that the "Notes" described in Pandi Capital's counterclaims were in fact equity contributions to PIA Assets.

WHEREFORE, the Allens pray for a declaration of rights as described above, for their costs and fees incurred herein; and further legal and equitable relief as the Court deems just and proper.

## COUNT IV—FRAUDULENT INDUCEMENT
### (Jim Allen v. Patterson, Illig, and Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

389.    At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

390.    Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement that contained the following material terms:  (a) reduction of his annual salary; (b) an incentive provision; (c) car allowance; (d) a note for the aforementioned loans from Jim and Nancy Allen under terms satisfactory to Allen; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

391.    The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon

43

"(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

392.    PIA has never signed the revised agreement nor delivered a Note acceptable to Allen.

393.    Unbeknownst to Allen, Illig directed that a note for Allen's debt not be delivered to Allen.

394.    Shortly after the parties agreed to the revised agreement in principle, and before any signatures of the parties, Allen began receiving a reduced salary.

395.    Additionally, Patterson and Illig, without consent or discussion with Allen, nixed a townhome project which was to generate a significant portion of the bonuses under Allen's modified employment agreement. Allen has never received any of the bonuses provided for in the revised employment agreement.

396.    Allen also never received any drafts of a note as was contemplated by the modified employment agreement.

397.    In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a sign copy or the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records. In response, Allen was presented with a "Note" signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

398.    Illig had previously directed that the Note not be delivered to Allen.

44

399.   The Allens' loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

400.   It further appears that Patterson and Illig through Pandi Development induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement.

401.   Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, Patterson and Illig through Pandi Development and Pandi Capital also have attempted to recharacterize their "capital contributions" as debt suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

402.   Patterson and Illig's failure to disclose that they did not consider their capital contributions as such, and rather considered them as loans which would take priority above other payments was willful misconduct or was made with reckless indifference to the rights of Allen and was done with the intent to induce Allen to enter into a modified employment agreement.

403.   Allen did not have any independent knowledge of Patterson and Illig's misrepresentations or intent to defraud him at the time.

404.   In entering into the modified employment agreement, which increased cash flow to PIA without any ability by Allen to benefit from that increased cash flow, Patterson and Illig intended Allen to rely on their representations.

405.   Allen never would have agreed to modify the terms of his original employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to

45

defraud the Allens out of money they loaned to the company and to decrease the value of Allen's shares.

406.     As a result of these fraudulent inducements, Allen gave up rights and benefits granted to him by his original agreement, including but not limited to a higher base salary and a six million dollar buyout provision of his Class A shares.

WHEREFORE, Plaintiff prays for judgment against Defendants Pandi Capital, Pandi Development, Patterson and Illig, jointly and severally, for fraudulent inducement through misrepresentations, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, and for such other and further relief as the Court may deem just and equitable.

## COUNT V—BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS ON GUARANTIES

### (Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

407.     At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA.  Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well.  Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

408.     Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment

agreement. The parties began to negotiate a revised employment agreement that contained the following material terms: (a) reduction of his annual salary; (b) an incentive provision; (c) car allowance; (d) a note for the Allens' aforementioned loans; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

409. Per the revised agreement, within one year of Allen's resignation from his employment, FiveStar and "the other PIA Companies" were obligated to obtain releases on personal guaranties Allen had signed on debt obligations of PIA, Five Star, and other subsidiaries of PIA.

410. If releases were not immediately obtained, FiveStar and the other PIA Companies were obligated to indemnify and hold Allen harmless.

411. Releases were not obtained on the conditional guaranties Allen signed on PIA loans from Missouri Bank.

412. If those guaranties were or are effective, FiveStar and the PIA Companies had an obligation to indemnify or hold Allen harmless with respect to those loans.

413. Allen has not received any indemnification or hold harmless agreement from FiveStar or any of the PIA Companies.

414. After causing PIA to default on the loans from Missouri Bank, Pandi, Illig and Patterson now claim to have purchased the Missouri Bank loans and seek to enforce Allen's guaranties.

415. Pandi, Illig and Patterson, as the alter egos of PIA, FiveStar and the PIA Companies, have an affirmative obligation to release, indemnify and hold Allen harmless on those guaranties.

416.    Defendants now seek to insulate themselves from liability for the wrongful acts described above, from their obligation to repay Allen's loans, and from their obligations to indemnify, hold harmless and/or release Allen from the very guaranties Defendants now seek to enforce through a purported foreclosure "sale" of Allen's claims against PIA.

417.    Defendants have breached their duty to release and/or indemnify and hold Allen harmless on not only the loans from Missouri Bank, but also several other loans third parties made to PIA, FiveStar and the PIA Companies.

418.    As a result, Allen has been damaged.

WHEREFORE, Plaintiff prays for judgment against Defendants jointly and severally for breach of Plaintiff's employment agreement, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## COUNT VI—CIVIL CONSPIRACY
### (Jim and Nancy Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiffs incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

419.    As described above, Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development had an agreement and meeting of the minds to defraud Jim Allen out of the benefits of his employment contract, to defraud and prevent Jim and Nancy Allen from being repaid on their loan, and to insulate themselves from liability.

420.    Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development took the affirmative steps described above in furtherance of their conspiracy.

48

421.    Defendants' conspiracy and the actions taken in furtherance of that conspiracy have damaged Plaintiffs by delaying and frustrating repayment of their loan and defrauding Jim Allen out of the benefit of his employment contract.

WHEREFORE, the Allens pray for judgment against Defendants jointly and severally for the conspiracy, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

The Allens hereby requests a trial by jury of all issues triable by jury.

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By:    /s/ Patrick J. Stueve
      Patrick J. Stueve, MO Bar # 37682
      stueve@stuevesiegel.com
      Andrew W. Funk, MO Bar # 59977
      funk@stuevesiegel.com
      460 Nichols Road, Suite 200
      Kansas City, MO 64112
      (816) 714-7100
      (816) 714-7101 Facsimile

**ATTORNEYS FOR PLAINTIFFS AND
COUNTERCLAIM-DEFENDANT**

49

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via email and First-Class U.S. Mail on

January 9, 2014 to the following:

R. Pete Smith
Kristie Orme
petesmith@mcdowellrice.com
korme@mcdowellrice.com
**MCDOWELL RICE SMITH & BUCHANAN**
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
**Attorneys for Defendant**

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
**SPENCER FANE BRITT & BROWNE, LLP**
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
dweems@spencerfane.com
sgoldstein@spencerfane.com
bdixon@spencerfane.com
**Attorneys for Pandi Capital, LLC**

Kirk T. May
F. Ryan Van Pelt
**ROUSE HENDRICKS GERMAN MAY, PC**
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
kirkm@rhgm.com
ryanv@rhgm.com
**Attorneys for Defendants Pandi Development, LLC,**
**Neal Patterson, and Clifford Illig**

/s/ Patrick J. Stueve _____



# Stueve · Siegel · Hanson

**LLP**

**Patrick J. Stueve**
stueve@stuevesiegel.com

460 Nichols Rd., Suite 200
Kansas City, Missouri 64112

Phone: (816) 714-7110
Fax:   (816) 714-7101



## FACSIMILE TRANSMITTAL SHEET

### January 9, 2014

**TO:**          Platte County Circuit Court Clerk

**FACSIMILE #:**     816-858-3392

**FROM:**        Patrick J. Stueve

**SUBJECT:**     *James S. Allen, Jr., et al. v. PIA Assets, LLC, et al.*
Case No. 13AE-CV00013

## TOTAL NO. OF PAGES, INCLUDING COVER SHEET: 51

**MESSAGE:**     Please file the attached Plaintiff James S. Allen's Answer to
and Counterclaims Against Intervenor Pandi Capital, LLC, and Plaintiff Nancy
Allen's Claims Against Defendants and Intervenor-Defendants.

## CONFIDENTIALITY NOTE

The documents accompanying this facsimile transmission contain information from the law firm of Stueve Siegel Hanson LLP which is confidential
and/or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended
recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this
facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES INDICATED ABOVE, PLEASE CALL (816) 714-7100.**

## IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

| | |
|---|---|
| **JAMES S. ALLEN, JR.,** )<br><br>    **Plaintiff,** )<br><br>**v.** )<br><br>**PIA ASSETS, LLC,** )<br>**RP GOLF, LLC,** )<br><br>    **Defendants,** )<br><br>**and** )<br><br>**PANDI CAPITAL, LLC,** )<br>**PANDI DEVELOPMENT, LLC,** )<br>**NEAL L. PATTERSON, and** )<br>**CLIFFORD W. ILLIG,** )<br><br>    **Intervenor-Defendants,** )<br>    **Counterclaimants, and Crossclaimants.** ) | **Case No. 13AE-CV00013**<br>**Division II** |

**F I L E D**

FEB 11 2014

SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## ORDER

Upon consideration of Defendants Pandi Capital Pandi Development, Neal Patterson, and Clifford Illig's Joint Unopposed Motion For Extension Of Time To Respond To James S. Allen Jr. And Nancy Allen's Counterclaims, IT IS HEREBY ORDERED that the motion be granted. The deadline for Defendants to respond to the respective counterclaims filed against them by the Allens is extended until and including February 17, 2014.

IT IS SO ORDERED

Date: *Feb 11, 2014*

_____
Circuit Judge

---

**EXHIBIT**

**12**

**IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**

FILED
FEB 18 2014
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

|  |  |  |
|---|---|---|
| JAMES S. ALLEN, JR. and NANCY T. ALLEN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 13AE-CV00013 |
| PIA ASSETS, LLC, RP GOLF, LLC, and FIVESTAR LIFESTYLES, LLC, | ) ) ) ) | Division 2 |
| Defendants, | ) ) ) | |
| PANDI CAPITAL, LLC, PANDI DEVELOPMENT, LLC, NEAL L. PATTERSON and CLIFFORD W. ILLIG, | ) ) ) ) ) | |
| Intervenor-Defendants, Cross-claimants and Counterclaimants. | ) ) ) | |

## ANSWER OF PIA ASSETS, LLC TO CROSSCLAIMS OF PANDI CAPITAL, LLC

COMES NOW Defendant PIA Assets, LLC, by and through undersigned counsel, and for its Answer to the Crossclaims of Pandi Capital, LLC, states as follows:

1.     Defendant admits the allegations contained in paragraphs 1 through 10.

2.     Defendant admits that Pandi Capital, LLC is owned by Patterson and Illig. Defendant admits that monies have been advanced by Pandi Capital to PIA Assets, but lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 11 and accordingly, those allegations are denied.

3.     Defendant admits that revenues generated by PIA Assets' operating subsidiaries have been and are insufficient to pay PIA Assets' operating subsidiaries' expenses, but denies the remaining allegations contained in paragraph 12.

4713953-1

**EXHIBIT**

**13**

4.    Defendant admits that Pandi Capital advanced monies to Defendant, but denies the remaining allegations contained in paragraph 13.

5.    Defendant generally admits the allegations in paragraphs 14 through 30 regarding the advancement of money by Pandi Capital to Defendant, except that the subject notes may have been beyond the authority of Dale Brouk, as Manager of PIA, to execute and to that extent, were, therefore, not made, executed and delivered by Defendant.

6.    Defendant generally admits the allegations in paragraphs 31 through 36 that the monies were advanced by Pandi Capital and received by Defendant, but any oral agreement to repay the same may have been beyond the authority of the Board of Managers or any individual member thereof to make.

7.    Defendant denies the allegations in paragraph 37.

8.    Defendant denies the allegations in paragraphs 38.

9.    Defendant states that the Notes speak for themselves and deny the remaining allegations contained in paragraph 39.

10.    Defendant admits the allegations in paragraph 40.

11.    The allegations in paragraph 41 are legal conclusions and therefore, no response is required. To the extent a response is required, the allegations are denied.

12.    Defendant generally admits that Pandi Capital advanced and continues to advance monies to Defendant, but that Allen refuses to do so.  Defendant denies the remaining allegations in paragraph 42.

13.    Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraph 43 and accordingly, those allegations are denied.

2

14. Defendant admits the allegations contained in paragraph 44.

15. Defendant admits the allegations contained in paragraphs 45 through 53.

16. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 54 and 55 and accordingly, those allegations are denied.

17. Defendants admit the allegations contained in paragraphs 56 through 58.

18. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 59 and 60 and accordingly, those allegations are denied.

## COUNTERCLAIMS
## COUNTS I THROUGH IV

19. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

20. The allegations contained in paragraphs 62 through 82 do not appear to be directed to this Defendant and accordingly, no response is required. To the extent a response is required, those allegations are denied.

## CROSSCLAIMS

## COUNT V – BREACH OF CONTRACT – NOTE 1

21. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

22. Defendant denies the allegations in paragraphs 84 and 85.

23. Defendant admits the allegations in paragraph 86.

24.    Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 87 and 88 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT VI – BREACH OF CONTRACT – NOTE 2

25.    Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

26.    Defendant denies the allegations in paragraphs 90 and 91.

27.    Defendant admits the allegations in paragraph 92.

28.    Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 93 and 94 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT VII – BREACH OF CONTRACT – NOTE 3

29.    Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

30.    Defendant denies the allegations in paragraphs 96 and 97.

31.    Defendant admits the allegations in paragraph 98.

4

32. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 99 and 100 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT VIII – BREACH OF CONTRACT – NOTE 4

33. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

34. Defendant denies the allegations in paragraphs 102 and 103.

35. Defendant admits the allegations in paragraph 104.

36. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 105 and 106 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT IX – BREACH OF CONTRACT – NOTE 5

37. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

38. Defendant denies the allegations in paragraphs 108 and 109.

39. Defendant admits the allegations in paragraph 110.

40. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 111 and 112 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT X – BREACH OF CONTRACT – NOTE 6

41. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

42. Defendant denies the allegations in paragraphs 114 and 115.

43. Defendant admits the allegations in paragraph 116.

44. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 117 and 118 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XI – BREACH OF CONTRACT – NOTE 7

45. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

46. Defendant denies the allegations in paragraphs 120 through 122.

47. Defendant admits the allegations in paragraph 123.

48.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 124 and 125 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XII – BREACH OF CONTRACT – NOTE 8

49.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

50.     Defendant denies the allegations in paragraphs 127 though 129.

51.     Defendant admits the allegations in paragraph 130.

52.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 131 and 132 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XIII – BREACH OF CONTRACT – NOTE 9

53.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

54.     Defendant denies the allegations in paragraphs 134 through 136.

55.     Defendant admits the allegations in paragraph 137.

56. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 138 and 139 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XIV – BREACH OF CONTRACT – NOTE 10

57. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

58. Defendant denies the allegations in paragraphs 141 through 143.

59. Defendant admits the allegations in paragraph 144.

60. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 145 and 146 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XV – BREACH OF CONTRACT – NOTE 11

61. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

62. Defendant denies the allegations in paragraphs 148 through 150.

63. Defendant admits the allegations in paragraph 151.

64.    Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 152 and 153 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XVI – BREACH OF CONTRACT – NOTE 12

65.    Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

66.    Defendant denies the allegations in paragraphs 155 through 157.

67.    Defendant admits the allegations in paragraph 158.

68.    Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 159 and 160 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XVII – BREACH OF CONTRACT – NOTE 13

69.    Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

70.    Defendant denies the allegations in paragraphs 162 through 164.

71.    Defendant admits the allegations in paragraph 165.

72.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 166 and 167 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XVIII – BREACH OF CONTRACT – NOTE 14

73.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

74.     Defendant denies the allegations in paragraphs 169 through 171.

75.     Defendant admits the allegations in paragraph 172.

76.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 173 and 174 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XIX – BREACH OF CONTRACT – NOTE 15

77.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

78.     Defendant denies the allegations in paragraphs 176 through 178.

79.     Defendant admits the allegations in paragraph 179.

80.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 180 and 181 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XX – BREACH OF CONTRACT – NOTE 16

81.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

82.     Defendant denies the allegations in paragraphs 183 through 185.

83.     Defendant admits the allegations in paragraph 186.

84.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 187 and 188 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXI – BREACH OF CONTRACT – NOTE 17

85.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

86.     Defendant denies the allegations in paragraphs 190 through 192.

87.     Defendant admits the allegations in paragraph 193.

88.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 194 and 195 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXII – BREACH OF CONTRACT – LOAN A

89.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

90.     Defendant denies the allegations in paragraphs 197 and 198.

91.     Defendant admits the allegations in paragraph 199.

92.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 200 and 201 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXIII – BREACH OF CONTRACT – LOAN B

93.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

94.     Defendant denies the allegations in paragraphs 203 and 204.

95.     Defendant admits the allegations in paragraph 205.

96.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 206 and 207 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXIV – BREACH OF CONTRACT – LOAN C

97.     Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

98.     Defendant denies the allegations in paragraphs 209 and 210.

99.     Defendant admits the allegations in paragraph 211.

100.    Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 212 and 213 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXV – BREACH OF CONTRACT – LOAN D

101.    Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

102.    Defendant denies the allegations in paragraphs 215 and 216.

103.    Defendant admits the allegations in paragraph 217.

104.  Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 218 and 219 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXVI – BREACH OF CONTRACT – LOAN E

105.  Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

106.  Defendant denies the allegations in paragraphs 221 and 222.

107.  Defendant admits the allegations in paragraph 223.

108.  Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 224 and 225 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXVII – BREACH OF CONTRACT – LOAN F

109.  Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

110.  Defendant denies the allegations in paragraphs 227 and 228.

111.  Defendant admits the allegations in paragraph 229.

112. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 230 and 231 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## COUNT XXVIII – IN THE ALTERNATIVE – UNJUST ENRICHMENT

113. Defendant incorporates herein by reference its responses to the preceding paragraphs as if fully set forth herein.

114. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in paragraphs 233 through 236 and accordingly, those allegations are denied.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

## AFFIRMATIVE DEFENSES

115. The Crossclaims fail to state a claim upon which relief may be granted.

116. Defendants deny each and every allegation and averment contained in the Crossclaims of Pandi Capital, LLC which are not hereinabove expressly admitted.

117. The transactions which are the subject matter of plaintiff's Petition were not authorized and were *ultra vires* acts.

118. The crossclaims are barred by the agreements of the parties, including but not limited to the Operating Agreement of PIA Assets, LLC.

119. The crossclaims are barred by waiver, laches and/or estoppel.

15

120. There is a pending dispute between the members of Defendant PIA Assets, LLC regarding whether monies advanced by Plaintiffs James S. Allen, Jr. and/or Nancy Allen (to RP Golf, LLC) and by Crossclaimant Pandi Capital, LLC (to PIA Assets, LLC) are properly characterized as equity contributions or debt. (*See* Plaintiffs' Counterclaims against Pandi Development, LLC, Neal Patterson, Cliff Illig and Pandi Capital, LLC, Count III, filed January 3, 2014 and January 9, 2014; Counterclaims of Pandi Development, LLC, Neal Patterson and Cliff Illig, Count III, filed December 4, 2013; and Counterclaims of Pandi Capital, LLC, Count III, filed December 10, 2013). The resolution and/or adjudication of that dispute impacts the enforceability of the notes and/or loans alleged by Plaintiffs and Crossclaimant Pandi Capital, LLC.

121. Defendant reserves the right to assert additional affirmative defenses as the same are found applicable hereto through the course of discovery.

WHEREFORE, having fully answered, Defendant prays that Crossclaimant Pandi Capital, LLC take naught and that the costs of this action be taxed against Crossclaimant.

Respectfully submitted,

McDOWELL, RICE, SMITH & BUCHANAN,
*A Professional Corporation*

By: _____

R. Pete Smith      #35408
Kristie Remster Orme      #48685
605 West 47th Street, Suite 350
Kansas City, MO 64112
Telephone: (816) 753-5400
Facsimile: (816) 753-9996
Email: petesmith@mcdowellrice.com
Email: korme@mcdowellrice.com
**ATTORNEYS FOR DEFENDANTS
PIA ASSETS, LLC, RP GOLF, LLC AND
FIVESTAR LIFESTYLES, LLC**

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served via electronic mail, this 17th day of February, 2014, to:

Patrick J. Stueve
Andrew W. Funk
Stueve Siegel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101
Email:  stueve@stuevesiegel.com
Email:  funk@stuevesiegel.com
**ATTORNEYS FOR PLAINTIFFS
JAMES S. ALLEN, JR. AND NANCY
T. ALLEN**

Kirk T. May
F. Ryan Van Pelt
Rouse Hendricks German May PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
Telephone:  816-471-7700
Facsimile:  816-471-2221
Email:  kirkm@rhgm.com
Email:  ryanv@rhgm.com
**ATTORNEYS FOR INTERVENORS
PANDI DEVELOPMENT, LLC, NEAL
PATTERSON AND CLIFFORD ILLIG**

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
Spencer Fane Britt & Browne, LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Telephone:  816-474-8100
Facsimile:  816-474-3216
Email:  dweems@spencerfane.com
Email:  sgoldstein@spencerfane.com
Email:  bdixon@spencerfane.com
**ATTORNEYS FOR INTERVENOR
PANDI CAPITAL, LLC**

Attorney for Defendants

17

**F I L E D**

**FEB 1 8 2014**

SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

| | |
|---|---|
| JAMES S. ALLEN, JR.<br>and NANCY T. ALLEN,<br><br>        Plaintiffs,<br><br>v.<br><br>PIA ASSETS, LLC,<br>RP GOLF, LLC, and<br>FIVESTAR LIFESTYLES, LLC,<br><br>        Defendants,<br><br>PANDI CAPITAL, LLC,<br>PANDI DEVELOPMENT, LLC,<br>NEAL L. PATTERSON and<br>CLIFFORD W. ILLIG,<br><br>        Intervenor-Defendants,<br>        Cross-claimants and<br>        Counterclaimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 13AE-CV00013<br><br>   Division 2 |

## DEFENDANTS PIA ASSETS, LLC, RP GOLF, LLC AND FIVESTAR LIFESTYLES, LLC'S JOINT ANSWER TO PLAINTIFFS' AMENDED PETITION AGAINST DEFENDANTS AND COUNTERCLAIMS

COME NOW Defendants PIA Assets, LLC, RP Golf, LLC and FiveStar Lifestyles, LLC, through their undersigned counsel, and submit their Joint Answer to Plaintiffs' Amended Petition against Defendants, filed January 3, 2014, and for their Counterclaims state as follows:

1.     Defendants admit the allegations contained in Paragraph 75 of Plaintiffs' claims against Defendants, with the exception of the alleged zip code which is believed to be 64152 and not 54152.

2.     Defendants admit that Neal Patterson resides at 20 E. Dundee Circle, Village of Loch Lloyd, Missouri 64012 and that at relevant times, he has served as one

4705611-1

┌─────────────────┐
│  **EXHIBIT**     │
│                  │
│  **14**          │
└─────────────────┘

of three managers on the Board of Managers of PIA Assets, LLC. Defendants deny the remaining allegations contained in Paragraph 76.

3. Defendants admit the allegations contained in Paragraph 77.

4. Defendants admit the allegations contained in Paragraph 78, except that the principal place of business of FiveStar Lifestyles, LLC is at 6325 Lewis Street, Suite 112, Parkville, Platte County, Missouri.

5. Defendants admit the allegations contained in Paragraph 79.

6. Defendants admit the allegations contained in Paragraph 80.

7. The allegations contained in Paragraphs 81 through 220 appear to be allegations directed at the Intervenor-Defendants not requiring a response from these Defendants. To the extent a response is required from these Defendants, their response follows:

8. Defendants admit the allegations contained in Paragraph 81.

9. Defendants admit the allegations contained in Paragraph 82.

10. Defendants admit that FiveStar is a wholly-owned subsidiary of J-3 Pandi, LLC, but deny the remaining allegations contained in Paragraph 83.

11. Defendants admit the allegations contained in Paragraph 84.

12. Defendants admit that Pandi Capital is the alleged owner of the "Notes" and "Loans" representing the monies advanced to PIA Assets, but deny the remaining allegations contained in Paragraph 85.

13. Defendants deny the allegations contained in Paragraph 86.

14. Defendants deny the allegations contained in Paragraph 87.

15. Defendants deny the allegations contained in Paragraph 88.

16. Defendants deny the allegations contained in Paragraph 89.

2

17. Defendants deny the allegations contained in Paragraph 90.

18. Defendants admit that Illig has been involved in the management and operations of PIA Assets and its subsidiaries, particularly since Allen's resignation. Defendants deny the remaining allegations contained in Paragraph 91.

19. Defendants admit that the quoted language was published, during a time period following Allen's resignation. Defendants deny the remaining allegations contained in Paragraph 92.

20. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 93, which are therefore denied.

21. Defendants deny the allegations contained in Paragraph 94.

22. Defendants admit that Patterson and Illig were members and managers of PIA Assets when some of the "Notes" were signed, along with Allen as a member and manager of PIA Assets, but deny the remaining allegations contained in Paragraph 95.

23. Defendants state that PIA's Operating Agreement speaks for itself and deny all remaining allegations contained in Paragraph 96.

24. Defendants deny the allegations contained in Paragraph 97. Defendants further aver that PIA's board of managers decided not to borrow and/or take any additional money advanced by Pandi Capital or any other party in order to fund existing debt, except for non-recourse debt.

25. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 98, which are therefore denied.

26. Defendants admit that payments to Class B shareholders and tax payments to Platte County were suspended, but then later paid. Defendants deny the remaining allegations contained in Paragraph 99.

3

27. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 100, which are therefore denied.

28. Defendants deny the allegations contained in Paragraph 101.

29. Defendants admit that Pandi Capital has advanced and/or loaned large sums of money to PIA, but deny the remaining allegations contained in Paragraph 102.

30. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 103, which are therefore denied.

31. Defendants deny the allegations contained in Paragraph 104.

32. Defendants deny the allegations contained in Paragraph 105.

33. Defendants admit that Dale Brouk was instructed to record monies advanced by Pandi Capital as debt, but deny the remaining allegations contained in Paragraph 106. Defendants further aver that Allen, while President of PIA, specifically instructed Dale Brouk to move the monies Allen had loaned to Defendant RP Golf to the financial statements of Defendant PIA and that instruction was given without approval of Patterson and Illig and without a meeting of the PIA managers or members.

34. Defendants deny the allegations contained in Paragraph 107.

35. Defendants state that the February 28, 2010 Balance Sheet of PIA Assets, LLC speaks for itself and deny all remaining allegations contained in Paragraph 108.

36. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 109, which are therefore denied.

37. Defendants state that the February 28, 2010 Balance Sheet of PIA Assets, LLC speaks for itself and deny all remaining allegations contained in Paragraph 110.

38. Defendants admit that certain refinancing and paydowns of PIA third-party loans have occurred. Defendants deny all remaining allegations contained in Paragraph 111.

39. Defendants admit that certain refinancing and paydowns of PIA third-party loans have occurred. Defendants deny all remaining allegations contained in Paragraph 112.

40. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 113, which are therefore denied.

41. Defendants state that the January 31, 2011 Balance Sheet of PIA Assets, LLC speaks for itself and deny all remaining allegations contained in Paragraph 114.

42. Defendants state that the January 31, 2011 Balance Sheet of PIA Assets, LLC speaks for itself and deny all remaining allegations contained in Paragraph 115.

43. Defendants deny the allegations contained in Paragraph 116.

44. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 117, which are therefore denied.

45. Defendants state that the Operating Agreement speaks for itself and deny all remaining allegations contained in Paragraph 118.

46. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 119, which are therefore denied.

47. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 120, which are therefore denied.

48. Defendants deny the allegations contained in Paragraph 121.

49. Defendants admit the allegations contained in Paragraph 122.

50. Defendants admit the allegations contained in Paragraph 123.

5

51.     Defendants admit that PIA was represented in the Jackson County action by the undersigned law firm which previously represented PIA Assets, Illig and Patterson in an unrelated litigation matter and an entity affiliated with which (MRS Service Corp.) had previously served as the registered agent for Pandi Capital. Defendants deny the remaining allegations contained in Paragraph 124.

52.     Defendants admit that PIA Assets filed an answer to the petition filed by Pandi Capital three days after it was filed and served.  Defendants deny the remaining allegations contained in Paragraph 125.

53.     Defendants deny the allegations contained in Paragraph 126.

54.     Defendants deny the allegations contained in Paragraph 127.

55.     Defendants cannot understand what Plaintiffs are referring to by "the terms of the deal", "entities" or "investment properties involved in the transaction." Accordingly, the allegations contained in Paragraph 128 are denied.

56.     Defendants deny the allegations contained in Paragraph 129.

57.     Defendants admit that RP Golf executed notes in favor of Plaintiffs. Defendants deny the remaining allegations contained in Paragraph 130.

58.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 131, which are therefore denied.

59.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 132, which are therefore denied.

60.     Defendants deny that PIA created new loans in favor of the Allens in the principal amount of $817,585.  Defendants admit that PIA's 2012 financial planning documents reflect a liability to the Allens, but deny that the financial statements or financial planning documents reflect a liability of twenty percent internal rate of return

6

with a maturity date of February 2012 and deny all other allegations contained in Paragraph 133.

61.     Defendants state that the Employment Agreement speaks for itself and deny any remaining allegations contained in Paragraph 134.

62.     Defendants state that the Employment Agreement speaks for itself and deny any remaining allegations contained in Paragraph 135.

63.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 136, which are therefore denied.

64.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 137, which are therefore denied.

65.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 138, which are therefore denied.

66.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 139, which are therefore denied.

67.     Defendants cannot understand what Plaintiffs are referring to by "the Agreement", which does not appear to be defined by Plaintiffs.   Accordingly, the allegations contained in Paragraph 140 are denied.

68.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 141, which are therefore denied.

69.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 142, which are therefore denied.

70.     Defendants admit that Allen made demand upon PIA in March 2012 and that PIA's counsel delivered a Note to counsel for Allen.   Defendants lack sufficient

knowledge, information and belief to admit or deny the remaining allegations contained in Paragraph 143, which are therefore denied.

71.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 144, which are therefore denied.

72.     Defendants deny the allegations contained in Paragraph 145.

73.     Defendants deny the allegations contained in Paragraph 146.

74.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 147, which are therefore denied.

75.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 148, which are therefore denied.

76.     Defendants admit that certain reasonable raises and bonuses were earned and/or provided during that time period.  Defendants also admit that additional staff were hired to improve overall operations.   Defendants deny the remaining allegations contained in Paragraph 149.

77.     Defendants deny the allegations contained in Paragraph 150.

78.     Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 151, which are therefore denied.

79.     Defendants admit that Allen submitted his resignation in November 2012. Defendants deny the remaining allegations contained in Paragraph 152.

80.     Defendants deny the allegations contained in Paragraph 153.

81.     Defendants deny the allegations contained in Paragraph 154.

82.     Defendants admit that Allen filed a lawsuit in January 2013 to collect on loans alleged to have been made to PIA.  Defendants deny the remaining allegations contained in Paragraph 155.

83.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 156, which are therefore denied.

84.    Defendants deny the allegations contained in Paragraph 157.

85.    Defendants admit the allegations contained in Paragraph 158.

86.    Defendants admit the allegations contained in Paragraph 159.

87.    Defendants admit that the managers of PIA requested contributions from both Allen and Pandi Development on a pro-rata basis, but deny the remaining allegations contained in Paragraph 160.

88.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 161, which are therefore denied.

89.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 162, which are therefore denied.

90.    Defendants admit the allegations contained in Paragraph 163.

91.    Defendants state that the Operating Agreement speaks for itself and deny all remaining allegations contained in Paragraph 164.

92.    Defendants state that the operating agreements speak for themselves and deny all remaining allegations contained in Paragraph 165.

93.    Defendants state that the operating agreements speak for themselves and deny all remaining allegations contained in Paragraph 166.

94.    Defendants deny the allegations contained in Paragraph 167.

95.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 168, which are therefore denied.

96.    Defendants admit that security was provided for recent monies advanced to PIA by Pandi Capital, but deny the remaining allegations contained in Paragraph 169.

97. Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 170, which are therefore denied.

98. Defendants deny the allegations contained in Paragraph 171.

99. Defendants deny the allegations contained in Paragraph 172.

100. Defendants deny the allegations contained in Paragraph 173.

101. Defendants deny the allegations contained in Paragraph 174.

102. Defendants admit that the existence of unpaid loans increase PIA's insolvency, but deny the remaining allegations contained in Paragraph 175.

103. Defendants deny the allegations contained in Paragraph 176.

## COUNT I – BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

104. Defendants re-allege and incorporate herein by reference the responses contained in the preceding paragraphs as though fully set forth herein.

105. This claim does not appear to be asserted against these Defendants and accordingly, no response is required by these Defendants to the allegations contained in Paragraphs 178 through 184. To the extent a response is required, those allegations are denied.

WHEREFORE, Defendants pray that Plaintiffs take naught by this claim, that judgment be entered in favor of Defendants, for their costs and expenses incurred herein and for such other and further relief as the Court may deem just and equitable.

## COUNT II – VIOLATION OF THE MISSOURI FRAUDULENT TRANSFER ACT

106. Defendants re-allege and incorporate herein by reference the responses contained in the preceding paragraphs as though fully set forth herein.

107. This claim does not appear to be asserted against these Defendants and accordingly, no response is required by these Defendants to the allegations contained

10

in Paragraphs 185 through 196. To the extent a response is required, those allegations are denied.

WHEREFORE, Defendants pray that Plaintiffs take naught by this claim, that judgment be entered in favor of Defendants, for their costs and expenses incurred herein and for such other and further relief as the Court may deem just and equitable.

## COUNT III – DECLARATORY JUDGMENT

108. Defendants re-allege and incorporate herein by reference the responses contained in the preceding paragraphs as though fully set forth herein.

109. This claim does not appear to be asserted against these Defendants and accordingly, no response is required by these Defendants to the allegations contained in Paragraphs 197 through 202. To the extent a response is required, those allegations are denied.

WHEREFORE, Defendants pray that Plaintiffs take naught by this claim, that judgment be entered in favor of Defendants, for their costs and expenses incurred herein and for such other and further relief as the Court may deem just and equitable.

## COUNT IV – FRAUDULENT INDUCEMENT

110. Defendants re-allege and incorporate herein by reference the responses contained in the preceding paragraphs as though fully set forth herein.

111. This claim does not appear to be asserted against these Defendants and accordingly, no response is required by these Defendants to the allegations contained in Paragraphs 203 through 220. To the extent a response is required, those allegations are denied.

WHEREFORE, Defendants pray that Plaintiffs take naught by this claim, that judgment be entered in favor of Defendants, for their costs and expenses incurred herein and for such other and further relief as the Court may deem just and equitable.

## COUNT V – BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS ON GUARANTIES

112.    Defendants re-allege and incorporate herein by reference the responses contained in the preceding paragraphs as though fully set forth herein.

113.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 221, which are therefore denied.

114.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 222, which are therefore denied.

115.    Defendants state that the revised agreement, to the extent it is enforceable, speaks for itself and lack sufficient knowledge, information and belief to admit or deny the remaining allegations contained in Paragraphs 223 and 224, which are therefore denied.

116.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 225, which are therefore denied.

117.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 226, which are therefore denied.

118.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 227, which are therefore denied.

119.    Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 228, which are therefore denied.

120.  Defendants lack sufficient knowledge, information and belief to admit or deny the allegations contained in Paragraph 229, which are therefore denied.

121.  Defendants deny the allegations contained in Paragraph 230.

122.  Defendants deny the allegations contained in Paragraph 231.

123.  Defendants deny the allegations contained in Paragraph 232 of.

WHEREFORE, Defendants pray that Plaintiffs take naught by this claim, that judgment be entered in favor of Defendants, for their costs and expenses incurred herein and for such other and further relief as the Court may deem just and equitable.

## COUNT VI—CIVIL CONSPIRACY

124.  Defendants re-allege and incorporate herein by reference the responses contained in the preceding paragraphs as though fully set forth herein.

125.  Defendants deny the allegations contained in Paragraph 233.

126.  Defendants deny the allegations contained in Paragraph 234.

127.  Defendants deny the allegations contained in Paragraph 235.

WHEREFORE, Defendants pray that Plaintiffs take naught by this claim, that judgment be entered in favor of Defendants, for their costs and expenses incurred herein and for such other and further relief as the Court may deem just and equitable.

## AFFIRMATIVE DEFENSES

128.  Plaintiffs' claims against Defendants have been improperly pleaded in a combined pleading labeled as an Answer to and Counterclaims against Intervenors rather than being asserted in an Amended Petition against Defendants. Accordingly, Plaintiffs' claims against Defendants should be re-aligned as follows:

a. Count V (Breach of Contract – Release, Indemnification and Hold Harmless on Guaranties) against Defendants PIA and FiveStar should be Count IV of Plaintiff's Amended Petition against Defendants; and

b. Count VI (Civil Conspiracy) against Defendants PIA and FiveStar should be Count V of Plaintiff's Amended Petition against Defendants

and this pleading (along with the Answer previously filed to Plaintiff's Petition) should constitute Defendants Joint Answer to Plaintiffs' Amended Petition against Defendants.

129. Plaintiffs' claims fail to state a claim upon which relief may be granted.

130. Defendants deny each and every allegation and averment contained in Plaintiffs' Amended Petition (claims against Defendants) which are not hereinabove expressly admitted.

131. Defendants deny that any loans or monies are owed to Plaintiffs by Defendant PIA Assets, LLC.

132. Plaintiffs' claims against Defendants PIA Assets, LLC and/or Fivestar Lifestyles, LLC are barred by lack of consideration in that Plaintiff provided and Defendants received nothing of value or consideration in exchange for the alleged note(s) or agreement(s).

133. Plaintiffs' claims against Defendants PIA Assets, LLC and/or FiveStar Lifestyles, LLC are barred in that the terms set forth in the various instruments and documents alleged by Plaintiffs are unconscionable and unenforceable.

134. Plaintiffs' claims are barred by the agreements between the parties, including but not limited to the Operating Agreement of PIA Assets, LLC.

135. By virtue of multiple subordination and/or assignment agreements executed by Plaintiff Jim Allen in favor of third parties, Plaintiffs are not the real party in interest.

136. By virtue of multiple subordination and/or assignment agreements executed by Plaintiff Jim Allen in favor of third parties, Plaintiffs are prohibited from enforcing their claims for payment against Defendants.

137. Plaintiffs' claims are barred by waiver, laches and/or estoppel as a result of Plaintiff Jim Allen's conduct as a member and former president of Defendant PIA Assets, LLC and/or FiveStar Lifestyles, LLC, including but not limited to the following particulars:

    a. The "Note" alleged by Plaintiff was not provided to the board of managers of PIA Assets for approval as required by the Operating Agreement of Defendant PIA Assets, LLC;

    b. There were no meetings of the board of managers of Defendant PIA Assets, LLC or resolutions approving the "Note";

    c. As the then-President of Defendant PIA Assets, LLC, Plaintiff directed how the alleged "Note" would be reflected on the financial statements of Defendants.

    d. The alleged 2010 "Note" was negotiated in the context of a broader agreement among the parties and Plaintiff now appears to be attempting to disavow other portions of the 2010 agreements among the parties.

138. Plaintiffs' claims against Defendant PIA Assets, LLC and/or FiveStar Lifestyles, LLC are barred by unjust enrichment.

139.   Plaintiff's claims against Defendant PIA Assets, LLC and/or FiveStar Lifestyles, LLC are barred by Plaintiff Jim Allen's breach of his duty of good faith and fair dealing.

140.   Plaintiffs' claims against Defendants are barred by Plaintiff Jim Allen's prior material breach of contract.

141.   Plaintiffs lack standing to assert their claims.

142.   There is a pending dispute between the members of Defendant PIA Assets, LLC regarding whether monies advanced by Plaintiffs James S. Allen, Jr. and/or Nancy Allen (to RP Golf, LLC) and by Crossclaimant Pandi Capital, LLC (to PIA Assets, LLC) are properly characterized as equity contributions or debt. (See Plaintiffs' Counterclaims against Pandi Development, LLC, Neal Patterson, Cliff Illig and Pandi Capital, LLC, Count III, filed January 3, 2014 and January 9, 2014; Counterclaims of Pandi Development, LLC, Neal Patterson and Cliff Illig, Count III, filed December 4, 2013; and Counterclaims of Pandi Capital, LLC, Count III, filed December 10, 2013). The resolution and/or adjudication of that dispute impacts the enforceability of the notes and/or loans alleged by Plaintiffs and Crossclaimant Pandi Capital, LLC.

143.   Defendant reserves the right to assert additional affirmative defenses as the same are found applicable hereto through the course of discovery.

## COUNTERCLAIM

1.   Defendant and Counterclaimant PIA Assets, LLC ("PIA") is a Missouri limited liability company with its principal place of business at 6325 Lewis Street, Suite 112, Parkville, Platte County, Missouri.

2.     Defendant and Counterclaimant FiveStar Lifestyles, LLC ("FiveStar") is a Missouri limited liability company with its principal place of business at 6325 Lewis Street, Suite 112, Parkville, Platte County, Missouri.

3.     Plaintiff and Counterclaim Defendant James S. Allen, Jr. is a resident of Parkville, Missouri.  Allen owns 13.5% of the Class A shares of PIA.

4.     Jurisdiction is proper in Missouri as all parties maintain a principal place of business in Missouri or are residents of Missouri.  In addition, the Court has jurisdiction pursuant to Mo. Rev. Stat. § 506.500(1) and § 506.500(3) in that the claims asserted arise out of business transactions in the State of Missouri and the making of contracts in the State of Missouri.

5.     Venue is proper in Platte County, Missouri, pursuant to Mo. Rev. Stat. § 508.010, as the causes of action accrued, at least in part, in said county.

6.     Plaintiff and Counterclaim Defendant Allen has alleged as follows:

   a.  He "signed an employment agreement in 2006 to serve as President of PIA." (Petition ¶ 22).

   b.  "Counsel for Defendants produced a document titled "Amended and Restated Employment Agreement" that referenced a note in favor of Jim Allen in the amount of $900,000." (Petition ¶ 39).

   c.  "Additionally, at the time of the closing, Allen entered into a 10 year employment agreement with PIA.  In consideration for Allen leaving his long-term job and providing his exclusive development knowledge to PIA as President, Allen was to be paid a salary of $325,000 per year, plus a yearly increase based upon the Consumer Price Index." (Plaintiff James S. Allen's Answer to and Counterclaims against

17

Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 134).

d. "Also, per the term of Allen's contract, Allen was to receive, an agreed-upon buy-out of his Class A shares at the time of his termination." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 135).

e. "At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, reduce his salary." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 136).

f. "Patterson and Illig agreed that the [sic] in exchange for the reduced salary, PIA would offer Allen performance incentives based on sales of homes." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 137).

18

g. "Based upon Patterson's and Illig's representations that they would make additional equity contributions to PIA and offer incentives if Allen modified his employment agreement, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement under which Allen would become an employee of FiveStar Lifestyles. The agreement contained the following material terms: (a) reduction of his annual salary; (b) a performance incentives; (c) car allowance; (d) a note for the aforementioned loans from the Allens with terms satisfactory to Allen; and (e) release from guaranties on any debts related to PIA or any of its subsidiaries and/or an obligation for PIA, FiveStar, RP Golf and all other subsidiaries of PIA to indemnify and hold Allen harmless upon termination of Allen's employment." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 138).

h. "The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff

Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 139).

i. "PIA has never signed the Agreement nor delivered a note acceptable to Allen." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 140).

j. "In fact, Illig instructed employees of PIA Assets and Pandi not to deliver the note to the Allens." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 141).

k. "Rather, it appears that Patterson and Illig never intended to execute on the agreement. Patterson and Illig induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement or to make future equity contributions." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 142).

l. "In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a signed copy of the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in

20

accordance with PIA's financial records. In response, Allen was presented with a copy of a "Note" purportedly signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 143).

m. "Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, PIA has breached Allen's employment agreement, including but not limited to by failing to provide Allen with his contractual raises and other benefits pursuant to the agreement." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 145).

n. "Also, shortly after the parties agreed to the 2010 Agreement in principle, Patterson and Illig, without consent or discussion with Allen, nixed the various homebuilding projects which were to generate the performance incentives under Allen's agreement. As a result Allen has never received any of the bonuses provided for in the contract." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig

21

and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 146).

o. "Allen never would have agreed to modify the terms of his employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to defraud Allen out of money he and his wife loaned to the company and to decrease the value of his shares." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 148).

p. "In November 2012, Jim Allen, Chief Executive Officer and a minority member of PIA Assets, submitted his resignation, triggering a contractual duty for PIA Assets, FiveStar Lifestyles, and PIA's subsidiaries and affiliates to seek releases from guaranties that Allen provided on several third-party loans to PIA Assets." (Plaintiff James S. Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 152).

q. "Allen's resignation triggered a contractual duty for PIA Assets to buy out Allen's interest in PIA Assets for $6 million." (Plaintiff James S.

Allen's Answer to and Counterclaims against Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig and Plaintiff Nancy Allen's Claims against Defendants and Intervenor-Defendants, ¶ 154).

7.      In March 2012, prior to this lawsuit being filed by Allen, PIA (by and through counsel) asked Allen (by and through counsel) to identify which employment agreement he believed was in force and effect.  Allen refused to do so.

## COUNT I – DECLARATORY JUDGMENT

8.      Counterclaimants incorporate herein by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

9.      A justiciable controversy exists between the parties regarding which employment agreement is in force or effect:   a) the 2006 Employment Agreement between PIA and Allen; or b) the 2010 Amended and Restated Employment Agreement by and among PIA, FiveStar, Double Eagle Builders, LLC and Allen.

10.     Counterclaimants ask this Court for a declaration as to which of the employment agreements alleged by Allen are in force and effect.

WHEREFORE, Counterclaimants pray for a declaration of rights as described above, for their costs and fees incurred herein, and for such other relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Defendants hereby request a trial by jury of all issues triable by jury.

Respectfully submitted,

**McDOWELL, RICE, SMITH & BUCHANAN,**
*A Professional Corporation*

By: _____

     R. Pete Smith         #35408
     Kristie Remster Orme   #48685
605 West 47th Street, Suite 350
Kansas City, MO 64112
Telephone: (816) 753-5400
Facsimile: (816) 753-9996
Email: petesmith@mcdowellrice.com
Email: korme@mcdowellrice.com
**ATTORNEYS FOR DEFENDANTS
PIA ASSETS, LLC, RP GOLF, LLC AND
FIVESTAR LIFESTYLES, LLC**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the above and foregoing was served via electronic mail, this 17th day of February, 2014, to:

Patrick J. Stueve
Andrew W. Funk
Stueve Siegel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
Email: stueve@stuevesiegel.com
Email: funk@stuevesiegel.com
**ATTORNEYS FOR PLAINTIFFS**

Kirk T. May
F. Ryan Van Pelt
Rouse Hendricks German May PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
Telephone: 816-471-7700
Facsimile: 816-471-2221
Email: kirkm@rhgm.com
Email: ryanv@rhgm.com
**ATTORNEYS FOR INTERVENORS
PANDI DEVELOPMENT, LLC, NEAL
PATTERSON AND CLIFFORD ILLIG**

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
Spencer Fane Britt & Browne, LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Telephone: 816-474-8100
Facsimile: 816-474-3216
Email: dweems@spencerfane.com
Email: sgoldstein@spencerfane.com
Email: bdixon@spencerfane.com
**ATTORNEYS FOR INTERVENOR**
**PANDI CAPITAL, LLC**

Attorney for Defendants

25

FILED
FEB 1 8 2014
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR., )
           )
    Plaintiff, )
           )
    v. )   Case No. 13AE-CV00013
           )   Division II
PIA ASSETS, LLC, )
RP GOLF, LLC, )
           )
    Defendants, )
           )
and )
           )
PANDI CAPITAL, LLC, )
PANDI DEVELOPMENT, LLC, )
NEAL L. PATTERSON, and )
CLIFFORD W. ILLIG, )
           )
    Intervenor-Defendants, )
    Counterclaimants, and Crossclaimants. )

### INTERVENOR-DEFENDANTS / COUNTERCLAIMANTS
### PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG'S
### ANSWER TO COUNTERCLAIMS OF JAMES ALLEN AND NANCY ALLEN

Intervenor-Defendants and Counterclaimants Pandi Development, LLC ("Pandi Development"), Neal Patterson ("Patterson"), and Clifford Illig ("Illig") (collectively "Intervenor-Defendants") submit their Answer To Counterclaims Of James Allen and Nancy Allen. In their preliminary paragraph, James Allen and Nancy Allen (the "Allens"), incorporate their Answer and Affirmative Defenses into their Counterclaims. In response to that preliminary paragraph, Intervenor-Defendants state they lack knowledge or information sufficient to form a belief about the truth of those averments, and therefore, deny the averments. Additionally, Intervenor-Defendants state the affirmative avoidances contained herein.

EXHIBIT

15

## ANSWER TO THE ALLENS' COUNTERCLAIMS

75.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 75.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 75.

76.     Intervenor-Defendants deny the averments contained in paragraph 76.

77.     Intervenor-Defendants admit the averments contained in paragraph 77.

78.     Intervenor-Defendants deny the averments contained in paragraph 78.

79.     The averments contained in paragraph 79 are legal conclusions to which no response is required.

80.     The averments contained in paragraph 80 are legal conclusions to which no response is required.

81.     Intervenor-Defendants admit the averments contained in paragraph 81.

82.     Intervenor-Defendants admit the averments contained in paragraph 82.

83.     Intervenor-Defendants lack sufficient knowledge, information, and belief as to the meaning of "affiliate" as used in paragraph 83 and, therefore, deny the averments contained in paragraph 83.

84.     Intervenor-Defendants admit the averments contained in paragraph 84.

85.     Intervenor-Defendants admit that Pandi Capital is the owner of the Notes and Loans representing the monies loaned to PIA Assets.  Intervenor-Defendants deny the remaining averments contained in paragraph 85.

86.     Intervenor-Defendants deny the averments contained in paragraph 86.

87.     Intervenor-Defendants deny the averments contained in paragraph 87.

88.     Intervenor-Defendants deny the averments contained in paragraph 88.

2

89.     Intervenor-Defendants deny the averments contained in paragraph 89.

90.     Intervenor-Defendants deny the averments contained in paragraph 90.

91.     Intervenor-Defendants admit that Patterson and Illig were managers of PIA Assets from its inception until December 21, 2012. Intervenor-Defendants deny the remaining averments contained in paragraph 91.

92.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 92. Intervenor-Defendants, therefore, deny the averments contained in paragraph 92.

93.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 93. Intervenor-Defendants, therefore, deny the averments contained in paragraph 93.

94.     Intervenor-Defendants deny the averments contained in paragraph 94.

95.     Intervenor-Defendants deny the averments contained in paragraph 95.

96.     PIA's Operating Agreement speaks for itself, and Intervenor-Defendants deny the averments contained in paragraph 96 to the extent they are inconsistent with the Operating Agreement. Intervenor-Defendants deny all other averments contained in paragraph 96.

97.     Intervenor-Defendants deny the averments contained in paragraph 97.

98.     Intervenor-Defendants deny the averments contained in paragraph 98.

99.     Intervenor-Defendants deny the averments contained in paragraph 99.

100.    Intervenor-Defendants deny the averments contained in paragraph 100.

101.    Intervenor-Defendants deny the averments contained in paragraph 101.

102.    Intervenor-Defendants admit that Pandi Capital made loans to PIA Assets. Intervenor-Defendants deny the remaining averments contained in paragraph 102.

103.   Intervenor-Defendants deny the averments contained in paragraph 103.

      a.   Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in subparagraph 103(a). Intervenor-Defendants, therefore, deny the averments contained in subparagraph 103(a).

      b.   Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in subparagraph 103(b). Intervenor-Defendants, therefore, deny the averments contained in subparagraph 103(b).

104.   Intervenor-Defendants deny the averments contained in paragraph 104.

105.   Intervenor-Defendants deny the averments contained in paragraph 105.

106.   Intervenor-Defendants deny the averments contained in paragraph 106.

107.   Intervenor-Defendants deny the averments contained in paragraph 107.

108.   Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 108. Intervenor-Defendants, therefore, deny the averments contained in paragraph 108.

109.   Intervenor-Defendants deny the averments contained in paragraph 109.

110.   Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 110. Intervenor-Defendants, therefore, deny the averments contained in paragraph 110.

111.   Intervenor-Defendants deny the averments contained in paragraph 111.

112.   Intervenor-Defendants deny the averments contained in paragraph 112.

113.   Intervenor-Defendants deny the averments contained in paragraph 113.

114.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 114. Intervenor-Defendants, therefore, deny the averments contained in paragraph 114.

115.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 115. Intervenor-Defendants, therefore, deny the averments contained in paragraph 115.

116.     Intervenor-Defendants deny the averments contained in paragraph 116.

117.     Intervenor-Defendants lack sufficient knowledge, information, and belief as to the averment that "Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based..." and, therefore, deny that averment. Intervenor-Defendants deny the remaining averments contained in paragraph 117.

118.     Intervenor-Defendants deny the averments contained in paragraph 118.

119.     Intervenor-Defendants deny the averments contained in paragraph 119.

120.     Intervenor-Defendants deny the averments contained in paragraph 120.

121.     Intervenor-Defendants deny the averments contained in paragraph 121.

122.     Intervenor-Defendants admit that Pandi Capital has brought counterclaims in this lawsuit seeking to collect on the Notes from Pandi Capital to PIA Assets. Intervenor-Defendants deny the remaining averments contained in paragraph 122.

123.     Intervenor-Defendants admit the averments contained in paragraph 123.

124.     Intervenor-Defendants deny the averments contained in paragraph 124.

125.     Intervenor-Defendants admit that Pandi Capital's Petition in Jackson County asserted claims to collect on its Notes to PIA Assets on April 30, 2013. Intervenor-Defendants

also admit that PIA Assets filed an Answer to Pandi Capital's Petition on May 3, 2013. Intervenor-Defendants deny the remaining averments contained in paragraph 125.

126. Intervenor-Defendants deny the averments contained in paragraph 126.

127. Intervenor-Defendants deny the averments contained in paragraph 127.

128. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 128. Intervenor-Defendants, therefore, deny the averments contained in paragraph 128.

129. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 129. Intervenor-Defendants, therefore, deny the averments contained in paragraph 129.

130. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 130. Intervenor-Defendants, therefore, deny the averments contained in paragraph 130.

131. Intervenor-Defendants deny the averments contained in paragraph 131.

132. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 132. Intervenor-Defendants, therefore, deny the averments contained in paragraph 132.

133. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 133. Intervenor-Defendants, therefore, deny the averments contained in paragraph 133.

134. Intervenor-Defendants admit that Allen entered into an employment agreement with PIA Assets the terms of which speak for itself. Intervenor-Defendants deny the remaining averments contained in paragraph 134.

135. The terms of the referenced agreement speak for themselves, and Intervenor-Defendants deny the remaining averments in paragraph 135.

136. Intervenor-Defendants deny the averments contained in paragraph 136.

137. The terms of the referenced agreement speak for themselves, and Intervenor-Defendants deny the remaining averments in paragraph 137.

138. Intervenor-Defendants deny the averments contained in paragraph 138.

139. Intervenor-Defendants admit the existence of a document entitled "Amended and Restated Employment Agreement" the terms of which speak for itself. Intervenor-Defendants deny the remaining averments in paragraph 139.

140. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 140. Intervenor-Defendants, therefore, deny the averments contained in paragraph 140.

141. Intervenor-Defendants deny the averments contained in paragraph 141.

142. Intervenor-Defendants deny the averments contained in paragraph 142.

143. Interrvenor-Defendants deny the averments contained in paragraph 143.

144. Intervenor-Defendants deny the averments contained in paragraph 144.

145. Intervenor-Defendants deny the averments contained in paragraph 145.

146. Intervenor-Defendants deny the averments contained in paragraph 146.

147. Intervenor-Defendants deny the averments contained in paragraph 147.

148. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 148. Intervenor-Defendants, therefore, deny the averments contained in paragraph 148.

149. Intervenor-Defendants deny the averments contained in paragraph 149.

150.    Intervenor-Defendants deny the averments contained in paragraph 150.

151.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 151. Intervenor-Defendants, therefore, deny the averments contained in paragraph 151.

152.    Intervenor-Defendants deny the averments contained in paragraph 152.

153.    Intervenor-Defendants deny the averments contained in paragraph 153.

154.    Intervenor-Defendants deny the averments contained in paragraph 154.

155.    Intervenor-Defendants admit that Allen filed a lawsuit against PIA in January 2013 and that lawsuit speaks for itself. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the remaining averments contained in paragraph 155. Intervenor-Defendants, therefore, deny the remaining averments contained in paragraph 155.

156.    Intervenor-Defendants deny the averments contained in paragraph 156.

157.    Intervenor-Defendants deny the averments contained in paragraph 157.

158.    Intervenor-Defendants deny the averments contained in paragraph 158.

159.    Intervenor-Defendants deny the averments contained in paragraph 159.

160.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 160. Intervenor-Defendants, therefore, deny the averments contained in paragraph 160.

161.    Intervenor-Defendants deny the averments contained in paragraph 161.

162.    Intervenor-Defendants deny the averments contained in paragraph 162.

163.    Intervenor-Defendants deny the averments contained in paragraph 163.

164.    Intervenor-Defendants deny the averments contained in paragraph 164.

165.    Intervenor-Defendants deny the averments contained in paragraph 165.

166. Intervenor-Defendants deny the averments contained in paragraph 166.

167. Intervenor-Defendants deny the averments contained in paragraph 167.

168. Intervenor-Defendants deny the averments contained in paragraph 168.

169. Intervenor-Defendants deny the averments contained in paragraph 169.

170. Intervenor-Defendants deny the averments contained in paragraph 170.

171. Intervenor-Defendants deny the averments contained in paragraph 171.

172. Intervenor-Defendants deny the averments contained in paragraph 172.

173. Intervenor-Defendants deny the averments contained in paragraph 173.

174. Intervenor-Defendants deny the averments contained in paragraph 174.

175. Intervenor-Defendants deny the averments contained in paragraph 175.

176. Intervenor-Defendants deny the averments contained in paragraph 176.

## COUNT I – BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
(Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

177. Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

178. Intervenor-Defendants deny the averments contained in paragraph 178 and all of its subparts.

179. Intervenor-Defendants deny the averments contained in paragraph 179.

180. Intervenor-Defendants deny the averments contained in paragraph 180 and all of its subparts.

181. Intervenor-Defendants deny the averments contained in paragraph 181.

182. Intervenor-Defendants deny the averments contained in paragraph 182.

183. Intervenor-Defendants deny the averments contained in paragraph 183.

184. Intervenor-Defendants deny the averments contained in paragraph 184 and all of its subparts.

## COUNT II – VIOLATION OF THE MISSOURI FRAUDULENT TRANSFER ACT
(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

185. Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

186. Intervenor-Defendants deny the averments contained in paragraph 186.

187. Intervenor-Defendants deny the averments contained in paragraph 187.

188. Intervenor-Defendants deny the averments contained in paragraph 188.

189. Intervenor-Defendants deny the averments contained in paragraph 189.

190. Intervenor-Defendants deny the averments contained in paragraph 190.

191. Intervenor-Defendants deny the averments contained in paragraph 191.

192. Intervenor-Defendants deny the averments contained in paragraph 192.

193. Intervenor-Defendants deny the averments contained in paragraph 193.

194. Intervenor-Defendants deny the averments contained in paragraph 194.

195. Intervenor-Defendants deny the averments contained in paragraph 195.

196. Intervenor-Defendants deny the averments contained in paragraph 196.

## COUNT III – DECLARATORY JUDGMENT
(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, LLC and Pandi Capital, LLC)

197. Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

198. Intervenor-Defendants deny the averments contained in paragraph 198.

199. Intervenor-Defendants deny the averments contained in paragraph 199.

200. Intervenor-Defendants deny the averments contained in paragraph 200.

201. Intervenor-Defendants deny the averments contained in paragraph 201.

202. Intervenor-Defendants deny the averments contained in paragraph 202.

## COUNT IV – FRAUDULENT INDUCEMENT
### (Jim Allen v. Patterson, Illig, Pandi Capital and Pandi Development)

Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

203. Intervenor-Defendants deny the averments contained in paragraph 203.

204. Intervenor-Defendants deny the averments contained in paragraph 204.

205. Intervenor-Defendants admit the existence of a document entitled "Amended and Restated Employment Agreement" the terms of which speak for itself. Intervenor-Defendants deny the remaining averments contained in paragraph 205.

206. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 206. Intervenor-Defendants, therefore, deny the averments contained in paragraph 206.

207. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 207. Intervenor-Defendants, therefore, deny the averments contained in paragraph 207.

208. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 208. Intervenor-Defendants, therefore, deny the averments contained in paragraph 208.

209. Intervenor-Defendants deny the averments contained in paragraph 209.

210. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 210. Intervenor-Defendants, therefore, deny the averments contained in paragraph 210.

211.     Intervenor-Defendants lack sufficient knowledge, information, and belief as to what Allen "believed" in March 2012. Intervenor-Defendants, therefore, deny the averments contained in paragraph 211.

212.     Intervenor-Defendants deny the averments contained in paragraph 212.

213.     Intervenor-Defendants deny the averments contained in paragraph 213.

214.     Intervenor-Defendants deny the averments contained in paragraph 214.

215.     Intervenor-Defendants deny the averments contained in paragraph 215.

216.     Intervenor-Defendants deny the averments contained in paragraph 216.

217.     Intervenor-Defendants deny the averments contained in paragraph 217.

218.     Intervenor-Defendants deny the averments contained in paragraph 218.

219.     Intervenor-Defendants deny the averments contained in paragraph 219.

220.     Intervenor-Defendants deny the averments contained in paragraph 220.

## COUNT V – BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS ON GUARANTIES
(Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

221.     Intervenor-Defendants deny the averments contained in paragraph 221.

222.     Intervenor-Defendants deny the averments contained in paragraph 222.

223.     Intervenor-Defendants admit the existence of a document entitled "Amended and Restated Employment Agreement" and the document speaks for itself. Intervenor-Defendants deny the remaining averments contained in paragraph 223.

224.     Intervenor-Defendants deny the averments contained in paragraph 224.

225. Intervenor-Defendants deny that Allen's guaranties were "conditional". Intervenor-Defendants admit the remaining averments contained in paragraph 225.

226. Intervenor-Defendants deny the averments contained in paragraph 226.

227. Intervenor-Defendants deny the averments contained in paragraph 227.

228. Intervenor-Defendants admit that Pandi Capital, Pandi Development, Patterson, and Illig purchased the Missouri Bank loans and that they seek to enforce Allen's guaranty in this lawsuit. Intervenor-Defendants deny the remaining averments contained in paragraph 228.

229. Intervenor-Defendants deny the averments contained in paragraph 229.

230. Intervenor-Defendants deny the averments contained in paragraph 230.

231. Intervenor-Defendants deny the averments contained in paragraph 231.

232. Intervenor-Defendants deny the averments contained in paragraph 232.

## COUNT VI – CIVIL CONSPIRACY
(Jim and Nancy Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

233. Intervenor-Defendants deny the averments contained in paragraph 233.

234. Intervenor-Defendants deny the averments contained in paragraph 234.

235. Intervenor-Defendants deny the averments contained in paragraph 235.

236. Intervenor-Defendants deny all averments not expressly admitted herein.

## AFFIRMATIVE DEFENSES AND AVOIDANCES

237. Allen fails to state a claim upon which relief may be granted against Intervenor-Defendants for breach of the implied covenant of good faith and fair dealing because Intervenor-Defendants and Pandi Capital were not parties to the agreement upon which Allen's averments are based.

238. Any claim for relief or cause of action of the Allens with respect to Pandi Capital's loans to PIA Assets is extinguished under Mo. Rev. Stat. § 428.049 and / or entitled to protection under the provisions of Mo. Rev. Stat. § 428.044, including, but not limited to, the following reasons:

    a.    The alleged "transfers" or "obligations" were made more than one year before the Allens brought this action.

    b.    Any alleged "transfer" or "obligation" incurred as a result of Pandi Capital's Loans and Notes to PIA Assets was in good faith and gave new value to and for the benefit of PIA Assets after the alleged "transfer" or "obligation" was made in that Pandi Capital provided PIA Assets with loaned funds so that PIA Assets could continue to operate.

    c.    PIA Assets received reasonably equivalent value for any alleged "transfer" or "obligation," including the loaned funds from Pandi Capital.

239. Allen fails to state a claim upon which relief may be granted because his claims are barred by the Operating Agreement of PIA Assets. Section 5.1(b) of the Operating Agreement states: "[e]ach Manager, in making any decisions or determinations or taking any actions in the capacity of a Manager, may and shall be entitled to consider and favor the rights and interests of the member that designated such Manager rather than the rights and interests of all Members, or the Company as a whole."

240. Allen fails to state a claim upon which relief may be granted because his claims are barred by Mo. Rev. Stat. § 347.088.4 because Pandi Development is merely a member of the

manager-managed PIA Assets. A member has no duties to the LLC or the other members solely by reason of acting in its capacity as a member.

241.     Allen fails to state a claim upon which relief may be granted against Intervenor-Defendants for breach of the implied covenant of good faith and fair dealing because the conduct Allen alleges was authorized by the Operating Agreement.

242.     Allen fails to state a claim upon which relief may be granted against Intervenor-Defendants for breach of the implied covenant of good faith and fair dealing because the Operating Agreement addresses the conduct of which Allen complains.

243.     The Allens, and each of them, fail to state a claim upon which relief may be granted against Intervenor-Defendants for violation of the Missouri Fraudulent Transfer Act because no transfer of PIA's property has been alleged or has occurred.

244.     The Allens, and each of them, fail to state a claim upon which relief may be granted against Intervenor-Defendants for violation of the Missouri Fraudulent Transfer Act because the Allens have not established that they are creditors of PIA Assets and have no standing to pursue any claims under the Act.

245.     The Allens, and each of them, fail to state a claim upon which relief may be granted against Intervenor-Defendants because the Allens do not allege that PIA Assets received inadequate consideration for the Loans and Notes from Pandi Capital.

246.     Allen ratified PIA Assets' decision to accept Loans and Notes from Pandi Capital.

247.     The Allens' claims are barred by the doctrines of laches, acquiescence, and equitable estoppel. Allen accepted the benefits of the Loans and Notes from Pandi Capital as a manager and employee of PIA Assets in that he was allowed to continue operating PIA Assets even though it did not have sufficient cash flow to fund its operations. Allen's salary and his

15

generous benefits were, in part, paid out of these funds. Allen approved these Loans and Notes and did not object to them at the time they were made. Pandi Capital loaned funds to PIA Assets based on its understanding from Allen's actions and express approval that he approved of the loans. Pandi Capital would not have continued to loan money to fund PIA Assets and Allen's salary if it knew of Allen's current asserted objections to the Loans and Notes.

248. The Allens, and each of them, fail to state a claim upon which relief may be granted under the Missouri Fraudulent Transfer Act because the Allens' claims did not arise before any alleged "transfer" or "obligation" was made.

249. The Allens, and each of them, have unclean hands to assert their claims because they are currently seeking repayment of a promissory note for money they allegedly loaned to PIA Assets in this lawsuit. The Allens cannot, in this case, claim that attempts to collect on any of Pandi Capital's Loans and Notes to PIA Assets are in any way fraudulent or breaches of the implied covenant of good faith and fair dealing while they seek to collect debts allegedly owed them by PIA Assets in the same suit.

250. Patterson and Illig are not in contractual privity with Allen because they are not parties to the Operating Agreement of PIA Assets or to Allen's alleged employment agreement. Allen, therefore, fails to state a claim upon which relief may be granted against Patterson and Illig.

251. Pandi Development is not a party to Allen's alleged employment agreement and, therefore, Allen fails to state a claim upon which relief may be granted against Pandi Development based on the alleged employment agreement.

252. The actions of Intervenor-Defendants alleged by the Allens were taken in good faith to fund PIA Assets' operations.

253. Allen does not have standing to assert any claims against PIA Assets, including his fraudulent transfer, breach of contract, civil conspiracy, piercing the corporate veil, and/or alter ego claims because, by virtue of the sale of PIA Assets' loan from Missouri Bank & Trust Co. of Kansas City to Pandi Capital, Pandi Development, Patterson, and Illig, Allen's claims now belong to Pandi Capital, Pandi Development, Patterson, and Illig, and Allen is not the real party in interest.

254. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil against Patterson and Illig because Patterson and Illig are not members of PIA Assets.

255. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because the Allens have failed to allege facts that show Intervenor-Defendants or Pandi Capital have domination or control of the corporate entity.

256. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because they have failed to allege facts that show Intervenor-Defendants or Pandi Capital have committed fraud or violated any legal duty.

257. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because they have failed to allege facts that show that Intervenor-Defendants or Pandi Capital proximately caused their alleged injury.

258. To the extent that Intervenor-Defendants owe any debts or obligations to the Allens, which Intervenor-Defendants deny, Intervenor-Defendants are entitled to recoup and/or set-off the repayment of any such debt against amounts adjudged to be owed by the Allens to Intervenor-Defendants.

259. The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding. The Allens seek a declaratory judgment re-characterizing Pandi Capital's loans to PIA Assets as equity contributions on behalf of Patterson and Illig, but they seek no re-characterization or determination as to their own alleged loan to PIA Assets.

260. The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the Allens have an adequate remedy at law by asserting a claim for damages.

261. The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because a justiciable controversy does not exist. The Allens' purported basis for declaratory judgment is that if Pandi Capital's loans are classified as debt, "PIA and its subsidiaries will be perpetually insolvent". Such an assertion seeks an advisory opinion on a hypothetical situation that may or may not come to pass.

262. The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the Allens do not have a legally-protected interest consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief. The Allens do not have any claim or interest in whether Pandi Capital's loans to PIA Assets are characterized as loans or equity contributions.

263. The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because it is not ripe for judicial determination. The factual basis for the declaratory judgment – that "PIA and its subsidiaries will be perpetually insolvent" – is hypothetical and not certainly impending.

18

264. The Allens, and each of them, fail to state a claim upon which relief may be granted for fraud because they fail to allege with particularity the circumstances constituting fraud as required by Mo. R. Civ. P. 55.15.

265. The Allens, and each of them, fail to state a claim upon which relief may be granted for fraud because they had knowledge of the truth that the Notes and Loans provided by Pandi Capital to PIA Assets were indeed loans.

266. Allen alleges that he did not receive the note for his alleged credit to PIA in paragraph 207 of his Counterclaims. Allen, therefore, had knowledge that the note was not delivered to him. If the alleged conduct occurred, it occurred with Allen's knowledge. Allen, therefore, fails to state a claim upon which relief may be granted for fraud.

267. Allen fails to state a claim upon which relief may be granted for fraud because he merely alleges that Patterson and Illig "discussed" additional capital contributions to PIA Assets. Allen alleges no statement of future intent on behalf of Patterson and Illig to make capital contributions to PIA. Further, statements of intent as to future events are not actionable under Missouri law.

268. The Allens, and each of them, fail to state a claim upon which relief may be granted for conspiracy because Patterson and Illig are agents and members of Pandi Development and cannot conspire with that LLC.

269. The Allens, and each of them, fail to state a claim upon which relief may be granted because Pandi Development is a member of PIA Assets and members of LLCs cannot conspire with their own LLC.

270. Patterson and Illig, as members of Pandi Development, are shielded from liability under Mo. Rev. Stat. § 347.057.

271.    Pandi Development, as a member of PIA Assets, is shielded from liability under Mo. Rev. Stat. § 347.057.

272.    Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Notes and are now the owners of the Notes and Allen's guaranties on the Notes. Allen's claims against PIA Assets, including his initial Petition and Counts V and VI of his counterclaims, were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA Assets as collateral and held a foreclosure sale of Allen's claims against PIA Assets. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen is, therefore, no longer the real party in interest and has no standing to assert claims against PIA Assets.

273.    Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Notes and are now the owners of the Notes and Allen's guaranties on the Notes. Allen's claims against PIA Assets were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA Assets as collateral and held a foreclosure sale of Allen's claims against PIA Assets. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen is, therefore, no longer the real party in interest and has no standing to assert claims against PIA Assets. Accordingly, Allen does not have standing to pursue claims against Pandi Development, Patterson, Illig, and Pandi Capital by asserting claims against PIA Assets and attempting to pierce PIA Assets' corporate veil.

274.    Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Notes and are now the owners of the Notes and Allen's guaranties on the Notes. Allen's claims against PIA Assets, including his initial Petition and Counts V and VI of his

counterclaims, were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA Assets as collateral and held a foreclosure sale of Allen's claims against PIA Assets. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen, therefore, fails to state a claim upon which relief may be granted.

275. Allen fails to state a claim upon which relief may be granted for fraud because he fails to plead facts that evidence a present intent not to perform the contract at the time the contract was made.

276. The Allens, and each of them, knew that Pandi Capital had made loans to PIA Assets and, therefore, he knew that Pandi Capital's loans to PIA were not equity contributions on behalf of Patterson and Illig, as Allen alleges in his Counterclaims. The Allens, therefore, fail to state a claim upon which relief may be granted for fraud.

277. Nancy Allen fails to state a claim upon which relief may be granted because she is not a maker on the alleged promissory note.

278. Counts IV and V of Allen's Counterclaims are barred by the doctrines of laches, acquiescence, and equitable estoppel. He accepted the benefits of the alleged contracts and he did not raise the issues complained of at the time they occurred.

279. The affirmative defenses contained in paragraphs 55-56, 59, and 65-70 are mere conclusions, and do not contain "a short and plain statement of the facts showing that the pleader is entitled to the defense" as required by Mo. R. Civ. P. 55.08.

280. The affirmative defense in paragraph 58 that the sale of Allen's claims was not commercially reasonable is barred by the doctrines of waiver, laches, acquiescence, and estoppel. Allen received notice of the disposition of his claims in compliance with the Missouri Uniform

Commercial Code and he did not raise a valid objection to the commercial reasonableness of the sale. Neither Allen, nor his representative attended the sale.

281. Allen's affirmative defense in paragraph 60 is barred by the doctrines of waiver, laches, acquiescence, and estoppel. Allen did not receive an indemnification agreement when he signed the guaranty nor did he raise the issue at that time.

282. Intervenor-Defendants reserve the right to add additional affirmative defenses and/or avoidances as additional facts are revealed through discovery.

Respectfully submitted,

ROUSE HENDRICKS GERMAN MAY PC

_____/s/ Kirk T. May_____

| | |
|---|---|
| Kirk T. May | MO Bar #31657 |
| F. Ryan Van Pelt | MO Bar #64208 |

1201 Walnut Street, 20th Floor
Kansas City, MO 64106
Tele: (816) 471-7700
Fax: (816) 471-2221
Email: kirkm@rhgm.com
Email: ryanv@rhgm.com
*Attorneys for Defendants Pandi Development, LLC, Neal Patterson, and Clifford Illig*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served by US mail, postage prepaid on the 18th of February, and by electronic mail, on this 17th day of February 2014, upon:

Patrick J. Stueve
Andrew W. Funk
Stueve Siegel Hanson LLP
460 Nichols Road, Ste. 200
Kansas City, MO 64112

Robert Shaw
303 Marshall Road
PO Box 268
Platte City, MO 64079

Kristie Orme
McDowell Rice Smith & Buchanan, PC
605 West 47th Street, Ste. 350
Kansas City, MO 64112

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
1000 Walnut, Suite 1400
Kansas City, Missouri 64106

_____/s/ Kirk T. May_____
Attorney for Defendants

IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

FILED
FEB 1 8 2014
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

| | | |
|---|---|---|
| JAMES S. ALLEN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 13AE-CV00013** |
| | ) | **Division II** |
| PIA ASSETS, LLC, | ) | |
| RP GOLF, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PANDI CAPITAL, LLC, | ) | |
| PANDI DEVELOPMENT, LLC, | ) | |
| NEAL L. PATTERSON, and | ) | |
| CLIFFORD W. ILLIG, | ) | |
| | ) | |
| Intervenors-Defendants, | ) | |
| Counterclaimants, and Crossclaimants. | ) | |

## INTERVENOR-DEFENDANT / COUNTERCLAIMANT PANDI CAPITAL, LLC'S ANSWER TO COUNTERCLAIMS OF JAMES S. ALLEN AND NANCY ALLEN

COMES NOW, by and through counsel, Intervenor-Defendant/Counterclaimant Pandi Capital, LLC ("Pandi Capital"), and submits its Answer to James S. Allen, Jr. ("Allen") and Nancy Allen's (collectively, the "Allens") Counterclaims ("Counterclaims"). In their preliminary paragraph, the Allens incorporate their Answer and Affirmative Defenses into their Counterclaims. In response to that preliminary paragraph, Pandi Capital states it lacks knowledge or information sufficient to form a belief about the truth of those averments and, therefore, denies those averments. Additionally, Pandi Capital states the following affirmative avoidances:

```
EXHIBIT

16
```

WA 4764641.1

## Additional Parties

261.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 261. Pandi Capital, therefore, denies the averments contained in paragraph 261.

262.    Pandi Capital denies the allegations in paragraph 262.

263.    Pandi Capital admits that Clifford Illig ("Illig") resides at 11504 Pawnee Circle, Leawood, Kansas and that Illig was a manager of PIA Assets from its inception to December 21, 2012. Pandi Capital denies the remaining averments contained in paragraph 263.

264.    Pandi Capital denies the allegations in Paragraph 264 and states that Five Star Lifestyles, LLC's principal place of business is at 6325 Lewis Street, Parkville, MO 64152.

## Jurisdiction and Venue

265.    Pandi Capital states that the averments in paragraph 265 are legal conclusions to which no factual response is required. To the extent that any response is required, Pandi Capital denies the same.

266.    Pandi Capital states that the averments in paragraph 266 are legal conclusions to which no factual response is required. To the extent that any response is required, Pandi Capital denies the same.

## Additional Facts Supporting Counterclaims

267.    Pandi Capital admits the averments contained in paragraph 267.

268.    Pandi Capital admits the averments contained in paragraph 268.

269.    Pandi Capital states that it lacks knowledge or information sufficient to form a belief regarding what is meant by the averment that Five Star is an "affiliate" of PIA Assets and, therefore denies the same. Pandi Capital admits the remaining averments contained in paragraph 269.

WA 4764641.1

270.    Pandi Capital admits that Pandi Development owns an 86.5% membership interest in PIA Assets. Pandi Capital also admits that Defendant Pandi Development, as member of PIA Assets, appoints two managers of PIA Assets. Pandi Capital denies the remaining averments in paragraph 270.

271.    Pandi Capital admits that it is the owner of the Notes and Loans representing the monies loaned to PIA Assets. Pandi Capital denies the remaining averments contained in paragraph 271.

272.    Pandi Capital denies the averments in paragraph 272.

273.    Pandi Capital denies the averments in paragraph 273.

274.    Pandi Capital denies the averments in paragraph 274.

275.    Pandi Capital denies the averments in paragraph 275.

276.    Pandi Capital denies the averments in paragraph 276.

277.    Pandi Capital admits that Patterson and Illig were managers of PIA Assets from its inception until December 21, 2012. Pandi Capital denies the remaining averments in paragraph 277.

278.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 278. Pandi Capital, therefore, denies the averments contained in paragraph 278.

279.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 279. Pandi Capital, therefore, denies the averments contained in paragraph 279.

280.    Pandi Capital denies the averments in paragraph 280.

281.    Pandi Capital denies the averments in paragraph 281.

WA 4764641.1

282. Pandi Capital states the PIA Assets' Operating Agreement speaks for itself and denies the averments in paragraph 282 to the extent they are inconsistent with the Operating Agreement. Pandi Capital denies the remaining averments in paragraph 282.

283. Pandi Capital denies the averments in paragraph 283.

284. Pandi Capital denies the averments in paragraph 284.

285. Pandi Capital denies the averments in paragraph 285.

286. Pandi Capital denies the averments in paragraph 286.

287. Pandi Capital denies the averments in paragraph 287.

288. Pandi Capital admits that Pandi Capital loaned money to PIA Assets under commercially-reasonable terms to fund PIA Assets' operations. Pandi Capital denies the remaining averments in paragraph 288.

289. Pandi Capital denies the averments contained in paragraph 289 and its subparts (a) and (b).

290. Pandi Capital denies the averments in paragraph 290.

291. Pandi Capital denies the averments in paragraph 291.

292. Pandi Capital denies the averments in paragraph 292.

293. Pandi Capital denies the averments in paragraph 293.

294. Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 294. Pandi Capital, therefore, denies the averments in paragraph 294.

295. Pandi Capital denies the averments in paragraph 295.

WA 4764641.1

296.     Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 296.     Pandi Capital, therefore, denies the averments in paragraph 296.

297.     Pandi Capital denies the averments in paragraph 297.

298.     Pandi Capital denies the averments in paragraph 298.

299.     Pandi Capital denies the averments in paragraph 299.

300.     Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 300.     Pandi Capital, therefore, denies the averments in paragraph 300.

301.     Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 301.     Pandi Capital, therefore, denies the averments in paragraph 301.

302.     Pandi Capital denies the averments in paragraph 302.

303.     Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averment that "Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based . . ." and, therefore, denies the same.     Pandi Capital denies the remaining averments in paragraph 303.

304.     Pandi Capital denies the averments in paragraph 304.

305.     Pandi Capital denies the averments in paragraph 305.

306.     Pandi Capital denies the averments in paragraph 306.

307.     Pandi Capital denies the averments in paragraph 307.

WA 4764641.1

308.   Pandi Capital admits that it has brought counterclaims in this action to collect on notes from Pandi Capital to PIA Assets. Pandi Capital denies the remaining averments in paragraph 308.

309.   Pandi Capital admits the averments in paragraph 309.

310.   Pandi Capital denies the averments in paragraph 310.

311.   Pandi Capital admits that its petition in Jackson County asserted twenty-four claims to collect on its Notes to PIA Assets on April 30, 2013. Pandi Capital also admits that PIA Assets filed an Answer to Pandi Capital's Petition on May 3, 2013. Pandi Capital denies the remaining averments contained in paragraph 311.

312.   Pandi Capital denies the averments in paragraph 312.

313.   Pandi Capital denies the averments in paragraph 313.

314.   Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 314. Pandi Capital, therefore, denies the averments in paragraph 314.

315.   Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 315. Pandi Capital, therefore, denies the averments in paragraph 315.

316.   Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 316. Pandi Capital, therefore, denies the averments in paragraph 316.

317.   Pandi Capital denies the averments in paragraph 317.

WA 4764641.1

318.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 318. Pandi Capital, therefore, denies the averments in paragraph 318.

319.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 319. Pandi Capital, therefore, denies the averments in paragraph 319.

320.    Pandi Capital admits that Allen entered into an employment agreement with PIA Assets, the terms of which speak for itself. Pandi Capital denies the remaining averments in paragraph 320.

321.    Pandi Capital states that the terms of the referenced contract speak for themselves. Pandi Capital denies the remaining averments in paragraph 321.

322.    Pandi Capital denies the averments in paragraph 322.

323.    Pandi Capital states that the terms of the referenced contract speak for themselves. Pandi Capital denies the remaining averments in paragraph 323.

324.    Pandi Capital denies the averments in paragraph 324.

325.    Pandi Capital admits the existence of a document entitled "Amended and Restated Employment Agreement," the terms of which speak for itself. Pandi Capital denies the remaining averments in paragraph 325.

326.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 326. Pandi Capital, therefore, denies the averments in paragraph 326.

327.    Pandi Capital denies the averments in paragraph 327.

328.    Pandi Capital denies the averments in paragraph 328.

329.    Pandi Capital denies the averments in paragraph 329.

330.    Pandi Capital denies the averments in paragraph 330.

331.    Pandi Capital denies the averments in paragraph 331.

332.    Pandi Capital denies the averments in paragraph 332.

333.    Pandi Capital denies the averments in paragraph 333.

334.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 334. Pandi Capital, therefore, denies the averments in paragraph 334.

335.    Pandi Capital denies the averments in paragraph 335.

336.    Pandi Capital denies the averments in paragraph 336.

337.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 337. Pandi Capital, therefore, denies the averments in paragraph 337.

338.    Pandi Capital denies the averments in paragraph 338.

339.    Pandi Capital denies the averments in paragraph 339.

340.    Pandi Capital denies the averments in paragraph 340.

341.    Pandi Capital admits that Allen filed this lawsuit against PIA Assets in January 2013 and the subject matter of this lawsuit speaks for itself. Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the remaining averments in paragraph 341 and, therefore, denies the same.

342.    Pandi Capital denies the averments in paragraph 342.

343.    Pandi Capital denies the averments in paragraph 343.

344.    Pandi Capital denies the averments in paragraph 344.

WA 4764641.1

345.    Pandi Capital denies the averments in paragraph 345.

346.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 346.   Pandi Capital, therefore, denies the averments in paragraph 346.

347.    Pandi Capital denies the averments in paragraph 347.

348.    Pandi Capital denies the averments in paragraph 348.

349.    Pandi Capital denies the averments in paragraph 349.

350.    Pandi Capital denies the averments in paragraph 350.

351.    Pandi Capital denies the averments in paragraph 351.

352.    Pandi Capital denies the averments in paragraph 352.

353.    Pandi Capital denies the averments in paragraph 353.

354.    Pandi Capital denies the averments in paragraph 354.

355.    Pandi Capital denies the averments in paragraph 355.

356.    Pandi Capital denies the averments in paragraph 356.

357.    Pandi Capital denies the averments in paragraph 357.

358.    Pandi Capital denies the averments in paragraph 358.

359.    Pandi Capital denies the averments in paragraph 359.

360.    Pandi Capital denies the averments in paragraph 360.

361.    Pandi Capital denies the averments in paragraph 361.

362.    Pandi Capital denies the averments in paragraph 362.

## COUNT I – BREACH OF THE IMPLIED DUTY OF GOOD FAITH
## AND FAIR DEALING

363.    Pandi Capital incorporates herein by reference its answers to the statements above as though more fully and completely set forth herein.

364.    Pandi Capital denies the averments in paragraph 364 and all of its subparts.

365.    Pandi Capital denies the averments in paragraph 365.

366.    Pandi Capital denies the averments in paragraph 366 and all of its subparts.

367.    Pandi Capital denies the averments in paragraph 367.

368.    Pandi Capital denies the averments in paragraph 368.

369.    Pandi Capital denies the averments in paragraph 369.

370.    Pandi Capital denies the averments in paragraph 370 and all of its subparts.

## COUNT II – VIOLATION OF MISSOURI FRAUDULENT TRANSFER ACT

371.    Pandi Capital incorporates herein by reference its answers to the statements above as though more fully and completely set forth herein.

372.    Pandi Capital denies the averments in paragraph 372.

373.    Pandi Capital denies the averments in paragraph 373.

374.    Pandi Capital denies the averments in paragraph 374.

375.    Pandi Capital denies the averments in paragraph 375.

376.    Pandi Capital denies the averments in paragraph 376.

377.    Pandi Capital denies the averments in paragraph 377.

378.    Pandi Capital denies the averments in paragraph 378.

379.    Pandi Capital denies the averments in paragraph 379.

380.    Pandi Capital denies the averments in paragraph 380.

381.    Pandi Capital denies the averments in paragraph 381.

382.    Pandi Capital denies the averments in paragraph 382.

## COUNT III – DECLARATORY JUDGMENT

383.    Pandi Capital incorporates herein by reference its answers to the statements above as though more fully and completely set forth herein.

WA 4764641.1

384.    Pandi Capital denies the averments in paragraph 384.

385.    Pandi Capital denies the averments in paragraph 385.

386.    Pandi Capital denies the averments in paragraph 386.

387.    Pandi Capital denies the averments in paragraph 387.

388.    Pandi Capital denies the averments in paragraph 388.

## COUNT IV – FRAUDULENT INDUCEMENT

Pandi Capital incorporates herein by reference its answers to the statements above as though more fully and completely set forth herein.

389.    Pandi Capital denies the averments in paragraph 389.

390.    Pandi Capital denies the averments in paragraph 390.

391.    Pandi Capital admits the existence of a document entitled "Amended and Restated Employment Agreement" and states that the document speaks for itself.  Pandi Capital denies the remaining averments in paragraph 391.

392.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 392.    Pandi Capital, therefore, denies the averments in paragraph 392.

393.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 393.    Pandi Capital, therefore, denies the averments in paragraph 393.

394.    Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 394.    Pandi Capital, therefore, denies the averments in paragraph 394.

395.    Pandi Capital denies the averments in paragraph 395.

11

396. Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 396. Pandi Capital, therefore, denies the averments in paragraph 396.

397. Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 397. Pandi Capital, therefore, denies the averments in paragraph 397.

398. Pandi Capital lacks knowledge or information sufficient to form a belief about the truth of the averments contained in paragraph 398. Pandi Capital, therefore, denies the averments in paragraph 398.

399. Pandi Capital denies the averments in paragraph 399.

400. Pandi Capital denies the averments in paragraph 400.

401. Pandi Capital denies the averments in paragraph 401.

402. Pandi Capital denies the averments in paragraph 402.

403. Pandi Capital denies the averments in paragraph 403.

404. Pandi Capital denies the averments in paragraph 404.

405. Pandi Capital denies the averments in paragraph 405.

406. Pandi Capital denies the averments in paragraph 406.

## COUNT V – BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS GUARANTIES

Pandi Capital incorporates herein by reference its answers to the statements above as though more fully and completely set forth herein.

407. Pandi Capital denies the averments in paragraph 407.

408. Pandi Capital denies the averments in paragraph 408.

WA 4764641.1

409.    Pandi Capital admits the existence of a document entitled "Amended and Restated Employment Agreement" and the document speaks for itself. Pandi Capital denies the remaining averments in paragraph 409.

410.    Pandi Capital denies the averments in paragraph 410.

411.    Pandi Capital denies that Allen's guaranties were "conditional." Pandi Capital admits the remaining averments in paragraph 411.

412.    Pandi Capital denies the averments in paragraph 412.

413.    Pandi Capital denies the averments in paragraph 413.

414.    Pandi Capital admits that Pandi Capital, Pandi Development, Patterson and Illig purchased the Missouri Bank loans and that they seek to enforce Allen's guaranty in this lawsuit. Pandi Capital denies the remaining averments in paragraph 414.

415.    Pandi Capital denies the averments in paragraph 415.

416.    Pandi Capital denies the averments in paragraph 416.

417.    Pandi Capital denies the averments in paragraph 417.

418.    Pandi Capital denies the averments in paragraph 418.

## COUNT VI – CIVIL CONSPIRACY

Pandi Capital incorporates herein by reference its answers to the statements above as though more fully and completely set forth herein.

419.    Pandi Capital denies the averments in paragraph 419.

420.    Pandi Capital denies the averments in paragraph 420.

421.    Pandi Capital denies the averments in paragraph 421.

## AFFIRMATIVE DEFENSES

422.    Pandi Capital denies all averments not expressly admitted herein.

423.    The Allens fail to state a claim upon which relief may be granted.

        WA 4764641.1

424.    The Allens fail to state a claim upon which relief may be granted against Pandi Capital for breach of the implied covenant of good faith and fair dealing because Pandi Capital was not a party to the agreement upon which Allen's averments are based.

425.    The Allens' claims are barred by Mo. Rev. Stat. § 347.057.

426.    Any claim for relief or cause of action of the Allens with respect to Pandi Capital's loans to PIA Assets is extinguished under Mo. Rev. Stat. § 428.049 and / or entitled to protection under the provisions of Mo. Rev. Stat. § 428.044, including, but not limited to, the following reasons:

       a.    The alleged "transfers" or "obligations" were made more than one year before the Allens brought this action.

       b.    Any alleged "transfer" or "obligation" incurred as a result of Pandi Capital's Loans and Notes to PIA Assets was in good faith and gave new value to and for the benefit of PIA Assets after the alleged "transfer" or "obligation" was made in that Pandi Capital provided PIA Assets with loaned funds so that PIA Assets could continue to operate.

       c.    PIA Assets received reasonably equivalent value for any alleged "transfer" or "obligation", including the loaned funds from Pandi Capital.

427.    Allen fails to state a claim upon which relief may be granted because his claims are barred by the Operating Agreement of PIA Assets. Section 5.1(b) of the Operating Agreement states: "[e]ach Manager, in making any decisions or determinations or taking any actions in the capacity of a Manager, may and shall be entitled to consider and favor the rights and interests of the member that designated such Manager rather than the rights and interests of all Members, or the Company as a whole."

428.    Allen fails to state a claim upon which relief may be granted because his claims are barred by Mo. Rev. Stat. § 347.088.4 because Pandi Capital is not a member of the member-managed PIA Assets. A non-member has no duties to the LLC or its members.

       WA 4764641.1

429.    Allen fails to state a claim upon which relief may be granted against Pandi Capital for breach of the implied covenant of good faith and fair dealing because the conduct Allen alleges was authorized by the Operating Agreement.

430.    Allen fails to state a claim upon which relief may be granted against Pandi Capital for breach of the implied covenant of good faith and fair dealing because the Operating Agreement addresses the conduct of which Allen complains.

431.    The Allens fail to state a claim upon which relief may be granted against Pandi Capital for violation of the Missouri Fraudulent Transfer Act because no transfer of PIA Assets' property has been alleged or has occurred.

432.    The Allens, and each of them, fail to state a claim upon which relief may be granted against Pandi Capital for violation of the Missouri Fraudulent Transfer Act because the Allens have not established that they are creditors of PIA Assets and have no standing to pursue any claims under the Act.

433.    The Allens, and each of them, fail to state a claim upon which relief may be granted against Pandi Capital because the Allens do not allege that PIA Assets received inadequate consideration for the Loans and Notes from Pandi Capital.

434.    Allen ratified PIA Assets' decision to accept Loans and Notes from Pandi Capital.

435.    The Allens' claims are barred by the doctrines of laches, acquiescence, and equitable estoppel. Allen accepted the benefits of the Loans and Notes from Pandi Capital as a manager and employee of PIA Assets in that he was allowed to continue operating PIA Assets even though it did not have sufficient cash flow to funds its operations. Allen's salary and his generous benefits were, in part, paid out of these funds. Allen approved these Loans and Notes and/or did not object to them at the time they were made. Pandi Capital loaned funds to PIA

15

Assets based on its understanding from Allen's actions and express approval that he approved of the loans. Pandi Capital would not have continued to loan money to fund PIA Assets and Allen's salary if it knew of Allen's current asserted objections to the Loans and Notes.

436. The Allens, and each of them, fail to state a claim upon which relief may be granted under the Missouri Fraudulent Transfer Act because the Allens' claims did not arise before any alleged "transfer" or "obligation" was made.

437. Any alleged "transfer" or "obligation" incurred as a result of Pandi Capital's Loans and Notes to PIA Assets was in good faith and gave new value to and for the benefit of PIA Assets after the alleged "transfer" or "obligation" was made in that Pandi Capital provided PIA Assets with loaned funds so that PIA Assets could continue to operate.

438. PIA Assets received reasonably equivalent value for any alleged "transfer" or "obligation."

439. The Allens, and each of them, have unclean hands to assert their claims because they are currently seeking repayment of a promissory note for money they allegedly loaned to PIA Assets in this lawsuit. The Allens cannot, in this case, claim that attempts to collect on any of Pandi Capital's Loans and Notes to PIA Assets are in any way fraudulent or breaches of the implied covenant of good faith and fair dealing while they seek to collect debts allegedly owed them by PIA Assets in the same suit.

440. Patterson and Illig are not in contractual privity with Allen because they are not parties to the Operating Agreement of PIA Assets or to Allen's alleged employment agreement. Allen, therefore, fails to state a claim upon which relief may be granted against Patterson and Illig.

WA 4764641.1

441. Pandi Capital is not a party to Allen's alleged employment agreement and, therefore, Allen fails to state a claim upon which relief may be granted against Pandi Capital based on the alleged employment agreement.

442. The actions of Pandi Capital were taken in good faith to fund PIA Assets' operations. Pandi Capital owed no duty of good faith to Allen.

443. Allen does not have standing to assert any claims against PIA Assets, including his fraudulent transfer, breach of contract, civil conspiracy, piercing the corporate veil, and/or alter ego claims because, by virtue of the sale of PIA Assets' loan from Missouri Bank & Trust Co. of Kansas City to Pandi Capital, Pandi Development, Patterson, and Illig, and the subsequent foreclosure described herein, Allen's claims now belong to Pandi Capital, Pandi Development, Patterson and Illig; Allen is not the real party in interest.

444. Allen does not have standing to assert any claims against PIA Assets, including his fraudulent transfer, piercing the corporate veil, or alter ego claims, as his claims have been transferred by virtue of the foreclosure described herein.

445. Allen does not have standing to assert any claims against PIA Assets, including his fraudulent transfer, piercing the corporate veil, or alter ego claims because, by virtue of the sale of PIA Assets' loan and the J-3 Pandi loan from Missouri Bank & Trust Co. of Kansas City to Pandi Capital, Pandi Development, Patterson, and Illig, and the subsequent foreclosure described herein, Allen's claims have been transferred to Pandi Capital, Pandi Development, Patterson, and Illig.

446. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil against Pandi Capital because Pandi Capital is not a member of PIA Assets.

17

447. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because the Allens have failed to allege facts that show Pandi Capital or the Intervenor-Defendants have domination or control of the corporate entity.

448. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because they have failed to allege facts that show that Pandi Capital or the Intervenor-Defendants have committed fraud or violated any legal duty.

449. The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because they have failed to allege facts that show that Pandi Capital or the Intervenor-Defendants proximately caused their injuries.

450. If Allen succeeds on his claim for piercing the corporate veil of PIA Assets, Allen, as a member of PIA Assets, is also responsible, in whole or in part, for the debts and obligations owed to Pandi Capital by PIA Assets.

451. To the extent that Pandi Capital owes any debts or obligations to the Allens, which Pandi Capital denies, Pandi Capital is entitled to recoup and/or set-off the repayment of any such debt against amounts adjudged to be owed by the Allens to Pandi Capital.

452. The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding. The Allens seek a declaratory judgment re-characterizing Pandi Capital's loans to PIA Assets as equity contributions on behalf of Patterson and Illig, but they seek no re-characterization or determination as to their own alleged loan to PIA Assets.

WA 4764641.1

453. The declaratory judgment sought by the Allens fails to state a claim upon which

459.    Allen alleges that he did not receive the note for his alleged credit to PIA Assets in paragraph 393 of his Counterclaims. Allen, therefore, had knowledge that the note was not delivered to him. If the alleged conduct occurred, it occurred with Allen's knowledge. Allen, therefore, fails to state a claim upon which relief may be granted for fraud.

460.    Allen fails to state a claim upon which relief may be granted for fraud because he merely alleges that Patterson and Illig "discussed" additional capital contributions to PIA. Allen alleges no statement of future intent on behalf of Patterson and Illig to make capital contributions to PIA. Further, statements of intent as to future events are not actionable under Missouri law.

461.    The Allens, and each of them, fail to state a claim upon which relief may be granted for conspiracy because Patterson and Illig are agents and members of Pandi Development and cannot conspire with that LLC.

462.    The Allens fail to state a claim upon which relief may be granted for conspiracy because Pandi Capital and Pandi Development are owned by the same individuals, who cannot conspire with themselves.

463.    Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Note and are now the owners of the Note and Allen's guaranty of the Note. Allen's claims against PIA, including his initial Petition and Counts V and VI of his counterclaims were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA as collateral and held a foreclosure sale of Allen's claims against PIA. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen is, therefore, no longer the real party in interest and has no standing to assert claims against PIA.

WA 4764641.1

464. By virtue of the purchase of the collateral by Pandi Development, Patterson, Illig, and Pandi Capital described in paragraph 463, Allen does not have standing to pursue claims against Pandi Development, Patterson, Illig, and Pandi Capital by asserting claims against PIA Assets and attempting to pierce PIA Assets' corporate veil. Allen, therefore, fails to state a claim upon which relief may be granted.

465. Allen fails to state a claim upon which relief may be granted for fraud because he fails to plead facts that evidence a present intent not to perform the contract at the time the contract was made.

466. The Allens, and each of them, knew that Pandi Capital had made loans to PIA Assets and, therefore, they knew that Pandi Capital's loans to PIA were not equity contributions on behalf of Patterson and Illig, as alleged in the Counterclaims. The Allens, therefore, fail to state a claim upon which relief may be granted for fraud.

467. Nancy Allen fails to state a claim upon which relief may be granted because she is not a maker on the alleged promissory note.

468. Counts IV and V of Allen's Counterclaims are barred by the doctrines of laches, acquiescence, and equitable estoppel. Allen accepted the benefits of the alleged contracts and he did not raise the issues complained of at the time they occurred.

469. Pandi Capital reserves the right to add additional affirmative defenses as additional facts are revealed through discovery.

470. The affirmative defenses contained in paragraphs 241-242, 244, and 251-256 are mere conclusions, and do not contain "a short and plain statement of the facts showing that the pleader is entitled to the defense" as required by Mo. R. Civ. P. 55.08.

WA 4764641.1

471.   The affirmative defense in paragraph 245 that the sale of Allen's claims was not commercially reasonable is barred by the doctrines of waiver, laches, acquiescence, and estoppel. Allen received notice of the disposition of his claims in compliance with the Missouri Uniform Commercial Code and he did not raise a valid objection to the commercial reasonableness of the sale. Neither Allen nor his representative attended the sale.

472.   Allen's affirmative defense in paragraph 246 is barred by the doctrines of waiver, laches, acquiescence, and estoppel. Allen did not receive an indemnification agreement when he signed the guaranty nor did he raise the issue at that time.

WA 4764641.1

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP

_(signature)_

| Douglas M. Weems | MO Bar #41165 |
| Scott J. Goldstein | MO Bar #28698 |
| Bradley S. Dixon | MO Bar #62846 |

1000 Walnut, Suite 1400
Kansas City, Missouri 64106
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
dweems@spencerfane.com
sgoldstein@spencerfane.com
bdixon@spencerfane.com
ATTORNEYS FOR PANDI CAPITAL, LLC

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and foregoing were e-mailed and served by U.S. Mail, first-class mail, postage paid, this 18th day of February, 2014, to:

Patrick J. Stueve
Andrew W. Funk
Stueve Sigel Hanson, LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
ATTORNEYS FOR PLAINTIFF

Kirk T. May
F. Ryan Van Pelt
Rouse Hendricks German May PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
ATTORNEYS FOR INTERVENORS
PANDI DEVELOPMENT, LLC, NEAL
PATTERSON, AND CLIFFORD ILLIG

R. Pete Smith
Kristie Remster Orme
McDowell, Rice, Smith & Buchanan
605 W. 74th Street, Suite 350
Kansas City, MO 64112
ATTORNEYS FOR DEFENDANTS

_(signature)_

An Attorney for Pandi Capital, LLC

23

WA 4764641.1



# SPENCER FANE

### BRITT & BROWNE LLP

ATTORNEYS & COUNSELORS AT LAW



FILED
FEB 1 8 2014
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## CONFIDENTIALITY NOTICE

The sender of this fax is a law firm. Information in this fax is CONFIDENTIAL. Please deliver this fax directly to the addressee. If you are unable to deliver this fax for any reason, please call the sender.

## PLEASE DELIVER AS SOON AS POSSIBLE TO

| RECIPIENT | COMPANY | FAX NO. | PHONE NO. |
|---|---|---|---|
| Clerk of Circuit Court Platte County | | (816) 858-3392 | ( ) - |

**FROM:** Bradley S. Dixon      **DATE:** February 18, 2014

**PHONE:** (816) 292-8122      **FILE NO.:** 5020220.01

**RE:** James S. Allen, Jr. v. PIA Assets, LLC and RP Golf, LLC
Case No. 13AE-CV00013
Certificate of Service

Total number of pages including this page: 24

If you do not receive all the pages, please call (573) 634-8115

## MESSAGE

Please file the attached in the above-referenced case.

Should you have any questions, please contact Brad Dixon at 816-474-8100.

---

1000 WALNUT STREET, SUITE 1400
KANSAS CITY, MISSOURI 64106-2140
(816) 474-8100 FAX (816) 474-3216

12925 WEST DODGE ROAD, SUITE 107
OMAHA, NEBRASKA 68154
(402) 965-8600 FAX (402) 965-8601

1 N. BRENTWOOD BOULEVARD, SUITE 1000
ST. LOUIS, MISSOURI 63105-3925
(314) 863-7733 FAX (314) 862-4656

304 E. HIGH STREET
JEFFERSON CITY, MISSOURI 65101
(573) 634-8115 FAX (573) 634-8140

9401 INDIAN CREEK PARKWAY, SUITE 700
OVERLAND PARK, KANSAS 66210-2005
(913) 345-8100 FAX (913) 345-0736

1700 LINCOLN STREET, SUITE 3800
DENVER, COLORADO 80203
(303) 839-3800 FAX (303) 839-3838

www.spencerfane.com

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR.,

        Plaintiff,

and

NANCY T. ALLEN

        Counterclaim Plaintiff

    v.

PIA ASSETS, LLC,
RP GOLF, LLC,
AND
FIVESTAR LIFESTYLES, LLC

        Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

        Intervenor-Defendants
        and Counterclaimants.

Case No.  13AE-CV00013

Division No. 2



F I L E D
MAR 2 0 2014
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## JAMES AND NANCY ALLENS' ANSWER TO PIA ASSETS' COUNTERCLAIM

Plaintiffs and Counterclaim Defendants James S. Allen, Jr., and Nancy T. Allen ("Plaintiffs"), through their undersigned counsel, submit their answer to Defendant PIA Assets' Counterclaim.

1.    Plaintiffs are without sufficient information to admit or deny the allegation in paragraph 1.

> EXHIBIT
>
> 17

2.     Plaintiffs are without sufficient information to admit or deny the allegation in paragraph 2.

3.     Plaintiffs admit the allegations in paragraph 3.

4.     Plaintiffs admit the allegations in paragraph 4.

5.     Plaintiffs admit the allegations in paragraph 5.

6.     Plaintiffs respond to the specific allegations in paragraph 6 as follows:

     a. Plaintiffs admit that paragraph 22 of the Petition states, "Allen signed an employment agreement in 2006 to serve as President of PIA."

     b. Plaintiffs admit that paragraph 39 of the Petition states, "In response, counsel for Defendants produced a document titled "Amended and Restated Employment Agreement that referenced a note in favor of Jim Allen in the amount of $900,000."

     c. Admitted.

     d. Admitted.

     e. Admitted.

     f. Admitted.

     g. Admitted.

     h. Admitted.

     i. Admitted.

     j. Admitted.

     k. Admitted.

     l. Admitted.

     m. Admitted.

     n. Admitted.

o.  Admitted.

p.  Admitted.

7.  Plaintiffs deny the allegations in paragraph 7.

## Count I – Declaratory Judgment

8.      Plaintiffs incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein

9.      Paragraph 9 states legal conclusions to which no response is required, but to the extent a response could be required, Plaintiffs deny the allegations in paragraph 9.

10.     Paragraph 10 states legal conclusions and a request for relief to which no response is required, but to the extent a response could be required, Plaintiffs deny the allegations in paragraph 10.

## Affirmative Defenses

11.     Count I fails to state a claim on which relief can be granted, in that the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding.

12.     Count I fails to state a claim on which relief can be granted because Counterclaimants have an adequate remedy at law.

13.     Count I fails to state a claim on which relief can be granted because Counterclaimants have not raised any controversy ripe for judicial determination.

14.     Count I fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a legally protectable interest in the effectiveness of Allen's employment agreements.

15.    Count I fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead the existence of a controversy ripe for judicial determination.

Dated:  March 20, 2014

Respectfully submitted,

STUEVE SIEGEL HANSON LLP

By: _____
Patrick J. Stueve, MO Bar # 37682
stueve@stuevesiegel.com
Andrew W. Funk, MO Bar # 59977
funk@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 714-7100
(816) 714-7101 Facsimile
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via email and First-Class U.S. Mail on

March 19, 2014 to the following:

R. Pete Smith
Kristie Orme
petesmith@mcdowellrice.com
korme@mcdowellrice.com
**MCDOWELL RICE SMITH & BUCHANAN**
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
**Attorneys for Defendant**

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
**SPENCER FANE BRITT & BROWNE, LLP**
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
dweems@spencerfane.com
sgoldstein@spencerfane.com
bdixon@spencerfane.com
**Attorneys for Pandi Capital, LLC**

Kirk T. May
F. Ryan Van Pelt
**ROUSE HENDRICKS GERMAN MAY, PC**
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
kirkm@rhgm.com
ryanv@rhgm.com
**Attorneys for Defendants Pandi Development, LLC,**
**Neal Patterson, and Clifford Illig**

/s/ Patrick J. Stueve



# Stueve · Siegel · Hanson

LLP

# Fax Cover

March 20, 2014



SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

**PLEASE DELIVER TO:**     Platte County Circuit Court Clerk

**FACSIMILE #:**    816-858-3392

**FROM:**        Andrew W. Funk
            Patrick J. Stueve

**SUBJECT:**      James S. Allen, Jr. v. PIA Assets, LLC and RP Golf, LLC, Case No. 13AE-CV00013

**TOTAL NO. OF PAGES, INCLUDING COVER SHEET:** _____ 6

*Please file attached.*

Thank you.

## CONFIDENTIALITY NOTE

The documents accompanying this facsimile transmission contain information from the law firm of Stueve Siegel Hanson LLP which is confidential and/or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES INDICATED ABOVE, PLEASE CALL (816) 714-7100.

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR.,

        Plaintiff,

and

NANCY T. ALLEN

        Counterclaim Plaintiff

      v.

PIA ASSETS, LLC,
RP GOLF, LLC,
AND
FIVESTAR LIFESTYLES, LLC

        Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

        Intervenor-Defendants
        and Counterclaimants.



Case No. 13AE-CV00013

Division No. 2

## ORDER

Pursuant to Mo. R. Civ. P. 52, Plaintiff James S. Allen, Jr.'s Motion to add Nancy T. Allen as a plaintiff to James Allen's claims for action to collect on promissory note, breach of contract, and unjust enrichment/quantum meruit against Defendant PIA Assets, as alleged in Plaintiff's Petition, is hereby granted. All of Defendant's and Intervenor-Defendants' defenses are preserved including those based on standing and/or failure to state a claim. Neither

EXHIBIT

18

Defendants nor Intervenor-Defendants concede the truth of any factual statements made in Plaintiff's Motion.

DATE: ___May 9___, 2014  _____
Circuit Judge

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR., )
)
    Plaintiff, )    Case No. 13AE-CV00013
v. )
)    Division No. 2
PIA ASSETS, LLC, and )
RP GOLF, LLC, )
)
    Defendants, )
         J3-Pandi )
and )
)
PANDI CAPITAL, LLC, )
PANDI DEVELOPMENT, LLC, )
NEAL L. PATTERSON, and )
CLIFFORD W. ILLIG, )
)
    Intervenor-Defendants )
    and Counterclaimants. )

**FILED**
SEP 0 5 2014
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

## ORDER

    Upon consideration of the Unopposed Motion of Intervenor-Defendants' Pandi Development, LLC, Neal Patterson, and Clifford Illig to File First Amended Answer And Counterclaims, and upon good cause shown and with no opposition, it is hereby Ordered that the motion is GRANTED. The First Amended Answer and Counterclaims of Intervenors Pandi Development, LLC, Neal Patterson, and Clifford Illig, attached to the motion as Exhibit A, is hereby deemed filed with the Court as of the date of this Order.

IT IS SO ORDERED.

Date:   9-5-2014

James Van Amburg, Circuit Judge

**EXHIBIT**

**19**

### IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

| | |
|---|---|
| JAMES S. ALLEN, JR., AND<br>NANCY T. ALLEN<br><br>        Plaintiffs,<br><br>    v.<br><br>PIA ASSETS, LLC,<br>RP GOLF, LLC,<br>AND<br>FIVESTAR LIFESTYLES, LLC<br><br>        Defendants,<br><br>and<br><br>PANDI CAPITAL, LLC<br>PANDI DEVELOPMENT, LLC,<br>NEAL L. PATTERSON, and<br>CLIFFORD W. ILLIG,<br><br>        Intervenor-Defendants<br>        and Counterclaimants. | Case No.  13AE-CV00013<br><br>Division No. 2 |

### PLAINTIFFS' FIRST AMENDED ANSWER TO AND COUNTERCLAIMS AGAINST INTERVENORS PANDI CAPITAL, LLC, PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG

Plaintiffs James S. Allen, Jr. and Nancy Allen (together, "the Allens"), through their undersigned counsel, submit their answer to Intervenor-Defendants and Counterclaimants Pandi Development LLC, Neal L. Patterson, and Clifford W. Illig's counterclaims and crossclaims and submits their counterclaims as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

#### Jurisdiction and Venue

1.     Allen admits the allegations in paragraph 1.

1

**EXHIBIT**

**20**

2.     Allen admits the allegations in paragraph 2.

<u>**Parties**</u>

3.     Allen admits the allegations in paragraph 3.

4.     Allen admits that PIA Assets owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, the Parkville Commons shopping district, and Loch Lloyd Country Club. PIA Assets owns RP Golf, which holds 100% of the interests in the clubs and golf courses. Allen denies all other allegations in paragraph 4.

5.     Allen admits the allegations in paragraph 5.

6.     Allen admits the allegations in paragraph 6.

7.     Allen admits the allegations in paragraph 7.

8.     Allen denies the allegations in paragraph 8.

9.      Allen admits the allegations in paragraph 9.

10.    Allen admits that on December 21, 2012, Patterson and Illig resigned as managers and appointed Randall Nay and Dale Brouk to act on their behalf as managers of PIA Assets. Allen admits that he remains a manager of PIA Assets. Allen denies all other allegations and characterizations in paragraph 10.

11.    Allen admits that Pandi Capital is owned by Patterson and Illig. Allen denies all other allegations and characterizations in paragraph 11.

<u>**Pandi Capital's Loans to PIA Assets**</u>

12.    Allen denies the allegations in paragraph 12.

13.    Allen denies the allegations in paragraph 13.

14.    Allen denies the allegations in paragraph 14.

15.    Allen denies the allegations in paragraph 15.

16.     Allen denies the allegations in paragraph 16.

**Allen's Loan**

17.     Allen admits that he filed a lawsuit against PIA Assets on January 2, 2013, styled *James S. Allen, Jr. v. PIA Assets LLC and RP Golf, LLC,* Case No. 13AE-CV00013 in the Circuit Court of Platte County, Missouri, and that the Petition sets for the basis of that lawsuit. Allen denies all other allegations in paragraph 17.

**PIA and Its Affiliates Default on Bank Loans**

18.     Allen admits that the allegations in paragraph 18.

19.     Allen admits the allegations in paragraph 19.

20.     Allen is without sufficient information to admit or deny the allegations in paragraph 20, and therefore denies the allegations.

21.     Allen is without sufficient information to admit or deny the allegations in paragraph 21, and therefore denies the allegations.

PIA—Missouri Bank Note

22.     Allen admits that Missouri Bank &Trust Co. of Kansas City made a loan to PIA in the principal amount of $5,000,000 and PIA made a promissory note dated June 29, 2012, to Missouri Bank in the same amount. Allen is without sufficient information to admit or deny the allegations in paragraph 22, and therefore denies the allegations.

23.     Allen admits that he signed a personal guaranty for 5% of the PIA-Missouri Bank Note dated June 29, 2012. Allen denies the remaining allegations in paragraph 23.

24.     Allen admits that Missouri Bank sent a Notice of Default on August 28, 2013. Allen denies the remaining allegations in paragraph 24.

25.     Allen is without sufficient information to admit or deny the allegations in paragraph 25, and therefore denies the allegations.

26.     Allen denies the allegations in paragraph 26.

J3-Pandi-Missouri Bank Note

27.     Allen admits the allegations in paragraph 27.

28.     Allen is without sufficient information to admit or deny the allegations in paragraph 28, and therefore denies the allegations.

29.     Allen admits the allegations in paragraph 29.

30.     Allen is without sufficient information to admit or deny the allegations in paragraph 30, and therefore denies the allegations.

31.     Allen denies the allegations in paragraph 31.

Country Club at Loch Lloyd-Bank of Kansas City Note

32.     Allen is without sufficient information to admit or deny the allegations in paragraph 32, and therefore denies the allegations.

33.     Allen is without sufficient information to admit or deny the allegations in paragraph 33, and therefore denies the allegations.

34.     Allen is without sufficient information to admit or deny the allegations in paragraph 34, and therefore denies the allegations.

35.     Allen denies the allegations in paragraph 35.

36.     Allen admits that Pandi Capital and Pandi Development sent a Notice of Default and Demand for Payment to Jim Allen. Allen denies the remaining allegations in paragraph 36.

Electronically Filed - Platte - October 06, 2014 - 04:49 PM

<u>RP Golf-Bank of Kansas City Note</u>

37.     Allen is without sufficient information to admit or deny the allegations in paragraph 37, and therefore denies the allegations.

38.     Allen is without sufficient information to admit or deny the allegations in paragraph 38, and therefore denies the allegations.

39.     Allen admits the allegations in paragraph 39.

40.     Allen is without sufficient information to admit or deny the allegations in paragraph 40, and therefore denies the allegations.

41.     Allen denies the allegations in paragraph 41.

<u>J3-Pandi-Bank of Kansas City</u>

42.     Allen is without sufficient information to admit or deny the allegations in paragraph 42, and therefore denies the allegations.

43.     Allen is without sufficient information to admit or deny the allegations in paragraph 43, and therefore denies the allegations.

44.     Allen is without sufficient information to admit or deny the allegations in paragraph 44, and therefore denies the allegations.

45.     Allen denies the allegations in paragraph 45.

46.     Allen admits the allegations in paragraph 46.

<u>LL-J3-Pandi-Bank Midwest Note</u>

47.     Allen is without sufficient information to admit or deny the allegations in paragraph 47, and therefore denies the allegations.

48.     Allen is without sufficient information to admit or deny the allegations in paragraph 48, and therefore denies the allegations.

49.     Allen is without sufficient information to admit or deny the allegations in paragraph 49, and therefore denies the allegations.

50.     Allen is without sufficient information to admit or deny the allegations in paragraph 50, and therefore denies the allegations.

51.     Allen admits the allegations in paragraph 51.

52.     Allen is without sufficient information to admit or deny the allegations in paragraph 52, and therefore denies the allegations.

53.     Allen denies the allegations in paragraph 53.

LL North-Bank Midwest Note

54.     Allen is without sufficient information to admit or deny the allegations in paragraph 54, and therefore denies the allegations.

55.     Allen is without sufficient information to admit or deny the allegations in paragraph 55, and therefore denies the allegations.

56.     Allen is without sufficient information to admit or deny the allegations in paragraph 56, and therefore denies the allegations.

57.     Allen is without sufficient information to admit or deny the allegations in paragraph 57, and therefore denies the allegations.

58.     Allen admits the allegations in paragraph 58.

59.     Allen is without sufficient information to admit or deny the allegations in paragraph 59, and therefore denies the allegations.

60.     Allen denies the allegations in paragraph 60.

<u>RP Golf-Enterprise Bank Note</u>

61.     Allen is without sufficient information to admit or deny the allegations in paragraph 61, and therefore denies the allegations.

62.     Allen is without sufficient information to admit or deny the allegations in paragraph 62, and therefore denies the allegations.

63.     Allen admits the allegations in paragraph 63.

64.     Allen is without sufficient information to admit or deny the allegations in paragraph 64, and therefore denies the allegations.

65.     Allen denies the allegations in paragraph 65.

<u>J3-Pandi-First National Bank Note</u>

66.     Allen is without sufficient information to admit or deny the allegations in paragraph 66, and therefore denies the allegations.

67.     Allen is without sufficient information to admit or deny the allegations in paragraph 67, and therefore denies the allegations.

68.     Allen is without sufficient information to admit or deny the allegations in paragraph 68, and therefore denies the allegations.

69.     Allen is without sufficient information to admit or deny the allegations in paragraph 69, and therefore denies the allegations.

70.     Allen denies the allegations in paragraph 70.

**<u>Litigation Regarding the Pandi Capital Debt</u>**

71.     Allen admits that Pandi Capital brought suit in the Circuit Court of Jackson County, Missouri. Allen denies all other allegations in paragraph 71.

72.     Allen admits that Pandi Capital has intervened in this case and has asserted crossclaims. Allen denies all other allegations in paragraph 72.

73.     Allen admits that Pandi Development, Patterson and Illig have also intervened in this case and filed an Answer In Intervention. Allen admits that Pandi Development, Patterson and Illig filed Counterclaims. Allen denies the remaining allegations in paragraph 73.

74.     Allen admits the allegations in paragraph 74.

75.     Allen denies the allegations in paragraph 75.

### COUNT I-RECOVERY ON GUARANTY OF DEBT

**(PIA-Missouri Bank Note)**

*Pandi Development, Patterson, and Illig v. Allen*

76.     In response to the allegations in paragraph 76, Allen incorporates the responses contained in the paragraphs above.

77.     Allen is without sufficient information to admit or deny the allegations in paragraph 77, and therefore denies the allegations.

78.     Paragraph 78 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 78 is denied.

79.     Allen denies the allegations in paragraph 79.

80.     Allen denies the allegations in paragraph 80.

81.     Allen is without sufficient information to admit or deny the allegations in paragraph 81, and therefore denies the allegations.

82.     Allen is without sufficient information to admit or deny the allegations in paragraph 82, and therefore denies the allegations.

83.     Allen denies the allegations in paragraph 83.

## COUNT II-RECOVERY ON GUARANTY OF DEBT

### (J3-Pandi-Missouri Bank Note)

*Pandi Development, Patterson, and Illig v. Allen*

84.     In response to the allegations in paragraph 84, Allen incorporates the responses responses contained in the paragraphs above.

85.     Allen is without sufficient information to admit or deny the allegations in paragraph 85, and therefore denies the allegations.

86.     Paragraph 86 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 86 is denied.

87.     Allen denies allegations in paragraph 87.

88.     Allen denies allegations in paragraph 88.

89.     Allen is without sufficient information to admit or deny the allegations in paragraph 89, and therefore denies the allegations.

90.     Allen is without sufficient information to admit or deny the allegations in paragraph 90, and therefore denies the allegations.

91.     Allen denies the allegations in paragraph 91.

## COUNT III-RECOVERY ON GUARANTY OF DEBT

### (Country Club at Loch Lloyd-and of Kansas City Note)

*Pandi Development v. Allen*

92.     In response to the allegations in paragraph 92, Allen incorporates the responses contained in the paragraphs above.

93.     Allen is without sufficient information to admit or deny the allegations in paragraph 93, and therefore denies the allegations.

94.     Paragraph 94 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 94 is denied.

95.     Allen denies the allegations in paragraph 95.

96.     Allen denies the allegations in paragraph 96.

97.     Allen is without sufficient information to admit or deny the allegations in paragraph 97, and therefore denies the allegations.

98.     Allen is without sufficient information to admit or deny the allegations in paragraph 98, and therefore denies the allegations.

99.     Allen denies the allegations in paragraph 99.


## COUNT IV RECOVERY ON GUARANTY OF DEBT

### (RP Golf-Bank of Kansas City Note)

*Pandi Development v. Allen*

100.     In response to the allegations in paragraph 100, Allen incorporates the responses contained in the paragraphs above.

101.     Allen is without sufficient information to admit or deny the allegations in paragraph 101, and therefore denies the allegations.

102.     Paragraph 102 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 102 is denied.

103.     Allen denies the allegations in paragraph 103.

104.     Allen denies the allegations in paragraph 104.

105.     Allen is without sufficient information to admit or deny the allegations in paragraph 105, and therefore denies the allegations.

106.     Allen denies the allegations in paragraph 106.

107.    Allen denies the allegations in paragraph 107.

## COUNT V-RECOVERY ON GUARANTY OF DEBT

### (J3-Pandi-Bank of Kansas City Note)

*Pandi Development, Patterson, and Illig v. Allen*

108.    In response to the allegations in paragraph 108, Allen incorporates the responses contained in the paragraphs above.

109.    Allen is without sufficient information to admit or deny the allegations in paragraph 109, and therefore denies the allegations.

110.    Paragraph 110 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 110 is denied.

111.    Allen denies the allegations in paragraph 111.

112.    Allen denies the allegations in paragraph 112.

113.    Allen is without sufficient information to admit or deny the allegations in paragraph 113, and therefore denies the allegations.

114.    Allen denies the allegations in paragraph 114.

115.    Allen denies the allegations in paragraph 115.

## COUNT VI-RECOVERY ON GUARANTY OF DEBT

### (Ll-J3-Pandi-Bank Midwest Note)

*Pandi Development, Patterson, and Illig v. Allen*

116.    In response to the allegations in paragraph 116, Allen incorporates the responses contained in the paragraphs above.

117.    Allen is without sufficient information to admit or deny the allegations in paragraph 117, and therefore denies the allegations.

118.     Paragraph 118 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 118 is denied.

119.     Allen denies the allegations in paragraph 119.

120.     Allen denies the allegations in paragraph 120.

121.     Allen is without sufficient information to admit or deny the allegations in paragraph 121, and therefore denies the allegations.

122.     Allen is without sufficient information to admit or deny the allegations in paragraph 122, and therefore denies the allegations.

123.     Allen is without sufficient information to admit or deny the allegations in paragraph 123, and therefore denies the allegations.

124.     Allen is without sufficient information to admit or deny the allegations in paragraph 124, and therefore denies the allegations.

125.     Allen denies the allegations in paragraph 125.

### COUNT VII-RECOVERY ON GUARANTY OF DEBT

### (LL North-Bank Midwest Note)

*Pandi Development, Patterson, and Illig v. Allen*

126.     In response to the allegations in paragraph 126, Allen incorporates the responses contained in the paragraphs above.

127.     Allen is without sufficient information to admit or deny the allegations in paragraph 127, and therefore denies the allegations.

128.     Paragraph 128 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 128 is denied.

129.     Allen denies the allegations in paragraph 129.

130.     Allen denies the allegations in paragraph 130.

131.     Allen is without sufficient information to admit or deny the allegations in paragraph 131, and therefore denies the allegations.

132.     Allen is without sufficient information to admit or deny the allegations in paragraph 132, and therefore denies the allegations.

133.     Allen is without sufficient information to admit or deny the allegations in paragraph 133, and therefore denies the allegations.

134.     Allen denies the allegations in paragraph 134.

135.     Allen denies the allegations in paragraph 135.

## COUNT VIII-RECOVERY ON GUARANTY OF DEBT

### (RP Golf-Enterprise Bank Note)

*Pandi Development, Patterson, and Illig v. Allen*

136.     In response to the allegations in paragraph 136, Allen incorporates the responses contained in the paragraphs above.

137.     Allen is without sufficient information to admit or deny the allegations in paragraph 137, and therefore denies the allegations.

138.     Paragraph 138 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 138 is denied.

139.     Allen is without sufficient information to admit or deny the allegations in paragraph 139, and therefore denies the allegations.

140.     Allen denies the allegations in paragraph 140.

141.     Allen denies the allegations in paragraph 141.

142.     Allen denies the allegations in paragraph 142.

143.     Allen denies the allegations in paragraph 143.

## COUNT IX-COLLECTION ON PROMISSORY NOTE

### (J3-Pandi – First National Bank Note)

*Pandi Development, Patterson, and Illig v. Allen*

144.     In response to the allegations in paragraph 144, Allen incorporates the responses contained in the paragraphs above.

145.     Allen is without sufficient information to admit or deny the allegations in paragraph 145, and therefore denies the allegations.

146.     Allen is without sufficient information to admit or deny the allegations in paragraph 146, and therefore denies the allegations.

147.     Allen is without sufficient information to admit or deny the allegations in paragraph 147, and therefore denies the allegations.

148.     Allen denies the allegations in paragraph 148.

149.     Allen denies the allegations in paragraph 149.

## COUNT X-ALTERNATIVE CLAIM FOR DECLARATORY JUDGMENT

*Pandi Development, Patterson, and Illig v. Allen*

150.     In response to the allegations in paragraph 150, Allen incorporates the responses contained in the paragraphs above.

151.     Paragraph 151 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 151.

152.     Paragraph 152 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 152.

153.     Paragraph 153 states legal conclusions to which no response is required, but to the extent a response could be required, Plaintiff denies the allegations in paragraph 153.

## COUNT XI-RECOUPMENT AND/OR SET-OFF

*Pandi Development, Patterson, and Illig v. Allen*

154.     In response to the allegations in paragraph 154, Allen incorporates his responses contained in the paragraphs above.

155.     Paragraph 155 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 155.

### Allen's Affirmative Defenses to Pandi Development, Neal Patterson and Clifford Illig's Counterclaims

156.     Pursuant to his employment agreement with Defendants and Counterclaimants, Allen is to be held harmless and/or indemnified on any guaranties or other obligations pertaining debts of PIA or its subsidiaries or affiliates.

157.     Count I fails to state a claim on which relief can be granted.

158.     Count II fails to state a claim on which relief can be granted.

159.     Count III fails to state a claim on which relief can be granted.

160.     Count IV fails to state a claim on which relief can be granted.

161.     Count V fails to state a claim on which relief can be granted.

162.     Count VI fails to state a claim on which relief can be granted.

163.     Count VII fails to state a claim on which relief can be granted.

164.     Count VIII fails to state a claim on which relief can be granted.

165.     Count IX fails to state a claim on which relief can be granted.

166.     Count X fails to state a claim on which relief can be granted.

167.     Count XI fails to state a claim on which relief can be granted

168.     Counterclaimants are not holders in due course of the debts discussed in Counts I-VIII, and therefore cannot enforce Allen's conditional guaranties.

169.     Counterclaimants are not holders in due course of the debts discussed in Count IX.

170.     The alleged purchase of the loans from Missouri Bank discussed in Counts I and II, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets was not commercially reasonable.

171.     The alleged purchases of the debts discussed in Counts III-IX were not commercially reasonable.

172.     The alleged purchase of the loans from Missouri Bank discussed in Counts I and II, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets violates the duty of good faith and fair dealing inherent in contracts subject to the Uniform Commercial Code as adopted in Missouri.

173.     The alleged purchase of the debts discussed in Counts III-IX and of Allen's guaranties violates the duty of good faith and fair dealing inherent in contracts subject to the Uniform Commercial Code as adopted in Missouri.

174.     Allen's guaranty on the loan from Missouri Bank to PIA Assets was conditioned upon Allen receiving an indemnification agreement from PIA.

175.     The debts of PIA and J-3 Pandi discussed in Counts I and II have been satisfied, extinguishing Allen's guaranties.

176.     The debts discussed in Counts III-IX have been satisfied, extinguishing Allen's guaranties.

177.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support a conclusion that Allen's Debt could be considered equity contributions.

178.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that Allen's claims to collect on his Note to PIA Assets is an action to collect on an equity contribution.

179.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that the Allen Debt must be re-characterized.

180.    Count X fails to state a claim on which relief can be granted, in that the characterization of Allen's Debt is not a controversy before this Court.

181.    Count X fails to state a claim on which relief can be granted, in that no justiciable controversy exists regarding to collection or characterization of Allen's Debt.

182.    Count X fails to state a claim on which relief can be granted, in that the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding.

183.    Count X fails to state a claim on which relief can be granted because Counterclaimants have an adequate remedy at law.

184.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a legally protectable interest in the characterization of Allen's Debt as an equity contribution.

185.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead the existence of a controversy ripe for judicial determination.

17

186.    Count XI fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a breach of contract by Allen, and Allen has not breached any contract with Counterclaimants.

187.    Count XI fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead facts sufficient for an affirmative defense of recoupment/set-off.

188.    Allen reserves the right to add additional affirmative defenses as additional facts are revealed through discovery.

Electronically Filed - Platte - October 06, 2014 - 04:49 PM

## ALLEGATIONS SUPPORTING ALLEN'S COUNTERCLAIMS

Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

### Additional Parties

189.   Plaintiff Nancy Allen is a Missouri resident residing at 7001 Waters Edge, Parkville, Missouri 54152.

190.   Defendant Neal L. Patterson is a Missouri resident residing at 20 E Dundy Circle, Belton, Missouri 64012. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

191.   Defendant Clifford W. Illig is a Kansas resident residing at 11504 Pawnee Circle, Leawood, Kansas 66211. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

192.   Defendant FiveStar Lifestyles, LLC ("FiveStar") is a Missouri limited liability company with its principal place of business at 8878 NW 63rd St, Parkville, Platte County Missouri.

### Jurisdiction and Venue

193.   This Court has personal jurisdiction over the counterclaim Defendants Illig, Patterson, Pandi Capital, Pandi Development, and Five Star pursuant to Missouri Revised Statutes Sections 506.500(1) and/or 506.500(3) because the cause of action herein asserted arises from their transaction of business within the State of Missouri and/or their making of a contract within the State of Missouri.

Electronically Filed - Platte - October 06, 2014 - 04:49 PM

194.    Venue is proper in this county pursuant to Missouri Revised Statutes Section 508.010 because counterclaim Defendants transact usual and customary business in Platte County, and the cause of action accrued, at least in part, in Platte County, Missouri.

**Additional Facts Supporting Counterclaims**

195.    Illig and Patterson are the sole members and owners of Pandi Capital, LLC.

196.    Illig and Patterson are the sole members and owners of Pandi Development, LLC.

197.    FiveStar is a wholly-owned subsidiary of J3-Pandi, LLC (which itself is a wholly-owned subsidiary of PIA Assets) and an affiliate of PIA Assets.

198.    Pandi Development controls 86.5% of the interest in PIA Assets and appoints two of the three managers of PIA Assets.

199.    Pandi Capital is the alleged owner of the "Notes" and "Loans" purportedly representing the monies advanced to PIA Assets and has made member contributions on behalf of Pandi Development to fund the operation of PIA Assets.

200.    Through Pandi Capital and Pandi Development, Patterson and Illig have completely dominated the finances, policy and business practices of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets.

201.    PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets have no existence of their own, but have functioned as the alter ego and instruments of Illig and Patterson.

202.    Patterson and Illig have treated the assets of PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets as their own personal assets in complete disregard for the rights and interests of the minority members.

203.     As more fully described below, Patterson and Illig have used their control of PIA Assets, RP Golf, Five Star, and other subsidiaries of PIA Assets to commit unjust acts in contravention of the rights of true creditors of PIA Assets.

204.     Through their control of PIA Assets, RP Golf, Five Star, and other subsidiaries and affiliates of PIA Assets, Patterson and Illig proximately caused the injuries to the Allens and PIA such that the Allens should be allowed to pierce the corporate veil and hold Patterson and Illig personally liable for the obligations of PIA Assets, RP Golf, Five Star, and other subsidiaries and affiliates of PIA Assets.

205.     Patterson and Illig have taken an active role in the management and operations of PIA Assets and its subsidiaries.

206.     In an interview published in the June/July 2013 issue of *North* magazine, Dale Brouk, the COO/CFO of PIA, is quoted as saying, "'What they [Neil and Cliff] did to make SportingKC the best soccer venue in the country, they're now doing with the golf clubs. They are making us implement all of the things they believe in, the little things that help us differentiate our club from every other club,' says Dale."

207.     Patterson and Illig have repeatedly been mentioned as members of and assets to the development team in public advertisements for the sale of residential developments owned by PIA's subsidiaries and affiliates.

208.     As described below, Patterson and Illig have used their control of PIA Assets and its subsidiaries and affiliates to strip the assets of PIA by reclassifying equity contributions as debt, making PIA Assets insolvent with the intent of avoiding creditors.

209.     For the period of time during which the alleged "Notes" were signed, Patterson and Illig were members and managers of PIA Assets, but failed to call required members or

Electronically Filed - Platte - October 06, 2014 - 04:49 PM

managers' meetings and maintain required records, including the records related to the alleged "Notes" and "Loans" which are the subject of Pandi's counterclaims.

210.    By PIA's Operating Agreement, to which Illig and Patterson are parties through their ownership of Pandi Development, any indebtedness in excess of $50,000 must be approved by the members of PIA Assets. Jim Allen, a member of PIA Assets, was not asked to and did not approve any of the "Notes" or "Loans" which are the subject of Pandi's counterclaims.

211.    Upon information and belief, Patterson and Illig have made decisions regarding the non-renewal of certain loans to PIA and its subsidiaries from third-party creditors without consultation of the other members of PIA, in violation of the Operating Agreement of PIA.

212.    Brouk, acting in conjunction with representatives from Pandi Capital, has interrupted a stream of payments from the revenues of the Clubs which was being used to make payments toward a loan to the Country Club of Loch Lloyd.

213.    By interrupting the stream of payments, Brouk and the representative of Pandi Capital allegedly put the loan to Loch Lloyd in default in furtherance of the conspiracy to defraud Allen.

214.    Upon information and belief, Patterson and Illig have refused proposals from third-party creditors that would have resulted in releases for Jim Allen from guaranties to those creditors. PIA, RP Golf, FiveStar and their subsidiaries and affiliates are contractually obligated to provide those releases.

215.    Patterson and Illig have made unilateral decisions to cease both required payments to both Class B shareholders and tax payments to Platte County.

216.    Patterson and Illig have made unilateral decisions to fund PIA's legal defense while claiming that PIA is insolvent.

217.    Patterson and Illig have unnecessarily encumbered assets to prevent recovery by the Allens and other minority shareholders.

**Illig and Patterson Reclassify Equity Contributions as Debt, Making PIA Assets Insolvent**

218.    As individuals and/or through Pandi Capital, Patterson and Illig have allegedly contributed large sums of money to PIA. Then, as managers of PIA, Patterson and Illig guaranteed themselves a large internal rate of return on their equity contributions to PIA.

219.    Allen was advised by Patterson and Illig that the contributions by Patterson and Illig would be considered equity. Allen's understanding is in accordance with PIA's contemporaneous financial records which state the following:

a.  The December 31, 2009 Balance Sheet identifies an equity contribution from Neal Patterson for $13,135,092.50 and an equity contribution from Cliff Illig for $12,950,092.50. These equity contributions are categorized as "Equity" on PIA's balance sheet.

b.  The January 31, 2010 Balance Sheet also reflected the same equity contributions from Illig and Patterson that appeared on the December 31, 2009 Balance Sheet. Those equity contributions were similarly categorized as "Equity" on the balance sheet.

220.    Beginning in 2010, Patterson and Illig began using their position as managers of PIA to implement a conspiracy to prioritize their equity contributions over the amounts PIA owed to other members, and to further dilute the value of shares held by the minority PIA Members. This scheme was in violation of the Operating Agreement and in breach of their fiduciary duties to the minority shareholders.

221.     Upon information and belief, this conspiracy was implemented at least in part as a response to a lawsuit filed by Class B shareholders of PIA Assets regarding Illig's and Patterson's unilateral decision to cease required payments to those shareholders. The conspiracy was designed to re-prioritize their equity contributions above the required payments to the Class B shareholders and to make PIA appear insolvent.

222.     In implementing this scheme, upon information and belief Patterson and Illig instructed Dale Brouk, CFO of PIA Assets, to re-categorize their capital contributions as debt or "Long-term liabilities" on the balance sheet.

223.     Patterson and Illig did this despite contemporaneously representing to third-party lenders that their contributions to PIA were equity, and not debt.

224.     On PIA's February 28, 2010 Balance Sheet, Patterson's and Illig's capital contributions in the total amount of $26,085,185.00 had been moved from the "Equity" category on the Balance Sheet and re-categorized as Long-term Liabilities.

225.     Allen did not approve the decision to "reclassify" Patterson and Illig's capital contribution into debt.  Accordingly, this unilateral decision on the part of Patterson and Illig was in direct violation of the Operating Agreement which required unanimous approval of the Class A Members before PIA could "incur indebtedness in excess of $50,000" or "knowingly do any Act which would make it impossible to carry on the ordinary business of the Company…"

226.     The amount of Long-term Liabilities to Patterson and Illig as reflected on PIA's balance sheets as of February 28, 2010 does not match the amounts Pandi Capital now claims it loaned to PIA Assets as of February 28, 2010.  There were no loans from Pandi Capital reflected on PIA's balance sheets in 2010.

227. Since 2010, in furtherance of their scheme to prioritize their capital contributions over the amounts owed to other shareholders, Patterson and Illig are incurring additional indebtedness on behalf of PIA by "refinancing" PIA's loans or paying off third-party loans before the maturity date. Upon information and belief, Patterson and Illig are funding these refinancing and pay-downs through their own personal lines of credit with banks at interest rates between 1 and 4 percent.

228. Upon information and belief, Patterson and Illig are funding these refinancing and paydowns of true third party obligations through personal lines of credit and Pandi Capital, LLC.

229. Patterson and Illig are being charged an interest rate on this line of credit that is far lower than the 20% internal rate of return that they have promised themselves in their capacity as managers of PIA.

230. By January 2011, the "Notes Payable" to Illig and Patterson had increased substantially. On the January 31, 2011 Balance Sheet, the "Note Payable" to Illig was $30,791,548.74. The "Note Payable" to Patterson was $30,976,548.75.

231. The amounts of the "Notes Payable" reflected on PIA's balance sheets as of January 2011 do not match the amounts Pandi Capital now asserts it had lent to PIA Assets of as January 2011. There are no loans to Pandi Capital reflected on PIA's balance sheets.

232. In violation of the Operating Agreement, Allen was not asked to consent to and did not agree that PIA could incur indebtedness in excess of $80 million dollars to Patterson and Illig at a 20 percent internal rate of return.

233. Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based, and no Members or Managers meetings of PIA Assets were held to discuss or ratify any notes from Patterson, Illig, or Pandi Capital.

234.     Even if  the equity contributions from Patterson and Illig were characterized now as  loans, these "loans" violate the Operating Agreement which states in relevant part:  "if a Manager . . . is the lending Member, the rate of interest shall be determined by the Board of Managers taking into consideration, without limitation, prevailing interest rates and the interest rates the lender is required to pay in the event such lender has itself borrowed funds to loan or advance to the Company and the terms and conditions of such loan, including the rate of interest, shall be no less favorable to the Company than if the lender had been an independent third party."  The interest rate being charged by Patterson and Illig exceeds the permissible amount, especially when Patterson and Illig borrowed this money at low interest rates, and this rate was not approved by a legitimate vote of the Board of Managers.

235.     To further their intentional and deceptive scheme of prioritizing their capital contributions above the amounts owed by PIA to Allen, in December 2011, Patterson and Illig further re-characterized their capital contributions as debt from PANDI Capital, LLC in excess of $80 million.

236.     These self-serving "loans" only benefit Patterson, Illig and PANDI Capital as they allow Patterson and Illig to take personal tax losses thereby significantly offsetting their other income sources, including income from their company Cerner. These self-serving "loans" also effectively dilute Allen's shares or interest in PIA.

237.     If Patterson and Illig's contributions to PIA were properly characterized on PIA's financial statements as "Equity", upon information and belief PIA would have a substantial net worth with balance sheet solvency.

238.     Patterson and Illig through Pandi Capital have now brought counterclaims in this lawsuit seeking to collect on the alleged notes from Pandi Capital to PIA Assets.

239.    Those claims were originally asserted by Pandi Capital against PIA Assets in the Sixteenth Judicial Circuit in Jackson County.

240.    In that action, PIA was represented by a law firm that had previously represented Illig and Patterson personally and had served as the registered agent for Pandi Capital.

241.    Pandi Capital's petition in Jackson County asserted twenty-four claims; the firm representing PIA Assets answered the lengthy petition only three days after it was filed.

242.    PIA's answer made multiple admissions that were contrary to facts and documents in PIA's possession.

243.    The circumstances surrounding the filing and the admissions made by PIA necessitated Allen's intervention in that lawsuit.

### Breach of Agreements with Allen.

244.    Prior to October 2006, when Jim Watson, Jack Manning, Allen, Illig and Patterson were negotiating the terms of a restructuring transaction, Jim and Nancy Allen made loans to entities that controlled the investment properties involved in the transaction.

245.    These loans were necessary to fund day-to-day operations of the entities, such as utilities, payroll and tax payments.

246.    The Allens received notes from RP Golf, LLC documenting some of the loans and the terms of repayment.

247.    The parties to the formation of PIA had an agreement that the Allens' loans would be repaid at or near the time of the closing of the transaction in October 2006.

248.    However, at closing Brouk advised Allen that there were insufficient funds to repay the Allens, and no payments were made.

249.    In 2008, PIA paid some of the accrued amounts on the loans from Jim and Nancy Allen and created new loans in favor of the Allens in the principal amount of $817,585. PIA's

2012 financial planning documents reflect the liability with a twenty percent internal rate of return with a maturity date of February 2012.

250.    Additionally, at the time of the closing, Allen entered into a 10 year employment agreement with PIA.  In consideration for Allen leaving his long-term job and providing his exclusive development knowledge to PIA as President, Allen was to be paid a salary of $325,000 per year, plus a yearly increase based upon the Consumer Price Index.

251.    Also, per the term of Allen's contract, Allen was to receive, an agreed-upon buy-out of his Class A shares at the time of his termination.

252.    At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA.  Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well.  Patterson and Illig requested that Allen, in lieu of capital contributions, reduce his salary.

253.    Patterson and Illig agreed that the in exchange for the reduced salary, PIA would offer Allen performance incentives based on sales of homes.

254.    Based upon Patterson and Illig's representations that they would make additional equity contributions to PIA and offer incentives if Allen modified his employment agreement, Allen agreed to modify his employment agreement. The parties began to negotiate a revised employment agreement under which Allen would become an employee of FiveStar Lifestyles. The agreement contained the following material terms:  (a) reduction of his annual salary; (b) a performance incentives; (c) car allowance; (d) a note for the aforementioned loans from the Allens with terms satisfactory to Allen; and (e) release from guaranties on any debts related to PIA or any of its subsidiaries and/or an obligation for PIA, FiveStar, RP Golf and all other

subsidiaries of PIA to indemnify and hold Allen harmless upon termination of Allen's employment.

255.    The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

256.    PIA has never signed the Agreement nor delivered a note acceptable to Allen.

257.    In fact, Illig instructed employees of PIA Assets and Pandi not to deliver the note to the Allens.

258.    Rather it appears that Patterson and Illig never intended to execute on the agreement.  Patterson and Illig induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement or to make future equity contributions.

259.    In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a sign copy or the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records.  In response, Allen was presented with a copy of a "Note" purportedly signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

260.    These loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

261.    Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, PIA has breached Allen's employment agreement, including but not limited to by failing to provide Allen with his contractual raises and other benefits pursuant to the agreement.

262.    Also, shortly after the parties agreed to the 2010 Agreement in principle, Patterson and Illig, without consent or discussion with Allen, nixed the various homebuilding projects which were to generate the performance incentives under Allen's agreement. As a result Allen has never received any of the bonuses provided for in the contract.

263.    Patterson and Illig also have attempted to recharacterize their "equity contributions" as debt, suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

264.    Allen never would have agreed to modify the terms of his employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to defraud Allen out of money he and his wife loaned to the company and to decrease the value of his shares.

265.    Despite these breaches, and Patterson and Illig's claims that PIA is having financial problems, employees of PIA received bonuses for PIA's financial performance and operating results in 2010. And, in 2011, PIA has provided pay raises to many of its high level employees and hired additional, unnecessary staff at the National in 2012.

266.    PIA, by and through its managing members, is also obligated to furnish to Allen the annual reports within 180 days after the end of each fiscal year and additional reports within

30

30 days after the end of each calendar quarter, which quarterly reports are to consist of unaudited financial statements prepared by PIA in the ordinary course of business for the preceding quarter.

267.    These reports have not been provided at all for certain quarters and untimely provided for others.

**Patterson and Illig Use Their Control of PIA Assets to Avoid Obligations to Jim Allen**

268.    In November 2012, Jim Allen, Chief Executive Officer and a minority member of PIA Assets, submitted his resignation, triggering a contractual duty for PIA Assets, FiveStar Lifestyles, and PIA's subsidiaries and affiliates to seek releases from guaranties that Allen provided on several third-party loans to PIA Assets.

269.    Until releases were obtained, FiveStar Lifestyles, PIA Assets, its subsidiaries and affiliated entities had a contractual duty to indemnify and hold Allen harmless with respect to his guaranties.

270.    Allen's resignation triggered a contractual duty for PIA Assets to buy out Allen's interest in PIA Assets for $6 million.

271.    In January 2013, Allen filed a lawsuit to collect on the Allens' loans to PIA which had never been repaid. Allen had been in discussions with counsel for PIA for much of 2012 regarding satisfaction of the Allens' loan, either through cash or through alternative means.

272.    In response, Illig and Patterson have sought to avoid repaying the Allens and have taken affirmative steps to prevent PIA and its affiliated companies from satisfying their obligations to the Allens.

273.    Though there has been no substantial change in PIA's financial condition from 2010 to the present, shortly before Allen filed his lawsuit, Pandi and the managers of PIA

31

appointed by Patterson and Illig have now begun to claim that PIA is insolvent and unable to repay its debts.

274.    Patterson and Illig appointed Dale Brouk and Randall Nay to PIA's board of managers to represent them and Pandi Development.

275.    Brouk and Nay began calling for regular managers and members meetings, which had not occurred since 2010.

276.    The managers appointed by Pandi began demanding large financial contributions from Allen to fund the operations of PIA and its subsidiaries.

277.    After appointing Brouk and Nay, Patterson and Illig through Pandi Capital stated that it was unwilling to continue funding PIA unless Allen agreed to relinquish his rights to repayment of his loans and the buyout of his interests in PIA and its subsidiaries.

278.    Pandi Capital also stated that it would not continue funding PIA unless the board of managers agreed to amend the operating agreements of PIA's subsidiaries to allow Pandi Capital to loan money directly to PIA's subsidiaries.

279.    The managers appointed by Patterson and Illig through Pandi approved the amended operating agreements over Allen's objection.

280.    Under PIA's Operating Agreement, any decisions regarding incurring indebtness or bankruptcy must be made by a unanimous vote of the board of managers.

281.    Under the new operating agreements for PIA subsidiaries required by Pandi Capital, decisions regarding incurring indebtedness and/or bankruptcy only require a majority vote of the board of managers.

282.    The amended operating agreements are also designed to allow the managers to put certain subsidiaries into bankruptcy.

283.    Upon information and belief, the goal of the actions taken by Patterson and Illig through Pandi and the managers appointed by Pandi are to make PIA's balance sheet show insolvency.

284.    Upon information and belief, the purpose of the amended operating agreements was to allow Illig and Patterson to encumber PIA's underlying entities through purported "loans" from Pandi Capital in such a way that would interfere with the rights of potential creditors by loading the subsidiaries up with debt owed to Pandi.

285.    Beginning in 2013, Pandi demanded security for its recent contributions to PIA.

286.    The only ostensible purpose for the actions described above is to make it impractical or impossible for PIA to repay its debts to Allen and to honor its obligations to indemnify and hold Allen harmless.

287.    Illig and Patterson have rejected proposals from third-party lenders, including Missouri Bank, which would have released Allen from his guaranties on loans from third-party lenders, a clear violation of the Operating Agreement and contractual duties owed to Allen by PIA, FiveStar and the subsidiaries of PIA.

288.    The managers appointed by Illig and Patterson have rejected proposals from Allen to indemnify and hold him harmless on his guaranty on a loan using unencumbered assets of PIA and its affiliates. The failure to accept Allen's proposal was a violation of the Operating Agreement and contractual duties owed to Allen by PIA, FiveStar and subsidiaries and affiliates of PIA.

289.    Patterson and Illig caused PIA to default on its loans from Missouri Bank.

290.    Patterson and Illig caused PIA and its subsidiaries to default on the loans discussed in Pandi Development's Counterclaims III-IX.

291.     Patterson and Illig's attempt to collect the "Notes" and "Loans" from Pandi Capital through this lawsuit will cause irreparable harm absent relief from this Court.

292.     Patterson and Illig's continued attempts to categorize equity contributions as loans to PIA Assets or its underlying entities will further encumber the assets of PIA Assets and increase PIA's insolvency.

293.     There is no adequate remedy at law, as Patterson and Illig continue to encumber the assets of PIA Assets by characterizing equity contributions from Pandi Development as debt owed to Pandi Capital.

## COUNT I -- BREACH OF THE IMPLIED DUTY OF GOOD FAITH
## AND FAIR DEALING

(Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

294.     Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

295.     Entering into the operating agreements with Pandi Development, Patterson and Illig, and based upon the intertwined relationship of the parties including their corporate positions and ownership as well as their course of dealing, among other things, required that:

    a.  Pandi, Patterson, and Illig, would act with good faith and fairness toward Allen on all matters concerning corporate affairs.

    b.  Neither Pandi, Patterson nor Illig would take any action to unfairly prevent Allen from obtaining the benefits of his corporate position, his compensation, his employment agreement, or his rights under the Operating Agreement.

    c. Pandi, Patterson and Illig would comply with their own rules, policies and procedures with respect to providing and making financial information available to Allen and consulting with him on corporate matters.

296. Pandi, Patterson or Illig's conduct as set forth above was conducted in bad faith and done with the purpose and intention of avoiding or diminishing payments owed to Allen for compensation and the value of his shares in PIA and to impair indemnity and hold harmless obligations owed to Allen.

297. Pandi, Patterson and/or Illig breached their covenant of good faith and fair dealing in one or more of the respects set forth herein:

    a. Pandi, Patterson or Illig purposefully and wrongfully failed and refused to pay Allen for the sums due him under the terms of the employment agreement;

    b. Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement made unauthorized corporate decisions to the detriment of Allen, and PIA.

    c. Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement re-characterized their equity contributions as debt and imposed unreasonable repayment terms and conditions.

    d. Pandi, Patterson or Illig did the other wrongful acts described herein.

298. Such breaches were performed by Pandi, Patterson or Illig to exploit economic conditions to their own benefit, and to intentionally undermine the fulfillment of PIA's and FiveStar's contractual obligations to Allen.

299.     Pandi, Patterson or Illig's breach of the covenant of good faith and fair dealing was a substantial factor in causing damage and injury to Allen.

300.     As a direct and proximate result of Pandi, Patterson or Illig's unlawful conduct alleged in this Petition, Allen has lost substantial compensation and other benefits. Allen has further suffered extreme anguish and emotional distress due to such conduct in an amount to be determined at trial.

301.     Because of the irreparable harm that would result from Illig, Patterson and Pandi's collection of the "Notes" and "Loans" and/or from a judgment characterizing the equity contributions as debt, Allen prays for an injunction from this Court:

    a. Enjoining further "loans" made pursuant to the amended operating agreements adopted by PIA's board of managers in 2013;

    b. Commanding the managers of PIA to satisfy PIA's debts with unencumbered assets, as required by PIA's Operating Agreement;

    c. Enjoining the managers of PIA and Pandi from characterizing future contributions from Pandi as third party debt.

WHEREFORE, Allen prays for judgment in an amount to be determined at trial, for his costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages; for an injunction as described above, and for such other and further legal and equitable relief as the Court deems just and proper.

**COUNT II – VIOLATION OF MISSOURI FRAUDULENT TRANSFER ACT**
(Jim and Nancy Allen v. Illig, Patterson, PANDI Development, and PANDI Capital, LLC)

302.     Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

303.    As described above, the Allens took steps to collect loans made to PIA and asserted Jim Allen's right to certain contractual obligations owed by PIA, FiveStar and PIA's subsidiaries.

304.    In anticipation of and response to Allen's suit and demand, Patterson and Illig through Pandi Development began taking the actions described in more detail above, including appointing new managers, calling for meetings, claiming that PIA was in financial crisis, demanding large capital contributions from Allen, refusing to continue making contributions to PIA through Pandi Capital as they had for years before Allen made his demands unless Allen abandoned his demands, and filing their counterclaims in this lawsuit.

305.    Patterson and Illig's pursuit of their counterclaims through Pandi Capital to recharacterize equity contributions as debt is an attempt to hinder, delay or defraud creditors of PIA, including the Allens.

306.    Patterson and Illig made the alleged "loans" and "notes" from one company they owned, Pandi Capital, to another company they controlled, PIA Assets.

307.    Patterson and Illig made the alleged "loans" and "notes" in anticipation of a substantial long-term gain, as the prospects of short-term repayment at substantial interest on unsecured notes from PIA was low.

308.    Pandi received inadequate consideration for its "Loans" or "Notes," in that it would have had no reasonable expectation of repayment given short maturity terms of the alleged loans combined with the large principal amounts, high interest rates.

309.    The "Notes" were not made in the usual method of transacting business, in that the "Notes" and "Loans" were made without the approval of the members of PIA as required by the Operating Agreement, and no copies of the "Notes" were provided to PIA.

310.    Pandi has begun demanding security on its alleged loans.

311.    The amount of the "Loans" and "Notes" is such that demanding repayment from PIA is in effect a transfer of all or nearly all of PIA's property.

312.    Repayment of the "Loans" and "Notes" would cause PIA's insolvency.

313.    The circumstances surrounding the execution and delivery of the "Notes" and "loans" are suspicious as described above, in that the amounts claimed do not match the amounts on PIA's books, PIA did not have copies of the "Notes" or "Loans," and several of the Notes reflected a debt owed to a Pandi Capital before Pandi Capital existed.

WHEREFORE, the Allens pray for judgment in an amount to be determined at trial, for their costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages; for an injunction, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT
(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, LLC and PANDI Capital, LLC)

314.    Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

315.    A justiciable controversy regarding the characterization of contributions made by Illig and Patterson through Pandi Capital exists in that Pandi Capital's counterclaims for breach of contract are based on "Notes" described in Pandi Capital's counterclaims.

316.    For the reasons described above, the contributions made by Patterson and Illig through Pandi Capital were not contractual obligations owed by PIA to Pandi Capital, but were equity contributions made by Illig and Patterson that have been re-characterized as loans in order to re-prioritize repayment.

317.    If Patterson and Illig through Pandi Capital are successful through their lawsuit in converting their equity contributions into debts, PIA and its subsidiaries will be perpetually insolvent, rendering it unable to repay debts or satisfy its contractual duties to third-party creditors like Allen.

318.    The disposition of Illig and Patterson's claims in this suit will impair or impede Allen's ability to protect both his interest as a Member of PIA in protecting PIA's financial solvency, and Jim and Nancy Allens' personal interests in protecting the priority of their loans made in 2006 over Illig and Patterson's equity contributions made from 2009-13.

319.    Allen therefore asks this Court for a declaration that the "Notes" described in Pandi Capital's counterclaims were in fact equity contributions to PIA Assets.

WHEREFORE, the Allens pray for a declaration of rights as described above, for their costs and fees incurred herein; and further legal and equitable relief as the Court deems just and proper.

## COUNT IV—FRAUDULENT INDUCEMENT
### (Jim Allen v. Patterson, Illig, and Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

320.    At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA.  Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well.  Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

321.    Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment

39

agreement.  The parties began to negotiate a revised employment agreement that contained the following material terms:  (a) reduction of his annual salary; (b) an incentive provision; (c) car allowance; (d) a note for the aforementioned loans from Jim and Nancy Allen under terms satisfactory to Allen; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

322.    The parties negotiated the terms of the revised agreement and finally reached agreement in principle.  Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

323.    PIA has never signed the revised agreement nor delivered a Note acceptable to Allen.

324.    Unbeknownst to Allen, Illig directed that a note for Allen's debt not be delivered to Allen.

325.    Shortly after the parties agreed to the revised agreement in principle, and before any signatures of the parties, Allen began receiving a reduced salary.

326.    Additionally, Patterson and Illig, without consent or discussion with Allen, nixed a townhome project which was to generate a significant portion of the bonuses under Allen's modified employment agreement. Allen has never received any of the bonuses provided for in the revised employment agreement.

327.    Allen also never received any drafts of a note as was contemplated by the modified employment agreement.

328.    In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a sign copy or the agreement or a draft promissory note, let alone

a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records. In response, Allen was presented with a "Note" signed by Illig that indicated the loans were due on January 1, 2013. Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

329. Illig had previously directed that the Note not be delivered to Allen.

330. The Allens' loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

331. It further appears that Patterson and Illig through Pandi Development induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement.

332. Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, Patterson and Illig through Pandi Development and Pandi Capital also have attempted to recharacterize their "capital contributions" as debt suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

333. Patterson and Illig's failure to disclose that they did not consider their capital contributions as such, and rather considered them as loans which would take priority above other payments was willful misconduct or was made with reckless indifference to the rights of Allen and was done with the intent to induce Allen to enter into a modified employment agreement.

334. Allen did not have any independent knowledge of Patterson and Illig's misrepresentations or intent to defraud him at the time.

335.     In entering into the modified employment agreement, which increased cash flow to PIA without any ability by Allen to benefit from that increased cash flow, Patterson and Illig intended Allen to rely on their representations.

336.     Allen never would have agreed to modify the terms of his original employment agreement, including to a reduced salary in order to provide PIA more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to attempt to reclassify their capital contributions as third-party debt to defraud the Allens out of money they loaned to the company and to decrease the value of Allen's shares.

337.     As a result of these fraudulent inducements, Allen gave up rights and benefits granted to him by his original agreement, including but not limited to a higher base salary and a six million dollar buyout provision of his Class A shares.

WHEREFORE, Plaintiff prays for judgment against Defendants Pandi Capital, Pandi Development, Patterson and Illig, jointly and severally, for fraudulent inducement through misrepresentations, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, and for such other and further relief as the Court may deem just and equitable.

Electronically Filed - Platte - October 06, 2014 - 04:49 PM

## COUNT V—BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS ON GUARANTIES
### (Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

338.     At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA.  Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well.  Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

339.     Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment agreement.  The parties began to negotiate a revised employment agreement that contained the following material terms:  (a) reduction of his annual salary; (b) an incentive provision; (c) car allowance; (d) a note for the Allens' aforementioned loans; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

340.     Per the revised agreement, within one year of Allen's resignation from his employment, FiveStar and "the other PIA Companies" were obligated to obtain releases on personal guaranties Allen had signed on debt obligations of PIA, Five Star, and other subsidiaries of PIA.

341.     If releases were not immediately obtained, FiveStar and the other PIA Companies were obligated to indemnify and hold Allen harmless.

342.     Releases were not obtained on the conditional guaranties Allen signed on PIA loans from Missouri Bank.

343.     If those guaranties were or are effective, FiveStar and the PIA Companies had an obligation to indemnify or hold Allen harmless with respect to those loans.

344.     Allen has not received any indemnification or hold harmless agreement from FiveStar or any of the PIA Companies.

345.     After causing PIA to default on the loans from Missouri Bank, Pandi, Illig and Patterson now claim to have purchased the Missouri Bank loans and seek to enforce Allen's guaranties.

346.     Pandi, Illig and Patterson, as the alter egos of PIA, FiveStar and the PIA Companies, have an affirmative obligation to release, indemnify and hold Allen harmless on those guaranties.

347.     Defendants now seek to insulate themselves from liability for the wrongful acts described above, from their obligation to repay Allen's loans, and from their obligations to indemnify, hold harmless and/or release Allen from the very guaranties Defendants now seek to enforce through a purported foreclosure "sale" of Allen's claims against PIA.

348.     Defendants have breached their duty to release and/or indemnify and hold Allen harmless on not only the loans from Missouri Bank, but also several other loans third parties made to PIA, FiveStar and the PIA Companies.

349.     As a result, Allen has been damaged.

WHEREFORE, Plaintiff prays for judgment against Defendants jointly and severally for breach of Plaintiff's employment agreement, including for their willful misconduct and intentional

breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## COUNT VI—CIVIL CONSPIRACY
**(Jim and Nancy Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)**

Plaintiffs incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

350.    As described above, Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development had an agreement and meeting of the minds to defraud Jim Allen out of the benefits of his employment contract, to defraud and prevent Jim and Nancy Allen from being repaid on their loan, and to insulate themselves from liability.

351.    Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development took the affirmative steps described above in furtherance of their conspiracy.

352.    Defendants' conspiracy and the actions taken in furtherance of that conspiracy have damaged Plaintiffs by delaying and frustrating repayment of their loan and defrauding Jim Allen out of the benefit of his employment contract.

WHEREFORE, the Allens pray for judgment against Defendants jointly and severally for the conspiracy, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

The Allens hereby requests a trial by jury of all issues triable by jury.


Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**


By:   /s/ Patrick J. Stueve
       Patrick J. Stueve, MO Bar # 37682
       stueve@stuevesiegel.com
       Andrew W. Funk, MO Bar # 59977
       funk@stuevesiegel.com
       460 Nichols Road, Suite 200
       Kansas City, MO 64112
       (816) 714-7100
       (816) 714-7101 Facsimile

**ATTORNEYS FOR PLAINTIFFS AND
COUNTERCLAIM-DEFENDANT**

Electronically Filed - Platte - October 06, 2014 - 04:49 PM

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via email and First-Class U.S. Mail this sixth day of October, 2014 to the following:

R. Pete Smith
Kristie Orme
petesmith@mcdowellrice.com
korme@mcdowellrice.com
**MCDOWELL RICE SMITH & BUCHANAN**
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
**Attorneys for Defendant**

Douglas M. Weems
Scott J. Goldstein
**SPENCER FANE BRITT & BROWNE, LLP**
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
dweems@spencerfane.com
sgoldstein@spencerfane.com
bdixon@spencerfane.com
**Attorneys for Pandi Capital, LLC**

Kirk T. May
F. Ryan Van Pelt
**ROUSE HENDRICKS GERMAN MAY, PC**
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
kirkm@rhgm.com
ryanv@rhgm.com
**Attorneys for Defendants Pandi Development, LLC,
Neal Patterson, and Clifford Illig**

/s/ Patrick J. Stueve

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR., AND

NANCY T. ALLEN

                Plaintiffs,

    v.

PIA ASSETS, LLC,

RP GOLF, LLC, and

FIVESTAR LIFESTYLES, LLC

                Defendants,

and

PANDI CAPITAL, LLC

PANDI DEVELOPMENT, LLC,

NEAL L. PATTERSON, and

CLIFFORD W. ILLIG,

                Intervenor-Defendants

                and Counterclaimants.

***FILED
10/14/2014
04:18 PM
SANDRA L. DOWD
CIRCUIT CLERK
PLATTE COUNTY, MO***

Case No. 13AE-CV00013

Division No. 2

## JOINT CONFIDENTIALITY AND PROTECTIVE ORDER

The parties hereby submit their Joint Confidentiality and Protective Order governing production, disclosure and use of certain documents and information produced and expected to be produced by the parties in this action. The parties jointly move the Court to enter the following confidentiality and protective order. In support, the parties state as follows.

    A.    The parties are engaged in discovery in this case, which may involve the production of documents, the inspection of tangible things, answering and responding to written discovery, and the taking of depositions;

189435

1

**EXHIBIT**

**21**

B. In the course of discovery, confidential and/or proprietary documents and/or information may be sought and/or used by the parties or other persons or entities as described herein;

C. Specifically, the confidential documents and/or proprietary information referenced above may contain information about the parties' businesses, business opportunities, designs, development, employees, sales, revenue, expenses, profits, financial status, income tax returns, and personal financial information;

D. The parties are interested in permitting discovery to proceed without delay occasioned by possible disputes about the confidential or proprietary nature of the documents and/or information being produced;

E. Missouri Rule of Civil Procedure 56.01(c) provides for the issuance of a protective order limiting the disclosure and use of information and documents for good cause;

F. The Court has previously granted the parties' request to designate tax returns and financial information confidential, and ordered the parties to work out the terms of a Protective Order;

G. Good cause exists for the issuance of a Protective Order; and

H. Specifically, good cause exists in that discovery may result in the production of materials that are confidential, proprietary and/or trade secrets, which, if not protected by an appropriate protective order, will result in the potential for damage to one or more of the parties. In addition, good cause exists, because the entry of such an order will permit discovery with less likelihood of disputes about confidentiality which would otherwise hinder the discovery process.

**IT IS ORDERED** that:

1.  The following definitions shall apply for purposes of this Confidentiality and Protective Order (hereinafter "Order"):

(a)     The term "CONFIDENTIAL MATERIAL" shall mean any and all materials, documents, information and testimony, whether disclosed during a deposition, in a document, in a discovery response or otherwise, which constitutes or contains trade secrets, proprietary data or other confidential information, including without limitation technical, financial, product and other proprietary information generally protected by law from dissemination.  In particular, documents that contain the following types of information may be designated as Confidential: non-public information about each party's businesses, business opportunities, products, product ideas, know how, designs, development, employees, sales, revenue, expenses, profits, financial information or status and income tax returns.

(b)     The term "Person" shall mean any natural person and any corporation, partnership, association or other entity.

(c)     The term "Party" shall mean Plaintiffs James S. Allen and Nancy T. Allen, and Defendants PIA Assets, LLC, RP Golf, LLC, and Fivestar Lifestyles, LLC, and Intervenors-Defendants and Counterclaimants Pandi Capital, LLC, Pandi Development, LLC, Neal L. Patterson, and Clifford W. Illig, and any other person who may become a named party to this matter.

(d)     The term "Producing Party" shall mean any Person requested or required to produce documents or provide information in this action.

2.  Any Producing Party may designate any document, thing, material, information, portion of transcripts or videotapes of depositions or other testimony, or other information derived therefrom, or response to discovery (including answers to interrogatories and discovery

requests), as "CONFIDENTIAL MATERIAL" under the terms of this Order. All CONFIDENTIAL MATERIALS shall be used and disclosed solely in accordance with the terms of this Order and for the purposes of the prosecution or defense of this matter and shall not be used or disclosed for any other purpose, unless ordered by this Court, or another court or any administrative agency having jurisdiction in this action.

3. Confidentiality shall be designated by stamping copies of the documents produced with the designation "CONFIDENTIAL." Stamping "CONFIDENTIAL" on the cover of any multi-page document shall designate all pages of the document as "CONFIDENTIAL," unless otherwise indicated by the Producing Party. All copies, prints or other reproductions, summaries, notes, synopses or any other memorialization of CONFIDENTIAL MATERIALS, or the information contained therein, shall be deemed CONFIDENTIAL MATERIALS subject to this Order.

4. In the event any Producing Party produces its files and records for inspection by a requesting party, no confidential designation need be made by the Producing Party in advance of said inspection. For purposes of the inspection, all material produced shall be considered as having been designated "CONFIDENTIAL MATERIAL," and the provision of such documents for review shall not be deemed to be an admission or waiver by the Producing Party of the confidentiality or non-confidentiality of any such documents. Thereafter, upon selection of specified documents by the requesting party for copying, the Producing Party shall mark as "CONFIDENTIAL" the copies of documents it desires to be subject to this Order prior to copying and further production. Moreover, to the extent that any such documents or portions thereof contain privileged or other matters subject to objections by the Producing Party, no such privilege or other objection shall be waived by such initial disclosure prior to copying.

189435

5. The Parties do not waive any privilege, including any attorney-client privilege, work product doctrine, or any other applicable privilege they might have with respect to any of the documents and information produced, nor do the Parties waive the right to challenge any assertion of privilege by entering into this Confidentiality Order. The Parties' production of Confidential Material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine, or any applicable privilege as to any other third party.

6. Deposition testimony may be designated as Confidential either during a deposition or within fourteen days after receipt of the transcript. The transcript of such testimony shall be marked or stamped "Confidential" on the first page and on each successive page containing such information. Any Party designating deposition testimony Confidential shall inform all other Parties, who shall appropriately mark or stamp the designated pages of their copies of deposition transcripts.

7. Except with the prior written consent of the Producing Party, or by Order of the Court, CONFIDENTIAL MATERIAL may be disclosed only to the following persons:

(a)     A Party to this action, provided that each Party agrees to limit disclosure of CONFIDENTIAL MATERIAL, or a Party's employees.

(b)     Party witnesses being prepared to testify in a deposition or hearing in this action, but only to the extent that counsel reasonably and in good faith believes that the CONFIDENTIAL MATERIAL is related to areas of possible examination.

(c)     Witnesses testifying in a deposition or hearing in this action, but only to the extent necessary for their participation in this action. If a Party believes CONFIDENTIAL

MATERIALS are being disclosed improperly to witnesses during any deposition, the Party may seek relief from this Court.

(d) Counsel of record for a Party and their legal associates, paralegals, and office staff.

(e) Outside experts, consultants, advisors and analysts retained or consulted for the purpose of assisting a Party in the preparation and trial of this case.

(f) The Court, court personnel and court reporters in the conduct of their official duties.

7. No other disclosure of CONFIDENTIAL MATERIAL may be made except pursuant to further Order of the Court or pursuant to a modification of this Order agreed to by written stipulations signed by counsel for the Parties. If any other person or entity demands, by subpoena or other judicial process, or by operation of law, production of documents produced and marked as Confidential pursuant to this Confidentiality Order, the Party receiving such demand shall promptly notify the producing Party of such demand. At its option, the producing Party may elect to challenge the demand and assert any applicable protections. The objecting Party shall notify the other Parties hereto and issuing court or tribunal of its challenge as required by law, the subpoena, or other judicial process. The burden of proving that Confidential Material is entitled to protection from disclosure shall lie with the Party making the claim. When such a challenge is made, the Party who received the demand shall not produce any Confidential Material in the absence of consent by the producing Party or an order by the issuing court or tribunal compelling production.

8. Absent written permission from the designating party or a Court Order secured after appropriate notice to all interested persons, all Confidential Material filed with the Court shall be filed under seal.

9. Nothing in this Order shall:

(a)    Prevent any Party from objecting to discovery that the Party believes is improper for any reason;

(b)    Preclude any Party from seeking any further or additional protection for CONFIDENTIAL MATERIAL not provided in this Order.

(c)    Any party may challenge the designation of Confidential Material and see relief from the Court in that regard.

10. Final resolution of this matter, including exhaustion of appellate remedies, shall not terminate the limitations on use and disclosure imposed by this Order, except with respect to documents or information that are no longer confidential. At the conclusion of the litigation, all documents and materials produced pursuant to the terms of this Order, and all copies, summaries and abstracts of such materials, however maintained, shall be kept completely confidential and destroyed (to the extent permitted by The Missouri Rules of Professional Conduct Rule 4-1.15) or returned to the producing or providing party. Counsel for the parties may use Confidential Material only for the purpose of defending ethical charges or professional malpractice charges, and may not use confidential documents or materials in any subsequent lawsuit..

11.    Notwithstanding the foregoing, counsel for the Parties shall be entitled to retain, in accordance with their regular office practice solely for the purpose of record keeping, one set of papers filed with the Court in this action, Orders entered by the Court in this action, correspondence, deposition transcripts, interrogatory responses, responses to requests to admit,

7

trial exhibits of record and attorney work-product that may contain or constitute CONFIDENTIAL MATERIALS. Any such documents retained by counsel shall continue to be subject to the terms of this Order.

12. Any notice to a Party required by this Order may be given by notifying that Party's counsel of record in this matter. Any act by a Party required by this Order may be performed by that Party's counsel of record in this case.

13. This Order shall not be modified, vacated, suspended, appealed or otherwise altered without further Order of the Court. This Court shall retain jurisdiction to enforce this Order, and this action may be reopened for purposes of enforcing this Order upon written motion and notice by any Party.

14. Nothing herein shall be construed to affect in any way the admissibility of any document, testimony or other evidence at trial.

**IT IS THEREFORE ORDERED** that the parties' joint motion for Confidentiality and Protective Order is granted.

**IT IS SO ORDERED.**

Dated this ___14___ day of ~~September~~ October, 2014.

_____
Circuit Court Judge

Submitted by:

**STUEVE SIEGEL HANSON, LLP**

By:_____

      Patrick J. Steuve #37682
      Andrew Funk #59977
      460 Nichols Road, Suite 200
      Kansas City, MO 64112
      Fax (816) 714-7101

And

      Robert M. Shaw #29007
      303 Marshall Road, Suite One
      P.O. Box 168
      Platte City, MO 64079
      Fax (816) 431-5086

ATTORNEYS FOR PLAINTIFFS

**McDOWELL, RICE, SMITH & BUCHANAN,**
A Professional Corporation

By:_____

      R. Pete Smith  #35408
      Kristie Orme #48685
      605 West 47th Street, Suite 350
      Kansas City, MO  64112-1905
      816/753-5400 | 816/753-9996
      petesmith@mcdowellrice.com

ATTORNEYS FOR DEFENDANTS

9

Submitted by:

**STUEVE SIEGEL HANSON, LLP**

By:_____

      Patrick J. Steuve #37682
      Andrew Funk #59977
      460 Nichols Road, Suite 200
      Kansas City, MO 64112
      Fax (816) 714-7101

And

      Robert M. Shaw #29007
      303 Marshall Road, Suite One
      P.O. Box 168
      Platte City, MO 64079
      Fax (816) 431-5086

ATTORNEYS FOR PLAINTIFFS

**McDOWELL, RICE, SMITH & BUCHANAN,**
A Professional Corporation

By:_____

      R. Pete Smith  #35408
      Kristie Orme #48685
      605 West 47th Street, Suite 350
      Kansas City, MO  64112-1905
      816/753-5400 | 816/753-9996
      petesmith@mcdowellrice.com

ATTORNEYS FOR DEFENDANTS

189435

**SPENCER FANE BRITT & BROWNE, LLP**

By:_____
Douglas M. Weems, MO Bar #41165
Scott J. Goldstein,   MO Bar #28698
1000 Walnut, Suite 1400
Kansas City, MO 64106
Telephone: (816) 474-8100
Facsimile (816) 474-3216
dweems@spencerfane.com
sgoldstein@spencerfane.com

ATTORNEYS FOR PANDI CAPITAL, LLC


**ROUSE HENDRICKS GERMAN MAY, P.C.**


By:_____
Kirk T. May, MO Bar #31657
F. Ryan Van Pelt, MO Bar #64208
1201 Walnut St., 20th Floor
Kansas City, MO 64106
kirkm@rhgm.com
ryanv@rhgm.com

ATTORNEYS FOR PANDI DEVELOPMENT, LLC
NEAL PATTERSON, AND
CLIFFORD ILLIG

10

**SPENCER FANE BRITT & BROWNE, LLP**


By:_____
Douglas M. Weems, MO Bar #41165
Scott J. Goldstein,    MO Bar #28698
1000 Walnut, Suite 1400
Kansas City, MO 64106
Telephone: (816) 474-8100
Facsimile (816) 474-3216
dweems@spencerfane.com
sgoldstein@spencerfane.com

ATTORNEYS FOR PANDI CAPITAL, LLC


**ROUSE HENDRICKS GERMAN MAY, P.C.**


By:_____
Kirk T. May, MO Bar #31657
F. Ryan Van Pelt, MO Bar #64208
1201 Walnut St., 20th Floor
Kansas City, MO 64106
kirkm@rhgm.com
ryanv@rhgm.com

ATTORNEYS FOR PANDI DEVELOPMENT, LLC
NEAL PATTERSON, AND
CLIFFORD ILLIG

189435

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR.,

and

NANCY T. ALLEN

          Plaintiffs

   v.

PIA ASSETS, LLC,
RP GOLF, LLC, and
FIVESTAR LIFESTYLES, LLC

          Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

          Intervenor-Defendants
          and Counterclaimants.

Case No.  13AE-CV00013

Division No. 2

*FILED
10/28/2014
11:29 AM
SANDRA L. DOWD
CIRCUIT CLERK
PLATTE COUNTY, MO*

## ORDER

For the reasons set forth Plaintiffs' Opposition to Missouri Bank's Motion for Protective Order Regarding Subpoena, the Motion is hereby denied.

DATE: October 28, 2014

_____
Honorable James W. Van Amburg, Circuit Judge

---

**EXHIBIT**

**22**

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR.,

and

NANCY T. ALLEN

        Plaintiffs

  v.

PIA ASSETS, LLC,
RP GOLF, LLC, and
FIVESTAR LIFESTYLES, LLC

        Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

        Intervenor-Defendants
        and Counterclaimants.

Case No.  13AE-CV00013

Division No. 2

*FILED*
*10/28/2014*
*11:30 AM*
*SANDRA L. DOWD*
*CIRCUIT CLERK*
*PLATTE COUNTY, MO*

## ORDER

      Pandi Capital, LLC, Pandi Development, LLC, Neal Patterson and Cliff Illig's Joint

Amended Motion for Protective Order is hereby denied.  Missouri Bank and Trust of Kansas

City's Motion for Protective Order is hereby denied. The production of documents required by

the subpoena served on Missouri Bank and Trust of Kansas City will be subject to the terms of

the Protective Order governing this case, entered on October 14, 2014.

DATE: __October 28__, 2014

_____
Honorable James W. Van Amburg, Circuit Judge

---

**EXHIBIT**

**23**

## IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

| | |
|---|---|
| **JAMES S. ALLEN, JR.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 13AE-CV00013** |
| | )    **Division II** |
| **PIA ASSETS, LLC,** | ) |
| **RP GOLF, LLC,** | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **PANDI CAPITAL, LLC,** | ) |
| **PANDI DEVELOPMENT, LLC,** | ) |
| **NEAL L. PATTERSON, and** | ) |
| **CLIFFORD W. ILLIG,** | ) |
| | ) |
| **Intervenor-Defendants,** | ) |
| **Counterclaimants, and Crossclaimants.** | ) |

### INTERVENOR-DEFENDANTS / COUNTERCLAIMANTS PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG'S ANSWER AND AFFIRMATIVE DEFENSES TO FIRST AMENDED COUNTERCLAIMS OF JAMES ALLEN AND NANCY ALLEN

Intervenor-Defendants and Counterclaimants Pandi Development, LLC ("Pandi Development"), Neal Patterson ("Patterson"), and Clifford Illig ("Illig") (collectively "Intervenor-Defendants") submit their Answer To Plaintiffs' First Amended Counterclaims Against Intervenors Pandi Capital, LLC, Pandi Development, LLC, Neal Patterson, and Clifford Illig. In their preliminary paragraph, James Allen and Nancy Allen (the "Allens"), incorporate their Answer and Affirmative Defenses into their Counterclaims. In response to that preliminary paragraph, Intervenor-Defendants state they lack knowledge or information sufficient to form a belief about the truth of those averments, and therefore, deny the averments. Additionally, Intervenor-Defendants state the affirmative defenses herein to the Allens' Counterclaims and also state the avoidances herein to the affirmative defenses pleaded by Allen.

```
┌─────────────────────┐
│      EXHIBIT        │
│                     │
│        24           │
└─────────────────────┘
```

## <u>ANSWER TO THE ALLENS' FIRST AMENDED COUNTERCLAIMS</u>

189.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 189.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 189.

190.    Intervenor-Defendants deny the averments contained in paragraph 190.

191.    Intervenor-Defendants admit the averments contained in paragraph 191.

192.    Intervenor-Defendants deny the averments contained in paragraph 192.

193.    The averments contained in paragraph 193 are legal conclusions to which no response is required.

194.    The averments contained in paragraph 194 are legal conclusions to which no response is required.

195.    Intervenor-Defendants admit the averments contained in paragraph 195.

196.    Intervenor-Defendants admit the averments contained in paragraph 196.

197.    Intervenor-Defendants lack sufficient knowledge, information, and belief as to the meaning of "affiliate" as used in paragraph 197 and, therefore, deny the averments contained in paragraph 197.

198.    Intervenor-Defendants admit the averments contained in paragraph 198.

199.    Intervenor-Defendants admit that Pandi Capital is the owner of the Notes and Loans representing the monies loaned to PIA Assets.  Intervenor-Defendants deny the remaining averments contained in paragraph 199.

200.    Intervenor-Defendants deny the averments contained in paragraph 200.

201.    Intervenor-Defendants deny the averments contained in paragraph 201.

202.    Intervenor-Defendants deny the averments contained in paragraph 202.

203.    Intervenor-Defendants deny the averments contained in paragraph 203.

204.    Intervenor-Defendants deny the averments contained in paragraph 204.

205.    Intervenor-Defendants admit that Patterson and Illig were managers of PIA Assets from its inception until December 21, 2012.  Intervenor-Defendants deny the remaining averments contained in paragraph 205.

206.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 206.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 206.

207.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 207.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 207.

208.    Intervenor-Defendants deny the averments contained in paragraph 208.

209.    Intervenor-Defendants deny the averments contained in paragraph 209.

210.    PIA's Operating Agreement speaks for itself, and Intervenor-Defendants deny the averments contained in paragraph 210 to the extent they are inconsistent with the Operating Agreement.  Intervenor-Defendants deny all other averments contained in paragraph 210.

211.    Intervenor-Defendants deny the averments contained in paragraph 211.

212.    Intervenor-Defendants deny the averments contained in paragraph 212.

213.    Intervenor-Defendants deny the averments contained in paragraph 213.

214.    Intervenor-Defendants deny the averments contained in paragraph 214.

215.    Intervenor-Defendants deny the averments contained in paragraph 215.

216.     Intervenor-Defendants deny the averments contained in paragraph 216.

217.     Intervenor-Defendants deny the averments contained in paragraph 217.

218.     Intervenor-Defendants admit that Pandi Capital made loans to PIA Assets. Intervenor-Defendants deny the remaining averments contained in paragraph 218.

219.     Intervenor-Defendants deny the averments contained in paragraph 219.

      a.   Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in subparagraph 219(a). Intervenor-Defendants, therefore, deny the averments contained in subparagraph 219(a).

      b.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in subparagraph 219(b). Intervenor-Defendants, therefore, deny the averments contained in subparagraph 219(b).

220.     Intervenor-Defendants deny the averments contained in paragraph 220.

221.     Intervenor-Defendants deny the averments contained in paragraph 221.

222.     Intervenor-Defendants deny the averments contained in paragraph 222.

223.     Intervenor-Defendants deny the averments contained in paragraph 223.

224.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 224.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 224.

225.     Intervenor-Defendants deny the averments contained in paragraph 225.

226.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 226.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 226.

227.    Intervenor-Defendants deny the averments contained in paragraph 227.

228.    Intervenor-Defendants deny the averments contained in paragraph 228.

229.    Intervenor-Defendants deny the averments contained in paragraph 229.

230.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 230.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 230.

231.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 231.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 231.

232.    Intervenor-Defendants deny the averments contained in paragraph 232.

233.    Intervenor-Defendants lack sufficient knowledge, information, and belief as to the averment that "Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based…" and, therefore, deny that averment.  Intervenor-Defendants deny the remaining averments contained in paragraph 233.

234.    Intervenor-Defendants deny the averments contained in paragraph 234.

235.    Intervenor-Defendants deny the averments contained in paragraph 235.

236.    Intervenor-Defendants deny the averments contained in paragraph 236.

237.    Intervenor-Defendants deny the averments contained in paragraph 237.

238.    Intervenor-Defendants admit that Pandi Capital has brought counterclaims in this lawsuit seeking to collect on the Notes from Pandi Capital to PIA Assets.  Intervenor-Defendants deny the remaining averments contained in paragraph 238.

239.    Intervenor-Defendants admit the averments contained in paragraph 239.

240.    Intervenor-Defendants deny the averments contained in paragraph 240.

241.    Intervenor-Defendants admit that Pandi Capital's Petition in Jackson County asserted claims to collect on its Notes to PIA Assets on April 30, 2013.  Intervenor-Defendants also admit that PIA Assets filed an Answer to Pandi Capital's Petition on May 3, 2013.  Intervenor-Defendants deny the remaining averments contained in paragraph 241.

242.    Intervenor-Defendants deny the averments contained in paragraph 242.

243.    Intervenor-Defendants deny the averments contained in paragraph 243.

244.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 244.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 244.

245.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 245.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 245.

246.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 246.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 246.

247.    Intervenor-Defendants deny the averments contained in paragraph 247.

248.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 248. Intervenor-Defendants, therefore, deny the averments contained in paragraph 248.

249.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 249. Intervenor-Defendants, therefore, deny the averments contained in paragraph 249.

250.     Intervenor-Defendants admit that Allen entered into an employment agreement with PIA Assets the terms of which speak for itself. Intervenor-Defendants deny the remaining averments contained in paragraph 250.

251.     The terms of the referenced agreement speak for themselves, and Intervenor-Defendants deny the remaining averments in paragraph 251.

252.     Intervenor-Defendants deny the averments contained in paragraph 252.

253.     The terms of the referenced agreement speak for themselves, and Intervenor-Defendants deny the remaining averments in paragraph 253.

254.     Intervenor-Defendants deny the averments contained in paragraph 254.

255.     Intervenor-Defendants admit the existence of a document entitled "Amended and Restated Employment Agreement" the terms of which speak for itself. Intervenor-Defendants deny the remaining averments in paragraph 255.

256.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 256. Intervenor-Defendants, therefore, deny the averments contained in paragraph 256.

257.     Intervenor-Defendants deny the averments contained in paragraph 257.

258.     Intervenor-Defendants deny the averments contained in paragraph 258.

259.	Interrvenor-Defendants deny the averments contained in paragraph 259.

260.	Intervenor-Defendants deny the averments contained in paragraph 260.

261.	Intervenor-Defendants deny the averments contained in paragraph 261.

262.	Intervenor-Defendants deny the averments contained in paragraph 262.

263.	Intervenor-Defendants deny the averments contained in paragraph 263.

264.	Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 264.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 264.

265.	Intervenor-Defendants deny the averments contained in paragraph 265.

266.	Intervenor-Defendants deny the averments contained in paragraph 266.

267.	Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 267.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 267.

268.	Intervenor-Defendants deny the averments contained in paragraph 268.

269.	Intervenor-Defendants deny the averments contained in paragraph 269.

270.	Intervenor-Defendants deny the averments contained in paragraph 270.

271.	Intervenor-Defendants admit that Allen filed a lawsuit against PIA in January 2013 and that lawsuit speaks for itself.   Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the remaining averments contained in paragraph 271. Intervenor-Defendants, therefore, deny the remaining averments contained in paragraph 271.

272.	Intervenor-Defendants deny the averments contained in paragraph 272.

273.	Intervenor-Defendants deny the averments contained in paragraph 273.

274.	Intervenor-Defendants deny the averments contained in paragraph 274.

275.     Intervenor-Defendants deny the averments contained in paragraph 275.

276.     Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 276.  Intervenor-Defendants, therefore, deny the averments contained in paragraph 276.

277.     Intervenor-Defendants deny the averments contained in paragraph 277.

278.     Intervenor-Defendants deny the averments contained in paragraph 278.

279.     Intervenor-Defendants deny the averments contained in paragraph 279.

280.     Intervenor-Defendants deny the averments contained in paragraph 280.

281.     Intervenor-Defendants deny the averments contained in paragraph 281.

282.     Intervenor-Defendants deny the averments contained in paragraph 282.

283.     Intervenor-Defendants deny the averments contained in paragraph 283.

284.     Intervenor-Defendants deny the averments contained in paragraph 284.

285.     Intervenor-Defendants deny the averments contained in paragraph 285.

286.     Intervenor-Defendants deny the averments contained in paragraph 286.

287.     Intervenor-Defendants deny the averments contained in paragraph 287.

288.     Intervenor-Defendants deny the averments contained in paragraph 288.

289.     Intervenor-Defendants deny the averments contained in paragraph 289.

290.     Intervenor-Defendants deny the averments contained in paragraph 290.

291.     Intervenor-Defendants deny the averments contained in paragraph 291.

292.     Intervenor-Defendants deny the averments contained in paragraph 292.

293.     Intervenor-Defendants deny the averments contained in paragraph 293.

**COUNT I – BREACH OF THE IMPLIED DUTY OF GOOD FAITH
AND FAIR DEALING**
(Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

294.    Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

295.    Intervenor-Defendants deny the averments contained in paragraph 295 and all of its subparts.

296.    Intervenor-Defendants deny the averments contained in paragraph 296.

297.    Intervenor-Defendants deny the averments contained in paragraph 297 and all of its subparts.

298.    Intervenor-Defendants deny the averments contained in paragraph 298.

299.    Intervenor-Defendants deny the averments contained in paragraph 299.

300.    Intervenor-Defendants deny the averments contained in paragraph 300.

301.    Intervenor-Defendants deny the averments contained in paragraph 301 and all of its subparts.

**COUNT II – VIOLATION OF THE MISSOURI FRAUDULENT TRANSFER ACT**
(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)

302.    Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

303.    Intervenor-Defendants deny the averments contained in paragraph 303.

304.    Intervenor-Defendants deny the averments contained in paragraph 304.

305.    Intervenor-Defendants deny the averments contained in paragraph 305.

306.    Intervenor-Defendants deny the averments contained in paragraph 306.

307.    Intervenor-Defendants deny the averments contained in paragraph 307.

308.    Intervenor-Defendants deny the averments contained in paragraph 308.

309.    Intervenor-Defendants deny the averments contained in paragraph 309.

310.    Intervenor-Defendants deny the averments contained in paragraph 310.

311.    Intervenor-Defendants deny the averments contained in paragraph 311.

312.    Intervenor-Defendants deny the averments contained in paragraph 312.

313.    Intervenor-Defendants deny the averments contained in paragraph 313.

## COUNT III – DECLARATORY JUDGMENT
### (Jim and Nancy Allen v. Illig, Patterson, Pandi Development, LLC and Pandi Capital, LLC)

314.    Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

315.    Intervenor-Defendants deny the averments contained in paragraph 315.

316.    Intervenor-Defendants deny the averments contained in paragraph 316.

317.    Intervenor-Defendants deny the averments contained in paragraph 317.

318.    Intervenor-Defendants deny the averments contained in paragraph 318.

319.    Intervenor-Defendants deny the averments contained in paragraph 319.

## COUNT IV – FRAUDULENT INDUCEMENT
### (Jim Allen v. Patterson, Illig, Pandi Capital and Pandi Development)

Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

320.    Intervenor-Defendants deny the averments contained in paragraph 320.

321.    Intervenor-Defendants deny the averments contained in paragraph 321.

322.    Intervenor-Defendants admit the existence of a document entitled "Amended and Restated Employment Agreement" the terms of which speak for itself. Intervenor-Defendants deny the remaining averments contained in paragraph 322.

323.    Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 323. Intervenor-Defendants, therefore, deny the averments contained in paragraph 323.

11

324. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 324. Intervenor-Defendants, therefore, deny the averments contained in paragraph 324.

325. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 325. Intervenor-Defendants, therefore, deny the averments contained in paragraph 325.

326. Intervenor-Defendants deny the averments contained in paragraph 326.

327. Intervenor-Defendants lack sufficient knowledge, information, and belief to admit or deny the averments contained in paragraph 327. Intervenor-Defendants, therefore, deny the averments contained in paragraph 327.

328. Intervenor-Defendants lack sufficient knowledge, information, and belief as to what Allen "believed" in March 2012. Intervenor-Defendants, therefore, deny the averments contained in paragraph 328.

329. Intervenor-Defendants deny the averments contained in paragraph 329.

330. Intervenor-Defendants deny the averments contained in paragraph 330.

331. Intervenor-Defendants deny the averments contained in paragraph 331.

332. Intervenor-Defendants deny the averments contained in paragraph 332.

333. Intervenor-Defendants deny the averments contained in paragraph 333.

334. Intervenor-Defendants deny the averments contained in paragraph 334.

335. Intervenor-Defendants deny the averments contained in paragraph 335.

336. Intervenor-Defendants deny the averments contained in paragraph 336.

337. Intervenor-Defendants deny the averments contained in paragraph 337.

**COUNT V – BREACH OF CONTRACT – RELEASE, INDEMNIFICATION AND HOLD HARMLESS ON GUARANTIES**
(Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

338.    Intervenor-Defendants deny the averments contained in paragraph 338.

339.    Intervenor-Defendants deny the averments contained in paragraph 339.

340.    Intervenor-Defendants admit the existence of a document entitled "Amended and Restated Employment Agreement" and the document speaks for itself.  Intervenor-Defendants deny the remaining averments contained in paragraph 340.

341.    Intervenor-Defendants deny the averments contained in paragraph 341.

342.    Intervenor-Defendants deny that Allen's guaranties were "conditional". Intervenor-Defendants admit the remaining averments contained in paragraph 342.

343.    Intervenor-Defendants deny the averments contained in paragraph 343.

344.    Intervenor-Defendants deny the averments contained in paragraph 344.

345.    Intervenor-Defendants admit that Pandi Capital, Pandi Development, Patterson, and Illig purchased the Missouri Bank loans and that they seek to enforce Allen's guaranty in this lawsuit.  Intervenor-Defendants deny the remaining averments contained in paragraph 345.

346.    Intervenor-Defendants deny the averments contained in paragraph 346.

347.    Intervenor-Defendants deny the averments contained in paragraph 347.

348.    Intervenor-Defendants deny the averments contained in paragraph 348.

349.    Intervenor-Defendants deny the averments contained in paragraph 349.

**COUNT VI – CIVIL CONSPIRACY**
(Jim and Nancy Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Intervenor-Defendants incorporate herein by reference the responses contained in the paragraphs above as though more fully and completely set forth herein.

350.    Intervenor-Defendants deny the averments contained in paragraph 350.

351.    Intervenor-Defendants deny the averments contained in paragraph 351.

352.    Intervenor-Defendants deny the averments contained in paragraph 352.

353.    Intervenor-Defendants deny all averments not expressly admitted herein.

## AFFIRMATIVE DEFENSES AND AVOIDANCES

353.    Allen fails to state a claim upon which relief may be granted against Intervenor-Defendants for breach of the implied covenant of good faith and fair dealing because Intervenor-Defendants and Pandi Capital were not parties to the agreement upon which Allen's averments are based.

354.    Any claim for relief or cause of action of the Allens with respect to Pandi Capital's loans to PIA Assets is extinguished under Mo. Rev. Stat. § 428.049 and / or entitled to protection under the provisions of Mo. Rev. Stat. § 428.044, including, but not limited to, the following reasons:

a.    The alleged "transfers" or "obligations" were made more than one year before the Allens brought this action.

b.    Any alleged "transfer" or "obligation" incurred as a result of Pandi Capital's Loans and Notes to PIA Assets was in good faith and gave new value to and for the benefit of PIA Assets after the alleged "transfer" or "obligation" was made in that Pandi Capital provided PIA Assets with loaned funds so that PIA Assets could continue to operate.

c.      PIA Assets received reasonably equivalent value for any alleged "transfer" or "obligation," including the loaned funds from Pandi Capital.

355.    Allen fails to state a claim upon which relief may be granted because his claims are barred by the Operating Agreement of PIA Assets.   Section 5.1(b) of the Operating Agreement states: "[e]ach Manager, in making any decisions or determinations or taking any actions in the capacity of a Manager, may and shall be entitled to consider and favor the rights and interests of the member that designated such Manager rather than the rights and interests of all Members, or the Company as a whole."

356.    Allen fails to state a claim upon which relief may be granted because his claims are barred by Mo. Rev. Stat. § 347.088.4 because Pandi Development is merely a member of the manager-managed PIA Assets. A member has no duties to the LLC or the other members solely by reason of acting in its capacity as a member.

357.    Allen fails to state a claim upon which relief may be granted against Intervenor-Defendants for breach of the implied covenant of good faith and fair dealing because the conduct Allen alleges was authorized by the Operating Agreement.

358.    Allen fails to state a claim upon which relief may be granted against Intervenor-Defendants for breach of the implied covenant of good faith and fair dealing because the Operating Agreement addresses the conduct of which Allen complains.

359.    The Allens, and each of them, fail to state a claim upon which relief may be granted against Intervenor-Defendants for violation of the Missouri Fraudulent Transfer Act because no transfer of PIA's property has been alleged or has occurred.

360.    The Allens, and each of them, fail to state a claim upon which relief may be granted against Intervenor-Defendants for violation of the Missouri Fraudulent Transfer Act

15

because the Allens have not established that they are creditors of PIA Assets and have no standing to pursue any claims under the Act.

361. The Allens, and each of them, fail to state a claim upon which relief may be granted against Intervenor-Defendants because the Allens do not allege that PIA Assets received inadequate consideration for the Loans and Notes from Pandi Capital.

362. Allen ratified PIA Assets' decision to accept Loans and Notes from Pandi Capital.

363. The Allens' claims are barred by the doctrines of laches, acquiescence, and equitable estoppel. Allen accepted the benefits of the Loans and Notes from Pandi Capital as a member, manager, and employee of PIA Assets in that he was allowed to continue operating PIA Assets even though it did not have sufficient cash flow to fund its operations. Allen's salary and his generous benefits were, in part, paid out of these funds. Allen approved these Loans and Notes and did not object to them at the time they were made. Pandi Capital loaned funds to PIA Assets based on its understanding from Allen's actions and express approval that he approved of the loans. Pandi Capital would not have continued to loan money to fund PIA Assets and Allen's salary if it knew of the Allens' current asserted objections to the Loans and Notes.

364. The Allens, and each of them, fail to state a claim upon which relief may be granted under the Missouri Fraudulent Transfer Act because the Allens' claims did not arise before any alleged "transfer" or "obligation" was made.

365. The Allens, and each of them, have unclean hands to assert their claims because they are currently seeking repayment of a promissory note for money they allegedly loaned to PIA Assets in this lawsuit. The Allens cannot, in this case, claim that attempts to collect on any of Pandi Capital's Loans and Notes to PIA Assets are in any way fraudulent or breaches of the

implied covenant of good faith and fair dealing while they seek to collect debts allegedly owed them by PIA Assets in the same suit.

366.     Patterson and Illig are not in contractual privity with Allen because they are not parties to the Operating Agreement of PIA Assets or to Allen's alleged employment agreement. Allen, therefore, fails to state a claim upon which relief may be granted against Patterson and Illig.

367.     Pandi Development is not a party to Allen's alleged employment agreement and, therefore, Allen fails to state a claim upon which relief may be granted against Pandi Development based on the alleged employment agreement.

368.     The actions of Intervenor-Defendants alleged by the Allens were taken in good faith to fund PIA Assets' operations.

369.     The Allens do not have standing to assert any claims against PIA Assets, including his fraudulent transfer, breach of contract, civil conspiracy, piercing the corporate veil, and/or alter ego claims because, by virtue of the sale of PIA Assets' loan from Missouri Bank & Trust Co. of Kansas City to Pandi Capital, Pandi Development, Patterson, and Illig, the Allens claims now belong to Pandi Capital, Pandi Development, Patterson, and Illig, and Allen is not the real party in interest.

370.     The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil against Patterson and Illig because Patterson and Illig are not members of PIA Assets.

371.     The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because the Allens have failed to allege facts that show Intervenor-Defendants or Pandi Capital have domination or control of the corporate entity.

372.    The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because they have failed to allege facts that show Intervenor-Defendants or Pandi Capital have committed fraud or violated any legal duty.

373.    The Allens, and each of them, fail to state a claim upon which relief may be granted for piercing the corporate veil because they have failed to allege facts that show that Intervenor-Defendants or Pandi Capital proximately caused their alleged injury.

374.    To the extent that Intervenor-Defendants owe any debts or obligations to the Allens, which Intervenor-Defendants deny, Intervenor-Defendants are entitled to recoup and/or set-off the repayment of any such debt against amounts adjudged to be owed by the Allens to Intervenor-Defendants.

375.    The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding.  The Allens seek a declaratory judgment re-characterizing Pandi Capital's loans to PIA Assets as equity contributions on behalf of Patterson and Illig, but they seek no re-characterization or determination as to their own alleged loan to PIA Assets.

376.    The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the Allens have an adequate remedy at law by asserting a claim for damages.

377.    The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because a justiciable controversy does not exist. The Allens' purported basis for declaratory judgment is that if Pandi Capital's loans are classified as debt, "PIA and its

subsidiaries will be perpetually insolvent". Such an assertion seeks an advisory opinion on a hypothetical situation that may or may not come to pass.

378.     The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because the Allens do not have a legally-protected interest consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief.  The Allens do not have any claim or interest in whether Pandi Capital's loans to PIA Assets are characterized as loans or equity contributions.

379.     The declaratory judgment sought by the Allens fails to state a claim upon which relief may be granted because it is not ripe for judicial determination.  The factual basis for the declaratory judgment – that "PIA and its subsidiaries will be perpetually insolvent" – is hypothetical and not certainly impending.

380.     The Allens, and each of them, fail to state a claim upon which relief may be granted for fraud because they fail to allege with particularity the circumstances constituting fraud as required by Mo. R. Civ. P. 55.15.

381.     The Allens, and each of them, fail to state a claim upon which relief may be granted for fraud because they had knowledge of the truth that the Notes and Loans provided by Pandi Capital to PIA Assets were indeed loans.

382.     Allen alleges that he did not receive the note for his alleged credit to PIA in paragraph 207 of his Counterclaims.  Allen, therefore, had knowledge that the note was not delivered to him.  If the alleged conduct occurred, it occurred with Allen's knowledge.  Allen, therefore, fails to state a claim upon which relief may be granted for fraud.

383.     Allen fails to state a claim upon which relief may be granted for fraud because he merely alleges that Patterson and Illig "discussed" additional capital contributions to PIA Assets.

Allen alleges no statement of future intent on behalf of Patterson and Illig to make capital contributions to PIA. Further, statements of intent as to future events are not actionable under Missouri law.

384. The Allens, and each of them, fail to state a claim upon which relief may be granted for conspiracy because Patterson and Illig are agents and members of Pandi Development and cannot conspire with that LLC.

385. The Allens, and each of them, fail to state a claim upon which relief may be granted because Pandi Development is a member of PIA Assets and members of LLCs cannot conspire with their own LLC.

386. Patterson and Illig, as members of Pandi Development, are shielded from liability under Mo. Rev. Stat. § 347.057.

387. Pandi Development, as a member of PIA Assets, is shielded from liability under Mo. Rev. Stat. § 347.057.

388. Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Notes and are now the owners of the Notes and Allen's guaranties on the Notes. Allen's claims against PIA Assets, including his initial Petition and Counts V and VI of his counterclaims, were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA Assets as collateral and held a foreclosure sale of Allen's claims against PIA Assets. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen is, therefore, no longer the real party in interest and has no standing to assert claims against PIA Assets.

389. Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Notes and are now the owners of the Notes and Allen's guaranties on the Notes.

Allen's claims against PIA Assets were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA Assets as collateral and held a foreclosure sale of Allen's claims against PIA Assets. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen is, therefore, no longer the real party in interest and has no standing to assert claims against PIA Assets. Accordingly, Allen does not have standing to pursue claims against Pandi Development, Patterson, Illig, and Pandi Capital by asserting claims against PIA Assets and attempting to pierce PIA Assets' corporate veil.

390. Pandi Development, Patterson, Illig, and Pandi Capital have purchased the Missouri Bank Notes and are now the owners of the Notes and Allen's guaranties on the Notes. Allen's claims against PIA Assets, including his initial Petition and Counts V and VI of his counterclaims, were collateral for the PIA Note. Pandi Development, Patterson, Illig, and Pandi Capital foreclosed on Allen's claims against PIA Assets as collateral and held a foreclosure sale of Allen's claims against PIA Assets. Pandi Development, Patterson, Illig, and Pandi Capital purchased the collateral at the sale. Allen, therefore, fails to state a claim upon which relief may be granted.

391. Allen has subordinated his claims to third-party lenders in certain guaranties of promissory notes to the rights and claims of the third-party lenders. Pandi Capital, Pandi Development, Patterson, and Illig purchased certain of those notes and are now the owners of those notes and Allen's guaranties of those notes. By virtue of those note purchases, Pandi Capital, Pandi Development, Patterson, and Illig are now the lender under those notes. Allen's claims in this suit, therefore, are subordinated to the rights and claims of Pandi Capital, Pandi Development, Patterson, and Illig under those notes and Allen's guaranties of those notes.

Electronically Filed - Platte - November 05, 2014 - 04:33 PM

392.     Nancy Allen executed multiple joinders of Allen's guaranties in favor of third-party lenders guarantying the debts of PIA affiliates, effectively making her a co-guarantor of the debt. These joinders contained subordination agreements in favor of the third-party lenders in which she subordinated any right or claim she had or may acquire against the "Lender" to all the rights of the "Lender" accruing directly or indirectly under Allen's guaranties and Nancy Allen's joinder in those guaranties.  Pandi Capital, Pandi Development, Patterson, and Illig have purchased certain notes guaranteed by Allen's guaranties and Nancy Allen's joinder in those guaranties.  Pandi Capital, Pandi Development, Patterson, and Illig are now the Lender under the loan documents, including Nancy Allen's joinder in Allen's guaranties.  Nancy Allen's claims against Pandi Capital, Pandi Development, Patterson, and Illig, therefore, are subordinated to Pandi Capital's, Pandi Development's, Patterson's, and Illig's claims against Allen and Nancy Allen under the guaranties and joinder of those guaranties.

393.     Allen fails to state a claim upon which relief may be granted for fraud because he fails to plead facts that evidence a present intent not to perform the contract at the time the contract was made.

394.     The Allens, and each of them, knew that Pandi Capital had made loans to PIA Assets and, therefore, he knew that Pandi Capital's loans to PIA were not equity contributions on behalf of Patterson and Illig, as Allen alleges in his Counterclaims.  The Allens, therefore, fail to state a claim upon which relief may be granted for fraud.

395.     Nancy Allen fails to state a claim upon which relief may be granted because she is not a party to the alleged promissory note.

396.     Counts IV and V of Allen's Counterclaims are barred by the doctrines of laches, acquiescence, and equitable estoppel.  He accepted the benefits of the alleged contracts and he did not raise the issues complained of at the time they occurred.

397.     The affirmative defenses contained in paragraphs 157-167, 170-173 and 180-185 are mere conclusions, and do not contain "a short and plain statement of the facts showing that the pleader is entitled to the defense" as required by Mo. R. Civ. P. 55.08.

398.     The affirmative defenses in paragraphs 170-172 that the sale of Allen's claims was not commercially reasonable and/or violated the duty of good faith and fair dealing under the Missouri Uniform Commercial Code are barred by the doctrines of waiver, laches, acquiescence, and estoppel.  Allen received notice of the disposition of his claims in compliance with the Missouri Uniform Commercial Code and he did not raise a valid objection to the commercial reasonableness and/or the good faith of the sale.   Neither Allen, nor his representative attended the sale.

399.     Allen's affirmative defense in paragraph 174 is barred by the doctrines of waiver, laches, acquiescence, and estoppel.  Allen did not receive an indemnification agreement when he signed the guaranty nor did he raise the issue at that time.

400.     The purchases of the notes and instruments which are the subject of Intervenor-Defendants' claims were at arms-length, in good faith, in a commercially reasonable manner, and a result of fair dealing.  Those purchases complied with all requirements, if any, of the Missouri Uniform Commercial Code.

401.     Intervenor-Defendants need not be holders in due course to assert their counterclaims, and to any extent they must be holders in due course, they are.

402. No debts, whether by virtue of a guaranty or otherwise, owed by Allen and the subject of Intervenor-Defendants' counterclaims have been extinguished. The obligations of any obligors were not altered as a result of any purchases.

403. Intervenor-Defendants reserve the right to add additional affirmative defenses and/or avoidances as additional facts are revealed through discovery.

Respectfully submitted,

ROUSE HENDRICKS GERMAN MAY PC

_____/s/ Kirk T. May_____

Kirk T. May                    MO Bar #31657
F. Ryan Van Pelt               MO Bar #64208
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
Tele:   (816) 471-7700
Fax:    (816) 471-2221
Email: kirkm@rhgm.com
Email: ryanv@rhgm.com
*Attorneys for Defendants Pandi Development, LLC, Neal Patterson, and Clifford Illig*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served by US mail, postage prepaid on the 5th of November and by electronic mail upon:

Patrick J. Stueve
Andrew W. Funk
Stueve Siegel Hanson LLP
460 Nichols Road, Ste. 200
Kansas City, MO 64112

Robert Shaw
303 Marshall Road
PO Box 268
Platte City, MO 64079

Kristie Orme
McDowell Rice Smith & Buchanan, PC
605 West 47th Street, Ste. 350
Kansas City, MO 64112

Douglas M. Weems
Scott J. Goldstein
Bradley S. Dixon
1000 Walnut, Suite 1400
Kansas City, Missouri 64106

_____/s/ Kirk T. May_____
Attorney for Defendants

## IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

JAMES S. ALLEN, JR.,
NANCY T. ALLEN

              Plaintiffs

    v.

PIA ASSETS, LLC,
RP GOLF, LLC, and
FIVESTAR LIFESTYLES, LLC

              Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

              Intervenor-Defendants
              and Counterclaimants.

Case No. 13AE-CV00013

Division No. 2



FILED
SEP 21 2015
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

### ORDER GRANTING PLAINTIFFS' MOTION
### TO COMPEL PRODUCTION OF DOCUMENTS

Upon consideration of Plaintiffs James S. Allen, Jr., and Nancy T. Allen's Motion to Compel Production of Documents, for good cause shown, the Court hereby GRANTS the Motion as described below.

Plaintiffs Motion to Compel production of electronically-stored documents and communications in the possession of custodians Neal Patterson, Cliff Illig, Maureen Evans, Karen Virgillito, Deborah Smeltzer, and Rob Heineman is hereby GRANTED.

Plaintiffs' Motion to Compel production of documents responsive to Requests 1-8 of Plaintiff's First Set of Requests for Production of Documents to Neal Patterson, Clifford Illig, and Pandi Development, including documents and electronic communications in the possession

EXHIBIT

25

of Neal Patterson, Cliff Illig, Maureen Evans, Karen Virgillito, Deborah Smeltzer, and Rob Heineman, is hereby GRANTED.

Plaintiffs' Motion to Compel production of documents responsive to Request 12-14 of Plaintiff's First Set of Requests for Production of Documents to Neal Patterson, Clifford Illig, and Pandi Development, including documents and electronic communications in the possession of Neal Patterson, Cliff Illig, Maureen Evans, Karen Virgillito, Deborah Smeltzer, and Rob Heineman, is hereby GRANTED.

Plaintiffs' Motion to Compel production of documents responsive to Request 18 of Plaintiff's First Set of Requests for Production of Documents to Neal Patterson, Clifford Illig, and Pandi Development, including documents and electronic communications in the possession of Neal Patterson, Cliff Illig, Maureen Evans, Karen Virgillito, Deborah Smeltzer, and Rob Heineman, is hereby GRANTED.

Plaintiffs' Motion to Compel production of documents responsive to Requests 31-32 of Plaintiff's First Set of Requests for Production of Documents to Neal Patterson, Clifford Illig, and Pandi Development, including documents and electronic communications in the possession of Neal Patterson, Cliff Illig, Maureen Evans, Karen Virgillito, Deborah Smeltzer, and Rob Heineman, is hereby GRANTED.

Plaintiffs' Motion to Compel production of documents responsive to Request 34 of Plaintiff's First Set of Requests for Production of Documents to Neal Patterson, Clifford Illig, and Pandi Development, including documents and electronic communications in the possession of Neal Patterson, Cliff Illig, Maureen Evans, Karen Virgillito, Deborah Smeltzer, and Rob Heineman, is hereby GRANTED.

Defendants Neal Patterson, Cliff Illig, and Pandi Development shall produce a privilege log on a date to be mutually agreed upon by the parties.

Defendants will supplement their responses to Plaintiff's First Set of Requests for Production of Documents, and confirm in their supplemental response that all responsive documents have been produced and whether any responsive documents are being withheld based on privilege .

IT IS SO ORDERED.

DATE: September 21, 2015

_____
Honorable James W. Van Amburg, Circuit Judge

FILED
3/30/2016
11:02 AM
KIMBERLY K JOHNSON
CIRCUIT CLERK
PLATTE COUNTY, MO

**IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**

| | |
|---|---|
| JAMES S. ALLEN, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Case No. 13AE-CV00013** |
| | )   **Division II** |
| PIA ASSETS, LLC, | ) |
| RP GOLF, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| PANDI CAPITAL, LLC, | ) |
| PANDI DEVELOPMENT, LLC, | ) |
| NEAL L. PATTERSON, and | ) |
| CLIFFORD W. ILLIG, | ) |
| | ) |
| Intervenor-Defendants, | ) |
| Counterclaimants, and Crossclaimants | ) |

**ORDER TO CONTINUE JUNE 20, 2016 TRIAL SETTING**

Upon motion of Pandi Development, Clifford Illig, and Neal Patterson, there being no objection from any party, and for good cause shown, it is hereby ORDERED that the June 20, 2016 trial setting is continued until further notice. It is further ORDERED that his matter is set for a hearing on ___April 15, 2016___ at __9:00 a.m.__, at which time the court will schedule a new trial setting.

IT IS SO ORDERED.

Date: __3/30/2016_____

_____
James W. Van Amburg, Circuit Judge

**EXHIBIT**

**26**

IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

F I L E D
JUN 27 2016
KIMBERLY K JOHNSON
Clerk of the Circuit Court Platte County, MO

JAMES S. ALLEN, JR.,　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
NANCY T. ALLEN,　　　　　　　 )
　　　　　Counterclaim Plaintiff,　)
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
v　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
PIA ASSETS, INC.,　　　　　　　)
RP GOLF, LLC, and　　　　　　 )
FIVESTAR LIFESTYLES, LLC,　　 )
　　　　　Defendants,　　　　　)
　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
PANDI CAPITAL, LLC,　　　　　 )
PANDI DEVELOPMENT,LLC,　　　)
NEAL L. PATTERSON, and　　　　)
CLIFFORD W. ILLIG,　　　　　　)
　　　　　Intervenor-Defendants　)
　　　　　And Counterclaimants.　)

Case No. 13AE-CV00013

## ORDER GRANTING MOTION TO QUASH SUBPOENAS, IN PART, AND DENYING MOTION TO QUASH SUBPOENAS, IN PART, AND DENYING MOTION FOR CLAWBACK

On the 13th day of May, 2016 and the 17th day of May 2016, the Plaintiffs appeared by attorneys Toji Calabro, Andrew Funk, Patrick Steuve, and Robert Shaw. The Defendants Pandi Development, Neal Patterson, and Clifford Illig appeared by attorney Kirk May. The Defendant PIA Assets appeared by attorney Kristie Orme. The Defendant Pandi Capital appeared by attorney Douglas Weems. Arguments of counsel were heard and the matter was taken under advisement.

Now on the 27ᵗ day of June, 2016, the Court finds as follows:

EXHIBIT

27

1. The Court declines to apply the crime-fraud exception in a civil lawsuit as a matter of law.
2. The Court declines to apply the crime-fraud exception in this civil lawsuit as a matter of fact.

3. The Defendant Pandi Capital's Motion to quash the subpoena issued to the law firm of Spencer Fane should be granted.

4. The Defendant PIA Assets Motion to quash the subpoenas issued to Pete Smith, Joe Harter and McDowell, Rice and Smith should be granted.

5. The Defendants Motion to quash the subpoena issued to Randall Nay should be denied.

6. The Motion of the Defendant Pandi Capital is compel clawback should be denied.

**Wherefore, it is Ordered** that the Defendant Pandi Capital's Motion to Quash the Subpoena issued to the Law Firm of Spencer Fane is granted.

**It is Further Ordered** that the Defendant PIA Assets' Motion to quash the subpoenas issued to Pete Smith, Joe Harter and McDowell, Rice and Smith is granted.

**It is Further Ordered** that the Defendant PIA Assets' Motion to Quash the Subpoena of Randall Nay is denied.

**It is Further Ordered** that the Defendant Pandi Capital's Motion to Compel Clawback is denied.

_____
James W. Van Amburg, Judge

# IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

| | | |
|---|---|---|
| JAMES S. ALLEN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| NANCY T. ALLEN | ) | |
| | ) | |
| Counterclaim Plaintiff | ) | |
| v. | ) | Case No. 13AE-CV00013 |
| | ) | Division No. 2 |
| PIA ASSETS, LLC, | ) | |
| RP GOLF, LLC, | ) | |
| AND | ) | |
| FIVESTAR LIFESTYLES, LLC | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| PANDI CAPITAL, LLC, | ) | |
| PANDI DEVELOPMENT, LLC, | ) | |
| NEAL L. PATTERSON, and | ) | |
| CLIFFORD W. ILLIG, | ) | |
| | ) | |
| Intervenor-Defendants | ) | |
| and Counterclaimants. | ) | |

## DEFENDANTS' CONSENT TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND THEIR PETITION AND FIRST AMENDED ANSWER TO INTERVENOR DEFENDANTS PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG'S COUNTERCLAIMS AND CROSS-CLAIMS, AND COUNTERCLAIMS AGAINST DEFENDANTS

Pursuant to Mo. R. Civ. Pro. 55.33(a), Defendants PIA Assets, LLC, RP Golf, LLC, Fivestar Lifestyles, LLC, Pandi Capital, LLC, Pandi Development, LLC, Neal L. Patterson, and Clifford W. Illig hereby consent to Plaintiffs' Motion for Leave to Amend Their Petition and First Amended Answer to Intervenor Defendants Pandi Development, LLC, Neal Patterson, and Clifford Illig's Counterclaims and Cross-Claims, and Counterclaims against Defendants, filed on October 4, 2016 (the "Consent").

1

EXHIBIT

28

exhibitsticker.com

The pleadings attached as Exhibits 1 and 2 to Plaintiff's motion are deemed filed and properly served on Defendants as of the date of this Consent.

The Consent is in no respect an admission as to the merits of any claims, allegations, or positions set forth in Allen's motion, or the now operative amended pleadings, and the parties against whom Allen asserts all such claims reserve all rights and defenses, including the right to move to dismiss any claim on the pleadings (with the exception of a motion based on the propriety or sufficiency of service, to which Defendants have consented).

The Consent is not a waiver of the attorney-client or attorney work product privileges applicable to documents Plaintiffs cited in whole or in part in the now operative amended pleadings, and Defendants reserve all rights to seek appropriate relief from the Court with respect to any such document or documents.

Dated: October 17, 2016                Respectfully submitted,

GERMAN MAY PC

By    /s/ Phillip G. Greenfield
           Kirk T. May      MO Bar #31657
           Phillip G. Greenfield  MO Bar #37457
           1201 Walnut Street, 20th Floor
           Kansas City, MO 64106
           Tele:  (816) 471-7700
           Fax:   (816) 471-2221
           Email: kirkm@germanmay.com
           Email: philg@germanmay.com

*Attorneys for Defendants Pandi Development, LLC, Neal Patterson, and Clifford Illig*

By:    /s/Kristie Orme

Kristie Orme       MO Bar #48685
R. Pete Smith       MO Bar #35408
MCDOWELL RICE SMITH &
BUCHANAN
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
Tele: 816-753-4500
Fax: 816-753-9996
petesmith@mcdowellrice.com
korme@mcdowellrice.com

*Attorneys for Defendants PIA Assets, LLC,*
*RP Golf, LLC, and FiveStar Lifestyles, LLC*

By:    /s/Douglas M. Weems

Douglas M. Weems    MO Bar# 41165
Scott J. Goldstein      MO Bar #28698
SPENCER FANE, LLP
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
Tele: 816-474-8100
Fax: 816-474-3216
dweems@spencerfane.com
sgoldstein@spencerfane.com

*Attorneys for Defendant Pandi Capital, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of October, 2016, the foregoing document was filed with the clerk of the court by using the Missouri e-filing system, which sends notification of such filing to all counsel of record.

       /s/ Phillip G. Greenfield
       Attorney for Defendants

3

**IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**

JAMES S. ALLEN, JR.

                Plaintiff,

and

NANCY T. ALLEN

                Counterclaim Plaintiff

vs.

PIA ASSETS, LLC,
RP GOLF, LLC,
and
FIVESTAR LIFESTYLES, LLC

                Defendants,

and

PANDI CAPITAL, LLC
PANDI DEVELOPMENT, LLC,
NEAL L. PATTERSON, and
CLIFFORD W. ILLIG,

                Intervenor-Defendants
                and Counterclaimants.

Case No. 13AE-CV00013

Division No. 2

**PLAINTIFFS' SECOND AMENDED PETITION**

    Plaintiffs James S. Allen, Jr., and Nancy T. Allen, through undersigned counsel, state as follows:

**INTRODUCTION**

    1.    Plaintiff James S. Allen, Jr. ("Allen"), along with other partners, held a majority interest in companies (including Defendant RP Golf, LLC) that owned large-scale investment properties, including the golf courses, residential lots and country clubs at the National and Loch

EXHIBIT

29

exhibitsticker.com

Lloyd, as well as several commercial properties. Allen oversaw the operations of these properties.

2.      In October 2006, there was a sale and restructuring of these companies and Neal Patterson and Cliff Illig became majority owners. Specifically, the parties created PIA Assets, LLC as a new holding company of the investment properties. After the transaction, Patterson and Illig were majority Class A shareholders. Allen remained as a minority Class A shareholder and president of Defendant PIA Assets, LLC. Allen's former partners became Class B shareholders with no role in the operation of the properties.

3.      Leading up to the restructuring, Plaintiffs loaned money to RP Golf to fund the day-to-day operations of the entities that were eventually consolidated under PIA.

4.      It was agreed that these loans would be repaid as a part of the October 6, 2006 transaction. But the loans were not repaid at the closing of the transaction and the parties agreed that the loans would be repaid at a later date.

5.      These loans were authorized by RP Golf's Board of Managers.

6.      Prior to January 1, 2008, these loans were on the balance sheets of RP Golf with accruing interest.

7.      In 2008, PIA created loans in favor of Allen in the principal amount of $817,585.

8.      PIA's financial statements reflect the liability with a twenty percent internal rate of return with a maturity date of February 2012.

9.      The loans have never been repaid.

## PARTIES

10.     Plaintiff James S. Allen, Jr. is a resident of Parkville, Missouri. Allen owns 13.5% of the Class A shares of Defendant PIA Assets, LLC.

11.     Plaintiff Nancy T. Allen is a resident of Parkville, Missouri.

12.     Defendant PIA Assets, LLC (collectively with its subsidiaries "PIA") is a Missouri limited liability company with its principal place of business at 8878 NW 63rd Street, Parkville, Platte County, Missouri.  PIA owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, Parkville Commons shopping district and Loch Lloyd Country Club, among other properties.  PIA may be served with process by serving its Registered Agent in Kansas City, Jackson County, Missouri.

13.     Defendant RP Golf, LLC is a Missouri limited liability company with its principal place of business at 8878 NW 63rd Street, Parkville, Platte County, Missouri. RP Golf holds 100% of the interests in clubs, golf courses and developments at the National. PIA owns RP Golf. RP Golf may be served with process by serving its Registered Agent in Kansas City, Missouri.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendants pursuant to Missouri Revised Statutes Sections 506.500(1) and/or 506.500(3) because the cause of action herein asserted arises from Defendants' transaction of business within the State of Missouri and/or Defendants' making of a contract within the State of Missouri.

15.     Venue is proper in this county pursuant to Missouri Revised Statutes Section 508.010 because PIA has at all times material and presently does maintain and keep an office and agent for transaction of its usual and customary business in Platte County, Missouri and the cause of action accrued, at least in part, in Platte County, Missouri.

## FACTS

16.     In 2006, Plaintiff Allen, along with two partners Jim Watson and Jack Manning, controlled multiple large scale real-estate investment properties, including Parkville Commons, the National (including residential lots, the golf courses ("The National" and "The Deuce") and

3

the country club), and Loch Lloyd (including residential lots, the golf course, and the country club).

17. In October 2006, Allen, Watson and Manning entered into an agreement with two of their investors, Neal Patterson and Cliff Illig, to restructure the management and control of these significant assets.

18. Under the terms of their agreement, Manning and Watson gave up their majority shares and all rights to control the assets to Patterson, Illig, and Allen in exchange for a regular stream of payments. Manning and Watson became "Class B" shareholders of the newly-formed PIA Assets, LLC.

19. PIA Assets, LLC (named for **P**atterson, **I**llig and **A**llen), was formed to own and manage the investment properties.

20. PIA is a holding company. Its primary assets are ownership interests in the assets previously held by PANDI Development LLC, Allen, and Watson and Manning.

21. Since the formation of PIA, Patterson and Illig, along with Allen, were elected and have served as the Managing Members of PIA. Patterson and Illig were replaced as managing members in December 2012. The three were and are Class A shareholders of PIA. Patterson and Illig share 86.5% of the Class A shares; Jim Allen holds 13.5%.

22. Patterson and Illig's interests in PIA are held by PANDI Development, LLC.

23. Allen signed an employment agreement in 2006 to serve as President of PIA.

24. Prior to October 2006, when Watson, Manning, Allen, Illig and Patterson were negotiating the terms of the transaction, Plaintiffs made loans to entities that controlled the investment properties involved in the transaction. These loans were necessary to fund day-to-day operations of the entities, such as utilities, payroll and tax payments.

25. All loans were approved by RP Golf's board of managers.

4

26.     In or around the closing of the transaction in October 2006, PIA took over RP Golf and all of its assets, liabilities and obligations.

**Plaintiff's Loans Were Reflected on the Balance Sheets of PIA**

27.     Plaintiff's loans were then reflected on the balance sheets of Defendant RP Golf, LLC from 2006 to 2008. The loans were accruing interest.

28.     In 2008, PIA transferred the balance of the debts to PIA's books.

29.     The December 31, 2008, Balance Sheet of PIA Assets, LLC reflects Plaintiff's loans as four Notes Payable to Plaintiff. These Notes are categorized as "Long Term Liabilities."

30.     One Note Payable is reflected as payable to Jim and Nancy Allen for $173,118.42.

31.     A second Note Payable is labeled "JSA #1" and reflected as payable to Jim Allen for $301,024.22.

32.     A third Note Payable is labeled "JSA #2" and reflected as payable to Jim Allen for $127,007.37.

33.     A fourth Note Payable is labeled "JSA #3" and reflected as payable to Jim Allen for $216,435.79.

34.     All four of these notes to Plaintiffs remained on PIA's balance sheets through 2011 for the same amounts as they appeared on the December 31, 2008 Balance Sheet.

35.     Upon information and belief, all four of the notes are currently on PIA's balance sheet.

**Plaintiff's Loans are Reflected in Other PIA Company Documents**

36.     In a PIA document labeled "Notes Receivable Reconciliation as of December 31, 2011," the four notes payable to Plaintiffs are consolidated as one note payable in the amount of

$817,585.00. This amount matches the total amount of the four notes payable that appeared on PIA's balance sheets from 2008-2011.

37.     PIA is listed as the borrower on the note payable to Allen for $817,585.00. The Note has a maturity date of February 2012 at a 20% internal rate of return.

38.     Plaintiff's loans are also reflected in a document titled "Amended and Restated Employment Agreement" dated January 1, 2010.

39.     In March 2012, counsel for Plaintiffs sent a letter to counsel for PIA demanding repayment of Plaintiff's loans in full.

40.     In response, counsel for Defendants produced a document titled "Amended and Restated Employment Agreement" that referenced a note in favor of Jim Allen in the amount of $900,000.

41.     Additionally, counsel for Defendants produced a note signed by Cliff Illig in the amount of $817,585.00 with a 20% internal rate of return and a maturity date of January 1, 2013, and a default interest rate of 25% that applies upon the occurrence, and during the continuation of an Event of Default.  "Event of Default" is defined to include, among other things, PIA failing to pay the Principal under the Note in accordance with the terms of the Note.

42.     As of the date of this Petition, Plaintiff's loans have not been repaid.  An Event of Default therefore occurred as of January 1, 2013, and has been continuing since then.

<u>**COUNT I**</u>
**ACTION TO COLLECT ON PROMISSORY NOTE**
(The Allens against PIA)

Plaintiffs incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

43.     Defendants are in default to Plaintiffs under the terms and conditions of the loan from Plaintiffs as reflected in the financial statements of PIA Assets, LLC.

44.     The loan is in the principal amount of $817,585.00 with a 20% rate of return, and a "default rate" of 25%.

45.     The amount is due and owing.

46.     Defendants have failed to make any payments despite the demand to do so by Plaintiffs.

47.     Defendants have refused to make any payments, refused to cure the default and remain in material breach of their obligations.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of $817,585.00, for costs and expenses (including attorneys fee) incurred herein as provided by the note, plus interest at the contractual return rate of 20% until January 1, 2013, and 25% interest continuing from January 1, 2013 until the note is paid in full, and for such other and further relief as the Court may deem just and equitable.

## COUNT II
## BREACH OF CONTRACT
### (The Allens against PIA)

Plaintiffs incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

48.     PIA and RP Golf agreed with Plaintiffs that Plaintiffs would loan Defendant RP Golf, LLC money to fund RP Golf's operations.

49.     Plaintiffs made the loans to RP Golf.

50.     Defendants agreed to repay Plaintiffs' loans in 2006 during the transaction that resulted in PIA's formation and acquisition of RP Golf.

51.     When Defendants did not repay Plaintiffs' loans in 2006, Defendants agreed with Plaintiffs to repay the loans at a later date with interest.

52.     A balance of $817,585.00 remained on Plaintiffs' loans in 2008.  The parties agreed that this amount would be paid back at a 20% rate of return and a default rate of 25%.

53.     Defendants have not repaid the $817,585.00 remaining balance, which is due and owing.

54.     Plaintiffs have met all conditions precedent and Defendants remain in breach of their agreement to repay Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of $817,585.00 plus interest at the contractual return rate of 20% and default rate of 25%, for interest on such judgment, including pre- and post-judgment interest, for his costs and expenses incurred herein, attorneys' fees, and for such other and further relief as the Court may deem just and equitable.

## COUNT III
## UNJUST ENRICHMENT / QUANTUM MERUIT
### (The Allens v. PIA)

Plaintiffs incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

55.     PIA and RP Golf agreed with Plaintiffs that Plaintiffs would loan Defendant RP Golf, LLC money to fund RP Golf's operations.

56.     Plaintiffs made the loans to RP Golf.

57.     Defendants agreed to repay Plaintiff's loans in 2006 during the transaction that resulted in PIA's formation and acquisition of RP Golf.

58.     When Defendants did not repay Plaintiffs' loans in 2006, Defendants agreed with Plaintiffs to repay the loans at a later date with interest.

59.     A principal balance of $817,585.00 remains on Plaintiffs' loans.

60.     Defendants have retained the $817,585.00 remaining principal balance on the loans.

61.     The full amount of the loans, plus interest, is due and owing.

62.     Despite Plaintiffs' demands for Defendants to repay the loans, Defendants have failed and refused to pay Plaintiffs the remaining balance of the loans or accrued interest thereon.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of $817,585.00 plus interest at 20% until maturity and a rate of 25% after maturity, for interest on such judgment, including pre- and post-judgment interest, for his costs and expenses incurred herein, attorneys' fees, and for such other and further relief as the Court may deem just and equitable.

Dated:   September 30, 2016

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By: _____
        Patrick J. Stueve, MO Bar # 37682
        stueve@stuevesiegel.com
        J. Toji Calabro, MO Bar #66574
        calabro@stuevesiegel.com
        460 Nichols Road, Suite 200
        Kansas City, MO 64112
        (816) 714-7100
        (816) 714-7101 Facsimile

**FUNK RIEMANN LLP**
        Andrew Funk, MO Bar # 59977
        andrew@frlawkc.com
        1600 Genessee, Suite 852
        Kansas City, MO  64102
        (815) 348-3002


**ATTORNEYS FOR PLAINTIFFS**

9

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served via email on September 30, 2016 to the following:

R. Pete Smith
Kristie Orme
petesmith@mcdowellrice.com
korme@mcdowellrice.com
MCDOWELL RICE SMITH & BUCHANAN
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
**Attorneys for Defendants PIA Assets, LLC,**
**RP Golf, LLC, and FiveStar Lifestyles, LLC**

Douglas M. Weems
Scott J. Goldstein
Angus Dwyer
SPENCER FANE, LLP
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
dweems@spencerfane.com
sgoldstein@spencerfane.com
adwyer@spencerfane.com
**Attorneys for Defendant Pandi Capital, LLC**

Kirk T. May
Phil G. Greenfield
GERMAN MAY, PC
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
kirkm@germanmay.com
philg@germanymay.com
**Attorneys for Defendants Neal Patterson, Clifford Illig,**
**and Pandi Development, LLC**

_____
J. Toji Calabro

10

## IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI

| | |
|---|---|
| JAMES S. ALLEN, JR., AND<br>NANCY T. ALLEN<br><br>        Plaintiffs,<br><br>        v.<br><br>PIA ASSETS, LLC,<br>RP GOLF, LLC,<br>AND<br>FIVESTAR LIFESTYLES, LLC<br><br>        Defendants,<br><br>and<br><br>PANDI CAPITAL, LLC<br>PANDI DEVELOPMENT, LLC,<br>NEAL L. PATTERSON, and<br>CLIFFORD W. ILLIG,<br><br>        Intervenor-Defendants<br>        and Counterclaimants. | Case No.  13AE-CV00013<br><br>Division No. 2 |

## PLAINTIFFS' SECOND AMENDED ANSWER TO INTERVENOR DEFENDANTS PANDI DEVELOPMENT, LLC, NEAL PATTERSON, AND CLIFFORD ILLIG'S COUNTERCLAIMS AND CROSS-CLAIMS, AND COUNTERCLAIMS AGAINST DEFENDANTS

Plaintiffs James S. Allen, Jr. and Nancy Allen (together, "the Allens" or "Plaintiffs"), through their undersigned counsel, submit their answer to Intervenor-Defendants and Counterclaimants Pandi Development LLC ("Pandi Development"), Neal L. Patterson, and Clifford W. Illig's amended counterclaims and crossclaims and submit their counterclaims against Pandi Development, Patterson, Illig, Pandi Capital, LLC (Pandi Capital"), PIA Assets, LLC, and RP Golf, LLC, and FiveStar Lifestyles, LLC ("FiveStar," collectively with PIA Assets,

LLC and RP Golf, LLC and all of their subsidiaries ("PIA"); PIA with Patterson, Illig, Pandi Development, Pandi Capital ("Defendants")) as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

### Jurisdiction and Venue

1.      Allen admits the allegations in paragraph 1.

2.      Allen admits the allegations in paragraph 2.

### Parties

3.      Allen admits the allegations in paragraph 3.

4.      Allen admits that PIA Assets owns and manages The National Golf Club of Kansas City, The National II (Deuce) Golf Club, the Parkville Commons shopping district, and Loch Lloyd Country Club. PIA Assets owns RP Golf, which holds 100% of the interests in the The National. Allen denies all other allegations in paragraph 4.

5.      Allen admits the allegations in paragraph 5.

6.      Allen admits the allegations in paragraph 6.

7.      Allen admits the allegations in paragraph 7.

8.      Allen denies the allegations in paragraph 8.

9.      Allen admits the allegations in paragraph 9.

10.      Allen admits that on December 21, 2012, Patterson and Illig resigned as managers and appointed Randall Nay and Dale Brouk to act on their behalf as managers of PIA Assets. Allen admits that he remains a manager of PIA Assets. Allen denies all other allegations and characterizations in paragraph 10.

11.      Allen admits that Pandi Capital is owned by Patterson and Illig. Allen denies all other allegations and characterizations in paragraph 11.

**Pandi Capital's Loans to PIA Assets**

12.      Allen denies the allegations in paragraph 12.

13.      Allen denies the allegations in paragraph 13.

14.      Allen denies the allegations in paragraph 14.

15.      Allen denies the allegations in paragraph 15.

16.      Allen denies the allegations in paragraph 16.

**Allen's Loan**

17.      Allen admits that he filed a lawsuit against PIA Assets on January 2, 2013, styled *James S. Allen, Jr. v. PIA Assets LLC and RP Golf, LLC,* Case No. 13AE-CV00013 in the Circuit Court of Platte County, Missouri, and that the Petition sets forth the basis of that lawsuit. Allen denies all other allegations in paragraph 17.

**PIA and Its Affiliates Default on Bank Loans**

18.      Allen admits that PIA and its subsidiaries have obtained funding through loans from third-party banks, but is without sufficient information to admit or deny the remaining allegations in paragraph 18.

19.      Allen admits that Allen, Patterson, and Illig have guaranteed the repayment of certain Bank Loans to PIA and its subsidiaries, Allen denies that he has guaranteed the repayment of certain Bank Loans to PIA's non-subsidiary affiliates, and is without sufficient information to admit or deny the remaining allegations in paragraph 19.

20.      Allen is without sufficient information to admit or deny the allegations in paragraph 20, and therefore denies the allegations.

21.      Allen denies the allegations in paragraph 21

<u>PIA—Missouri Bank Note</u>

22.     Allen admits that Missouri Bank &Trust Co. of Kansas City made a loan to PIA in the principal amount of $5,000,000 and PIA made a promissory note dated June 29, 2012, to Missouri Bank in the same amount. Allen denies all other allegations in paragraph 22.

23.     Allen admits that he signed a personal guaranty for 5% of the PIA-Missouri Bank Note dated June 29, 2012. Allen denies the remaining allegations in paragraph 23.

24.     Allen admits that Missouri Bank sent a Notice of Default on August 28, 2013. Allen denies the remaining allegations in paragraph 24.

25.     Allen denies the allegations in paragraph 25.

26.     Allen denies the allegations in paragraph 26.

<u>J3-Pandi-Missouri Bank Note</u>

27.     Allen admits the allegations in paragraph 27.

28.     Allen admits the allegations in paragraph 28.

29.     Allen admits the allegations in paragraph 29.

30.     Allen denies the allegations in paragraph 30.

31.     Allen denies the allegations in paragraph 31.

<u>Country Club at Loch Lloyd-Bank of Kansas City Note</u>

32.     Allen admits the allegations in paragraph 32.

33.     Allen admits the allegations in paragraph 33.

34.     Allen denies the allegations in paragraph 34.

35.     Allen denies the allegations in paragraph 35.

36.     Allen admits that Pandi Capital and Pandi Development sent a Notice of Default and Demand for Payment to Jim Allen. Allen denies the remaining allegations in paragraph 36.

## RP Golf-Bank of Kansas City Note

37.     Allen admits the allegations in paragraph 37.

38.     Allen admits the allegations in paragraph 38.

39.     Allen admits the allegations in paragraph 39.

40.     Allen denies the allegations in paragraph 40.

41.     Allen denies the allegations in paragraph 41.

### J3-Pandi-Bank of Kansas City

42.     Allen admits the allegations in paragraph 42.

43.     Allen admits the allegations in paragraph 43.

44.     Allen denies the allegations in paragraph 44.

45.     Allen denies the allegations in paragraph 45.

46.     Allen admits the allegations in paragraph 46.

### LL-J3-Pandi-Bank Midwest Note

47.     Allen admits the allegations in paragraph 47.

48.     Allen is without sufficient information to admit or deny the allegations in paragraph 48, and therefore denies the allegations.

49.     Allen is without sufficient information to admit or deny the allegations in paragraph 49, and therefore denies the allegations.

50.     Allen is without sufficient information to admit or deny the allegations in paragraph 50, and therefore denies the allegations.

51.     Allen admits the allegations in paragraph 51.

52.     Allen denies the allegations in paragraph 52.

53.     Allen denies the allegations in paragraph 53.

## LL North-Bank Midwest Note

54.     Allen admits the allegations in paragraph 54.

55.     Allen is without sufficient information to admit or deny the allegations in paragraph 55, and therefore denies the allegations.

56.     Allen is without sufficient information to admit or deny the allegations in paragraph 56, and therefore denies the allegations.

57.     Allen is without sufficient information to admit or deny the allegations in paragraph 57, and therefore denies the allegations.

58.     Allen admits the allegations in paragraph 58.

59.     Allen denies the allegations in paragraph 59.

60.     Allen denies the allegations in paragraph 60.

## RP Golf-Enterprise Bank Note

61.     Allen is without sufficient information to admit or deny the allegations in paragraph 61, and therefore denies the allegations.

62.     Allen is without sufficient information to admit or deny the allegations in paragraph 62, and therefore denies the allegations.

63.     Allen admits the allegations in paragraph 63.

64.     Allen is without sufficient information to admit or deny the allegations in paragraph 64, and therefore denies the allegations.

65.     Allen denies the allegations in paragraph 65.

## J3-Pandi-First National Bank Note

66.     Allen denies the allegations in paragraph 66.

67.     Allen is without sufficient information to admit or deny the allegations in paragraph 67, and therefore denies the allegations.

68.     Allen is without sufficient information to admit or deny the allegations in paragraph 68, and therefore denies the allegations.

69.     Allen is without sufficient information to admit or deny the allegations in paragraph 69, and therefore denies the allegations.

70.     Allen denies the allegations in paragraph 70.

### Litigation Regarding the Pandi Capital Debt

71.     Allen admits that Pandi Capital brought suit in the Circuit Court of Jackson County, Missouri. Allen denies all other allegations in paragraph 71.

72.     Allen admits that Pandi Capital has intervened in this case and has asserted crossclaims. Allen denies all other allegations in paragraph 72.

73.     Allen admits that Pandi Development, Patterson and Illig have also intervened in this case and filed an Answer In Intervention. Allen admits that Pandi Development, Patterson and Illig filed Counterclaims. Allen denies the remaining allegations in paragraph 73.

74.     Allen admits the allegations in paragraph 74.

75.     Allen admits that he and his wife answered Pandi Capital's, Pandi Development, Patterson and Illig's counterclaims and filed counterclaims. Allen denies all other allegations in paragraph 75.

### COUNT I-RECOVERY ON GUARANTY OF DEBT
**(PIA-Missouri Bank Note)**

*Pandi Development, Patterson, and Illig v. Allen*

76.     In response to the allegations in paragraph 76, Allen incorporates the responses contained in the paragraphs above.

77.     Allen is without sufficient information to admit or deny the allegations in paragraph 77, and therefore denies the allegations.

78.     Paragraph 78 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 78 is denied.

79.     Allen denies the allegations in paragraph 79.

80.     Allen denies the allegations in paragraph 80.

81.     Allen denies the allegations in paragraph 81.

82.     Allen denies the allegations in paragraph 82.

83.     Allen denies the allegations in paragraph 83.

## COUNT II-RECOVERY ON GUARANTY OF DEBT

### (J3-Pandi-Missouri Bank Note)

*Pandi Development, Patterson, and Illig v. Allen*

84.     In response to the allegations in paragraph 84, Allen incorporates the responses contained in the paragraphs above.

85.     Allen is without sufficient information to admit or deny the allegations in paragraph 85, and therefore denies the allegations.

86.     Paragraph 86 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 86 is denied.

87.     Allen denies allegations in paragraph 87.

88.     Allen denies allegations in paragraph 88.

89.     Allen denies the allegations in paragraph 89.

90.     Allen denies the allegations in paragraph 90.

91.     Allen denies the allegations in paragraph 91.

8

## COUNT III-RECOVERY ON GUARANTY OF DEBT

### (Country Club at Loch Lloyd-Bank of Kansas City Note)

*Pandi Development v. Allen*

92.    In response to the allegations in paragraph 92, Allen incorporates the responses contained in the paragraphs above.

93.    Allen is without sufficient information to admit or deny the allegations in paragraph 93, and therefore denies the allegations.

94.    Paragraph 94 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 94 is denied.

95.    Allen denies the allegations in paragraph 95.

96.    Allen denies the allegations in paragraph 96.

97.    Allen is without sufficient information to admit or deny the allegations in paragraph 97, and therefore denies the allegations.

98.    Allen is without sufficient information to admit or deny the allegations in paragraph 98, and therefore denies the allegations.

99.    Allen denies the allegations in paragraph 99.

## COUNT IV RECOVERY ON GUARANTY OF DEBT

### (RP Golf-Bank of Kansas City Note)

*Pandi Development v. Allen*

100.    In response to the allegations in paragraph 100, Allen incorporates the responses contained in the paragraphs above.

101.    Allen is without sufficient information to admit or deny the allegations in paragraph 101, and therefore denies the allegations.

102.     Paragraph 102 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 102 is denied.

103.     Allen denies the allegations in paragraph 103.

104.     Allen denies the allegations in paragraph 104.

105.     Allen is without sufficient information to admit or deny the allegations in paragraph 105, and therefore denies the allegations.

106.     Allen denies the allegations in paragraph 106.

107.     Allen denies the allegations in paragraph 107.

## COUNT V-RECOVERY ON GUARANTY OF DEBT

### (J3-Pandi-Bank of Kansas City Note)

*Pandi Development, Patterson, and Illig v. Allen*

108.     In response to the allegations in paragraph 108, Allen incorporates the responses contained in the paragraphs above.

109.     Allen is without sufficient information to admit or deny the allegations in paragraph 109, and therefore denies the allegations.

110.     Paragraph 110 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 110 is denied.

111.     Allen denies the allegations in paragraph 111.

112.     Allen denies the allegations in paragraph 112.

113.     Allen is without sufficient information to admit or deny the allegations in paragraph 113, and therefore denies the allegations.

114.     Allen denies the allegations in paragraph 114.

115.     Allen denies the allegations in paragraph 115.

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

## COUNT VI-RECOVERY ON GUARANTY OF DEBT
### (LL-J3-Pandi-Bank Midwest Note)

*Pandi Development, Patterson, and Illig v. Allen*

116.    In response to the allegations in paragraph 116, Allen incorporates the responses contained in the paragraphs above.

117.    Allen is without sufficient information to admit or deny the allegations in paragraph 117, and therefore denies the allegations.

118.    Paragraph 118 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 118 is denied.

119.    Allen denies the allegations in paragraph 119.

120.    Allen denies the allegations in paragraph 120.

121.    Allen is without sufficient information to admit or deny the allegations in paragraph 121, and therefore denies the allegations.

122.    Allen is without sufficient information to admit or deny the allegations in paragraph 122, and therefore denies the allegations.

123.    Allen is without sufficient information to admit or deny the allegations in paragraph 123, and therefore denies the allegations.

124.    Allen is without sufficient information to admit or deny the allegations in paragraph 124, and therefore denies the allegations.

125.    Allen denies the allegations in paragraph 125.

## COUNT VII-RECOVERY ON GUARANTY OF DEBT
### (LL North-Bank Midwest Note)

*Pandi Development, Patterson, and Illig v. Allen*

126.    In response to the allegations in paragraph 126, Allen incorporates the responses contained in the paragraphs above.

127.     Allen is without sufficient information to admit or deny the allegations in paragraph 127, and therefore denies the allegations.

128.     Paragraph 128 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 128 is denied.

129.     Allen denies the allegations in paragraph 129.

130.     Allen denies the allegations in paragraph 130.

131.     Allen is without sufficient information to admit or deny the allegations in paragraph 131, and therefore denies the allegations.

132.     Allen is without sufficient information to admit or deny the allegations in paragraph 132, and therefore denies the allegations.

133.     Allen is without sufficient information to admit or deny the allegations in paragraph 133, and therefore denies the allegations.

134.     Allen denies the allegations in paragraph 134.

135.     Allen denies the allegations in paragraph 135.

## COUNT VIII-RECOVERY ON GUARANTY OF DEBT
### (RP Golf-Enterprise Bank Note)

*Pandi Development, Patterson, and Illig v. Allen*

136.     In response to the allegations in paragraph 136, Allen incorporates the responses contained in the paragraphs above.

137.     Allen is without sufficient information to admit or deny the allegations in paragraph 137, and therefore denies the allegations.

138.     Paragraph 138 is a legal conclusion to which no response is required, but to the extent a response is required, paragraph 138 is denied.

139.    Allen is without sufficient information to admit or deny the allegations in paragraph 139, and therefore denies the allegations.

140.    Allen denies the allegations in paragraph 140.

141.    Allen denies the allegations in paragraph 141.

142.    Allen denies the allegations in paragraph 142.

143.    Allen denies the allegations in paragraph 143.

## COUNT IX-COLLECTION ON PROMISSORY NOTE

### (J3-Pandi – First National Bank Note)

*Pandi Development, Patterson, and Illig v. Allen*

144.    In response to the allegations in paragraph 144, Allen incorporates the responses contained in the paragraphs above.

145.    Allen is without sufficient information to admit or deny the allegations in paragraph 145, and therefore denies the allegations.

146.    Allen is without sufficient information to admit or deny the allegations in paragraph 146, and therefore denies the allegations.

147.    Allen is without sufficient information to admit or deny the allegations in paragraph 147, and therefore denies the allegations.

148.    Allen denies the allegations in paragraph 148.

149.    Allen denies the allegations in paragraph 149.

## COUNT X-ALTERNATIVE CLAIM FOR DECLARATORY JUDGMENT

*Pandi Development, Patterson, and Illig v. Allen*

150.    In response to the allegations in paragraph 150, Allen incorporates the responses contained in the paragraphs above.

151.     Paragraph 151 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 151.

152.     Paragraph 152 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 152.

153.     Paragraph 153 states legal conclusions to which no response is required, but to the extent a response could be required, Plaintiff denies the allegations in paragraph 153.

## COUNT XI-RECOUPMENT AND/OR SET-OFF

### *Pandi Development, Patterson, and Illig v. Allen*

154.     In response to the allegations in paragraph 154, Allen incorporates his responses contained in the paragraphs above.

155.     Paragraph 155 states legal conclusions to which no response is required, but to the extent a response could be required, Allen denies the allegations in paragraph 155.

### Allen's Affirmative Defenses to Pandi Development, Neal Patterson and Clifford Illig's Counterclaims

156.     Pursuant to his employment agreement with Defendants, Allen is to be fully and completely released, indemnified and held harmless from any guaranties or other obligations pertaining to debts of PIA or its subsidiaries or affiliates.

157.     Count I fails to state a claim on which relief can be granted.

158.     Count II fails to state a claim on which relief can be granted.

159.     Count III fails to state a claim on which relief can be granted.

160.     Count IV fails to state a claim on which relief can be granted.

161.     Count V fails to state a claim on which relief can be granted.

162.     Count VI fails to state a claim on which relief can be granted.

163.     Count VII fails to state a claim on which relief can be granted.

164.     Count VIII fails to state a claim on which relief can be granted.

165.     Count IX fails to state a claim on which relief can be granted.

166.     Count X fails to state a claim on which relief can be granted.

167.     Count XI fails to state a claim on which relief can be granted.

168.     Counterclaimants are not holders in due course of the debts discussed in Counts I-VIII, and therefore cannot enforce Allen's conditional guaranties, because the loans discussed in Counts I-VIII were in default prior to their alleged purchase by Counterclaimants.

169.     Counterclaimants are not holders in due course of the debts discussed in Count IX.

170.     The alleged purchase of the loans from Missouri Bank discussed in Counts I and II, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets was not commercially reasonable.

171.     The alleged purchases of the debts discussed in Counts III-IX were not commercially reasonable.

172.     The alleged purchase of the loans from Missouri Bank discussed in Counts I and II, of Allen's guaranties, and the resulting "sale" of Allen's claims against PIA Assets violates the duty of good faith and fair dealing inherent in contracts subject to the Uniform Commercial Code as adopted in Missouri, in that the purchasers had a pre-existing contractual duty to release, hold harmless and indemnify Allen on the debts and loans allegedly purchased.

173.     The alleged purchase of the debts discussed in Counts III-IX and of Allen's guaranties violates the duty of good faith and fair dealing inherent in contracts subject to the Uniform Commercial Code as adopted in Missouri, in that the purchasers had a pre-existing

contractual duty to release, hold harmless and indemnify Allen on the debts and loans allegedly purchased.

174.    Allen's guaranty on the loan from Missouri Bank to PIA Assets was conditioned upon Allen receiving an indemnification agreement from PIA.

175.    The debts of PIA and J-3 Pandi discussed in Counts I and II have been satisfied, extinguishing Allen's guaranties.

176.    The debts discussed in Counts III-IX have been satisfied, extinguishing Allen's guaranties.

177.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support a conclusion that Allen's Debt could be considered equity contributions.

178.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that Allen's claims to collect on his note from PIA Assets is an action to collect on an equity contribution.

179.    Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to allege any facts to support their conclusion that the Allen Debt must be re-characterized.

180.    Count X fails to state a claim on which relief can be granted, in that the characterization of Allen's Debt is not a controversy before this Court.

181.    Count X fails to state a claim on which relief can be granted, in that no justiciable controversy exists regarding to collection or characterization of Allen's Debt.

182.    Count X fails to state a claim on which relief can be granted, in that the requested declaration would not terminate the uncertainty or controversy giving rise to the proceeding.

183.   Count X fails to state a claim on which relief can be granted because Counterclaimants have an adequate remedy at law.

184.   Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a legally protectable interest in the characterization of Allen's Debt as an equity contribution.

185.   Count X fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead the existence of a controversy ripe for judicial determination.

186.   Count XI fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead a breach of contract by Allen, and Allen has not breached any contract with Counterclaimants.

187.   Count XI fails to state a claim on which relief can be granted, in that Counterclaimants have failed to plead facts sufficient for an affirmative defense of recoupment/set-off.

188.   Counts I-XI fail to state a claim because Counterclaimants are contractually barred and equitably estopped by the 2010 Amended and Restated Employment Agreement from asserting such claims.

189.   Allen reserves the right to add additional affirmative defenses as additional facts are revealed through discovery.

## ALLEGATIONS SUPPORTING ALLEN'S COUNTERCLAIMS

Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

### Additional Parties

190.  Plaintiff Nancy Allen is a Missouri resident residing at 7001 Waters Edge, Parkville, Missouri 64152.

191.  Defendant Neal L. Patterson is a Missouri resident residing at 20 E Dundy Circle, Belton, Missouri 64012. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

192.  Defendant Clifford W. Illig is a Kansas resident residing at 11504 Pawnee Circle, Leawood, Kansas 66211. At relevant times, he has served as one of three managers on the Board of Managers of PIA Assets, LLC.

193.  Defendant FiveStar Lifestyles, LLC ("FiveStar") is a Missouri limited liability company with its principal place of business at 8878 NW 63rd St, Parkville, Platte County Missouri.

194.  Illig and Patterson are the sole members and owners of Pandi Capital, LLC.

195.  Illig and Patterson are the sole members, managers, and owners of Pandi Development, LLC.

196.  FiveStar is a wholly-owned subsidiary of J3-Pandi, LLC (which itself is a wholly-owned subsidiary of PIA Assets).

197.  Pandi Development is an LLC owned 50/50 by Neal Patterson and Cliff Illig. Pandi Development's purpose is to hold Patterson and Illig's interest in PIA Assets LLC.

198.    Pandi Development controls 86.5% of the interest in PIA Assets and appoints two of the three managers of PIA Assets.

199.    Pandi Capital is an LLC for which Neal Patterson and Cliff Illig are the sole managers and members.  As reflected in Pandi Capital's Operating Agreement, the business of Pandi Capital includes providing funding to "PIA Assets, LLC, ("PIA") and its subsidiary entities ("Subsidiaries")."

200.    Pandi Capital is the alleged owner of the "notes" and "loans" purportedly representing the monies advanced to PIA Assets and has made member contributions on behalf of Pandi Development to fund the operations of PIA Assets.

201.    Patterson and Illig have at times acted through Robb Heineman, the Chief Executive Officer of OnGoal, LLC. Illig and Patterson own a controlling interest in OnGoal, LLC.  Heinemann was not and has never been employed by PIA or any of its subsidiaries.

202.    One of Heineman's functions, according to Illig, was "to coordinate all aspects of our [Illig's and Patterson's] various debt facilities across our lifestyle real estate portfolio and our soccer/commercial real estate portfolio."

203.    On December 1, 2008, Illig emailed Brouk and Allen, with Patterson and Heineman copied, writing, "Guys. I was doing some calendar work with Robb today and it became apparent that he was trying to book a meeting over the PIA meeting on Wednesday. That in turn caused me to consider the question as to whether Robb should be in the PIA meeting Wednesday. I'm not sure I concluded on an answer, however, I would appreciate it if from now on you would include Robb as an invitee to all meetings Neal and I are invited to. He may or may not choose to attend, or Neal or I may waive him off, but lets make sure that he has all such meetings on his calendar. Thanks..Cliff."

204. Heineman acted as Illig's and Patterson's personal agent on PIA matters beginning no later than 2008.

**Jurisdiction and Venue**

205. This Court has personal jurisdiction over the counterclaim Defendants Illig, Patterson, Pandi Capital, Pandi Development, and FiveStar pursuant to Missouri Revised Statutes Sections 506.500(1) and/or 506.500(3) because the cause of action herein asserted arises from their transaction of business within the State of Missouri and/or their making of a contract within the State of Missouri.

206. Venue is proper in this county pursuant to Missouri Revised Statutes Section 508.010 because counterclaim Defendants transact usual and customary business in Platte County, and the cause of action accrued, at least in part, in Platte County, Missouri.

**Additional Facts Supporting Counterclaims**

207. In early 1996, James Allen and non-party business partners Jim Watson and Jack Manning conceived of a residential lifestyle development which would become The National.

208. Allen and Watson quit their jobs and invested substantially all of their time and efforts into The National.

209. They purchased the former Windbrook Hills Golf Course and roughly 600 acres of undeveloped land located just outside Parkville, Missouri.

210. Allen, Watson and non-party business partner Jack Manning invested millions of dollars into the planning, engineering and development of The National.

211. Allen ran the day-to-day operations and designed the strategy for The National development.

212.    At Allen's request, pro-golfer Tom Watson designed the golf course at The National.

213.    Five years later, in 2001, most of the residential infrastructure had been built out, at Allen's direction, and The National club house and golf course opened for play.

214.    Manning, Watson and Allen began making residential lots available for sale, and home construction started.

215.    Simultaneously, Watson, Manning and Allen were building a second golf course at The National and began negotiating and planning for Parkville Commons, a commercial property designed to bring much-needed residential amenities such as a grocery store, fitness facility, and community center, to Parkville.

216.    Allen spent years successfully marketing and filling Parkville Commons with tenants.

217.    With much of the work at The National completed, Allen, Watson and Manning began searching for equity investors.

218.    Clifford Illig approached Allen, Watson and Manning about making an equity investment if they agreed to let Illig and Neal Patterson conduct due diligence on the potential investment.

219.    Patterson and Illig's accountant, Rusty Jandl, and an attorney representing Patterson and Illig spent roughly four weeks investigating financial statements and operations of The National.

220.    After the due diligence, Patterson and Illig decided to invest and become minority equity partners in The National.

221.    They also became equity partners in Parkville Commons.

222. Patterson and Illig were, as they have testified, "passive investors."

223. The operations and strategy during this time period were primarily run by Allen.

224. In 2002, at Patterson's urging, Illig, Patterson, Manning, Watson, and Allen purchased Loch Lloyd, a development south of Kansas City which was struggling with homeowner lawsuits and lack of development.

225. Allen continued to manage the day-to-day operations of the real estate development and golf clubs at both The National and Loch Lloyd.

226. But by 2006, the relationships between the partners had soured.

227. Specifically, Patterson refused to do anything more with Watson.

228. Patterson's refusal disrupted the viability of the company.

229. Specifically, the company could not make required payroll, tax and insurance payments.

230. Jim and Nancy Allen personally made loans to the company so these payments could be made.

231. The Allens received notes from RP Golf, LLC documenting their loans and the terms of repayment.

232. In an attempt to resolve the dispute between Watson and Patterson, in early 2006, Allen, Watson and Manning made a proposal to Illig and Patterson setting a price for a potential buyout.

233. Allen, Manning and Watson gave Illig and Patterson the choice to either sell their interests or take majority ownership and control.

234. Patterson and Illig decided to buy the company, and the parties began negotiating a restructuring that closed in October 2006.

22

235.    Patterson and Illig asked Allen to remain a partner and continue to run the day-to-day operations of the residential developments and the golf clubs.

236.    This restructuring resulted in the formation of PIA Assets.

237.    "PIA" stands for Patterson, Illig, and Allen.

238.    Patterson and Illig formed Pandi Development to hold their ownership of 86.5% of the Class A Shares of PIA.

239.    James Allen held 13.5% of the Class A Shares.

240.    To induce Allen to stay and run the operation, Patterson and Illig offered Allen a ten-year employment agreement (the "2006 Employment Agreement") with a $325,000 annual salary, benefits, and an express agreement to buy out his Class A interest in the company for $6 million dollars should he leave for any reason.  A copy of the 2006 Employment Agreement is attached hereto as Exhibit A.

241.    Specifically, Allen's 2006 Employment Agreement stated:

> 3.1  Purchase Payment.  Upon Termination of Employee's employment at the end of the Employment Period or for any reason under Section 2.4, the Company shall purchase Employee's interest in the Company, including any interest held in trust with respect to Employee (collectively "Employee Membership Interest") for the amount of Six Million and No/100 Dollars ($6,000,000.00);

242.    Illig, Patterson and Allen agreed that Allen would invest his time running the operations, and Illig and Patterson would provide the financial backing.

243.    The parties to the formation of PIA, including Illig, Patterson, Watson, and Manning, had an agreement that the Allens' loans would be repaid at or shortly after the time of the closing of the transaction in October 2006.

244.    However, at closing, Dale Brouk advised Allen that there were insufficient funds to repay the Allens, and no payments were made.

245.     Patterson and Illig, however, received over $9 million from PIA at or around the closing, which represented a return of their original equity investment.

246.     In 2008, PIA paid some of the accrued amounts on the loans from Jim and Nancy Allen and created new loans in favor of the Allens in the principal amount of $817,585.

247.     Patterson and Illig later investigated and confirmed the existence of the debt to the Allens.

248.     Dale Brouk later documented the amounts of the Allen's loan in an email to Neal Patterson, Cliff Illig and Robb Heineman on August 14, 2009.

249.     That email had an attached spreadsheet detailing the multiple loans the Allens had made to support the company, the accruing interest, and the limited payments PIA had made on the loans.

250.     As part of the October 2006 restructuring, the parties also agreed that in exchange for their shares, Watson and Manning would receive payments from the gross revenues of the newly-formed PIA.

251.     This pledge by Patterson and Illig is reflected in the Operating Agreement of PIA Assets.

252.     Watson and Manning became Class B members of PIA Assets with no control over operations.

253.     Neal Patterson personally signed the PIA Operating Agreement in October 2006.

254.     Because Neal Patterson signed the PIA Operating Agreement, he had notice of the provisions of the agreement no later than October 2006.

255.     Cliff Illig personally signed the PIA Operating Agreement in October 2006.

256.    Because Cliff Illig signed the PIA Operating Agreement, he had notice of the provisions of the agreement no later than October 2006.

257.    The PIA Operating Agreement provides in part that PIA cannot "[b]orrow or incur indebtedness in excess of $50,000 in any single transaction or series of related transactions" "without the prior unanimous approval of the Members holding Class A interests."

258.    The Members holding Class A interests in PIA are Neal Patterson and Cliff Illig (ostensibly through Pandi Development), and Plaintiff James Allen.

**Illig and Patterson and the Downturn**

259.    PIA used loans and lines of credit from banks to develop real estate lots and the infrastructure to support prospective residents.

260.    After lots were sold, the proceeds from the sales were used to pay down the loans and lines of credit.

261.    But by the end of 2008, the economic slowdown occurring throughout the United States was forcing banks to tighten lending to PIA.

262.    Banks were refusing to renew loans, demanding that PIA pay down existing loans, and reducing the amount of credit available for PIA to fund operations.

263.    At the same time, home sales were slowing, making it more difficult for PIA to repay the loans and lines of credit.

264.    The real estate slow down and lack of liquidity in the marketplace were the result of the financial crisis in the broader macroeconomic environment.

265.    As a result, additional cash equity was necessary for PIA to function.

266.    At that time, Allen was the only member with cash invested in PIA.

267.    When it became clear that Patterson and Illig (as 86.5% owners) would have to start contributing capital into the company, Patterson was livid and they began looking for

someone to blame. Rather than blame the financial crisis, or even their own poor market timing, they fixed their sights on others, including the founding partners: Manning, Watson, and Allen.

268. With regard to (now) Class B Members Manning and Watson, Patterson and Illig ordered PIA to stop making the payments the PIA Operating Agreement entitled Manning and Watson to receive.

269. The December 31, 2008 PIA Board Meeting Minutes state:

> The group began to examine the consolidated operating plan (i.e. page 2 of 3). Many things were discussed and the following were highlighted:
>
> 1. Disbursements to the Class B partners were discussed. Cliff to investigate the ramifications of stopping the payments. No payments will be made until Cliff and/or Neal gets back to us.

270. The meeting minutes also state, "The group then had a general discussion and agreed Robb, Jim and Dale should get together and outline a plan of attack and report back to Neal and Cliff for approval."

271. The "Robb" referred to in the meeting minutes is Robb Heinemann, who acted as Illig and Patterson's personal agent with respect to PIA.

272. The same December 2008 PIA meeting minutes which indicate that Illig and Patterson refused to pay the Class B members also note that Illig and Patterson had chosen to fund a golf course renovation (which would benefit them as Class A members) instead.

273. Heineman and Illig met with PIA's counsel, Pete Smith, to discuss the Class B payments in late January 2009.

274. Allen objected to Illig and Patterson's plan to stiff Manning and Watson, and to avoid a lawsuit, Allen negotiated a modified payment amortization schedule under which PIA

would make reduced payments in the near-term with larger payments in later years. Watson and Manning agreed not to sue, and signed the modification agreement as of January 1, 2009.

**Illig and Patterson Implement the Conspiracy Against Allen**

275.    Meanwhile, unbeknownst to Allen, Patterson and Illig were also secretly plotting to eliminate Allen from the company without repaying the loans he and his wife had made to the company, and without paying the $6 million purchase payment his employment agreement expressly entitled him to receive.

276.    In a December 11, 2008 email to Illig and Heineman, Patterson directed Illig and Heineman to "cut [their] losses" in part by "eliminat[ing]" Jim Allen (among others).

277.    But terminating Allen's employment, however, would have entitled Allen to immediate payment of the $6 million "Purchase Payment" clearly stated in the 2006 Employment Agreement.

278.    So Patterson, Illig and Heineman devised a scheme to defraud Allen out of the $6 million purchase payment, and the repayment of the money he and his wife had loaned to the company.  Patterson also repeatedly demanded of Illig and Heineman to find a way to dilute Allen's equity stake in PIA.

279.    Their first step was to induce Allen into a new agreement that eliminated the $6 million purchase payment.

280.    Heinemann negotiated Allen's new employment agreement on Illig and Patterson's behalf, and met frequently with Allen to do so.

281.    At the time, Allen was unaware of Patterson's and Illig's intentions to eliminate him from the company.  Instead, and to the exact opposite of what Patterson and Illig were secretly scheming, Patterson and Illig (including through Heineman) conveyed to Allen that

27

shared sacrifice among all the owners—Patterson, Illig, and Allen—was necessary given the economic climate, and that they were committed to supporting PIA long-term if Allen would make a similar gesture of good will.  Heineman pitched a new employment agreement to Allen as a symbol of Allen's commitment to the team effort.  If Allen agreed to the new employment agreement without the $6 million purchase payment, they told him, Patterson and Illig would continue to support the company by making *equity* contributions into the company.

282.    To reinforce the point, in an April 1, 2009 email to Allen, Illig, Heineman and Brouk, Patterson made clear his longstanding demand for a new employment agreement from Allen as a condition for his equity contributions:

> At [] the meeting where we were reviewing the proposed plan, the one where I made several asks, including not to pay [Class B Member] Watson . . .
>
> I also made two other points which no one has [actioned]:
>
> 1. Asked for Jim [Allen] and Dale [Brouk] to be on a compensation plan which puts them at risk  . .
>
> 2. I asked for the model dealing with the disparate equity contributions between Jim [Allen] and Cliff and Neal.
>
> Since the meeting, PI [Patterson & Illig] have invested a lot of equity.  ***I want the two above items dealt with before the next equity contribution.***

(emphasis added).

283.    Heineman responded to Patterson's April 1, 2009, email the same day, copying Illig but removing Allen from the chain.  Heineman assured Patterson that he understood Patterson's demand  that agreements on Allen's compensation plan and the equity infusions from Illig and Patterson "are inextricably tied together."

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

284.    On April 3, 2009, Patterson responded to Heineman's email, making clear his priority, "I will have: A comp plan for Jim Allen . . . plus an equity agreement with Allen before I send any more equity cash. My position has not changed."

285.    As commanded by Patterson, Heineman responded less than a week later with specifics for how he thought Allen's equity ownership in PIA could dilute with each additional equity infusion from Illig and Patterson.

286.    Part of those negotiations included discussions of new equity contributions from Patterson and Illig.  Heineman and Allen discussed giving those new equity contributions a prioritized payback as preferred equity.

287.    On June 3, 2009, Patterson emailed Heineman and Illig, writing, " We still have outstanding items which are not done: I want the Equity accounting clean [inception to date] supported by a signed agreement with Jim …  I do not trust him. I want incentive comp implemented . . . there should be no issue with Dale … just not getting done."

288.    Heineman responded the same day, with an update on their plan to "dilute" Allen's interest in PIA:

"Some info on the 'outstanding items':

a.    We need to determine how much of the approximate $11m that you [Neal Patterson] and CI [Cliff Illig] have put in will remain as equity, as opposed to repaid as "shareholder loans." This impacts what the total dilution will be and/or what the "fee" is that JA [Jim Allen] owes to PANDI for putting in the temporary capital. The calculation is pretty straightforward once it is determined whether it's equity or debt. My recommendation has been that it is put in as redeemable preferred with a dividend to match the interest cost. Under this scenario JA's equity will dilute substantially. The three of us need to determine the structure.

Heineman's recommendation for "redeemable preferred" is a reference to preferred equity.

289.    The same day, Illig responded to Heineman's email, writing that his motivation behind getting Allen to agree to dilute his equity ownership in exchange for additional equity from Patterson and Illig was to address "a potential future dispute or legal action with JA."

290.    In June 2009, Heineman, Illig and Patterson were discussing an evolution in the plan.  In particular, Heineman and Illig discussed putting PIA into bankruptcy as another way of preventing Allen from collecting what he was due.   For example, on June 29, 2009, Heineman emailed Illig and noted that he was having trouble finding lenders for PIA because of the "bank collapse."  He wrote that one alternative to new debt from banks was "to take PIA and 'flush' it through a bankruptcy reorg – which is actually something I'd like to talk to Pete about in the medium term."

291.    The reference to "Pete" in the email was to lawyer Pete Smith of McDowell Rice who was (and is) ostensibly counsel to PIA.

292.    At no point in the negotiations regarding Allen's new employment agreement did Defendants (or Pete Smith for that matter) ever inform Allen that they were contemplating bankruptcy for PIA.  Instead, the negotiations continued with Allen based on the same premises: shared sacrifice, and that Patterson and Illig would contribute new equity over the long term and Allen would contribute the sweat equity.

293.    On August 10, 2009 Heineman emailed Patterson with a proposal that would have reduced Allen's salary by 20% but allowed Allen additional compensation through a performance bonus, given Patterson and Illig preferred repayment on any additional equity contributions to PIA from PI Lending, and diluted Allen's equity ownership percentage.

294.    Despite meeting all of the requirements that Patterson had been demanding of Illig, Heineman, and Allen since December 2008, there was no agreement on the proposal.

30

295.    Instead, as discovery has revealed, Patterson, Illig, and Heineman, were finalizing their plan to shut Allen out.  Working secretly with PIA's counsel (and without Allen's knowledge), Pete Smith, Patterson, Illig, and Heineman were planning to label all of Patterson and Illig's prior equity contributions to PIA as debt and structuring a way to claim that Patterson's and Illig's future contributions were debt too.

296.    Though Pete Smith was supposed to be representing PIA's best interests, he was in fact working to further Patterson's and Illig's personal interests, which were directly contrary to PIA's with respect to this strategy.

297.    On September 1, 2009, Heineman emailed Illig and Patterson, writing:

> Additionally, I am working to get Pete Smith documentation on PIA so we are able to make some decisions conclusions [sic] on our approach to Jim's situation. He [Smith] has proposed that we:
>
> 1. Put in all additional capital as secured debt.
>
> 2. Do a [sic] inner-creditor collateral agreement which I'm working on. This would allow us to cause a default of the business, thus leaving the "member interests" with no value. I've spoken to MoBank and Private Bank and both are willing to sign an inner-creditor agreement. Pete and I are speaking on Thursday (he is in court) to move this to the next phase.

298.    Patterson responded by email, asking if what Heineman was proposing was the same idea that they had been discussing: "Is this different than the Preferred [Equity] Series we discussed last week?  If so, more discussion please?"

299.    Heineman responded that it was, and that the strategy Smith was proposing gave Patterson and Illig what they wanted:  repayment priority for the funds that Patterson and Illig contributed to the company, while thwarting Allen's ability to be repaid on his loan or receive the benefits of his employment contract.

300.    Heineman wrote by email:

> We are putting an additional layer or 'leverage' in to the structure by doing an inner-creditor collateral agreement. Basically, we are giving member interests as collateral to a group of senior lenders (including PANDI) so in the event of necessity, we can put the company in default. This will give the pool of senior lenders first money out, leaving little or no economic value for the common member interests. This will mimic the preferred cash out, but give us a bigger capital pool (all PANDI capital, plus senior lenders) from which to negotiate.
>
> ***In actuality, this is probably a little more structuring than we'll need, but it certainly would put Pete in a great negotiating position if Jim ever filed a lawsuit.***

(Emphasis added).

301.    On September 29, 2009, Heineman emailed a memo to Illig, Patterson, and Patterson's personal assistant Elaine Scheid.  The email is further evidence of Patterson, Illig, and Heineman's secret fraudulent scheme.  In particular, Heineman explicitly references their "approach to the Jim Allen situation" when discussing their efforts to load the company up with "creat[ed]" debt.  Heineman goes on to clarify that his negotiations with Allen are simply a ruse, because such negotiations "will not circumvent [Defendants'] strategic approach whatsoever":

> **Secured Debt Process**
>
> Cliff and I have had numerous conversations with Pete Smith and Joe Harter on our approach to the Jim Allen situation. We are creating a layer of senior secured debt in conjunction with all of the senior lenders. This will provide us default protections, since we will have a first lien on membership interests along with the senior lenders. We now have a draft set of documents which Cliff provided to Neal on Monday. We are sitting down with Joe this week to edit the draft. The intention is to have all documentation completed by the November PIA meeting. Additionally, Cliff has asked me to provide a debt portfolio evolution view which I will begin to assemble.

32

> I plan on sitting with Jim on Friday afternoon to discuss reducing his compensation in light of the new economic situation. He has suggested this, so I'm going to take the meeting. This will not circumvent our strategic approach whatsoever.

302. On September 30, 2009, Illig emailed Patterson updating him on the status of their plan to put a "firewall" around their assets so they can default out Allen:

> On the 'Jim' deal. This week we are finalizing the legal docs to put a firewall around our interests in PIA and protect us and the assets from the various minority shareholders and the employment deal in the event we have to go nuclear … which, generally, I expect to have to do around the North. There is a finalizing meeting with Pete's #2 lawyer tomorrow."

303. Illig's reference to the "various minority shareholders" was not an accident. The scheme they were concocting was designed to shut out not only Allen, but also the Class B minority members Manning and Watson, of the money and other obligations PIA owed them.

304. The next day, on October 1, 2009, Heineman emailed Patterson and Illig, writing, "Disregard the financial schedules at the front, They are some reconciliations that Dale and I are running. I wanted to show you that we have all the cancelled checks and deposit slips on JA's cash infusions. As you know, we are working on solidifying our position in the agreements. I am spending most of tomorrow with Pete Smith and Joe Harter."

305. Illig and Patterson, acting through Heineman and, in conjunction with PIA's counsel Pete Smith and Joe Harter, were now referring to their strategy as a "firewall," and its purpose was clear: to make minority membership interests (like Allen's and the Class B Members') appear worthless, to avoid repayment on Allen's loans, and to thwart any future attempt by Jim Allen to enforce any of the promises in his employment contract by converting their existing equity to debt and giving themselves repayment priority.

33

306.    This maneuvering would make PIA appear insolvent on its balance sheets because of the greatly increased purported debt load. This balance sheet insolvency would allow Patterson and Illig to effectively default out Allen's equity membership interest, as well as avoid any contractual duties of repayment to either the Class B members or the Allens because it would appear as if PIA had insufficient assets with which it could satisfy its debts.

307.    Should Allen try to collect his debt or enforce his employment contract, Illig and Patterson could say PIA was insolvent and, if necessary, cause a default which would leave Illig and Patterson as senior secured lenders in complete control of the assets of PIA.

308.    The problem with the strategy was that it was inherently fraudulent.  It was based on the false notion that Patterson's and Illig's contributions were debt when in fact they were not (and could not be).  Indeed, Patterson and Illig (including through Heineman) had promised Allen they would make future *equity* contributions if Allen signed the new employment agreement, and the PIA Operating Agreement expressly prohibited PIA from incurring indebtedness without Allen's consent (which he did not give).  Moreover, PIA's accounting records had long recognized Patterson's and Illig's prior contributions as "equity" contributions.

309.    Nevertheless, the Defendants proceeded anyway. When Allen sought repayment on the loans from PIA, PIA (through Pete Smith) followed the plan and claimed PIA was unable to pay because of insolvency.

310.    But, as noted above, this was all a sham.  Even though Defendants claimed PIA was insolvent, it was not. Operations have continued as usual.  Defendants continued to fund PIA on a regular basis, PIA spent tens of millions of dollars over the coming years in various projects (including building an entirely new golf course, building a new pool, changing the grass on the golf course, and changing the color of the sand in the sandtraps), and when the Defendants'

contributions to PIA are properly recognized as equity instead of "debt," PIA has a positive net worth of tens of millions of dollars. Indeed, for years, and as recently as September 18, 2016, Defendants have been touting the "financial strength" of PIA in advertisements that are distributed in both Missouri and Kansas, and PIA is not past due or in default on any debts except (1) the amounts PIA owes the Allens and (2) the bank loans Defendants purposefully caused PIA to default on to further their fraudulent scheme (as described in more detail below).

311.    Despite being CEO of PIA at the time, Allen was unaware Heineman and Illig were meeting with PIA's counsel, Pete Smith, to negotiate and implement this fraudulent scheme.

312.    Throughout the remainder of 2009, Allen continued negotiating his new employment agreement in good faith based upon Patterson and Illig's representations that they would continue to make equity contributions in exchange for Allen's sweat equity (that is, Allen would continue to serve as CEO and run the day to day operations of PIA but at a much lower guaranteed compensation), Allen giving up the $6 million purchase payment, and Allen restructuring his incentives based on this framework. He did not know that Patterson's and Illig's representations were false when made, that they secretly intended to eliminate him without paying him what he was due, and that they were secretly planning to claim that their cash infusions were actually debt instead of equity.

313.    In advance of the February 5, 2010 Board of Managers meeting, Heineman by phone or by email that morning told Allen that Heineman had to have a signed copy of the new agreement for the meeting later that day, otherwise Heineman would face severe consequences from Neal Patterson. In response, Allen sent Robb Heineman an email later that day forwarding

a revised draft of the agreement, and noting that Dale Brouk had already reduced Allen's salary even though the agreement had not yet been signed.

314.     Allen also told Heineman via email that he had not received a note memorializing the Allens' loans. Because he had not received the note, Allen asked for and Heineman agreed on behalf of Patterson and Illig that the language in the agreement would be amended to ensure that the agreement did not become effective until all parties had signed the new agreement and Allen had received his note.

315.     Heinemann, acting on behalf of Patterson and Illig, approved the changes by email and told Allen to bring two signed copies of the new agreement to the meeting.

316.     Allen signed the new employment agreement later that day, February 5, 2010 (the "2010 Employment Agreement").   A copy of the 2010 Employment Agreement is attached hereto as Exhibit B.

317.     The 2010 Employment Agreement effectively eliminated the $6 million buyout, and contained the following material terms, among others:  (a) reduction of Allen's annual salary from $325,000 to $150,000; (b) performance incentives; (c) fringe benefits including lifetime club memberships and a car allowance; and (d) a provision for a note for the aforementioned loans from the Allens with terms satisfactory to Allen.   It also required PIA and the "PIA Companies" to "fully and completely" release, indemnify and hold Allen harmless from all liabilities, costs, obligations, or guaranties of any nature directly or indirectly associated with the PIA Companies or any of the PIA Companies' operations.

318.     Allen agreed to a reduced salary in the 2010 Employment Agreement in exchange for a bonus compensation structure that was tied to the profitability of one of PIA's operating

subsidiaries, Double Eagle, which had the potential to increase Allen's overall compensation had Patterson and Illig intended to follow through with the terms of the agreement.

319.    In Section 2.13, the 2010 Employment Agreement expressly states that the "agreement will only become binding and effective upon: (a) its execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

320.    Allen's salary was reduced, but he has not received many of the benefits of this agreement.  He has not received all compensation and benefits he is owed, the loans he and his wife made to PIA have not been repaid, and he has not been indemnified, released or held harmless from millions of dollars' worth of guaranties he made on bank loans for the benefit of PIA and its subsidiaries.

321.    Indeed, documentary evidence shows that Patterson and Illig never intended to perform the 2010 Employment Agreement with Allen. Patterson and Illig induced Allen into taking a reduced salary and surrendering a $6,000,000 buyout without intending to honor (a) their express representations that they would contribute equity into the company if he signed, (b) the repayment of the Allens' loans, and (c) the other provisions of the 2010 Employment Agreement.  Instead, as noted above, it was part of their scheme to force Allen out without paying him what he was due.

**Illig and Patterson Reclassify Equity Contributions as Debt, Making PIA Assets Balance Sheet Appear Insolvent**

322.    Almost immediately after Allen provided Heineman with a signed copy of the 2010 Employment Agreement, Illig and Patterson moved to deny him the benefit of that bargain, first by re-characterizing their equity contributions as debt.

323.    Allen justifiably understood that the contributions by Patterson and Illig were and would continue to be considered equity because that was the express representations Defendants

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

made to him, the PIA Operating Agreement required his express consent before PIA took on any new debt, and PIA's contemporaneous financial records had clearly stated that Patterson's and Illig's past contributions were "equity."  For example:

    a.   The December 31, 2009 Balance Sheet identifies an equity contribution from Neal Patterson for $13,135,092.50 and an equity contribution from Cliff Illig for $12,950,092.50. These equity contributions are categorized as "Equity" on PIA's balance sheet.

    b.   The January 31, 2010 Balance Sheet also reflected the same equity contributions from Illig and Patterson that appeared on the December 31, 2009 Balance Sheet. Those equity contributions were similarly categorized as "Equity" on the balance sheet.

324.    Illig's 2008 Personal Financial Statement, prepared personally by Illig, reflects the same.

325.    But almost immediately after Allen signed his Employment Agreement in February 2010, Illig and his agents Robb Heinemann and Maureen Evans, CFO of Pandi Capital, instructed Dale Brouk to re-characterize all of Patterson and Illig's equity contributions into debt.

326.    In an email from Maureen Evans to Dale Brouk dated March 8, 2010, Evans wrote, "I talked to Cliff and Robb [Heineman] about you having the loans to Pandi Capital showing in the equity section. They agreed that it should not be shown in the equity section but as a liability. Could you check with Robb on the exact description he wanted you to use and incorporate that with your 2009 financial statements."

327.    Brouk responded five minutes later, confirming that he would comply.

328. Brouk testified that he did not advise Allen of the change nor seek Allen's approval. This despite the fact that Allen was CEO of PIA and therefore Brouk's boss.

329. On PIA's Balance Sheet dated February 28, 2010 but prepared in March 2010 (just after Allen signed the 2010 Employment Agreement), Patterson and Illig's capital contributions in the total amount of $26,085,185.00 had been moved from the "Equity" category on prior balance sheets and re-categorized as Long-term Liabilities.

330. Allen did not approve the decision to "reclassify" Patterson and Illig's capital contribution into debt. Accordingly, this unilateral decision on the part of Patterson and Illig was in direct violation of the PIA Operating Agreement which required unanimous approval of the Class A Members before PIA could "incur indebtedness in excess of $50,000" or "knowingly do any Act which would make it impossible to carry on the ordinary business of the Company…"

331. The change violated the PIA Operating Agreement in other ways, as well.

332. The amount of Long-term Liabilities to Patterson and Illig as reflected on PIA's balance sheets as of February 28, 2010 does not match the amounts Pandi Capital now claims it loaned to PIA Assets as of February 28, 2010. There were no loans from Pandi Capital reflected on PIA's balance sheets in 2010.

333. At this same time, while PIA's internal books reflected a significant increase in debt to Pandi Capital, Defendants were soliciting new loans for PIA from banks by telling the banks that PIA was reducing its debt load.

334. A "Pandi Lifestyle Real Estate Group 2010 Business Summary" states: "PIA invested significant capital and deleveraged its assets during 2010 and has continued to do so into 2011. In 2010 and early 2011 capital deployed by PIA to reduce debt was in excess of $31 million."

335.    To further their intentional and deceptive scheme of prioritizing their capital contributions above the amounts owed by PIA to Allen, in December 2011, Patterson and Illig further re-characterized their capital contributions as debt from PANDI Capital, LLC in excess of $80 million.  But, of course, this was all a sham.  These contributions were not debt, but equity.

336.    As noted above, however, this scheme was not designed to defraud just Allen (although he was the principal target), Defendants also devised it to defraud the Class B Members Manning and Watson, and Defendants were also pursuing that part of the conspiracy full steam ahead.

### Patterson and Illig Use Their Firewall to Refuse to Make Payments to the Class B Members for the Second Time

337.    In late 2010, Patterson and Illig once again decided not to make payments under the revised payment schedule to Manning and Watson that they had just agreed to.

338.    On November 18, 2010, Patterson emailed Brouk, Evans, Illig and Heineman, saying, "Please do not pay the Class B payments… if we are defaulting the NID .. architecting our walk away .. we should hold on this payment until we have a plan."

339.    Brouk confirmed that no payment would be made to the Class B members.

340.    Patterson's reference to "defaulting the NID" was a reference to the Neighborhood Improvement District taxes that PIA owed to Platte County.  Patterson planned on defaulting on the NID by not paying the taxes owed.  This was yet *another* clear financial obligation PIA had that Patterson directed should not be paid.

341.    Patterson did not include Allen, PIA's CEO, on the email.

342.    Neither Illig nor Patterson consulted with Allen regarding the decision to cease making payments to the Class B members.

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

343.    Neither Patterson nor Illig asked Allen for his consent regarding the decision to cease making required NID tax payments to Platte County.

344.    Brouk, however, informed Allen of Patterson's decision not to pay the Class B members and to default on the Platte County NID taxes.  He forwarded Allen the email he had received from Patterson, since Allen had not been copied on the original email.

345.    Allen did not agree with this strategy.  He was concerned and on November 21, 2010, Allen questioned the decisions in an email to Brouk.

346.    The subject line of the email was "Class B Payments & Operating Agreement." Allen wrote, "Do you have a PIA Operating Agreement in your office? I can't find my copy. I am very concerned that the Operating Agreement provides that the obligation is a gross pledge. Moreover, the Operating Agreement may provide an affirmative obligation to pay taxes and assessments. As Chief Financial Officer, you had better take a look and know what we're doing before we jump off the edge."

347.    In November 2010, Watson wrote to Allen and Brouk requesting that the contractually-required Class B member payments be made.

348.    Nevertheless, and over Allen's objections, the payments were not made.

349.    Accordingly, on December 13, 2010, counsel for Manning and Watson forwarded Illig a copy of the proposed lawsuit seeking payment.

350.    There was a clear contractual obligation for PIA to make the payments to Manning and Watson, as alleged in the lawsuit. Manning and Watson were suing under the revised payment schedule Patterson and Illig had agreed to just two years prior. That revised payment schedule, of course, was the negotiated resolution of the dispute Patterson created when he unilaterally decided to cease paying Watson and Manning the first time in late 2008.

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

351.   In response to the lawsuit, and as planned, Patterson and Illig invoked their "firewall" strategy in an attempt to avoid their contractual obligations to Watson and Manning.

352.   First, Illig and Patterson used the reclassification of their equity contributions to defend against Manning and Watson's lawsuit.  Represented personally by Pete Smith, who helped design and implement the "firewall" scheme to protect Illig and Patterson by increasing PIA's "debt" and defaulting out the minority shareholders of PIA, Illig and Patterson argued in their Answer to Manning and Watson's Petition that Manning and Watson's "claims are barred in whole or in part by Section 347.109, R.S.Mo., which prohibits a distribution to members of a limited liability company when such distribution would render the company unable to pay its debts as they become due in the ordinary course of business, or the company's total assets would be less than the sum of its total liabilities to which such assets are subject."

353.   Patterson and Illig's defense was, in essence, that because PIA did not have sufficient assets to pay back its "debts" to Pandi Capital, PIA could not make the contractually-required payments to the Class B members.

354.   Patterson and Illig's decision to label their equity contributions as debt allowed PIA to argue the statute did not allow Class B members to receive payments as LLC members.

355.   To document PIA's alleged "debt" to Pandi Capital, Illig and Patterson created fraudulent promissory notes from PIA to Pandi Capital (the "Pandi Notes").

356.   These Pandi Notes, were clearly not authorized by the PIA Operating Agreement and their sole purpose was to further the "firewall" strategy by misrepresenting the nature of the cash infusions Defendants had regularly contributed to PIA, by wire, over the previous two years.

357.	Patterson and Illig received the Class B members' demand on December 13, 2010.

358.	Two days later (purportedly), on December 15, 2010, Illig signed numerous Pandi Notes from PIA to Pandi Capital, purportedly documenting all of Pandi Capital's past contributions (which were accomplished by wire transfer) to PIA.

359.	Illig signed the Pandi Notes on behalf of Pandi Capital, as the lender.

360.	At that time, no one signed on behalf of PIA, the purported borrower.

361.	Illig has admitted that prior to December 15, 2010, no Notes from PIA to Pandi Capital existed.

362.	Maureen Evans, the Chief Financial Officer of Pandi Capital, also testified that she was not aware of any notes from PIA to Pandi Capital before December 2010.

363.	These Pandi Notes, all signed by Illig purportedly on December 15, 2010, purportedly documented $37,979,891 in loans from Pandi Capital to PIA Assets.

364.	But Pandi Capital did not loan PIA Assets $39,979,891 in December 2010.

365.	All of the Pandi Notes signed purportedly in December 2010 were backdated to appear as if they had been signed every quarter dating back to December 31, 2008.

366.	For instance, one of the Pandi Notes, signed purportedly on December 15, 2010, purports to document a loan made by Pandi Capital to PIA Assets on December 31, 2008. The loan, which was never even discussed with, much less approved as required, by Allen, had a three-year term and a 20% interest rate.

367.	By the time Illig signed that December 31, 2008 note from PIA to Pandi Capital in December 2010, the note required PIA to make repayment in one year.

368.     Brouk has testified that PIA had no ability to repay that note when it was signed in 2010.

369.     Illig has testified that he had no expectation that the note would be repaid on time when he signed it.

370.     Brouk and Illig have confirmed that no financial plans were ever made for PIA to repay Pandi Capital on the December 31, 2008 note or any of the purported Pandi Notes.

371.     And, in fact, PIA did not make any payments required by the purported Pandi Notes.

372.     All of the Pandi Notes from PIA to Pandi Capital contain a provision allowing Pandi Capital to accelerate payment under all of its Notes from PIA in the event PIA fails to make a required payment under any of the Notes.

373.     As a result, when PIA did not repay the December 31, 2008 Pandi Note on December 31, 2011, all of the purported Notes from PIA to Pandi Capital were purportedly in default according to their terms.

374.     However, Pandi Capital did not make any demands for repayment on these notes.

375.     Brouk testified that he did not sign the Pandi Notes from PIA to Pandi Capital until 2013.

376.     Brouk testified that at the time he signed the Pandi Notes, he did not show them to Allen.

377.     Brouk testified that Allen did not approve the Pandi Notes.

378.     Allen did not vote to approve any of the Pandi Notes upon which Pandi Capital is suing in this litigation.  Nor did Allen vote to approve of PIA incurring any of the indebtedness that Pandi Capital is attempting to collect in this litigation.

379.     Brouk has testified that the lack of Allen's approval of the Pandi Notes was a violation of PIA's Operating Agreement.

380.     Maureen Evans has testified that she did not contemporaneously provide Allen with copies of the Pandi Notes on which Pandi Capital's current claims against PIA are based, and no PIA Members' or Managers' meetings were held to discuss or ratify any notes from Patterson, Illig, or Pandi Capital.

381.     In fact, Allen had never even seen the Pandi Notes until Pandi Capital made demand on PIA for repayment in 2013.

382.     Even if the equity contributions from Patterson and Illig are labeled now as loans, these "loans" violate the PIA Operating Agreement which states in relevant part: "if a Manager . . . is the lending Member, the rate of interest shall be determined by the Board of Managers taking into consideration, without limitation, prevailing interest rates and the interest rates the lender is required to pay in the event such lender has itself borrowed funds to loan or advance to the Company and the terms and conditions of such loan, including the rate of interest, shall be no less favorable to the Company than if the lender had been an independent third party."

383.     After years of litigation, with PIA incurring significant legal fees, the lawsuit between Class B members Manning and Watson and PIA was eventually resolved in Manning and Watson's favor.  Indeed, Illig admitted that Patterson and Illig deliberately defaulted on the Manning and Watson payments and later agreed to resume payments only after they were sued and incurred hundreds of thousands of dollars' worth of legal bills.

**After Inducing Allen to Sign the 2010 Agreement, Defendants Take Further Steps to Prevent Allen From Enforcing His Rights**

384.    Almost immediately after Allen signed the 2010 Employment Agreement, Patterson and Illig took additional steps to frustrate any effort Allen would undertake to enforce any of his rights or claims.

385.    Illig testified that he signed the 2010 Employment Agreement on behalf of Defendants, but Defendants never delivered a signed copy to Allen.  Allen has still never seen the copy signed by Illig.

386.    Moreover, Defendants drafted a promissory note to Allen dated January 1, 2010, that Illig signed, a copy of which is attached hereto as Exhibit C.  This note (the "Allen Note" or "Allen's Note") identified the "Borrower" as "PIA Assets, LLC," and the "Lender" as "James S. Allen, Jr."

387.    Allen's Note provides that the "Borrower shall pay all outstanding principal and accrued interest together with the IRR True Up (defined below) and all other amounts owed pursuant to this note . . . on the third anniversary of the date hereof (the "**Maturity Date**"), unless earlier accelerated pursuant to the terms of this Note." (emphasis added).

388.    Allen's Note goes on to define the "IRR True Up" as "an amount necessary such that, after the payment of which, as of such date, Lenders' internal rate of return (as calculated using Microsoft Excel's XIRR function) on the Loan will be 20%."

389.    The IRR True Up means, effectively, that the interest rate on the loan was approximately 20%.

390.    Allen's Note further defines an "Event of Default" to include "Borrower fails to timely pay the Principal under this Note in accordance with the terms of this Note," and that "[u]pon the occurrence of any Event of Default (whether or not Lender has knowledge that such

Event of Default exists), then the Loan shall, at the option of Lender immediately become due and payable without demand without notice to Borrower or any other person or entity."

391.    Allen's Note further provides in part that "Upon the occurrence, and during the continuation of an Event of Default:  (i) Lender shall have all rights and remedies available to it at law or equity," that "(iii) Borrower shall pay to Lender, in addition to the sums stated above, the reasonable costs of collection, regardless of whether litigation is commenced, including any reasonable attorneys' (and any other consultants' or experts') fees, expenses and other costs, to the extent not prohibited by law," and that "(iv) notwithstanding any other provision of this Note, during the period of existence of such Event of Default, interest on the Loan evidenced by this Note shall accrue and be paid, not at the Interest Rate, but at the lesser of (A) the Default Rate, or (B) the maximum lawful rate of interest under the applicable Usury Law, if any."  Allen's Note goes on to define "Default Rate" as "a rate per annum equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) five percent (5.0%) above the applicable Interest Rate."

392.    There is no usury rate maximum that applies to this loan.  Thus, the "Default Rate" for Allen's Note is 25%.

393.    By its plain terms, the debt evidenced by Allen's Note incurred interest at a rate of 20% until (at the latest) its maturity date on January 1, 2013, and has been incurring and continues to incur interest at the rate of 25% starting no later than January 1, 2013 until it is paid in full (which it has not been).

394.     Illig has testified that he signed Allen's Note "[a]s authorized signatory of PIA Assets, LLC," but directed Maureen Evans, Defendant Pandi Capital's Chief Financial Officer, not to deliver it. Her testimony is confirmed by Illig's own handwriting, which instructs Evans to hold the Note, and an April 25, 2012 email from Pandi Capital's Deborah Smeltzer stating, "We

wrote the note in late October 2010 and had Cliff [Illig] sign it. Cliff [Illig] asked us to hold it as he did not want to ask Jim to sign at the time. Attached is what we have."

395.    As described above, in March 2010, a month after Allen signed the 2010 Employment Agreement, Illig directed Dale Brouk, PIA's CFO, to alter the company's books and reclassify (falsely) as liabilities over $100 million of equity contributions Patterson and Illig had made in prior years. Brouk followed Patterson and Illig's instructions without question and without informing Allen.

396.    There are no corroborating documents justifying the reclassification.

397.    Allen objected to this reclassification but his objections were futile as Defendants refused to address his concerns.

398.    At this time, PIA was already actively litigating its case against the Class B members.

399.    Despite Allen's continuing to hold the title of CEO of PIA, Patterson and Illig began ignoring Allen shortly after he signed his 2010 Employment Agreement.

400.    Allen was no longer invited to some meetings pertaining to PIA business, and he was not involved in major strategy decisions regarding Loch Lloyd or The National.

401.    Despite Allen's history in developing PIA's real estate assets, his ideas for the future were ignored.

402.    As a result of being prevented from performing his duties as CEO, Allen believed he had no choice but to reach out to Illig to negotiate his separation from PIA.

403.    The negotiations went nowhere.

404.    Though Allen never received a signed copy of the Allen Note as required in his 2010 Agreement until after he made a demand for repayment, he was aware that PIA's financial

documents and 2012 Plan showed that the Allens' $817,585 loan had matured in February 2012. By the terms of the Allen Note Illig signed, the loan had been accruing at 20% interest since October 2006, when the loan was made, and 25% interest after the maturity date.

405.    Accordingly, Allen made a formal demand upon PIA for repayment of his and his wife's loan in March 2012.

406.    Because he had never received the signed 2010 Agreement, Allen also inquired about PIA's ability to make the $6 million buyout of his interest in PIA as required under his 2006 Employment Agreement.

407.    In response, and knowing that the $6 million purchase payment would be due if the 2010 Employment Agreement (which had, as a condition precedent, delivery of the note to Allen) was not in effect, Defendants' Counsel, Pete Smith of McDowell Rice, presented Allen for the first time with a copy of the "Allen Note" that Illig had previously signed but instructed representatives of Pandi Capital not to deliver.

408.    That Note was dated January 1, 2010 and matured on January 1, 2013.

409.    Allen had never seen this Note.

410.    Allen remained in discussions with counsel for PIA for much of 2012 regarding satisfaction of the Allens' loans, either through cash or alternative means.

411.    In November 2012, Allen submitted his resignation as CEO.

412.    His resignation triggered a response from Illig and Patterson; almost immediately, they took steps to ratchet up their "firewall" efforts and set out to ruin Allen financially.

**Patterson and Illig Appoint Managers to Take Affirmative Steps to Pressure Allen Into Dropping His Lawsuit and Prevent Him From Collecting If He Did Not**

413.     Shortly after Allen resigned as CEO, on December 21, 2012, Patterson and Illig resigned as managers of PIA and appointed Dale Brouk and Randy Nay to replace them as managers on behalf of Pandi Development, LLC.

414.     Defendants claim that Brouk and Nay would be "independent" managers, but they were Patterson's and Illig's puppets.

415.     Nay testified that Patterson and Illig wanted "independent" managers because of the legal disputes between the members.

416.     Brouk and Nay began calling for regular PIA managers' and members' meetings, which had not occurred since 2010.

417.     Scott Goldstein, counsel for Illig and Patterson, suggested agenda items for PIA Managers' Meetings to Randy Nay.  One suggested item was the "Propriety of any additional payments/compensation/benefits to Mr. Allen in light of his suit against the Company."  Nay dutifully placed Mr. Goldstein's suggested items on the agenda.

418.     Though it had been business as usual since 2010, shortly before Allen filed his lawsuit, Pandi Development, Dale Brouk and Randy Nay (who were PIA Managers appointed by Patterson and Illig) thereafter began to claim that PIA was insolvent and unable to repay its debts.

419.     The managers appointed by Pandi Development began demanding large financial contributions from Allen to fund the capital requirements of PIA and its subsidiaries in violation of PIA's Operating Agreement.

420.     No one, including Illig and Patterson, had ever previously demanded financial contributions from Allen, and these demands were in direct violation of the Operating

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

Agreement that made clear that "a Member . . . shall not be required to lend any funds to the Company or . . . to make any additional Capital Contributions to the Company."

421.     After appointing Brouk and Nay, Patterson and Illig through Pandi Capital and Pandi Development stated that they were unwilling to continue providing capital for PIA unless Allen agreed to relinquish his rights to repayment of his loans and the buyout of his interests in PIA and its subsidiaries.  This, of course, was the very result Patterson and Illig had been trying to achieve since 2008.

422.     Pandi Development also threatened that it would not continue funding PIA unless PIA's Board of Managers agreed to amend the operating agreements of PIA's subsidiaries to allow Pandi Capital to loan money directly to PIA's subsidiaries.

423.     Under PIA's Operating Agreement, any decisions to incur indebtedness must have unanimous approval of the Class A Members (Pandi Development and Allen).

424.     Pandi Development demanded that PIA amend the operating agreements for PIA subsidiaries to state that decisions regarding incurring indebtedness require only a majority vote of the board of managers.

425.     The amended operating agreements contain provisions allowing a majority of the board of managers of each entity to determine that additional capital contributions from "Members" are necessary. The "Members" are then required to make the contributions. If a Member does not make a capital contribution, the other Members can sue the non-contributing Member.

426.     The practical purpose of these provisions in the amended operating agreements for required capital contributions was to allow billionaires Patterson and Illig to use their wealth as leverage over Allen.

427. As noted above, the PIA Operating Agreement contained a provision prohibiting required capital contributions.

428. The reason the PIA Operating Agreement prohibited required capital calls was to prevent Illig and Patterson from using their wealth to ruin Allen by having their appointed managers approve capital calls that Allen could not meet.

429. The amended operating agreements also purport to allow Pandi Capital to make loans directly to PIA's subsidiaries and give repayment of Pandi Capital's new loans priority over any other existing debt.

430. This was a blatant attempt to thwart Allen's ability to collect on the Allen Note and the other obligations he was owed.

431. The amended operating agreements state:

> Any loan to the Company made by an affiliate of a Member shall be treated as a third-party loan and not as a loan from a Member and shall be on such terms and conditions as agreed to by the Managers and any such loan made after March 13, 2013 shall have priority with respect to repayment over any loans owing to any Member or its affiliate made before such date. For the purpose of this provision, the term "affiliate" means, with respect to any Member, any other person directly or indirectly controlling, controlled by, or under common control with such Member.

432. The "priority" language in this provision is an attempt to put repayment of loans by Pandi Capital made after March 13, 2013, ahead of repayment of the much earlier Allen Note.

433. The amended operating agreements also purport to allow a simple majority of the "Managers" of the subsidiary to grant security interests in any assets owned by a subsidiary of PIA. Patterson and Illig controlled the choice of two out of the three managers of these entities.

434. The amended operating agreements also purport to allow a simple majority of managers to put certain subsidiaries into bankruptcy.

435.    Upon information and belief, the purpose of the amended operating agreements was to allow Illig and Patterson to encumber PIA's underlying entities through purported "loans" from Pandi Capital in such a way that would interfere with the rights of potential creditors by loading the subsidiaries up with debt owed to Pandi.

436.    The only ostensible purpose for the actions described above is to make it impractical or impossible for PIA to repay its debts to Allen and to honor its obligations to indemnify and hold Allen harmless.

437.    The Pandi entities provided the new operating agreements to Pete Smith and Randy Nay.

438.    On March 7, 2013, shortly after Allen filed this lawsuit seeking payment on Allen's Note, Scott Goldstein sent a letter to The Board of Managers of PIA by both email and U.S. mail.  Goldstein wrote that he represented Pandi Development and that the "purpose of this letter is to describe the circumstances under which Pandi or its affiliates may loan additional monies to PIA and its subsidiaries, and other matters relevant to PIA."

439.    Goldstein wrote, "Pandi [Development], through its affiliate Pandi Capital, has already loaned PIA approximately $3,135,630 in 2013, which amounts includes Jim Allen's share, which he has not loaned."

440.    According to Goldstein, the Pandi entities would no longer loan funds to PIA (the parent company) and would only loan funds to PIA's subsidiaries.

441.    Goldstein demanded that PIA change its subsidiaries' operating agreements to allow the subsidiaries to take on the debt without Allen's consent.

442.    Goldstein's letter also threatened that Pandi Capital would sue PIA and seek collection on the purported $100 million in fraudulent Pandi Notes unless Allen withdrew his

lawsuit against PIA (which, of course, was the entire goal of the "firewall" strategy). Indeed, the Goldstein letter made clear that the Pandi entities had never before attempted to collect on the notes even though at least $20 million of the purported notes were due and payable. It was only now that Allen was attempting to enforce his rights that Defendants were threatening to obtain a $100 million judgment against PIA to foreclose Allen's ability to recover.

443. Attached to Goldstein's letter was a resolution, proposing that the PIA Members adopt at a Members'/Managers' meeting on March 13, 2013 to approve Pandi Development's demands, and recommending that the PIA Board of Managers make the amendments to the subsidiaries' operating agreements that Pandi Development demanded.

444. On March 12, 2013, Randy Nay, who had been appointed by Goldstein's clients Illig and Patterson, emailed Brouk, Allen, Goldstein and Pete Smith recommending the Managers of PIA "act expeditiously to accept and implement" the conditions on funding proposed by Goldstein.

445. Nay made no attempt to negotiate the terms proposed by Goldstein.

446. Instead, Nay forwarded by email to the PIA Board of Managers a sister resolution for adoption by the PIA Board. Its wording was drafted and/or edited by Pandi Development and its lawyers at Spencer Fane. It purports to adopt amendments to the operating agreements of PIA's subsidiaries that were prepared by PIA's counsel and that purport to effect the changes Pandi Development demanded.

447. As the two resolutions state, and the testimony of Randy Nay confirms, the very purpose of the resolutions and the changes Pandi Development proposed were to get around the restrictions in the PIA Operating Agreement, including: (1) prohibiting mandatory capital calls to its members; (2) clarifying that no member has an obligation to loan funds to PIA; and (3)

preventing PIA's Board of Managers from incurring indebtedness over $50,000 without the unanimous consent of both Pandi Development and Allen.

448.    Indeed, Randy Nay conceded that because PIA operations are conducted exclusively through its operating subsidiaries, that when Defendants were encumbering the operating subsidiaries with debt, they were effectively encumbering PIA's operations with debt, particularly because those loans show up on PIA's books.

449.    Nevertheless, Illig signed the Member resolution on behalf of Pandi Development.  Nay and Brouk (the two managers appointed by Pandi Development) signed the Board of Managers resolution.  Allen did not consent to either.

450.    On March 19, 2013, the managers appointed by Patterson and Illig through Pandi Development purportedly approved the amended operating agreements for the subsidiaries over Allen's objection.

451.    But the amendments were not valid for many reasons, including that the PIA Operating Agreements required Allen's approval for such changes.  Notably, at one point, even Kris Dekker, a lawyer at Spencer Fane (the same firm where Scott Goldstein works, the same firm that represents the Pandi entities), wrote in a May 16, 2013 email to Karen Virgillito that the amendments "were required to have been approved by all 3 Managers."  It was only after Ms. Virgillito of the closely-held Illig Family Enterprise Company (with obvious close ties to Illig, Patterson, and the Pandi companies—all lucrative Spencer Fane clients) protested and argued to the contrary, did Mr. Dekker relent.

452.    On April 2, 2013, Nay and Brouk approved a "Resolution of the Board of Managers of PIA Assets" which stated:

> 2. To the extent permitted under the Company's existing financing, the Company is further authorized to grant such

55

subordinate security interests and deeds of trust liens on its assets as requested by PANDI Capital LLC to secure the Loan and any future borrowings the Company may obtain from PANDI Capital, LLC; and

3. Any manager of the Company is hereby authorized and directed to, for and on behalf of the Company, to execute and deliver on behalf of the Company, a Promissory note in substantially the same form of the Promissory note attached hereto as Exhibit A, to the extent permitted by the Company's existing financing, such security agreements, pledges and deeds of trust as requested by Pandi Capital, LLC, to secure the Loan and any future borrowings that the Company may obtain from PANDI Capital, LLC….

453.    The Note attached as Exhibit A to the resolution was from PIA Assets to Pandi Capital for $53,000.

454.    Allen did not approve the resolution or the Note.

455.    The approval of this resolution was a blatant violation of the PIA Operating Agreement's prohibition on the PIA Board of Mangers incurring indebtedness over $50,000 without Allen's consent.

456.    Nay and Brouk approved several similar resolutions and promissory notes for PIA's subsidiaries and Allen did not consent to these either.

457.    The resolutions were done to allow Patterson and Illig to tie up PIA's real estate assets with "debt" that would prevent PIA from selling the real estate to pay off a potential judgment to Allen.

458.    No PIA Board resolutions were proposed and/or unanimously approved documenting Patterson's, Illig's, or Pandi Development's capital contributions to PIA through Pandi Capital in 2010, 2011, or 2012.

**Illig and Patterson Implement the Next Phase of the Firewall Conspiracy**

459.    One of the key provisions in Allen's 2010 Employment Agreement obligated PIA to "fully and completely release[]" and "fully and completely indemnify and hold [Allen] harmless" from all guaranties he had personally extended on bank loans.

460.    Like many businesses, PIA relied on bank loans to smooth out cash flow irregularities and fund capital expenditures. And, as is common for such loans, the banks who lent money to PIA required each of Patterson, Illig, and Allen to personally guaranty repayment of the loans.

461.    Allen's resignation at the end of 2012 triggered the clause in the contract (the "FCRIHH Clause") requiring Defendants to fully and completely release and fully and completely indemnify and hold Allen harmless from such guaranties:

> (h)    In the event the Employee no longer is an employee of Five Star, Five Star will either (i) cause the Employee to be fully and completely released from liabilities, costs, obligation or guaranties of any nature directly or indirectly associated with the PIA Companies or any of the PIA Companies' operations (collectively "Company Obligation") within twelve (12) months after the date Employee's employment terminates ("12 Month Period"); or (ii) fully and completely indemnify and hold harmless Employee with respect to all existing and future Company Obligations pursuant to the terms and conditions of an indemnification agreement which will be in a form acceptable to Employee; provided, however, in circumstance (i) above, Five Star and the other PIA Companies will fully and completely indemnify and hold harmless the Employee during the 12 Month Period.

462.    Despite this clear contractual obligation to hold Allen harmless, Patterson and Illig conspired with PIA to do just the opposite.

463.    On January 2, 2013, Allen filed a lawsuit against RP Golf, LLC and PIA to collect on the Allen Note.

464.    Scott Goldstein, counsel for Illig, Patterson, and Pandi Capital, discussed and coordinated PIA's response to Allen's lawsuit with Pete Smith, ostensibly counsel for PIA and FiveStar Lifestyles.

465.    On January 9, 2013, just seven days after Allen filed his lawsuit in Platte County against only PIA and RP Golf, Pandi Capital's Maureen Evans began forwarding the loan guaranty documentation to both Spencer Fane's Scott Goldstein and McDowell Rice's Pete Smith by email.

466.    The next day Goldstein emailed Smith several times about the documentation. He did not discuss a strategy for facilitating Allen's *release* or how to hold Allen harmless from the guaranties, but rather how to use them *against* Allen.

467.    For instance, on January 10, 2013, Goldstein emailed Smith, "Here is the first Guaranty I have gotten a copy of. See what I have marked. A payment to Allen is a breach under this loan document. Query whether his mere filing of a lawsuit to enforce collection of the same is also a violation. Arguably yes. Sjg."

468.    A couple of days later, on January 14, 2013, Pandi Capital's Evans created a spreadsheet of "PIA Bank Debt by Maturity Date." In a section entitled "Bank Discussions for PIA Loans," she made a notation of Defendants' "Immediate" goal: "pay off" underlying loans secured by Jim Allen's guaranties and "go after . . . Jim."

469.    Later, when Pete Smith filed PIA's Answer in this case, Smith used Goldstein's suggestion that Allen's mere filing of a lawsuit caused a violation of Allen's guaranty.

470.    In fact, Smith had one of his law partners at McDowell Rice write a memo concluding that Allen's lawsuit violated the terms of the bank guaranties he signed on debts to PIA Assets and its subsidiaries.

471.   On January 14, 2013, Smith emailed the memorandum to Randall Nay, Dale Brouk, and Jim Allen (members of the PIA Board), and cited the memorandum to advise the Board that Allen's claims against PIA are subordinated to the bank debt.  In the same email, Smith "recommend[ed]" that the Board ask Jim Allen to dismiss his suit against PIA.

472.   The McDowell Rice memo concluded as much despite the fact that McDowell Rice lawyers had unequivocally recognized on several previous occasions that PIA had an obligation under both the 2006 and 2010 Employment Agreements to release, indemnify, and hold Allen harmless with respect to the loan guaranties.

473.   PIA (through McDowell Rice) nevertheless cited those same loan guaranties as an affirmative defense in this litigation *against* Allen.

### Spencer Fane's Scott Goldstein Acknowledges, and Lists Steps to Effectuate, the Conspirators' Unlawful Purpose of Using the Bank Loan Guaranties Against Allen

474.   Meanwhile, Spencer Fane's Scott Goldstein, counsel for the Pandi companies, and McDowell Rice's Pete Smith, putatively counsel for PIA, were coordinating on several items to further the "firewall" strategy.

475.   But by April 2013, Patterson was already expressing frustration with the conspirators' lack of progress.  In an April 8, 2013 email exchange (the "Patterson-Goldstein Email Chain," attached hereto as Exhibit D), Pandi Capital's Evans wrote to Spencer Fane's Goldstein at Patterson's request and asked why they had not gone after Allen's bank guaranties as previously agreed.

476.   On April 8, 2013, Maureen Evans emailed Scott Goldstein, subject "bank strategy." Evans wrote, "Scott, When we talk on Monday, can we also address the next steps we are taking with the Banks. Neal [Patterson] wants to know why we haven't approached the

Banks and gotten them to go after Jim Allen's guaranty. He says that was our strategy when we got this thing started and he wants to know why we haven't done any of that yet."

477.    Upon receiving this email, Goldstein did not give any indication that Evans was mistaken about a "strategy" to breach the contractual obligation to fully and completely release, indemnify, and hold Allen harmless.  Instead, Goldstein reached out to other members of the conspiracy to discuss Evans' question and created a list of action items for the group to further the conspiracy.

478.    The other members he emailed included Spencer Fane's Doug Weems and Richard Hertel, as well as Defendant Illig and non-party Karen Virgillito, General Counsel for The Illig Family Enterprise Company ("TIFEC").

479.    Goldstein responded to Evans' email the same day, writing:

> Here is a list of items I would like to discuss today, which includes Maureen's question below about dealing with the Banks.
> …
>
> 2.    Making sure all resolutions, notes, minutes, corporate documents have been signed, are organized and we have copies of the same.
>
> 3.    Bank follow-up:
>
> Completion of document gathering on loan documents.
>
> Karen/Cliff to work on script to be delivered by Pete.
>
> Pete is communicator – does not want Cliff or Neal to be involved – will need to harmonize obligation of PIA to indemnify with keeping Allen on guaranties.
>
> Goals: Allen stays on guaranties – no more Banks providing two sets of documents; Neal and Cliff don't sign any new or additional guaranties or reaffirmations of guaranties; Banks allow Pandi to take a subordinate lien on

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

assets; longer term alternatives, but for now need to deal with first three items.

Meet with Pete later this week to get this underway.

4. Lawsuit by Pandi Capital/Development to protect our rights:

Notes – changes to same as necessary.

Draft Petition.

480. At this time, PIA and the Pandi companies were supposed to be adverse. As described above, prior to the date of this email chain, Goldstein had already written a letter to Pete Smith and PIA threatening PIA with a lawsuit to collect on Pandi Capital's alleged "loans" to PIA.

481. In his email, Goldstein designated Illig and TIFEC's Virgillito to develop a "script" that PIA's counsel Pete Smith was to follow when dealing with banks.

482. The goal of the script was that Pete Smith, PIA's counsel, would get the banks to *keep* Allen on guaranties instead of releasing and/or holding him harmless as required under Allen's 2010 Employment Agreement. Goldstein wrote:

> Karen [Virgillito] / Cliff [Illig] work on script to be delivered by Pete [Smith].
>
> Pete is communicator—does not want Cliff [Illig] or Neal [Patterson] to be involved—will need to harmonize obligations of PIA to indemnify with keeping Allen on guaranties.

483. PIA, through its counsel Pete Smith, had an affirmative obligation to fully and completely indemnify and hold Allen harmless on the guaranties Allen had made for PIA's benefit.

484. And Spencer Fane's Goldstein expressly acknowledged the contractual "obligations of PIA to indemnify" Allen, in the same breath that he expressly admitted the

directly contrary notion that the group's "goal" was to *keep* Allen on the very same bank loan guaranties. He wrote, "Goals:  Allen stays on guaranties . . ."

485.     Goldstein's list of action items also included tasks related to the claims Pandi Capital ultimately filed as intervenors in this case and in a related proceeding in Jackson County. In particular, Goldstein's email states that the group needed to make "necessary" "changes" to the notes at issue so that it could file suit:

>     "4.  Lawsuit by Pandi Capital / Development to protect our rights:
>
>     Notes—changes to same as necessary."

486.     And a few days later, on April 16, 2013, Pandi Capital through Scott Goldstein sent PIA a demand for repayment by both email and interstate U.S. mail.

487.     The April 16, 2013 demand letter noted that the loans were made by Pandi Capital "[o]n Pandi Development's behalf" "pursuant to the terms of certain promissory notes as outlined in the letter.  Those purported promissory notes, purported to include one "promissory [sic]" per quarter, for each quarter, dated as of the last date of the quarter, from December 31, 2008 through December 31, 2012.  A total of 17 notes spanning a time period of more than four years.

488.     The April 16, 2013 demand letter also claimed that Pandi Development had made eight different "demand loans to PIA," spanning the time period from January 2013 through March 2013, ranging in value from $50,297 to $1.75 million, and that Pandi Development was demanding repayment of those loans too.

489.     All of these representations in the April 16, 2013 demand letter were false, and all of the purported promissory notes (to the extent they actually existed at the time) were false because none of them were authorized by the PIA Operating Agreement, and both Pandi

Development and Pandi Capital knew that at the time of the April 16, 2013 demand letter, and the date(s) the purported promissory notes were actually created, because the Pandi entities knew that Allen's consent was required under the PIA Operating Agreement, and the Pandi entities knew that Allen had not consented to them as required in the PIA Operating Agreement.

490.     Moreover, all of the purported "loans" made by Pandi Development (through Pandi Capital) to PIA were misrepresentations of equity contributions Patterson, Illig, and/or Pandi Capital wired to PIA.  Indeed, Illig admitted in deposition that there was no plan or expectation that these amounts would be repaid when made.

491.     In fact, the Pandi entities have never before attempted to collect on the purported notes prior to the Goldstein demand letter (even though several of them were purportedly already past due).

492.     Thus there was a clear pattern and practice over the course of at least four years to send wire transfers to PIA, and then misrepresent the nature of those wire transfers by creating false promissory notes.  Indeed, Defendants continue to wire funds to PIA and purport to "document" them with false notes or other documentation purporting to describe the equity contributions as debt.

493.     Allen, who had been CEO of PIA, had never seen nor approved any of these alleged notes and/or loans from PIA to Pandi Development / Pandi Capital.

494.     PIA did not possess copies of these alleged notes to Pandi Capital.

495.     Indeed, after Pandi Development sent the April 16, 2013 demand letter, PIA's counsel, Pete Smith, had to ask Pandi Development for copies of the purported notes on April 17, 2013.

496.    Scott Goldstein, representing the Pandi entities, responded on April 23, 2013, by forwarding some of the purported notes by email, and stating: "Attached are copies of the Notes, where there are notes."

### Defendants Doctor Notes to File Sham Litigation Claims in Jackson County

497.    Just a few weeks later, on April 30, 2013, Pandi Capital filed a petition against PIA in Jackson County.

498.    In the Jackson County lawsuit, Pandi Capital claimed that Patterson and Illig's past contributions to PIA were not equity contributions as PIA's books reflected, but instead loans that were past due.

499.    Spencer Fane, who represented Pandi Capital, attached sixteen different purported "Promissory Notes" as exhibits to the petition.

500.    These alleged notes are riddled with errors, suggesting they were hastily thrown together.

501.    For example, the introductory paragraph of each document identifies the "Borrower" as "PIA Assets, LLC, a *Missouri* limited liability company" (emphasis added), but the "Representations and Warranties" section of each nevertheless states that "Borrower . . . is duly formed . . . under the laws of *Kansas*" (emphasis added). All of the notes purport to be entered into with Pandi Capital, but several of them pre-date the formation of Pandi Capital, which occurred at the end of 2009.  Moreover, those dated before 2011 identify "Pandi Capital, LLC" as a "Kansas limited liability company" even though it is organized in Missouri and not registered in Kansas.

502.    Further, each of the Notes is signed by Dale Brouk. In his deposition testimony, Brouk testified that he signed the Notes after he was appointed PIA Manager (in December 2012) and before Pandi Capital's lawsuit was filed in Jackson County (April 30, 2013).

503.    Regardless of when he signed them, notes pre-dating 2011 identify Brouk as a "Manager" (which he was not until December 2012), and notes after 2010 identify him as "President" (which he never was).

504.    All of the loan documentation violates the PIA Operating Agreement, which provides that PIA could not "[b]orrow or incur indebtedness in excess of $50,000 in any single transaction or series of related transactions" without "unanimous approval of the Members," and, Defendants had no right to demand repayment of capital contributions.

505.    Allen, a "Member" who's approval was required for these loans to be authorized under the PIA Operating Agreement, never approved these alleged "notes."

506.    Moreover, Defendants had no expectation of repayment at the time the loans were purportedly made, which further confirms that the economic substance of the transactions was that they were equity and not debt.

**PIA's Counsel Colludes with Pandi Capital in Pandi Capital's Lawsuit Against PIA**

507.    On May 3, 2013—*just three days* after Spencer Fane filed Pandi Capital's *24-count* petition in Jackson County—PIA's counsel McDowell Rice filed PIA's Answer.

508.    Pete Smith, on PIA's behalf, did *not* assert as a defense that the contributions were equity (as PIA's books and the parties' past practice reflected).

509.    The next week, on May 10, 2013, Allen's trial counsel wrote to McDowell Rice, noting the serious ethical issues raised by Defendants' pleadings in the Jackson County litigation.

510.    In particular, Pandi Capital's Petition listed McDowell Rice's address as Pandi Capital's registered office, which suggested that McDowell Rice was representing *both* Plaintiff Pandi Capital *and* Defendant PIA *in the same case*.

511.     Plaintiffs' counsel went on to note that even if McDowell Rice was not actively representing Pandi Capital, it had represented Pandi Capital, as well as Patterson and Illig personally, regarding the same general matters, which raised its own ethical concerns.

512.     On May 13, McDowell Rice responded and conceded that McDowell Rice represents PIA "and its interests *are clearly adverse*" to Patterson, Illig, and Pandi Capital:

> Comment 7 to Rule 4–1.13 addresses a situation where representation of an organizational entity may be adverse to  that of its constituents and indicates that the attorney should advise any constituent of the conflict, that the attorney cannot represent such constituent and that such person(s) may wish to obtain independent representation.  In this situation, ***we are representing PIA Assets and its interests are clearly adverse to that of the constituents which are suing it and all of the constituents are aware of that adversity.***   At present, it is our understanding that ***Mr. Illig and Mr. Patterson are represented by separate counsel.*** Accordingly, there is no present concern related to Comment 7 to Rule 4-1.13.

(emphasis added.)

513.     McDowell Rice's Pete Smith went on to note that, because of the conflict Plaintiffs raised, McDowell Rice would withdraw from the representation.

514.     While Smith feigned that there was no actual conflict of interest necessitating the withdrawal, PIA's manager Randall Nay understood that there was: "[Nay to the PIA Board:] Gentlemen – as you know Pete Smith's firm has a conflict that cannot be waived and is unable to represent PIA in this matter."

515.     Similarly, the lawyer who took over the PIA representation from McDowell Rice determined the same: "Mr. Smith and his firm have now withdrawn from representation because of a conflict and I have entered my appearance in the matter at your request."

516.     Remarkably, when PIA Board Member Randall Nay emailed the rest of the PIA Board for authorization to hire the new lawyer (Bob Strauss), forwarding Strauss's resume and

retainer agreement, Nay cc'd McDowell Rice's Pete Smith (the lawyer withdrawing for conflicts reasons) and Spencer Fane's Scott Goldstein (opposing counsel) on the authorization request.

517.    What's more, Strauss had already entered his appearance in the Jackson County lawsuit before Nay's email seeking authorization to hire Strauss, which means that PIA's Board of Managers was not making the litigation decisions on behalf of PIA.

518.    Notably, despite PIA and Pandi Capital asserting the same claims and defenses against one another in this case as they did in the Jackson County case, McDowell Rice continues to represent PIA adverse to Pandi Capital without any explanation for how McDowell Rice can do so given the acknowledged conflict of interest.

### Illig and Patterson Cause PIA to Default on the Bank Loans So They Can Purchase Allen's Guaranties

519.    As Evans noted in the Patterson-Goldstein Email Chain, and in the bank loan spreadsheet she created, part of the conspirators' plan was to get the banks with loans from PIA and its subsidiaries to "go after" Allen's guaranties in response to Allen's lawsuit.

520.    One such bank was Missouri Bank, which held a $5 million line of credit which was scheduled to mature on June 28, 2013. Allen signed a 5% personal guaranty on the line of credit. Illig and Patterson had personal guaranties for the other 95%.

521.    Pete Smith notified Missouri Bank by letter dated April 30, 2013, of PIA's obligation to release / indemnify Allen, but then asked to meet with the bank, no doubt to deliver in person the "script" Illig and TIFEC's Virgillito had prepared for him to keep Allen on the guaranty. On several occasions Allen also directly notified Missouri Bank and PIA of PIA's obligation to indemnify him.

522.    As of mid-June 2013, the plan was for the guarantors to pay off the loan.

523.    On June 18, 2013, Missouri Bank's Senior Vice President Nicole Garren emailed the Missouri Bank Loan Committee seeking approval of two notes that would be used to pay off the PIA Assets $5 million note. One note would be from Jim Allen in his capacity as a personal guarantor of the PIA note for $250,000. The other note, to be guaranteed by Patterson and Illig, would be to Pandi Capital for $4,750,000 at 4.5%.

524.    Garren sent Loan Maturity notices to Allen, Illig and Patterson asking them to repay the loan as guarantors.

525.    On June 24, 2013, Garren met with Allen and his counsel and offered three options for resolving the $5 million loan. Garren offered to release Allen from his guaranty if Illig and Patterson would increase their guaranties from the current 47.5% to 50%. Garren also offered to renew the loan on its current terms with Allen as a 5% guarantor. Alternatively, the guarantors could pay off the loan.

526.    Garren separately conveyed the same options to Illig, Evans and Goldstein.

527.    Garren had understood from a conversation with Goldstein that Illig and Patterson wanted to pay off the loan.

528.    On June 25, 2013, Garren emailed Allen informing Allen that Missouri Bank would have paperwork necessary for Allen to pay off his guaranty portion of the $5 million PIA note to Missouri Bank. Allen had informed Garren at their meeting on June 24, 2013 that PIA owed him a contractual duty to release, indemnify or hold him harmless on his guaranty.

529.    Allen asked Garren via email if the Bank could renew the note from PIA using the existing guaranties from Allen, Illig and Patterson. Garren responded that, "All paperwork has to be redone anyway and we always have guaranties re-signed as well, so we will adjust paperwork accordingly."

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

530.    The Board of Managers of PIA met on June 26, 2013 to discuss the loan and PIA's duty to release or indemnify Allen on his guaranty.  Patterson and Illig refused to increase their guaranties from 47.5% to 50%, and so the managers decided to renew the loan on its current terms with the company to indemnify Allen on terms acceptable to Allen.

531.    On June 27, 2013, Allen emailed Brouk regarding the $5,000,000 loan from PIA to Missouri Bank.  He agreed to sign the new paperwork but he noted that PIA was not authorized to send his signature to the bank until he received an acceptable indemnification agreement:

> "Please note for the record, that my signature as a Guarantor is specifically conditioned upon receipt by my counsel of an Indemnity and Hold Harmless Agreement acceptable to me.
>
> [The lawyers] will need to work that out.
>
> *Then*, you can deliver [my signature] to [Missouri Bank] when appropriate."

(emphasis added).

532.    Despite this express condition, Brouk delivered Allen's guaranty to Missouri Bank without providing the indemnity to Allen, and the loan was renewed on June 28, 2013. Brouk did so because it was critical to Defendants' scheme that Allen remain a guarantor on the loan.

533.    On August 1, 2013, Randy Nay (Patterson's and Illig's appointee to the PIA Board) emailed Brouk, Allen, Pete Smith, Scott Goldstein and Bruce Strauss. Nay wrote that PIA was insolvent and that the "legal issues" surrounding PIA continuing to accept money from Pandi Capital "create a virtually impossible situation for the Board of Managers in its attempt to operate the company as called for in the operating agreement."

534.     Nay recommended that PIA not seek any additional funds from Pandi Capital for thirty days to allow Allen, Illig and Patterson to hold settlement talks. Nay recommended that, "Intensive negotiations should be undertaken for settlement. Settlement discussions should focus on a simple plan that would provide some form of payment in exchange for full and complete mutual releases from all claims. This would be no more than a 30-day process."

535.     Nay met with Allen to discuss his proposals. In that meeting, Nay re-iterated that any further contributions from Pandi Capital should be temporarily stalled to give the parties a chance to resolve the competing lawsuits, and that the banks would not seek to foreclose on the underlying collateral within the 30-day negotiation period.

536.     The Managers met on August 2, 2013, to discuss the proposal. Allen approved the proposal because he believed negotiations would occur and, based in part on Nay's past experience as a banker, Allen trusted Nay's representations that the banks would not move to foreclose on the underlying collateral in the interim.

537.     What Nay did not discuss in his email, in his meeting with Allen, or at the Board of Manager's meeting, was that he planned to take affirmative steps almost immediately to cause defaults on loans to PIA and its subsidiaries. Allen therefore believes that Nay's suggestion to stop paying the banks pending good faith negotiations was simply a ruse to help Patterson and Illig implement their scheme.

538.     On August 15, 2013, Nay wrote a letter to Nicole Garren at Missouri Bank informing Garren that PIA did not plan on making its next payment on the $5 million line of credit. The letter was delivered by email.

539.     As a result of the letter, Missouri Bank informed PIA by email that it expected full repayment from the guarantors (Patterson, Illig, and Allen).

540.    On August 23, 2013, Goldstein informed Missouri Bank by email that Patterson and Illig intended to "deal with their guaranty obligations."

541.    Allen also stood ready to satisfy his guaranty. But Missouri Bank cancelled a scheduled meeting with Allen and began negotiating secretly with Pandi Capital, Pandi Development, Illig and Patterson.

542.    Missouri Bank did not inform Allen of these negotiations.

543.    Missouri Bank agreed to make new loans to Pandi Capital and Pandi Development to be guaranteed by Illig and Patterson personally which would entirely pay off the two loans Missouri Bank had to PIA entities.

544.    But it was curious that Patterson and Illig sought to pay off the entire loan balance when the bank loan guaranties obligated them to only 95% of the loans.

545.    Nevertheless, Pandi Capital and Pandi Development financed the 100% purchase of the Missouri Bank loans to PIA with new Missouri Bank loans, personally guaranteed by Patterson and Illig at 50% each. This was essentially the same deal Patterson and Illig rejected just months before, the deal which would have released Allen from his guaranty.  The only major difference was that this deal did not release Allen.

546.    Scott Goldstein prepared the "purchase" documents and insisted that Missouri Bank include Allen's personal guaranty with the sale.

547.    On September 18, 2013, Pandi Capital, Pandi Development, Illig and Patterson "jointly and severally" bought (allegedly) both loans (one, a line of credits) Missouri Bank had made to the PIA entities.

548.    The purpose of the purchase was to acquire Allen's guaranty.

549.    Most, if not all of these negotiations, were conducted by the Defendants through email and telephone calls.

550.    But the Pandi entities, Illig, and Patterson purchased an expired guaranty.  The note to PIA in the line of credits from Missouri Bank was dated June 29, 2012. Allen's guaranty, which was allegedly purchased by the Pandi entities, Patterson, and Illig, specifically references that Note dated June 29, 2012.  However, the Note dated June 29, 2012 was paid off with the proceeds of a new note dated June 28, 2013. Accordingly, Allen was asked to sign a new guaranty on the 2013 Note which, as noted before, he did but that was subject to the express condition that PIA provide him an indemnity agreement for the guaranty that was acceptable to him and his counsel (which PIA never did).  And in any case, Illig and Patterson did not purchase the 2013 Note or Allen's conditional 2013 guaranty.

551.    Several months later, in keeping with Defendants' original plan to "go after the 5% from Jim [Allen]," Patterson, Illig and Pandi Development (represented by Kirk May of the German May law firm, and TIFEC's Virgillito as their "authorized agent") and Pandi Capital (represented by Spencer Fane's Scott Goldstein) purportedly foreclosed on Allen's guaranty, asserting (wrongly) that the foreclosure included Allen's claims against Patterson and Illig.

552.    This alleged foreclosure of Allen's guaranties on the Missouri Bank loans and his claims against PIA were the basis of Illig and Patterson's Motion for Substitution as the Real Party in Interest for Plaintiff James S. Allen, Jr.  The motion argued that Patterson and Illig, as the purchasers of Allen's guaranties and claims, were the proper parties to prosecute Allen's claims for repayment of his debt and for indemnification under his 2010 Employment Agreement.

553.    The motion asked the Court to allow Patterson, Illig, Pandi Development and Pandi Capital to prosecute Allen's claims against themselves.  In doing so, Defendants ignored their duty in the 2010 Employment Agreement to "fully and completely" release, indemnify, and hold Allen harmless, and their intent was clear:  to prevent Allen from enforcing his claims against Defendants.

554.    A similar scheme was repeated for other bank loans to PIA on which Allen was a personal guarantor.  Illig and Patterson (in conjunction with the Pandi entities) negotiated (through emails and telephone calls) with banks which held PIA loans that Allen had guaranteed, to purchase the loans and Allen's guaranties.

555.    The intent of every alleged loan purchase was to allow Patterson and Illig to sue Allen on his guaranties as a form of economic leverage.  They took the millions of dollars' worth of guaranties Allen had made for the benefit of PIA, and leveraged them to pressure Allen into forfeiting his claims against PIA.

556.    For example, on September 25, 2013, Karen Virgillito emailed Spencer Fane lawyer Kris Dekker regarding Illig and Patterson's purchase of a loan to a PIA subsidiary from Bank Midwest. Virgillito works for Illig at TIFEC (The Illig Family Enterprise Company), and Dekker is a lawyer representing Bank Midwest at Spencer Fane, the same firm which represents Pandi Capital.  Pandi Capital was one of the alleged purchasers of the Bank Midwest loan. Ms. Virgillito wrote, "Kris, I appreciate your efforts to move this thing along.  I just spoke to Scott [Goldstein, another lawyer at Spencer Fane who represents the Pandi entities] about how the proposed structure would impact our ability to seek contribution from Jim Allen.  I am still of the opinion that BMW is tying our hands with the collateral structure."

557.    On October 1, 2013, Ms. Virgillito followed up by email, noting that Illig would not agree to the position Bank Midwest was taking with respect to collateral for the new loan to pay off the old one, and that "Cliff and Neal as guarantors under the old notes must maintain their legal rights to force contribution by their co-guarantor Jim Allen."  Ms. Virgillito explicitly referenced Patterson's and Illig's own personal net worth (and potential value to both Spencer Fane and Bank Midwest) as a reason to grant the new loan on Patterson and Illig's terms:  "The new note will be approximately $12M.  I cannot imagine that the nearly $2 billion of combined net worth of Cliff and Neal is insufficient to give the bank some comfort on a $12M loan."

558.    In response, Bank Midwest agreed to fund the loan according to Patterson and Illig's terms.

559.    Emails from these negotiations also make clear that Defendants expected (if not hoped) that their efforts with respect to the loan guaranties would ruin Allen financially.  For example, in an October 28, 2013 email to Spencer Fane's Kris Dekker, Ms. Virgillito wrote: "Can we make it clear that if Jim Allen . . . files bankruptcy, it will not be an event of default under the new loan? . . . Under paragraph 5, how would this apply if Jim Allen files bankruptcy vs. Cliff or Neal?  I hope you understand why this matters."

560.    Defendants repeated the same scheme with a well-secured Bank of Kansas City ("BOKC") loan to one of PIA's subsidiaries, Loch Lloyd Country Club.

561.    Like the Missouri Bank loans, Defendants refused, on the advice of Spencer Fane, to release Allen from his guaranties on the loan after Allen resigned, even though the BOKC loan officer told Allen the releases would be no problem.

562.    On October 2, 2013, Brouk emailed Nay, Allen, Pete Smith, Scott Goldstein, and Maureen Evans to report that BOKC was not putting its loan to Loch Lloyd Country Club in

default despite the fact that PIA had informed BOKC that PIA would not make payments on the loan.

563.    Instead of putting the loan in default and making it available for purchase by Pandi Capital, the Bank was exercising its right to be repaid from the cash receipts of Loch Lloyd Country Club members which were deposited at the bank.

564.    Brouk referred to BOKC's right to the cash receipts as a "lockbox." The cash receipts from the member deposits were sufficient to make the payments due on the loan, and BOKC had the right under the loan documents to service the debt from those deposits before the funds were passed to PIA.

565.    But Defendants' plan required that BOKC put the loan into default so that Defendants could purchase the loan plus Allen's guaranty.

566.    Accordingly, Brouk suggested that PIA close the BOKC lockbox, and set up an entirely new account at a different bank to accept the payments. But to do so "the membership would have to be informed about making payments to another lockbox and [the conspirators] would also have to adjust the automatic credit card and ACH payments our members are currently making through Bank of Kansas City."

567.    Goldstein responded to Brouk's email and told him to proceed: "[P]lease do whatever is necessary so the issues you describe in your e-mail do not occur in the future."

568.    Allen, a member and manager of PIA at the time, objected but Brouk obeyed Goldstein, a lawyer representing Pandi Capital who at that time was suing PIA for over $100 million.

569.    TIFEC's Virgillito then arranged the purchase of the loan, informing BOKC that "the names of the note purchasers [are] Clifford W. Illig; Neal L. Patterson; Pandi Development,

LLC and Pandi Capital, LLC [who] will jointly purchase the existing BOKC notes." Two months later, Pandi Capital, Pandi Development, Patterson and Illig purchased the BOKC loan.

570.    Spencer Fane, representing *BOKC*, drafted the loan documents despite the fact that Pandi Capital (also represented by Spencer Fane) was a co-purchaser of the loan. Defendants again financed their purchase of the loan with a new BOKC loan, with Patterson and Illig as 50/50 guarantors.

## Pandi Capital's Admissions

571.    Pandi Capital, LLC, never filed a responsive pleading denying Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33.

572.    Therefore, pursuant to Mo. R. Civ. P. 55.09, Pandi Capital has admitted all allegations in Plaintiffs' First Amended Answer and Counterclaims.

573.    Paragraph 194 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 195 in Plaintiff's First Amended Answer and Counterclaims.

574.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 195 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

575.    Paragraph 200 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 199 in Plaintiff's First Amended Answer and Counterclaims.

576.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 199 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

577.    Paragraph 332 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 226 in Plaintiff's First Amended Answer and Counterclaims.

578. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 226 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

579. Paragraph 435 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 284 in Plaintiff's First Amended Answer and Counterclaims.

580. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 284 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

581. Paragraph 731 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 295 in Plaintiff's First Amended Answer and Counterclaims.

582. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 295 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

583. Paragraph 732 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 296 in Plaintiff's First Amended Answer and Counterclaims.

584. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 296 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

585. Paragraph 733 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 297 in Plaintiff's First Amended Answer and Counterclaims.

586. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 297 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

587.    Paragraph 735 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 298 in Plaintiff's First Amended Answer and Counterclaims.

588.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 298 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

589.    Paragraph 736 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 299 in Plaintiff's First Amended Answer and Counterclaims.

590.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 299 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

591.    Paragraphs 737 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 300 in Plaintiff's First Amended Answer and Counterclaims.

592.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 300 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

593.    Paragraph 739(d) in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 301(b) in Plaintiff's First Amended Answer and Counterclaims.

594.    Pandi Capital, LLC, never filed a responsive pleading denying paragraphs 301(b) in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

595.    Paragraphs 739(e) in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraphs 301(c) in Plaintiff's First Amended Answer and Counterclaims.

596.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 301(c) in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

597.     Paragraphs 741 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 303 in Plaintiff's First Amended Answer and Counterclaims.

598.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 303 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

599.     Paragraphs 742 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 304 in Plaintiff's First Amended Answer and Counterclaims.

600.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 304 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

601.     Paragraphs 743 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 305 in Plaintiff's First Amended Answer and Counterclaims.

602.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 305 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

603.     Paragraph 744 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 306 in Plaintiff's First Amended Answer and Counterclaims.

604.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 306 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

605.    Paragraph 745 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 307 in Plaintiff's First Amended Answer and Counterclaims.

606.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 307 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

607.    Paragraph 746 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 308 in Plaintiff's First Amended Answer and Counterclaims.

608.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 308 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

609.    Paragraph 747 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 309 in Plaintiff's First Amended Answer and Counterclaims.

610.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 309 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

611.    Paragraph 748 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 233 in Plaintiff's First Amended Answer and Counterclaims.

612.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 233 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

613.    Paragraph 749 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 310 in Plaintiff's First Amended Answer and Counterclaims.

614.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 345 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

615.     Paragraphs 750 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 311 in Plaintiff's First Amended Answer and Counterclaims.

616.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 311 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

617.     Paragraph 751 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraphs 312 in Plaintiff's First Amended Answer and Counterclaims.

618.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 312 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

619.     Paragraph 752 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 313 in Plaintiff's First Amended Answer and Counterclaims.

620.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 313 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

621.     Paragraph 754 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 315 in Plaintiff's First Amended Answer and Counterclaims.

622.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 315 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

623.    Paragraph 755 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 316 in Plaintiff's First Amended Answer and Counterclaims.

624.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 316 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

625.    Paragraph 756 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 317 in Plaintiff's First Amended Answer and Counterclaims.

626.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 317 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

627.    Paragraph 757 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 318 in Plaintiff's First Amended Answer and Counterclaims.

628.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 318 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

629.    Paragraph 759 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 319 in Plaintiff's First Amended Answer and Counterclaims.

630.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 319 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

631.    Paragraph 762 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 320 in Plaintiff's First Amended Answer and Counterclaims.

632.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 320 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

633.     Paragraph 763 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 321 in Plaintiff's First Amended Answer and Counterclaims.

634.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 321 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

635.     Paragraph 765 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 322 in Plaintiff's First Amended Answer and Counterclaims.

636.     Pandi Capital, LLC, never filed a responsive pleading denying paragraphs 350-352 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, those paragraph are admitted.

637.     Paragraph 767 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 323 in Plaintiff's First Amended Answer and Counterclaims.

638.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 323 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

639.     Paragraph 767 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 323 in Plaintiff's First Amended Answer and Counterclaims.

640.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 323 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

641.     Paragraph 768 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 324 in Plaintiff's First Amended Answer and Counterclaims.

642.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 324 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

643.     Paragraph 769 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 325 in Plaintiff's First Amended Answer and Counterclaims.

644.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 325 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

645.     Paragraph 771 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 326 in Plaintiff's First Amended Answer and Counterclaims.

646.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 326 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

647.     Paragraph 772 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 327 in Plaintiff's First Amended Answer and Counterclaims.

648.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 327 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

649.     Paragraph 773 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 328 in Plaintiff's First Amended Answer and Counterclaims.

650.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 328 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

651.     Paragraph 774 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 329 in Plaintiff's First Amended Answer and Counterclaims.

652.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 329 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

653.     Paragraph 775 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 330 in Plaintiff's First Amended Answer and Counterclaims.

654.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 330 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

655.     Paragraph 776 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 331 in Plaintiff's First Amended Answer and Counterclaims.

656.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 331 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

657.     Paragraph 778 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 332 in Plaintiff's First Amended Answer and Counterclaims.

658.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 332 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

659.    Paragraph 779 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 333 in Plaintiff's First Amended Answer and Counterclaims.

660.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 333 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

661.    Paragraph 780 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraph 334 in Plaintiff's First Amended Answer and Counterclaims.

662.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 334 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

663.    Paragraph 781 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 335 in Plaintiff's First Amended Answer and Counterclaims.

664.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 335 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

665.    Paragraph 785 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 336 in Plaintiff's First Amended Answer and Counterclaims.

666.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 336 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

667.    Paragraph 789 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 337 in Plaintiff's First Amended Answer and Counterclaims.

668.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 337 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

669.    Paragraph 790 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 338 in Plaintiff's First Amended Answer and Counterclaims.

670.    Pandi Capital, LLC, never filed a responsive pleading denying paragraphs 350-352 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, those paragraph are admitted.

671.    Paragraph 791 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 339 in Plaintiff's First Amended Answer and Counterclaims.

672.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 339 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

673.    Paragraph 793 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 340 in Plaintiff's First Amended Answer and Counterclaims.

674.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 340 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

675.    Paragraph 794 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 341 in Plaintiff's First Amended Answer and Counterclaims.

676.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 341 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

677. Paragraph 805 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 342 in Plaintiff's First Amended Answer and Counterclaims.

678. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 342 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

679. Paragraph 806 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 343 in Plaintiff's First Amended Answer and Counterclaims.

680. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 343 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, those paragraph are admitted.

681. Paragraph 807 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 344 in Plaintiff's First Amended Answer and Counterclaims.

682. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 344 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

683. Paragraph 813 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 345 in Plaintiff's First Amended Answer and Counterclaims.

684. Pandi Capital, LLC, never filed a responsive pleading denying paragraph 345 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

685. Paragraph 815 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 347 in Plaintiff's First Amended Answer and Counterclaims.

686.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 347 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

687.     Paragraph 817 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 348 in Plaintiff's First Amended Answer and Counterclaims.

688.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 348 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

689.     Paragraph 818 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 349 in Plaintiff's First Amended Answer and Counterclaims.

690.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 349 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

691.     Paragraph 819 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 350 in Plaintiff's First Amended Answer and Counterclaims.

692.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 350 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

693.     Paragraph 821 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 351 in Plaintiff's First Amended Answer and Counterclaims.

694.     Pandi Capital, LLC, never filed a responsive pleading denying paragraphs 350-352 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

695.    Paragraph 822 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 352 in Plaintiff's First Amended Answer and Counterclaims.

696.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 352 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

697.    Paragraph 832 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 200 in Plaintiff's First Amended Answer and Counterclaims.

698.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 200 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

699.    Paragraph 835 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 202 in Plaintiff's First Amended Answer and Counterclaims.

700.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 202 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

701.    Paragraph 836 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraphs 203 in Plaintiff's First Amended Answer and Counterclaims.

702.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 203 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

703.    Paragraph 838 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 204 in Plaintiff's First Amended Answer and Counterclaims.

704.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 204 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

705.     Paragraph 839 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 205 in Plaintiff's First Amended Answer and Counterclaims.

706.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 205 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

707.     Paragraph 840 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 206 in Plaintiff's First Amended Answer and Counterclaims.

708.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 206 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

709.     Paragraph 841 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 207 in Plaintiff's First Amended Answer and Counterclaims.

710.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 207 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

711.     Paragraph 843 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraphs 208 in Plaintiff's First Amended Answer and Counterclaims.

712.     Pandi Capital, LLC, never filed a responsive pleading denying paragraph 208 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

713.    Paragraph 844 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraphs 209 in Plaintiff's First Amended Answer and Counterclaims.

714.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 209 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

715.    Paragraph 845 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraphs 210 in Plaintiff's First Amended Answer and Counterclaims.

716.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 210 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

717.    Paragraph 848 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 211in Plaintiff's First Amended Answer and Counterclaims.

718.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 211 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

719.    Paragraph 850 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 212 in Plaintiff's First Amended Answer and Counterclaims.

720.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 212 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

721.    Paragraph 851 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 213 in Plaintiff's First Amended Answer and Counterclaims.

722.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 213 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

723.    Paragraph 852 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraph 214 in Plaintiff's First Amended Answer and Counterclaims.

724.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 214 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

725.    Paragraph 853 in this Plaintiff's Second Amended Answer and Counterclaims was averred as paragraphs 215 in Plaintiff's First Amended Answer and Counterclaims.

726.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 215 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

727.    Paragraph 855 in this Plaintiff's Second Amended Answer and Counterclaims were averred as paragraphs 216 in Plaintiff's First Amended Answer and Counterclaims.

728.    Pandi Capital, LLC, never filed a responsive pleading denying paragraph 216 in Plaintiffs' First Amended Answer and Counterclaims as required by Mo. R. Civ. P. 55.01 and 55.33. Therefore, pursuant to Mo. R. Civ. P. 55.09, it is admitted.

### COUNT I -- BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
### (Allen v. Patterson, Illig, Pandi Development, Pandi Capital, PIA Assets, FiveStar, RP Golf)

729.    Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

730.    The 2006 Employment Agreement, 2010 Employment Agreement, and PIA Operating Agreement are valid and enforceable contracts at the times relevant here.

731.    Entering into the operating agreement with Pandi Development, Patterson and Illig, and based upon the intertwined relationship of the parties including their corporate positions and ownership as well as their course of dealing, among other things, required that:

a.  Pandi, Patterson, and Illig, would act with good faith and fairness toward Allen on all matters concerning corporate affairs.

b.  Neither Pandi, Patterson nor Illig would take any action to unfairly prevent Allen from obtaining the benefits of his corporate position, his compensation, his employment agreement, or his rights under the Operating Agreement.

c.  Pandi, Patterson and Illig would comply with their own rules, policies and procedures with respect to providing and making financial information available to Allen and consulting with him on corporate matters.

732.    Pandi, Patterson or Illig's conduct as set forth above was conducted in bad faith and done with the purpose and intention of avoiding or diminishing payments owed to Allen for compensation and the value of his shares in PIA and to impair indemnity and hold harmless obligations owed to Allen.

733.    Pandi, Patterson and/or Illig breached the covenant of good faith and fair dealing in one or more of the  respects set forth herein:

a.  Pandi, Patterson or Illig purposefully and wrongfully failed and refused to pay Allen for the sums due him under the terms of the employment agreement;

b.  Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement made unauthorized corporate decisions to the detriment of Allen, and PIA.

c.  Pandi, Patterson or Illig unilaterally and in direct violation of the operating agreement re-characterized their equity contributions as debt and imposed unreasonable repayment terms and conditions;

d.  Pandi, Patterson or Illig did the other wrongful acts described herein.

734.  In addition, Defendants breached the covenant of good faith and fair dealing in one or more of the following ways:

a.  Defendants purposefully and wrongfully failed and refused to pay Allen for the sums due him under the terms of the 2006 and 2010 employment agreements, including repayment of the amounts he and his wife loaned the company, full payment of his compensation (including but not limited to the purchase payment amount, his full salary, bonuses and benefits);

b.  Defendants made unauthorized corporate decisions to the detriment of Allen, and PIA that contravened the spirit of the PIA Operating Agreement and the employment agreements;

c.  Defendants demanded that Allen make additional capital contributions to the company;

d.  Defendants without Allen's consent, nixed a townhome project which was to generate a significant portion of the bonuses under Allen's modified employment agreement. Allen has never received any of the bonuses provided for in the revised employment agreement;

e.  Defendants unilaterally and without Allen's consent changed the operating agreements of PIA subsidiaries to permit them to increase the indebtedness, and encumber the assets of PIA and its subsidiaries without Allen's consent;

f.  Defendants without Allen's consent incurred indebtedness of PIA and its subsidiaries;

g.  Defendants have falsely claimed that PIA is insolvent, even though PIA is current with all of its creditors except Allen and the bank loans and other debts Defendants purposefully caused PIA to default on as part of their fraudulent scheme; and

h.  Defendants did the other wrongful acts described herein.

735.  Such breaches were performed by Pandi, Patterson or Illig to exploit economic conditions to their own benefit, and to intentionally undermine the fulfillment of PIA's and FiveStar's contractual obligations to Allen.

736.  Pandi, Patterson or Illig's breach of the covenant of good faith and fair dealing was a substantial factor in causing damage and injury to Allen.

737.  As a direct and proximate result of Pandi, Patterson or Illig's unlawful conduct alleged in this Petition, Allen has lost substantial compensation and other benefits. Allen has further suffered extreme anguish and emotional distress due to such conduct in an amount to be determined at trial.

738.  Defendants' breach of the covenant of good faith and fair dealing directly and proximately caused damage to Allen, including lost compensation, Defendants' refusal to pay the

amounts due under Allen's Note, diminution in the value of his ownership and other interests in PIA, extreme anguish and emotional distress

739. Because of the irreparable harm that would result from Defendants collecting on the purported "Notes" and "Loans" and/or from a judgment characterizing the equity contributions as debt, Allen prays for an injunction from this Court:

    a. Declaring all of the Pandi Notes void and unenforceable;

    b. Declaring all of the purported loans Defendants made to PIA and PIA's subsidiaries without Allen's consent to be void and unenforceable;

    c. Enjoining further purported "loans" without Allen's consent to PIA or any of its subsidiaries;

    d. Commanding the managers of PIA to satisfy PIA's debts with unencumbered assets, as required by PIA's Operating Agreement;

    e. Enjoining the managers of PIA and Pandi from characterizing future contributions from Defendants as third party debt.

WHEREFORE, Allen prays for a declaratory judgment that all purported "loans," promissory notes, or other indebtedness purportedly incurred by PIA or its subsidiaries without Allen's express written consent are void and unenforceable; a judgment in an amount to be determined at trial, for his costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages in such an amount that is fair and reasonable; for an injunction as described above, and for such other and further legal and equitable relief as the Court deems just and proper.

**COUNT II – VIOLATION OF MISSOURI FRAUDULENT TRANSFER ACT**
**(Jim and Nancy Allen v. Illig, Patterson, Pandi Development, and Pandi Capital, LLC)**

740.　Allen incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

741.　As described above, the Allens took steps to collect loans made to PIA and asserted Jim Allen's right to certain contractual obligations owed by PIA, FiveStar and PIA's subsidiaries.

742.　In anticipation of and response to Allen's suit and demand, Patterson and Illig through Pandi Development began taking the actions described in more detail above, including appointing new managers, calling for meetings, claiming that PIA was in financial crisis, demanding large capital contributions from Allen, refusing to continue making contributions to PIA through Pandi Capital as they had for years before Allen made his demands unless Allen abandoned his demands, and filing their counterclaims in this lawsuit.

743.　Patterson and Illig's pursuit of their counterclaims through Pandi Capital to recharacterize equity contributions as debt is an attempt to hinder, delay or defraud creditors of PIA, including the Allens.

744.　Patterson and Illig made the alleged "loans" and "notes" from one company they owned, Pandi Capital, to another company they controlled, PIA Assets.

745.　Patterson and Illig made the alleged "loans" and "notes" in anticipation of a substantial long-term gain, as the prospects of short-term repayment at substantial interest on unsecured notes from PIA was low.

746.　Pandi received inadequate consideration for the purported "Loans" or "Notes," in that it would have had no reasonable expectation of repayment given short maturity terms of the alleged loans combined with the large principal amounts, high interest rates.

747.    The "Notes" were not made in the usual method of transacting business, in that the "Notes" and "Loans" were made without the approval of the members of PIA as required by the Operating Agreement, and no copies of the "Notes" were provided to PIA.

748.    Allen did not contemporaneously receive copies of the Notes on which Pandi Capital's claims are based, and no Members or Managers meetings of PIA Assets were held to discuss or ratify any notes from Patterson, Illig, Pandi Development, or Pandi Capital.

749.    Pandi has begun demanding security on its alleged loans.

750.    The amount of the "Loans" and "Notes" is such that demanding repayment from PIA is in effect a transfer of all or nearly all of PIA's property.

751.    Repayment of the "Loans" and "Notes" would cause PIA's insolvency.

752.    The circumstances surrounding the execution and delivery of the "Notes" and "loans" are suspicious as described above, in that the amounts claimed do not match the amounts on PIA's books, PIA did not have copies of the "Notes" or "Loans," and several of the Notes reflected a debt owed to a Pandi Capital before Pandi Capital existed.

WHEREFORE, the Allens pray for judgment in an amount to be determined at trial, for their costs incurred herein; for pre-judgment and post-judgment interest; for punitive damages in such an amount that is fair and reasonable; for an injunction, and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT
### (Jim and Nancy Allen v. PIA, Illig, Patterson, Pandi Development, LLC and PANDI Capital, LLC)

753.    The Allens incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

754.    A justiciable controversy regarding the characterization of contributions made by Illig and Patterson through Pandi Capital exists in that Pandi Capital's counterclaims for breach of contract are based on "Notes" described in Pandi Capital's counterclaims.

755.    For the reasons described above, the contributions made by Patterson and Illig through Pandi Capital were not contractual obligations owed by PIA to Pandi Capital, but were equity contributions made by Illig and Patterson that have been re-characterized as loans in order to re-prioritize repayment.

756.    If Patterson and Illig through Pandi Capital are successful through their lawsuit in converting their equity contributions into debts, PIA and its subsidiaries will be perpetually insolvent, rendering it unable to repay debts or satisfy its contractual duties to actual creditors like the Allens.

757.    The disposition of Illig and Patterson's claims in this suit will impair or impede Allen's ability to protect both his interest as a Member of PIA in protecting PIA's financial solvency, and Jim and Nancy Allens' personal interests in protecting the priority of their loans made in 2006 over Illig and Patterson's equity contributions made from 2009-13,

758.    The disposition of Illig and Patterson's claims in this suit will impair or impede Allen's personal interests in the rights and obligations to which he is entitled under the 2006 and 2010 employment agreements.

759.    Allen therefore asks this Court for a declaration that the "Notes" described in Pandi Capital's counterclaims were in fact equity contributions to PIA Assets.

760.    The Allens therefore ask this Court for a declaration that:

    a. The "Notes" described in Pandi Capital's counterclaims were in fact equity contributions to PIA Assets, the repayment of which does not take priority over the funds PIA owes the Allens; and

    b. All purported "loans" or other indebtedness to PIA and its subsidiaries that did not receive unanimous consent by both Allen and Pandi Development as required by the PIA Operating Agreement are void and unenforceable.

WHEREFORE, the Allens pray for a declaration of rights as described above, for their costs and fees incurred herein; and further legal and equitable relief as the Court deems just and proper.

## COUNT IV—FRAUDULENT INDUCEMENT
### (Jim Allen v. Patterson, Illig, and Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

761. At the end of 2008 and into 2010, Patterson, Illig and Allen discussed additional capital contributions into PIA.

762. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

763. Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment agreement. The parties negotiated a revised employment agreement that contained the following material terms: (a) reduction of Allen's annual salary; (b) an incentive provision; (c) car

allowance; (d) a note for the aforementioned loans from Jim and Nancy Allen under terms satisfactory to Allen; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

764.    It also dispensed with the  multi-million dollar "Purchase Payment" provision of the 2006 employment agreement.

765.    The parties negotiated the terms of the revised agreement and finally reached agreement in principle. Acceptance of the revised employment agreement was conditioned upon "(a) execution and delivery by all the parties, and (b) the execution and delivery of a note in form and substance satisfactory to" Allen.

766.    Patterson and Illig's representations that they would make additional equity contributions into the company and that they had a long term commitment to Allen and PIA were false when made because Patterson and Illig were secretly scheming to "eliminate" Allen and design and implement their "firewall" strategy that would allow them to breach obligations to Allen with impunity.   Because they were actively engaged in this plan to deceive Allen, Patterson and Illig knew that their representations to Allen were false or, at the very least, they were reckless.

767.    PIA has never signed the revised agreement nor delivered a Note acceptable to Allen.

768.    Unbeknownst to Allen, Illig directed that a note for Allen's debt not be delivered to Allen.

769.    Shortly after the parties agreed to the revised agreement in principle, and before any signatures of the parties, Allen began receiving a reduced salary.

770.    At the time the parties were negotiating the agreement, when they reached an agreement in principle, and at execution of the agreement, Allen was unaware that in concert with Heineman and PIA's counsel Pete Smith, Patterson and Illig had designed a "firewall" to allow them in part to prevent Allen from receiving any of the benefits of his new employment agreement, or any other contractual right he had in connection with PIA.  Allen did not learn any of this information until discovery in this case, and could not have learned of any of this information through the exercise of reasonable diligence.

771.    Additionally, Patterson and Illig, without consent or discussion with Allen, nixed a townhome project which was to generate a significant portion of the bonuses under Allen's modified employment agreement.  Allen has never received any of the bonuses provided for in the revised employment agreement.

772.    Allen also never received any drafts of a note as was contemplated by the modified employment agreement.

773.    In March 2012, believing that PIA had never accepted the 2010 Agreement because he had never received a signed copy or the agreement or a draft promissory note, let alone a note acceptable to Allen, Allen made a demand upon PIA for the repayment of his loans in accordance with PIA's financial records.  In response, Allen was presented with a "Note" signed by Illig that indicated the loans were due on January 1, 2013.  Allen had never seen this note before, let alone approved the note given the various problems, including that it was for the incorrect loan amount.

774.    Illig had previously directed that the Note not be delivered to Allen.

775.    The Allens' loans have not been repaid and the debt to the Allens is not currently reflected in any of PIA's financial plans. Accordingly, it appears that Patterson and Illig have no intention to ever repay the Allens.

776.    It further appears that Patterson and Illig through Pandi Development induced Allen into taking a reduced salary without ever intending to honor the other provisions of the agreement.

777.    It also appears that Patterson and Illig induced Allen into taking a reduced salary without ever intending to honor their promise to contribute equity into the company or honor various provisions of the agreement.

778.    Additionally, at the direction of Patterson and Illig, and in furtherance of their plan to drive Allen from PIA, Patterson and Illig through Pandi Development and Pandi Capital also have attempted to recharacterize their "capital contributions" as debt suggesting that their stated reasons for wanting Allen to take a reduction in salary were pretextual.

779.    Patterson and Illig's failure to disclose that they did not consider their capital contributions as such, and rather considered them as loans which would take priority above other payments was willful misconduct or was made with reckless indifference to the rights of Allen and was done with the intent to induce Allen to enter into a modified employment agreement.

780.    Allen did not have any independent knowledge of Patterson and Illig's misrepresentations or intent to defraud him at the time.

781.    In entering into the modified employment agreement, which increased cash flow to PIA without any ability by Allen to benefit from that increased cash flow, Patterson and Illig intended Allen to rely on their representations.

782.    At the time Allen signed the 2010 Employment Agreement, he was relying on Patterson's and Illig's false representations (including those representations made through Heineman) that they would contribute equity into the company if Allen signed the new agreement and that they had a long term commitment to PIA.

783.    Allen justifiably relied on Patterson and Illig's false representations in part because Patterson and Illig's past contributions had been equity contributions, PIA's books recognized their past contributions as equity contributions, Patterson himself frequently referred to his past and future equity contributions, Allen knew that his consent was required for PIA to take on additional debt (which he never gave), Patterson and Illig (nor any of their agents or surrogates) never disavowed or corrected their past representations, and Allen had no reason to believe that Patterson's and Illig's representations were otherwise false.

784.    Allen never would have agreed to modify the terms of his original employment agreement, including a reduced salary in order to provide PIA more working capital and relinquishment of a $6,000,000 buyout provision if he had known at the time that Patterson and Illig:  (1) had no intention of keeping Allen as the operational head of PIA for the long term; (2) had no intention of contributing future equity into the company; (3) had no intention of honoring the terms of the modified employment agreement; (4) intended to reclassify their past equity contributions as debt in an attempt to defraud the Allens out of money they loaned to the company; (5) were attempting to "eliminate" him from the company without paying him and without honoring PIA's contractual obligations to him; and/or (6) were in the process of erecting a "firewall" around their assets so that they could breach their obligations to Allen with impunity.

785.    Allen never would have agreed to modify the terms of his original employment agreement, including to a reduced salary in order to provide PIA with more working capital if he had known at the time that Patterson and Illig had no intention of honoring the terms of the modified agreement and intended to reclassify their capital contributions as third-party debt to defraud the Allens out of money they loaned to the company and to decrease the value of Allen's shares.

786.    Moreover, this information was clearly material to Allen's decision to enter into the 2010 employment agreement and Allen could not have discovered this information by the exercise of reasonable diligence.  Defendants therefore had a duty to disclose this information to Allen, particularly in light of Defendants' express representations and past conduct intended to make Allen believe, and which Allen reasonably did believe, that Patterson and Illig: (1) were making a long term commitment to PIA and planning to keep Allen as operational head of the company; (2) would continue to make equity contributions to the company; (3) would honor the provisions of the 2010 Employment Agreement, if Allen agreed to the new agreement.  This information was therefore required to be disclosed to make prior representations from being misleading and/or outright false.

787.    Defendants also had a duty to disclose this information to Allen in light of Defendants' 86.5% ownership interest in PIA compared to Allen's 13.5% ownership interest, and Patterson's and Illig's roles as managers of PIA, which created a fiduciary duty from Defendants to Allen, or a similar relation of trust and confidence between them.

788.    Defendants also had a duty to disclose this information to Allen because they knew he was entering into the 2010 Employment Agreement without this information, mistakenly believing that the purpose of the 2010 Employment Agreement was for shared

sacrifice, that Patterson and Illig had a long term commitment to PIA and with Allen as head of operations, and that Patterson and Illig would continue to contribute equity into the company if he agreed to the new arrangement. Under the circumstances as alleged above, the parties' prior dealings, the relationship between them, and common decency (among other things), Allen reasonably expected, and Defendants knew that one would reasonably expect, a disclosure of these facts.

789.    As a result of these fraudulent inducements, Allen gave up rights and benefits granted to him by his original agreement, including but not limited to a higher base salary and a six million dollar buyout provision of his Class A interest.

WHEREFORE, Plaintiff prays for judgment against Defendants Pandi Capital, Pandi Development, Patterson and Illig, jointly and severally, in an amount to be determined at trial for fraudulent inducement through misrepresentations and omissions, including for their willful misconduct, for his costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, for pre-judgement and post-judgment interest, and for such other and further relief as the Court may deem just and equitable.

## COUNT V−BREACH OF CONTRACT
### (Allen v. PIA, FiveStar, RP Golf, Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

790.    At the end of 2009, Patterson, Illig and Allen discussed additional capital contributions into PIA. Patterson and Illig were willing to make additional equity contributions but did not want to do so unless Allen made some type of contribution to PIA as well. Patterson and Illig requested that Allen, in lieu of capital contributions, modify his employment agreement with PIA, including taking a reduction in salary and other benefits.

107

791.     Based upon Patterson and Illig's representations that they would make additional capital contributions to PIA if Allen modified his employment agreement thereby reducing his salary and providing additional capital to PIA, Allen agreed to modify his employment agreement.  The parties began to negotiate a revised employment agreement that contained the following material terms:  (a) reduction of his annual salary; (b) an incentive provision; (c) car allowance; (d) a note for the Allens' aforementioned loans; and (e) release, indemnification and hold harmless on guaranties relating to debts of PIA Assets or its subsidiaries.

792.     Per Section 1.4(h) of Allen's 2010 Employment Agreement, FiveStar and "the other PIA Companies" were obligated to, at a minimum, "fully and completely indemnify and hold [Allen] harmless" with respect to "all liabilities, costs, obligations or guaranties of any nature directly or indirectly associated with the PIA Companies or any of the PIA Companies' operations."

793.     Per the revised agreement, within one year of Allen's resignation from his employment, FiveStar and "the other PIA Companies" were obligated to obtain releases on personal guaranties Allen had signed on debt obligations of PIA, FiveStar, and other subsidiaries of PIA.

794.     If releases were not immediately obtained, FiveStar and the other PIA Companies were obligated to indemnify and hold Allen harmless.

795.     Per Section 2.12 of Allen's 2010 Employment Agreement, the PIA Companies guaranteed performance of all of the terms  of Allen's 2010 Employment Agreement:

> 2.12 <u>Guaranty</u>. PIA Assets, on behalf of itself and each of the other PIA Companies, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, to Employee the due and punctual performance, observance and discharge of each term, provision, duty, covenant and agreement of Five Star and Double Eagle contained in, and the due and punctual payment (when and

as the same may become due and payable) of each amount which Five Star or Double Eagle is or may become obligated to pay pursuant to this Agreement. PIA Assets, on behalf of itself and each of the other PIA Companies, hereby waives promptness, diligence and notice as to the obligations and covenants contained herein, and waive any other circumstance which might otherwise constitute a legal or equitable discharge release or defense of a guarantor or surety, or that might otherwise limit the obligations of PIA Assets and the other PIA Companies under this Agreement. PIA Asset's [sic] and the other PIA Companies' guaranties hereunder are a guaranties of payment, performance and compliance and not of collection, and PIA Assets and the other PIA Companies waive any right to require that any action be brought against Five Star.

796. "PIA Companies" as defined in Allen's 2010 Employment Agreement includes "PIA Assets or any of its subsidiaries or affiliates."

797. The word "affiliates" is not defined in Allen's 2010 Employment Agreement.

798. The word "affiliate" is defined in PIA's Operating Agreement, to which both Allen and Pandi Development are parties. Section 1.10(b) of the Operating Agreement states:

(b) "Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this paragraph (b), the terms "control," "controlled" or "controlling" shall include, without limitation (i) the ownership, control or power to vote ten percent (10%) or more of (A) the outstanding shares of any class of voting securities, or (B) the partnership, limited liability company or beneficial interest of any Person, directly or indirectly, or acting through one or more Persons, (ii) the control in any manner over the general partner(s) or manager(s) or the electing of more than one director or trustee (or persons exercising similar functions) of such Person, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such Person.

799. "Person" is defined in PIA's Operating Agreement as "any individual, partnership, corporation, trust, limited liability company, or other entity."

800. Under this definition, at a minimum, Pandi Capital, Pandi Development, FiveStar, PIA Assets and their subsidiaries are all "affiliates."

801.     At a minimum, Pandi Capital, Pandi Development, FiveStar, PIA Assets, and their subsidiaries are all "PIA Companies" as defined in Allen's 2010 Employment Agreement.

802.     As "PIA Companies," Pandi Capital, Pandi Development, FiveStar, and PIA Assets have all guaranteed performance of the promises in Allen's 2010 Employment Agreement.

803.     As "PIA Companies," Pandi Capital, Pandi Development, FiveStar, and PIA Assets are bound by the promise in Allen's 2010 Employment Agreement to fully and completely release, indemnify, and hold Allen harmless.

804.     Pandi Development, Pandi Capital, Illig, and Patterson, to the extent they are alter egos of PIA, FiveStar, and the other PIA Companies, have an affirmative obligation to release, indemnify and hold Allen harmless on those guaranties.

805.     Releases were not obtained on the conditional guaranties Allen signed on PIA loans from Missouri Bank.

806.     If those guaranties were or are effective, FiveStar and the PIA Companies had an obligation to indemnify or hold Allen harmless with respect to those loans.

807.     Allen has not received any indemnification or hold harmless agreement from FiveStar or any of the PIA Companies.

808.     Pandi, Illig and Patterson, to the extent they are alter egos of PIA, FiveStar and the PIA Companies, have an affirmative obligation to release, indemnify and hold Allen harmless on those guaranties.

809.     PIA, FiveStar, Pandi Development, and Pandi Capital failed to fully and completely indemnify Allen on the guaranties Allen signed for the loans from Missouri Bank, and the loans described in Pandi Development's Counterclaims III-IX.

810. PIA, FiveStar, Pandi Development, and Pandi Capital failed to fully and completely hold Allen harmless on the guaranties Allen signed for the loans from Missouri Bank, and the loans described in Pandi Development's Counterclaims III-IX.

811. PIA, FiveStar, Pandi Development, and Pandi Capital failed to secure releases for Allen on the guaranties Allen signed for the loans from Missouri Bank, and the loans described in Pandi Development's Counterclaims III-IX.

812. Allen has not been indemnified nor held harmless by any of the PIA Companies for the loans from Missouri Bank, and the loans described in Pandi Development's Counterclaims III-IX.

813. After causing PIA to default on the loans from Missouri Bank, Pandi, Illig and Patterson now claim to have purchased the Missouri Bank loans and are attempting to enforce Allen's guaranties.

814. After causing PIA to default on the loans described in Pandi Development's Counterclaims III-IX, Patterson, Illig, Pandi Development, and Pandi Capital now claim to have purchased the loans and are seeking to enforce Allen's guaranties.

815. Defendants now seek to insulate themselves from liability for the wrongful acts described above, from their obligation to repay Allen's loans, and from their obligations to indemnify, hold harmless and/or release Allen from the very guaranties Defendants now seek to enforce through a purported foreclosure "sale" of Allen's claims against PIA.

816. Defendants have also breached the 2010 Employment Agreement in other ways, including failure to pay him the compensation and benefits he is owed under Section 1.3 of the Agreement, and failure to pay the Allen Note.

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

817.     Defendants have breached their duty to release and/or indemnify and hold Allen harmless on not only the loans from Missouri Bank, but also several other loans third parties made to PIA, FiveStar, and the PIA Companies.

818.     As a result, Allen has been damaged.

WHEREFORE, Plaintiff prays for judgment against Defendants jointly and severally in an amount to be determined at trial for breach of Plaintiff's employment agreement, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for pre-judgment and post-judgment interest, for his costs and expenses incurred herein, and for such other and further relief as the Court may deem just and equitable.

## COUNT VI–CIVIL CONSPIRACY
### (Jim and Nancy Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiffs incorporate herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

819.     As described above, Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development had an agreement and meeting of the minds to defraud Jim Allen out of the benefits of his employment contract, to defraud and prevent Jim and Nancy Allen from being repaid on their loan, and to insulate themselves from liability.

820.     As described above, Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development had an agreement and meeting of the minds to deny Jim Allen the benefits and rights of his 2006 and 2010 Employment Agreements and the PIA Operating Agreement.

821.     Patterson and Illig together and through PIA, FiveStar, Pandi Capital and Pandi Development took the affirmative steps described above in furtherance of their conspiracy.

822.    Defendants' conspiracy and the actions taken in furtherance of that conspiracy have damaged Plaintiffs by delaying and frustrating repayment of their loan and defrauding Jim Allen out of the benefit of his employment contract.

823.    Defendants' conspiracy and the actions taken in furtherance of that conspiracy have damaged Plaintiffs by fraudulently inducing him into giving up the $6 million purchase payment (or doing so through negligent misrepresentations), delaying and frustrating repayment of their loan, denying Jim Allen the benefit of his employment contracts and the PIA Operating Agreement, and causing mental pain and suffering.

824.    Patterson and Illig, together and through PIA, FiveStar, Pandi Capital and Pandi Development, had an agreement and meeting of the minds to avoid repaying Jim Allen on Allen's Note, to induce Jim Allen into the 2010 Employment Agreement in order to eliminate the $6 million purchase payment, reduce his salary and deprive him of other contractual rights under the 2006 employment agreement, to keep Jim Allen as a guarantor on the bank loans to PIA and its subsidiaries, and to default on the bank loans so that Patterson, Illig, Pandi Capital, and Pandi Development could purchase the bank notes and sue Allen for payment under the bank notes, to re-characterize their equity contributions as debt in order to make PIA appear insolvent, and do the other acts described above to achieve their unlawful purpose of denying Allen his rights under the 2006 Employment Agreement and the 2010 Employment Agreements, Allen's Note, and the PIA Operating Agreement.

WHEREFORE, the Allens pray for judgment against Defendants jointly and severally in an amount to be determined at trial for the conspiracy, including for their willful misconduct and intentional breach of Plaintiff's employment agreement, for his costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, for pre-judgment and

post-judgment interest, for an injunction preventing any Defendant from attempting to enforce the bank loan guaranties against Allen, and for such other and further relief as the Court may deem just and equitable.

## COUNT VII—BREACH OF FIDUCIARY DUTY
### (Allen v. Illig)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

825.    In April 2013, Illig became President of FiveStar Lifestyles, LLC.

826.    From October 2006 through November 2012, Illig was a manager of PIA Assets, LLC.

827.    As an officer and manager of an LLC, Illig had a fiduciary relationship with the members of the LLC for which he served as an officer.

828.    Specifically, under RSMo. Section 347.088, Illig had a duty of care and good faith to act "in good faith, with the care a corporate officer of like position would exercise under similar circumstances, in a manner a reasonable person would believe to be in the best interest of the LLC."

829.    James Allen has been a member of PIA Assets, LLC since 2006.

830.    Illig has breached those duties by engaging in the actions described above.

831.    Illig's breaches of his duties to Allen have harmed Allen, specifically by causing Allen to lose the benefits of his 2010 Employment Agreement and thwarting Allen's ability to collect on Allen's Note.

WHEREFORE, Plaintiff prays for judgment against Illig in an amount to be determined at trial for breach of his fiduciary duties to Allen, including for his willful misconduct and intentional

breach of his fiduciary duties, his costs and expenses incurred herein, for pre-judgment and post-judgment interest, and for such other and further relief as the Court may deem just and equitable.

## COUNT VIII—PIERCING CORPORATE VEIL
### (Allen v. PIA, FiveStar, Patterson, Illig, Pandi Capital and Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

832. Through Pandi Capital and Pandi Development, Patterson and Illig have completely dominated the finances, policy and business practices of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets.

833. Indeed, when asked who he understood PIA's owners to be, Randy Nay (the Board member appointed by (ostensibly) Pandi Development), testified he understood the owners to be Patterson, Illig, and Allen. In fact, during his testimony Nay had a difficult time distinguishing between Patterson, Illig, Pandi Development and Pandi Capital.

834. PIA Assets, RP Golf, FiveStar, and other subsidiaries of PIA Assets have no separate mind or will of their own, but have functioned solely at the whim and direction of Patterson and Illig. PIA Assets, and its subsidiaries, do nothing that is contrary or inconsistent with Patterson's and Illig's will, interest, and command.

835. Patterson and Illig have treated the assets of PIA Assets, RP Golf, FiveStar, and other subsidiaries of PIA Assets as their own personal assets in complete disregard for the rights and interests of the minority members.

836. As more fully described below, Patterson and Illig have used their control of PIA Assets, RP Golf, FiveStar, and other subsidiaries of PIA Assets to commit unjust acts in contravention of the rights of true creditors of PIA Assets.

837.     Patterson and Illig have used their control of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets, to commit fraud and wrong, to perpetrate the violation of positive legal duties owed to Plaintiffs, and to cause dishonest and unjust acts in contravention of Plaintiffs' legal rights.

838.     Through their control of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets, Patterson and Illig proximately caused the injuries to the Allens and PIA such that the Allens should be allowed to pierce the corporate veil and hold Patterson and Illig personally liable for the obligations of PIA Assets, RP Golf, FiveStar, and other subsidiaries and affiliates of PIA Assets.

839.     Patterson and Illig have taken an active role in the management and operations of PIA Assets and its subsidiaries.

840.     In an interview published in the June/July 2013 issue of *North* magazine, Dale Brouk, the COO/CFO of PIA, is quoted as saying, "'What they [Neil and Cliff] did to make SportingKC the best soccer venue in the country, they're now doing with the golf clubs. They are making us implement all of the things they believe in, the little things that help us differentiate our club from every other club,' says Dale."

841.     Patterson and Illig have repeatedly been mentioned as members of and assets to the development team in public advertisements for the sale of residential developments owned by PIA's subsidiaries and affiliates.

842.     These advertisements induce members of the public to buy real estate by touting the "strength" and "vision" of Patterson and Illig, the founders of Cerner Corporation.

843.    As described below, Patterson and Illig have used their control of PIA Assets and its subsidiaries and affiliates to strip the assets of PIA by reclassifying equity contributions as debt, making PIA Assets appear to be insolvent with the intent of avoiding creditors.

844.    For the period of time during which the alleged "Notes" were signed, Patterson and Illig were members and managers of PIA Assets, but failed to call required members' or managers' meetings and maintain required records, including the records related to the alleged "Notes" and "Loans" which are the subject of Pandi's counterclaims.

845.    By PIA's Operating Agreement, to which Illig and Patterson are parties through their ownership of Pandi Development, any indebtedness in excess of $50,000 must be approved by the members of PIA Assets. Jim Allen, a member of PIA Assets, was not asked to and did not approve any of the "Notes" or "Loans" which are the subject of Pandi's counterclaims.

846.    Dale Brouk, PIA's Chief Financial Officer, has testified that he knew the Notes and Loans were not properly approved according to the Operating Agreement.

847.    Pete Smith, PIA's counsel, has acknowledged that Pandi Capital's purported Notes violated PIA's Operating Agreement, which Patterson and Illig both signed.

848.    Upon information and belief, Patterson and Illig have made decisions regarding the non-renewal of certain loans to PIA and its subsidiaries from third-party creditors without consultation of the other members of PIA, in violation of the Operating Agreement of PIA.

849.    As described below, Patterson and Illig have used the non-renewal of these loans to attack Jim Allen's guaranties and in furtherance of their conspiracy to defraud Allen.

850.    Brouk, acting in conjunction with representatives from Pandi Capital, has interrupted a stream of payments from the revenues of the Clubs which was being used to make payments toward a loan to the Country Club of Loch Lloyd.

851.    By interrupting the stream of payments, Brouk and the representative of Pandi Capital allegedly put the loan to Loch Lloyd in default in furtherance of the conspiracy to defraud Allen.

852.    Upon information and belief, Patterson and Illig have refused proposals from third-party creditors that would have resulted in releases for Jim Allen from guaranties to those creditors. PIA, RP Golf, FiveStar and their subsidiaries and affiliates are contractually obligated to provide those releases.

853.    Patterson and Illig have made unilateral decisions to cease both required payments to both Class B shareholders and tax payments to Platte County.

854.    In November 2010, Patterson instructed Allen and Brouk not to make required tax payments to Platte County because he wanted to start "walking away" from PIA's real estate assets in Platte County.

855.    Patterson and Illig have made unilateral decisions to fund PIA's legal defense while claiming that PIA is insolvent.

856.    Patterson and Illig have made unilateral decisions to the detriment of Allen that benefitted Grand Construction, which they own, for development services at PIA.

857.    Patterson and Illig have made unilateral decisions to fund capital improvements to The National and Loch Lloyd while claiming in Court filings that PIA is insolvent and while refusing to pay Jim Allen pursuant to his employment contract.

858.    Patterson and Illig have unnecessarily encumbered assets to prevent recovery by the Allens and other minority shareholders.

859.    Patterson and Illig have committed other wrongful acts as described above.

860. Patterson and Illig committed the above acts to prevent Allen and others from enforcing their contractual rights against PIA.

861. Under Missouri law, where a corporation or an LLC is used for an improper purpose and to perpetuate injustice by which it avoids its legal obligations, equity will step in, pierce the corporate veil and grant appropriate relief.

WHEREFORE, the Court should put aside the limited liability of PIA Assets LLC, FiveStar Lifestyles LLC, Pandi Capital, LLC, and Pandi Development, LLC, and hold Patterson and Illig personally liable for the ostensible actions of the limited liability corporations' actions.

## COUNT VIII−RECOVERY ON ALLEN'S NOTE UNDER RSMO § 347.059
### (Allen v. Illig)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

862. To the extent Allen's Note is not authorized under the PIA Operating Agreement or binding on PIA, Illig nevertheless signed Allen's Note purporting to be the "authorized signatory of PIA Assets, LLC."

863. In so doing, Illig expressly represented and warranted that the "execution, delivery and performance by [PIA] of [the] Note: (i) are within [PIA]'s organizational powers; (ii) have been duly authorized by all necessary action; and (iii) do not contravene any [PIA] certificate of formation or operating agreement or any law or contractual restriction binding on or affecting [PIA] or its properties."

864. By virtue of Illig's history with PIA, his role as a manager of PIA, his status as a manager and owner of Pandi Development (the majority member of PIA), Illig could not have a good faith but mistaken understanding of whether he was authorized to sign Allen's Note,

particularly because Illig signed the PIA Operating Agreement which contains the operative restriction on authority.

865.    Thus, if Allen's Note was not authorized by the PIA Operating Agreement, Illig is personally responsible for repayment of the note according to its terms. *See* RSMo § 347.059.

WHEREFORE, if the Court determines that Allen's Note was not authorized by the PIA Operating Agreement or not binding on PIA,  the Court should hold Illig personally liable for the debts and liabilities stated in Allen's Note, and enter a judgment against Illig for breach of the note, and awarding Allen damages in the amount of $817,585.00, attorneys' fees, costs and expenses incurred in connection with the enforcement and/or collection of the loan as provided in Allen's Note, plus interest at the contractual return rate of 20% until the maturity date of January 1, 2013, and 25% after maturity until paid, and for such other and further relief as the Court may deem just and equitable.

## COUNT IX – NEGLIGENT MISREPRESENTATION
### (Allen v. Patterson, Illig, Pandi Capital, Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

866.    Patterson's and Illig's negotiations (including through Heineman) with Allen regarding the 2010 Employment Agreement (as noted above) were done in the course of their business.

867.    Patterson and Illig (including through Heineman) supplied information to Allen during those negotiations as noted above.

868.    Defendants intentionally provided the information to Allen (including through Heineman) for the purposes of entering into the 2010 Employment Agreement as noted above.

869.    Allen justifiably relied on the information as noted above.

870.     Patterson and Illig also failed to disclose information they had a duty to disclose to Allen as noted above.

871.     Due to Allen's reliance on the false information Defendants provided to Allen, and the failure of Defendants to provide information they had a duty to disclose to him, Allen suffered a pecuniary loss in an amount to be determined at trial.

872.     Defendants acted intentionally and with an evil motive or, at the very least, with reckless disregard to Allen's rights.

WHEREFORE, Plaintiff prays for judgment against Defendants Pandi Capital, Pandi Development, Patterson and Illig, jointly and severally, in an amount to be determined at trial for negligent misrepresentation, through misrepresentations and omissions, including for their willful misconduct, for Allen's costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, and for such other and further relief as the Court may deem just and equitable.

## COUNT X - TORTIOUS INTERFERENCE
### (Allen v. Patterson, Illig, Pandi Capital, Pandi Development)

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

873.     Allen's rights under the 2006 Employment Agreement, 2010 Employment Agreement, and the Allen Note each constituted a contract and/or a valid business expectancy.

874.     At all relevant times, each of Patterson, Illig, Pandi Capital, and Pandi Development were aware of the 2006 Employment Agreement, the 2010 Employment Agreement, and the Allen Note.

875.     Patterson, Illig, Pandi Capital, and Pandi Development intentionally and without justification interfered by inducing and/or causing a breach of the obligations contained in these documents as noted above.

876.     As a direct and proximate result of Defendants' interference, Allen was injured.

WHEREFORE, Plaintiff prays for judgment against Defendants Pandi Capital, Pandi Development, Patterson and Illig, jointly and severally, in an amount to be determined at trial for tortious interference, including for their willful misconduct, for Allen's costs and expenses incurred herein, for punitive damages in such an amount that is fair and reasonable, and for such other and further relief as the Court may deem just and equitable.

**COUNT XI - RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT (RICO) - 18 U.S.C.  § 1962(C)**
**(Allen v. Patterson and Illig)**

Plaintiff incorporates herein by reference the statements and allegations contained in the paragraphs above as though more fully and completely set forth herein.

877.     The enterprise consists of Defendant PIA Assets, LLC and its subsidiaries (collectively "PIA"), which has as a legitimate purpose the development and sale of real estate in interstate commerce.  Indeed, PIA owns land in both Kansas and Missouri, and advertises to, sells to, and serves customers from both Kansas and Missouri.

878.     There also exists an enterprise comprised of PIA and Pandi Development.  They work together for the common purpose of developing and selling real estate in interstate commerce.  Pandi Development provides the funding, and PIA operates the business.  Pandi Development in turn is funded by contributions from Patterson and Illig which, on information and belief, come from accounts outside of Missouri, such as Goldman Sachs and Credit Suisse in New York, and are wired into Missouri and Kansas for use by PIA.

879.    There also exists an enterprise comprised of PIA, Pandi Development, and Pandi Capital.  They work together for the common purpose of developing and selling real estate in interstate commerce.  Pandi Development provides the funding through Pandi Capital, and PIA operates the business.  Indeed, Pandi Capital's Operating Agreement states that the purpose of the business is, in part, to fund PIA.  Pandi Capital is also funded by contributions from Patterson and Illig which, on information and belief, come from accounts outside of Missouri, such as Goldman Sachs and Credit Suisse in New York, and are wired into Missouri and Kansas for use by PIA.

880.    Defendants Patterson and Illig conduct the affairs of all three of these enterprises.

881.    Patterson and Illig are the sole managers and members of Pandi Development. On information and belief, they are the only people who make any decisions for Pandi Development.

882.    Patterson and Illig are the sole managers and members of Pandi Capital.  They are the principal decision makers for Pandi Capital.

883.    Patterson and Illig conduct the affairs of PIA in multiple ways, including but not limited to:

    a.  Patterson and Illig (ostensibly through Pandi Development) own 86.5% of PIA.  Because of their position as super-majority owners,  Patterson and Illig have personally directed and have full control over the affairs of PIA. PIA does not do anything against the wishes of Patterson and Illig;

    b.  Patterson and Illig were two of the three members of the PIA Board of Manager from 2006 through December 2012, and then appointed Brouk and Nay to replace them.  Brouk and Nay serve as Patterson and Illig's proxies

on the Board, and the PIA Operating Agreement permits them to favor Patterson's and Illig's interests over Allen's. Brouk and Nay are beholden to Patterson and Illig, they consult with Patterson and Illig (and/or representatives of Patterson and Illig) on issues that affect PIA, and vote the interests of Patterson and Illig only. On information and belief, neither Nay nor Brouk has ever taken a vote or done any other act related to PIA that is not in the interests of Patterson and Illig personally;

c.  Patterson and Illig provide a large part of the funding to PIA, and only provide funds if they (or one of their representatives) agree to fund the specific items for which funds are requested;

d.  Illig has been the CEO of FiveStar, the executive in charge of PIA operations, and has been charged with providing the oversight a CEO would provide for PIA, since early 2013 (and no later than March 2013).

884.  Patterson and Illig agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Allen. Specifically, Patterson and Illig, among other things, devised, implemented and directed a fraudulent scheme to "eliminate" Allen from PIA without paying him the $6 million purchase payment he had a contractual right to be paid, and without repaying the funds Allen and his wife loaned the company.

885.  Pursuant to and in furtherance of their fraudulent scheme, Defendants Patterson and Illig committed multiple related acts of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), including as follows.

886.    As part of the fraudulent scheme, Patterson and Illig (including through their agent Heineman) fraudulently induced Allen into a new employment agreement that eliminated the $6 million purchase payment and reduced his compensation as noted above.  This scheme involved the use of interstate wires, as evidenced by the email communications referenced above.

887.    As part of the fraudulent scheme, Patterson and Illig worked with PIA counsel Pete Smith and other personnel at McDowell Rice, to devise and implement a "firewall" strategy that was designed to make PIA appear insolvent so that if Allen (and other minority owners Manning and Watson) ever tried to enforce his (their) rights, Defendants could claim that PIA was judgement proof and frustrate Allen's (and the other minority owners') recovery.  This scheme involved the use of interstate wires, as evidenced by the email communications referenced above.

888.    This fraudulent "firewall" strategy included, among other things, Defendants Patterson and Illig (personally and/or through their agents and employees):

    a.    Instructing PIA officer Dale Brouk to falsify PIA's books and financial statements to mischaracterize Patterson and Illig's past equity contributions as debt;

    b.    Causing Pandi Development to contribute cash, through Pandi Capital, to PIA, and falsely characterizing the transactions as loans (which they could not be without Allen's express consent, and Allen did not consent to the purported notes at issue in this litigation).  According to Pandi Development, the cash contributions were effected by at least 24 interstate wires transfers over a 4 year period in or about the time periods stated in

Scott Goldstein's April 16, 2013 demand letter, and Defendants continue to send contributions to PIA by interstate wire on a regular basis today and will undoubtedly continue to do so into the future unless this Court stops them;

c.     Creating false promissory notes purportedly memorializing the Pandi Development / Pandi Capital contributions as loans. The false promissory notes were distributed to participants in the fraudulent scheme by email as noted above. Defendants continue to mischaracterize incoming wire transfers as debt with false and fraudulent notes and/or other documentation and will undoubtedly continue to do so into the future unless this Court stops them;

d.     Having Illig personally sign the false promissory notes;

e.     Directing PIA's Brouk to sign the false promissory notes;

f.     Attempting to avoid the restrictions in the PIA Operating Agreement by amending the operating agreements for the PIA subsidiaries to permit them to do the very things the PIA Operating Agreement prohibited (as described above). The negotiation and implementation of this plan was conducted largely by email as described above;

g.     Having Pandi Development, through counsel Spencer Fane, send threatening letters by both interstate email and interstate U.S. mail as part of the fraudulent scheme, including:

        i.      A March 7, 2013 letter from Spencer Fane's Scott Goldstein in Missouri to PIA's Board of Managers (c/o Randy Nay in Kansas),

in which Goldstein threatened that if Mr. Allen did not withdraw his lawsuit, Pandi Capital would purportedly "accelerate" and demand payment on nearly $100 million of false promissory notes;

ii.      An April 16, 2013 demand letter Goldstein sent from Missouri to PIA's Board of Managers (c/o Randy Nay in Kansas), in which Goldstein demands payment on the approximately $100 million of false promissory notes, further demands payment on several other purported "demand loans to PIA"; and

iii.     Though neither of these letters was addressed specifically to Allen, Defendants knew that Allen was a PIA Board member, and would receive and/or hear about the contents of the letter, and the purpose of the letters was to threaten Allen and pressure him to forfeit his claims.

h.      Having Pandi Capital, represented by Spencer Fane, and PIA, represented by McDowell Rice, collude in filing a sham litigation in Jackson County, Missouri, in which Pandi Capital attempted to secure a judgment and collect on the false promissory notes. Spencer Fane and McDowell Rice colluded on the sham litigation through the use of the wires, as evidenced by the email communications referenced above.

889.     Patterson and Illig's fraudulent scheme to defraud Allen also included a conspiracy to exert financial pressure on Allen by leveraging certain guaranties Allen made on

PIA bank loans used to fund PIA's operations.  As part of this unlawful loan guaranty strategy,

Defendants Patterson and Illig (personally and/or through their agents and employees):

a.    Knew that Allen had a contractual right to be fully and completely released, indemnified and held harmless on all loan guaranties Allen had made for the benefit of PIA, and that, at a minimum, PIA and its subsidiaries and affiliates had guaranteed the performance of the contractual obligation;

b.    Agreed nevertheless to use the bank loan guaranties against Allen, and to employ Pandi Capital, lawyers at Spencer Fane, The Illig Family Enterprise Company, PIA Board Members Dale Brouk and Randy Nay, and PIA's counsel Pete Smith, to do so.  This strategy, some of the participants' roles in it, as well as the participants' clear knowledge that the strategy was unlawful, is manifest in the April 8, 2013 "Patterson-Goldstein Email Chain" referenced above;

c.    Concocted and implemented a plan to have PIA default on the loans that Allen had guaranteed.  The implementation of this plan involved extensive use of email as referenced above;

d.    Negotiated with the banks, by email, for the purchase of the defaulted loans;

e.    Purported to foreclose on the collateral securing at least one of the bank loans, Allen's claims against PIA, with notices related to such foreclosure sale being sent by U.S. mail, including:

        i.       A December 17, 2013 "Notification of Disposition of Collateral Relating to Commercial Guaranty (the "Guaranty") Given by James S. Allen, Jr. ("Allen") to Missouri Bank Regarding PIA Assets, LLC ("PIA")" letter from Goldstein to Jim Allen,

        ii.      A January 23, 2014 "Notice of Results of Foreclosure Sale" letter from Goldstein to Jim Allen, and

        iii.     A January 24, 2014 "Notice of Exercise of Ownership Rights" letter sent by Goldstein to Jim Allen.

    f.      Filed claims through Pandi Development and Pandi Capital against Allen in Platte County, Missouri, to collect on the guaranties; and

    g.      Filed a motion for substitution in Platte County, falsely claiming that the foreclosure sale rendered Allen without standing to sue PIA.

890.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

891.    Patterson and Illig have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

892.    As a direct and proximate result of Patterson's and Illig's racketeering activities and violations of 18 U.S.C. § 1962(c), Allen has been injured in his business and property in that:

    a.   He was fraudulently induced into the 2010 Employment Agreement (and out of the right to the $6 million purchase payment guaranteed to him in the 2006 Employment Agreement);

b. Defendants refuse to pay all amounts due under Allen's Note and the 2010

Employment Agreement based on the false notion that PIA is insolvent; and

c. Allen has had to expend considerable resources pursuing this litigation.

WHEREFORE, Plaintiff prays for judgment against Defendants Patterson and Illig, jointly and

severally, in an amount to be determined at trial for actual damages, treble damages, and the cost

of suit including attorneys fees for violation of 18 U.S.C. § 1962(c), and for such other and

further relief as the Court may deem just and equitable.

## COUNT XII - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) CONSPIRACY - 18 U.S.C. § 1962(D)
### (Allen v. Patterson, Illig, PIA, Pandi Development, Pandi Capital)

Plaintiff incorporates herein by reference the statements and allegations contained in the

paragraphs above as though more fully and completely set forth herein.

893.    As set forth above, Defendants Patterson, Illig, PIA, Pandi Development, and

Pandi Capital conspired to violate 18 U.S.C. § 1962(c).

894.    Defendant PIA agreed to and participated in Patterson and Illig's fraudulent

scheme to defraud Allen as noted above and by, among other things, as follows:

a. PIA's Counsel Pete Smith suggesting that Defendants Patterson and Illig

implement the "firewall" strategy by making future contributions to PIA

as debt, instead of equity;

b. PIA Board Member and Officer Dale Brouk signed the false promissory

notes that purported to document the contributions as loans;

c. PIA's Counsel McDowell Rice colluded with the Pandi entities and their

counsel Spencer Fane, to file sham litigation pleadings in Jackson County;

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

d.  PIA's counsel McDowell Rice strategized with the Pandi entities' counsel Spencer Fane by email as noted above to find ways to use the bank loan guaranties against Allen in direct contravention of PIA's obligations under the employment agreements;

e.  PIA's counsel McDowell Rice, as evidenced by the Patterson-Goldstein Email Chain referenced above, was an integral part of the bank loan strategy, in which Smith was the designated "communicator" to keep Allen on the guaranties, and actually met with both Goldstein and the banks to carry out his part of the conspiracy;

f.  PIA Board Member and Officer Dale Brouk delivered Allen's loan guaranty paperwork to Missouri Bank without authority to do so, and in direct contravention of Allen's express instructions. Brouk ignored Allen's instructions to facilitate the conspirators' goal of keeping Allen as a signed guarantor on the Missouri Bank loans, so that Defendants could purchase the bank loans and guaranties and use them against Allen.

g.  PIA Board Member Randall Nay devised a plan to have PIA default on the bank loans, paving the way for Patterson, Illig, and the Pandi entities to buy the defaulted loans to effectuate the bank loan strategy. In particular, Nay (through emails and in person as noted above) convinced Allen that PIA should stop paying the banks temporarily, so that the PIA owners could engage in good faith settlement discussions. But this was a ruse designed to secure Allen's consent under false pretenses.

h.  The PIA Board, in conjunction with PIA counsel McDowell Rice among others, and over Allen's objection, changed the operating agreements of PIA's subsidiaries to get around the restrictions in the PIA operating agreement prescribing the circumstances under which PIA could take on more debt.  PIA did so at Pandi Development's request so that Pandi Development could purport to encumber PIA's operations and balance sheet with debt as part of the firewall strategy.

895.  Defendants Pandi Development and Pandi Capital agreed to and participated in Patterson and Illig's fraudulent scheme to defraud Allen as noted above and by, among other things, as follows:

a.  Claiming, in knowing violation of the PIA Operating Agreement, that the funds wired to PIA on behalf of Pandi Development, and purportedly "through" Pandi Capital, were "loans" to PIA;

b.  Spencer Fane (counsel to the Pandi entities) strategizing with McDowell Rice (counsel to PIA) by email to find ways to use the bank loan guaranties against Allen in direct contravention of PIA's and the Pandi entities' obligations under the 2010 Employment Agreement;

c.  Spencer Fane sending threatening letters, by email and U.S. mail as referenced above, to pressure Allen into forfeiting his rights;

d.  Pandi Capital, and Pandi Development (through Spencer Fane), as evidenced by the Patterson-Goldstein Email Chain referenced above, were an integral part of the bank loan strategy, in which Spencer Fane planned

to make "changes" to the false promissory notes so that they could file the sham Jackson County lawsuit;

e. Spencer Fane (counsel to the Pandi Entities) colluding with McDowell Rice (counsel to PIA) to file sham litigation claims in Jackson County, for collection on the fraudulent promissory notes;

f. Pandi Development asking the PIA Class A Members and the PIA Board to change the operating agreements of PIA's subsidiaries to get around the restrictions in the PIA operating agreement prescribing the circumstances under which PIA could take on more debt. Signing one of the resolutions requesting the change and ensuring that Brouk and Nay implemented the changes. Pandi Development did this so that it could encumber PIA's operations and balance sheet with debt as part of the firewall strategy.

g. Working with PIA (including by emails referenced above) to ensure that PIA defaulted on bank loans that Allen had personally guaranteed;

h. The Pandi entities purchasing, jointly and severally with Patterson and Illig, the bank loans that PIA defaulted on so that they could use them against Allen (which, as referenced above, required the use of the wires and U.S. mail);

i. The Pandi entities purporting to foreclose on Allen's claims against PIA (which, as referenced above, required the use of the wires and U.S. mail);

j. The Pandi entities filing claims in the Platte County litigation against Allen;

> k.   The Pandi entities filing a motion for substitution in Platte County, falsely claiming that the foreclosure sale rendered Allen without standing to sue PIA.

896.   Patterson, Illig, PIA, Pandi Development, and Pandi Capital have intentionally conspired and agreed to directly and indirectly conduct and participate in the affairs of the enterprise through a pattern of racketeering activity.

897.   Patterson, Illig, PIA, Pandi Development, and Pandi Capital knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the fraudulent scheme described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

898.   As a direct and proximate result of Defendants' conspiracy, the above acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), the Allens have been injured in their business and property as set forth above.

WHEREFORE, Plaintiff prays for judgment against Defendants Patterson, Illig, PIA, Pandi Development, and Pandi Capital, jointly and severally, in an amount to be determined at trial for actual damages, treble damages, and the cost of suit including attorneys fees for violation of 18 U.S.C. § 1962(d), and for such other and further relief as the Court may deem just and equitable.

## **JURY DEMAND**

The Allens hereby request a trial by jury of all issues triable by jury.

/

/

/

/

Dated:   September 30, 2016

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By: _____
   Patrick J. Stueve, MO Bar # 37682
   stueve@stuevesiegel.com
   J. Toji Calabro, MO Bar #66574
   calabro@stuevesiegel.com
   460 Nichols Road, Suite 200
   Kansas City, MO 64112
   (816) 714-7100
   (816) 714-7101 Facsimile


   **FUNK RIEMANN LLP**
   Andrew Funk, MO Bar # 59977
   andrew@frlawkc.com
   1600 Genessee, Suite 852
   Kansas City, MO  64102
   (815) 348-3002

   **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via email on September 30, 2016 to the following:

R. Pete Smith
Kristie Orme
petesmith@mcdowellrice.com
korme@mcdowellrice.com
MCDOWELL RICE SMITH & BUCHANAN
605 W. 47th Street, Suite 350
Kansas City, Missouri 64112
**Attorneys for Defendants PIA Assets, LLC,**
**RP Golf, LLC, and FiveStar Lifestyles, LLC**

Douglas M. Weems
Scott J. Goldstein
Angus Dwyer
SPENCER FANE, LLP
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106
dweems@spencerfane.com
sgoldstein@spencerfane.com
adwyer@spencerfane.com
**Attorneys for Defendant Pandi Capital, LLC**

Kirk T. May
Phil G. Greenfield
GERMAN MAY, PC
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
kirkm@germanmay.com
philg@germanymay.com
**Attorneys for Defendants Neal Patterson, Clifford Illig,**
**and Pandi Development, LLC**

_____
J. Toji Calabro

# EXHIBIT A

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

## EMPLOYMENT AGREEMENT

This Employment Agreement is dated as of October 6, 2006 ("**Effective Date**") and entered into by and among PIA, LLC, a Missouri limited liability company ("**Company**") and James S. Allen, Jr., an individual resident of the State of Missouri ("**Employee**").

NOW, THEREFORE, in consideration of the mutual undertakings contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### Definitions

1.1     Definitions. As used herein, the following terms shall have the following meanings.

"**Board**" means the vote of 66% of the Members of the Company.

"**Cause**" means the final non appealable conviction of Employee by a court of competent jurisdiction of a felony.

"**Employment Period**" has the meaning set forth in Section 2.1.

### ARTICLE II
### Employment

2.1     Employment. The Company hereby agrees to employ Employee, and Employee hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and terminating as provided in Section 2.4 ("**Employment Period**").

2.2     Position and Duties.

(a)     During the Employment Period, Employee shall serve as President of the Company, and shall perform such executive and managerial duties normally associated with such position, shall have overall responsibility for the Company's assets and shall have such additional duties, responsibilities and authority as shall be reasonably assigned to him from time to time by the Board.

(b)     Employee shall perform his duties and responsibilities to the best of his abilities on a full-time basis in a diligent, trustworthy and businesslike manner, and may perform his duties either at or away from the Company's offices, as appropriate for the business needs of the Company. In the performance of his duties hereunder, Employee shall at all times report to and be subject to the lawful direction of the Board.

2.3     Base Salary and Benefits.

(a)     During the Employment Period, Employee's base salary shall be Three Hundred Twenty-Five Thousand and No/100 Dollars ($325,000.00) per annum (the "Base

KC01 806317



DEPOSITION
EXHIBIT
62
PENGAD 800-631-6989

Salary"), which salary shall be payable in regular bi-weekly installments in accordance with the Company's general payroll practices and shall be subject to deductions for customary withholdings for federal, state and local taxes.

(b)     The Company shall provide to Employee, without charge of any kind including, but not limited to, any initial fee, dues or similar charges, membership at all clubs owned and/or operated by the Company and/or its affiliates. Except in the event of termination of Employee's employment for Cause under Section 2.4(b), such membership shall remain in effect following the end of the Employment Period and shall continue for Employee's lifetime. Such membership shall also allow Employee to purchase food, drink and merchandise at the Company's most favorable rates, with an allowance of $2,500 per month for the purpose of making such purchases.

(c)     The Company shall provide Employee with the use of an automobile, of Employee's choice, to be owned or leased by the Company. In addition, the Company will arrange and provide for appropriate levels of insurance on such automobile.

(d)     Employee's Base Salary under subsection (a) and the allowances under subsections (b) and (c) shall be increased each year, effective on each anniversary of the date of this Agreement during the Employment Period, by the percentage increase in the Consumer Price Index for All Urban Consumers for the 12-month period ending on or immediately prior to each such anniversary.

(e)     Employee shall also be entitled to payment or reimbursement by the Company of all expenses incurred by Employee in connection with the performance of his duties hereunder, plus all expenses incurred by Employee in connection with the negotiation of this Agreement, plus all expenses (if any) incurred to enforce this Agreement;

(f)     In addition to the foregoing, Employee shall be entitled, during the Employment Period (and following the Employment Period to the extent provided in any plans, policies, programs or arrangements described below), to participate in all retirement, pension, savings, health, medical, dental, disability, insurance and other fringe benefit plans, policies, programs or arrangements of the Company generally available to executive employees (whether now or hereafter provided to such employees) in accordance with the terms thereof (collectively, "Benefits"), which shall at a minimum consist of the following:

(1)     Six (6) weeks of paid vacation per year;

(2)     Continuation of Employee's Base Salary for up to twelve (12) months during any period of short-term disability during which Employee is unable to perform his duties under this Agreement;

(3)     The Company will pay the premiums on a long-term disability insurance policy providing a benefit of eighty percent (80%) of Employee's Base Salary in the event of Employee's continued disability following the period set forth in paragraph (2);

(4)     The Company will pay the premiums on a term life insurance policy in the face amount of Six Million and No/100 Dollars ($6,000,000.00) for the benefit of Employee and such beneficiary as Employee shall name thereunder;

PLTF000068

(5)     The Company will pay the premiums on an accidental death and dismemberment policy in the face amount of Six Million and No/100 Dollars ($6,000,000.00) for the benefit of Employee and such beneficiary as Employee shall name thereunder;

(6)     The Company shall maintain a health care plan covering Employee and his spouse; and

(7)     The Company shall maintain a 401(k) plan, in accordance with Section 401(k) of the Internal Revenue Code of 1986, as amended, in which Employee shall be immediately eligible to participate and to contribute the maximum contribution permitted by law.

2.4     Term.

(a)     The Employment Period shall terminate on the date that is ten years after the date set forth in Section 2.1; provided, however, that the Employment Period shall continue for successive periods of one year thereafter unless either the Company or Employee gives written notice of termination to the other party on or before the date that is six months prior to the date the Employment Period would otherwise end. Notwithstanding the foregoing, the Employment Period shall be subject to earlier termination only upon the following circumstances in accordance with the terms of this Agreement: (i) by the Company for Cause, (ii) by reason of Employee's death, (iii) by reason of Employee's disability, or (iv) upon Employee's voluntary resignation.

(b)     Termination for Cause. The Company may terminate Employee's employment for Cause. If Employee's employment is terminated for Cause, the Company shall pay to Employee all earned and accrued but unpaid Base Salary, allowances and expense reimbursements, plus the purchase payment described in Section 3.1. The Company may not terminate Employee's employment for Cause, however, unless (i) no fewer than 60 days prior to the date of termination of Employee's employment, the Company provides Employee with written notice ("Notice of Consideration") of its intent to consider termination of Employee's employment for Cause, including a detailed description of the specific reasons which form the basis for such consideration; (ii) for a period of not less than 30 days after the date Notice of Consideration is provided, Employee shall have the opportunity to appear before the Board, with or without legal representation, at Employee's election, to present arguments and evidence on his own behalf; and (iii) following the presentation to the Board as provided above, Employee may be terminated for Cause only if (A) the Board, by the affirmative vote of all of its members (excluding Employee if he is a member of the Board), determines that the actions or inactions of Employee specified in the Notice of Termination occurred, that such actions or inactions constitute Cause and that Employee's employment should accordingly be terminated for Cause; and (B) the Board provides Employee with a written determination ("Notice of Termination for Cause") setting forth in specific detail the basis of such termination of employment, which Notice of Termination for Cause shall be consistent with the reasons set forth in the Notice of Consideration.

(c)     Death. If Employee's employment is terminated as a result of his death, the Company shall pay to Employee's estate all previously earned and accrued but unpaid Base Salary, allowances and expense reimbursements up to the date of his death, plus the purchase

PLTF000069

payment described in Section 3.1, and shall provide to Employee's spouse and dependents any Benefits continuing after the death of Employee in accordance with their terms and conditions; provided, that Employee's beneficiary under any term life insurance policy and/or accidental death and dismemberment policy under Section 2.3(f) shall be entitled to receive the proceeds payable under any such policy(ies).

     (d)    Disability. Employee's employment with the Company shall terminate in the event of Employee's disability within the meaning of the long-term disability policy described in Section 2.3(f). If Employee's employment is terminated as a result of disability, the Company shall pay to Employee all earned and accrued but unpaid Base Salary, allowances and expense reimbursements, plus the purchase payment described in Section 3.1, and shall provide to Employee and his spouse and dependent any Benefits continuing after termination of employment in accordance with their terms and conditions.

     (e)    Resignation. Employee may resign from employment with the Company by giving thirty (30) days written notice to the Company. If during the Employment Period Employee's employment is terminated upon Employee's voluntary resignation, the Company shall pay to Employee all earned and accrued but unpaid Base Salary, allowances and expense reimbursements, plus the purchase payment described in Section 3.1, and shall provide to Employee and his spouse and dependents any Benefits continuing after termination of employment in accordance with their terms and conditions.

     (f)    Any payments pursuant to this Section 2.4 (other than the purchase payment, which shall be made in a lump sum as described in Section 3.1) shall be made on the payment dates on which Employee's Base Salary and allowances would have otherwise been paid if the Employment Period had continued.

### ARTICLE III
### Miscellaneous

     3.1    Purchase Payment. Upon termination of Employee's employment at the end of the Employment Period or for any reason under Section 2.4, the Company shall purchase Employee's interest in the Company, including any interest held in trust with respect to Employee (collectively "Employee Membership Interest") for the amount of Six Million and No/100 Dollars ($6,000,000.00); provided, however, if the Employee voluntarily resigns from employment with the Company, the Company will purchase the Employee Membership Interest for (i) Four Million and No/100 Dollars ($4,000,000) if the Employee voluntarily resigns on a date prior to the date thirty-six (36) months after the Effective Date ("3 Year Period"); (ii) Five Million and No/100 Dollars ($5,000,000) if the Employee voluntary resigns after the expiration of the 3 Year Period and prior to the date seventy-two months after the Effective Date ("6 Year Period"); and (iii) Six Million and No/100 Dollars ($6,000,000) if the Employee voluntary resigns after the expiration of the 6 Year Period. Such amount shall be payable in a lump sum payment in cash within 60 days after termination of employment. The Company shall purchase, and shall maintain in force throughout the Employment Period, a life insurance policy in an amount sufficient to enable the Company to pay this purchase payment out of the proceeds of such life insurance policy in the event of Employee's death.

PLTF000070

In the event the Employee's employment is terminated for any reason under Section 2.4, the Company will either (i) cause the Employee to be completely released from all liabilities, costs, obligations or guaranties of any nature directly or indirectly associated with the Company or any of the Company's operations (collectively "**Company Obligations**"); or (ii) fully and completely indemnify and hold harmless Employee with respect to all existing and future Company Obligations pursuant to the terms and conditions of an indemnification agreement which will be in a form acceptable to Employee.

      3.2   Survival. Sections 2.3(b), (c) and, to the extent the terms and conditions of any Benefits provide for continuation after termination of employment, (f) and Sections 3.3 through 3.12 shall survive and continue in full force in accordance with their terms notwithstanding any termination of the Employment Period.

      3.3   Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally, mailed by certified or registered mail, return receipt requested and postage prepaid, or sent via a nationally recognized overnight courier, or sent via facsimile to the recipient. Such notices, demands and other communications will be sent to the address indicated below:

        To the Company:

           PIA, LLC
           10316 Tom Watson Parkway
           Attention: Chief Administrative Officer
           Facsimile: (816) 741-1462

      To Employee:
           James S. Allen, Jr.
           7001 Waters Edge
           Parkville, Missouri 64152

      With a copy to:

           Michael J. Royle
           Bryan Cave LLP
           1200 Main Street, Suite 3500
           Kansas City, Missouri 64105
           Facsimile: (816) 374-3300

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.

      3.4   Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed,

PLTF000071

construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

    3.5    Complete Agreement. This Agreement is the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral.

    3.6    Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

    3.7    Successors and Assigns. Except as otherwise provided herein, all covenants and agreements contained in this Agreement shall bind and inure to the benefit of and be enforceable by Employee, the Company, and their respective successors and assigns. Except as otherwise specifically provided herein, this Agreement, including the obligations and benefits hereunder, may not be assigned to any party by Employee or the Company.

    3.8    No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied to this Agreement.

    3.9    Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

    3.10    Governing Law. All questions concerning the construction, validity and interpretation of this Agreement will be governed by and construed in accordance with the domestic law of the State of Missouri, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Missouri or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Missouri.

    3.11    Remedies. Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.

    3.12    Amendment and Waiver. The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and Employee.

*  *  *  *  *

PLTF000072

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

law provision or rule (whether of the State of Missouri or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Missouri.

4.10   Remedies.  Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.

4.11   Amendment and Waiver.  The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and Employee.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

PIA ASSETS, LLC,
a Missouri limited liability company

By: _____
Print Name: _____
Title: _____

_____
James S. Allen, Jr., in his individual capacity

PLTF000073

# EXHIBIT B

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement ("**Agreement**") is dated as of January 1, 2010 ("**Effective Date**") and entered into by and among PIA ASSETS, LLC, a Missouri limited liability company ("**PIA Assets**"), FIVE STAR LIFESTYLES, LLC, a Missouri limited liability company ("**Five Star**"), and DOUBLE EAGLE BUILDERS, LLC, a Missouri limited liability company ("**Double Eagle**") and James S. Allen, Jr., an individual resident of the State of Missouri ("**Employee**").

### Preliminary Statements

A.     Employee and PIA Assets are parties to that certain Employment Agreement (the "**Original Agreement**") dated October 9, 2006 setting forth the terms and conditions of Employee's employment by PIA Assets.

B.     Five Star and Double Eagle are wholly owned subsidiaries of PIA Assets, for which Employee has performed substantial duties in the course of his employment with PIA Assets.

C.     In connection with a non-taxable event transaction involving certain loans being made to PIA Assets by Employee and PI Lending, LLC, PIA Assets desires to assign, and Five Star desires to assume, the obligations of PIA Assets under the Original Agreement upon the amended and restated terms and conditions stated herein.

### Agreement

NOW, THEREFORE, in consideration of the mutual undertakings contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### Employment

1.1     <u>Assignment, Assumption, and Employment</u>. As of the Effective Date, PIA Assets assigns, and Five Star assumes, all of the rights and obligations arising in connection with Employee's employment after the Effective Date, including, without limitation, those rights and obligations under the terms and conditions stated herein. Five Star hereby agrees to employ Employee, and Employee hereby accepts employment with Five Star, upon the terms and conditions set forth in this Agreement and terminating as provided in <u>Section 1.4</u> ("**Employment Period**").

1.2     <u>Position and Duties</u>.

(a)     During the Employment Period, Employee will serve as President of Five Star, and will perform such executive and managerial duties normally associated with such position, will have overall responsibility for Five Star's assets and will have such additional duties, responsibilities and authority as will be reasonably assigned to him from time to time by the Board of Managers of Five Star (the "**Board**").

(b)     Employee will perform his duties and responsibilities to the best of his abilities on a full-time basis in a diligent, trustworthy and businesslike manner, and may perform his duties either at or away from Five Star's offices, as appropriate for the business needs of Five

DEPOSITION
EXHIBIT
64

PENGAD 800-631-6989

PC000816

Star. In the performance of his duties hereunder, Employee will at all times report to and be subject to the lawful direction of the Board.

1.3    Compensation and Benefits.

(a)    Until January 18, 2010, Employee's Base Salary shall remain as stated in the Original Agreement. Effective January 18, 2010 and continuing throughout the remainder of the Employment Period, Employee's base salary will be One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) per annum (such salary, the "**Base Salary**"). The Base Salary will be payable in regular bi-weekly installments in accordance with Five Star's general payroll practices and will be subject to deductions for customary withholdings for federal, state and local taxes.

(b)    Five Star will provide to Employee, without charge of any kind including, but not limited to, any initial fee, dues or similar charges, membership at all clubs owned and/or operated by PIA Assets or any of its subsidiaries or affiliates (collectively, the "**PIA Companies**"). Such membership will remain in effect following the end of the Employment Period and will continue for Employee's lifetime or for as long as PIA Assets has operating control of such clubs. Such membership will also allow Employee to purchase food, drink and merchandise at the most favorable rates made available by the PIA Companies, with an allowance of $2,500.00 per month for the purpose of making such purchases.

(c)    Employee's Base Salary under subsection (a) will be increased effective January 1 of each year by the percentage increase in the Consumer Price Index for All Urban Consumers over the immediately preceding twelve calendar months for which such information is then available.

(d)    Employee will also be entitled to payment or reimbursement by Five Star of all expenses incurred by Employee in connection with the performance of his duties hereunder, plus all legal costs and expenses (if any, up to the amount of $50,000.00) incurred to enforce this Agreement;

(e)    Five Star will provide Employee with the use of an automobile, of Employee's choice, to be owned or leased by Five Star, with the monthly lease cost not to exceed $750.00. In addition, Five Star will arrange and provide for appropriate levels of insurance on such automobile.

(f)    Five Star will pay Employee, as additional compensation, a percentage of the Profit (as defined below) that Double Eagle generates prior to the tenth (10th) anniversary of the Effective Date. For each calendar year, Employee will receive the first One Hundred Thousand and No/100 Dollars ($100,000.00) of Profit and twenty-five percent (25%) of all Profit thereafter. As used herein, "**Profit**" shall mean the Gross Income (as defined in Exhibit A) of Double Eagle, less Cost of Goods Sold (as defined in Exhibit A), less Overhead (as defined in Exhibit A). All computations of Overhead and Cost of Goods Sold will exclude payments made by Double Eagle to any other PIA Companies. Payments under this subsection shall be made to Employee no later than thirty (30) days after end of the calendar year during which such sales, transfers, or other dispositions occur. Until the tenth (10th) anniversary of the Effective Date, the PIA Companies will continue to use Double Eagle as the entity which is the non-exclusive preferred builder of homes, consistent with past practices of the PIA Companies, at the

PC000817

developments commonly known as "The National" and "Loch Lloyd", and that the PIA Companies, or any successors thereof, will not direct the operations or any transactions that have the purpose or effect of avoiding or limiting Profit of Double Eagle.

(g)     In addition to the foregoing, Employee will be entitled, during the Employment Period (and following the Employment Period to the extent provided in any plans, policies, programs or arrangements described below), to participate in all retirement, pension, savings, health, medical, dental, disability, insurance and other fringe benefit plans, policies, programs or arrangements of the PIA Companies generally available to executive employees (whether now or hereafter provided to such employees) in accordance with the terms thereof (collectively, "**Benefits**"), which will at a minimum consist of the following:

(1)     Six (6) weeks of paid vacation per year;

(2)     Continuation of Employee's Base Salary for up to twelve (12) months during any period of short-term disability during which Employee is unable to perform his duties under this Agreement;

(3)     Five Star will pay the premiums on a long-term disability insurance policy providing a benefit of sixty percent (60%) of Employee's Base Salary (or if greater, in accordance with Five Star's policies) in the event of Employee's continued disability following the period set forth in paragraph (2);

(4)     Five Star will pay the premiums on a term life insurance policy on the life of the employee in the face amount of Six Million and No/100 Dollars ($6,000,000.00) for the benefit of Five Star (the "**Life Insurance Policy**").

(5)     Five Star will maintain a health care plan covering Employee and his spouse; and

(6)     Five Star will maintain a 401(k) plan, in accordance with Section 401(k) of the Internal Revenue Code of 1986, as amended, in which Employee will be immediately eligible to participate and to contribute the maximum contribution permitted by law.

1.4     Term.

(a)     The Employment Period will terminate on the date that is ten years after the Effective Date; provided, however, that the Employment Period will continue for successive periods of one year thereafter unless either Five Star or Employee gives written notice of termination to the other party on or before the date that is six months prior to the date the Employment Period would otherwise end.  Notwithstanding the foregoing, the Employment Period will be subject to earlier termination only upon the following circumstances in accordance with the terms of this Agreement:  (i) by Five Star for justifiable business reasons in accordance with Section 1.4(b), (ii) by reason of Employee's death, (iii) by reason of Employee's disability, or (iv) upon Employee's voluntary resignation.

(b)     Five Star may terminate Employee's employment for justifiable business reasons ("**Company Termination**") upon sixty (60) days prior written notice from Five Star to the Employee ("**Company Notice of Termination**").  As used herein, "justifiable business reasons" does not include, among other similar things, the avoidance of paying any obligations

PC000818

owing to Employee under the terms of this Agreement or otherwise. In the event of any dispute as to justifiable business reasons, it shall be Five Star's burden to evidence and establish such circumstances. Upon the occurrence of a Company Termination, Five Star will pay to Employee all earned and accrued but unpaid Base Salary, allowances and expense reimbursements until the date sixty (60) days after the date the Employee receives the Company Notice of Termination. Additionally, with respect to the obligations under that certain Promissory Note dated on or about the date hereof in the original principal amount of Nine Hundred Thousand and No/100 Dollars ($900,000.00) and executed by PIA Assets in favor of Employee (the "**Note**"), Five Star will pay, or cause to be paid, to Employee, a principal payment of Six Hundred Thousand and No/100 Dollars ($600,000.00) no later than sixty (60) days of the effectiveness of a Company Termination. The remaining principal and all outstanding interest having accrued and thereafter accruing thereon will be amortized over a three year period and will be paid to Employee in three equal installments, each paid no later than January 1 of each of the first three calendar years following the effectiveness of the Company Termination.

(c)     If Employee's employment is terminated as a result of his death, Five Star will pay to Employee's estate all previously earned and accrued but unpaid Base Salary and other compensation hereunder, allowances and expense reimbursements up to the date of his death, plus a payment equal to Six Million and 00/100 Dollars ($6,000,000.00) in cash ("**Payment Upon Death**"). The Payment Upon Death will be paid upon the earlier of: (i) the date Five Star receives the Life Insurance proceeds from the Life Insurance Policy; or (ii) the date six (6) months after the date of the Employee's death. Notwithstanding the preceding sentence, Five Star's obligation to make the Payment Upon Death will be subject to payment of the proceeds by the issuer of the Life Insurance Policy; provided, however, that Five Star will remain obligated to make the Payment Upon Death as otherwise required herein if proceeds of the Life Insurance Policy are not paid because of Five Star's breach of its obligations under this Agreement (i.e. the non-payment of premiums or voluntary termination or amendment to the Life Insurance Policy). Five Star will also provide to Employee's spouse and dependents any Benefits continuing after the death of Employee in accordance with their terms and conditions. Five Star shall purchase, and shall maintain in force throughout the Employment Period, the Life Insurance Policy in an amount sufficient to enable Five Star to pay the Payment Upon Death out of the proceeds of such life insurance policy in the event of Employee's death. Further, during the Employment Period, the Life Insurance Policy will not be materially different than the Life Insurance Policy in effect under the terms of the Original Agreement. Upon the Payment Upon Death being made, any membership interests in any of the PIA Companies then held by the Employee (other than rights to those which Employee may hold as security for the Note or other obligations of the PIA Companies to him), if any, will terminate and revert back to the issuing entity and all outstanding obligations of PIA Assets under the Note shall terminate. If the Payment Upon Death is not made within six (6) months of Employee's death (whether such non-payment is permitted hereunder or not), Five Star will pay, or cause to be paid, to Employee's estate, a principal payment of Six Hundred Thousand and No/100 Dollars ($600,000.00) on the Note no later than fifteen (15) days following expiration of said six (6) month period. Thereafter, the remaining principal and all outstanding interest having accrued and thereafter accruing on the Note will be amortized over a three year period and will be paid to Employee's estate or devisees in three equal installments, each paid no later than January 1 of each of the first three calendar years following the year in which the initial principal payment is made. If the Payment Upon Death is

KC01DOCS981124.10

4

not made for any reason, Employee's membership interests in any of the PIA Companies will not be affected.

(d)     Employee's employment with Five Star will terminate in the event of Employee's disability within the meaning of the long-term disability policy described in Section 1.3(g). If Employee's employment is terminated as a result of disability, Five Star will pay to Employee all earned and accrued but unpaid Base Salary, allowances and expense reimbursements up to the date the Employee became disabled, plus within sixty (60) days of the date the Employee became disabled, all principal and interest outstanding under the Note, and will provide to Employee and his spouse and dependent any Benefits continuing after termination of employment in accordance with their terms and conditions.

(e)     Employee may resign from employment with Five Star by giving thirty (30) days written notice to Five Star. If during the Employment Period Employee's employment is terminated upon Employee's voluntary resignation, Five Star will pay to Employee all earned and accrued but unpaid Base Salary, allowances and expense reimbursements until the date thirty (30) days after the date the Employee provides Five Star with written notice of the Employee's voluntary resignation, and will provide to Employee and his spouse and dependents any Benefits continuing after termination of employment in accordance with their terms and conditions.

(f)     In additional to all other rights and benefits otherwise accruing or contained herein, including without limitation any continuing Benefits, if Five Star terminates the employment of Employee for justifiable business reasons (unless such termination is For Cause, as defined below) prior to the tenth (10th) anniversary of the Effective Date, Five Star will pay Employee, no later than fifteen (15) days after the date of such termination, a sum equal to one year's Base Salary. As used herein, "**For Cause**" means (1) Employee's material breach of any of Employee's obligations under this Agreement, or Employee's repeated failure or refusal to materially perform or observe Employee's duties, responsibilities and obligations as an Employee of Five Star, for reasons other than disability; (2) Conviction of Employee of a felony involving misrepresentation or fraud;  (3) Commission by Employee of acts or failure to act which constitutes willful misconduct or gross negligence, any of which could reasonably be expected to materially injure the reputation, business or business relationships of Five Star and/or Employee.

(g)     Except as otherwise provided, any payments pursuant to this Section 1.4, will be made on the payment dates on which Employee's Base Salary and allowances would have otherwise been paid if the Employment Period had continued.

(h)     In the event the Employee no longer is an employee of Five Star, Five Star will either (i) cause the Employee to be fully and completely released from all liabilities, costs, obligations or guaranties of any nature directly or indirectly associated with the PIA Companies or any of the PIA Companies' operations (collectively "**Company Obligations**") within twelve (12) months after the date Employee's employment terminates ("**12 Month Period**"); or (ii) fully and completely indemnify and hold harmless Employee with respect to all existing and future Company Obligations pursuant to the terms and conditions of an indemnification agreement which will be in a form acceptable to Employee; provided, however, in circumstance (i) above, Five Star and the other PIA Companies will fully and completely indemnify and hold harmless the Employee during the 12 Month Period.

PC000820

(i)    During the 12 Month Period, Employee will not: (i) participate in, or be involved in any manner with, the hiring (or any attempt to hire) as an employee any person who is, at the time of such hiring or attempted hiring, an employee of Double Eagle or Five Star; or (ii) otherwise induce or attempt to induce any employee of Double Eagle or Five Star to leave the employ of either such company.

## ARTICLE II
### Miscellaneous

2.1    Survival.  Section 1.3 and, to the extent the terms and conditions of any Benefits provide for continuation after termination of employment, will survive and continue in full force in accordance with its terms notwithstanding any termination of the Employment Period.

2.2    Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally, mailed by certified or registered mail, return receipt requested and postage prepaid, or sent via a nationally recognized overnight courier, or sent via facsimile to the recipient.  Such notices, demands and other communications will be sent to the address indicated below:

To Five Star:

c/o PIA Assets, LLC
11504 Pawnee Circle
Leawood, Kansas 66211

To Employee:

James S. Allen, Jr.
7001 Waters Edge
Parkville, Missouri 64152

With a copy to:

Michael J. Royle
Bryan Cave LLP
1200 Main Street, Suite 3500
Kansas City, Missouri 64105
Facsimile: (816) 374-3300

or such other address or to the attention of such other person as the recipient party will have specified by prior written notice to the sending party.

2.3    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

PC000821

2.4 <u>Complete Agreement</u>. This Agreement and the other agreements referenced herein, constitute the complete agreement and understanding among the parties and supersedes and preempts any other prior understandings, agreements or representations by or among the parties, written or oral, including, without limitation, the Original Agreement.

2.5 <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

2.6 <u>Successors and Assigns</u>. Except as otherwise provided herein, all covenants and agreements contained in this Agreement will bind and inure to the benefit of and be enforceable by all of the parties hereto and their respective successors and assigns. Except as otherwise specifically provided herein, this Agreement, including the obligations and benefits hereunder, may not be assigned to any party to hereto.

2.7 <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied to this Agreement.

2.8 <u>Descriptive Headings</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

2.9 <u>Governing Law</u>. All questions concerning the construction, validity and interpretation of this Agreement will be governed by and construed in accordance with the domestic law of the State of Missouri, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Missouri or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Missouri.

2.10 <u>Remedies</u>. Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.

2.11 <u>Amendment and Waiver</u>. The provisions of this Agreement may be amended and waived only with the prior written consent of Five Star and Employee.

2.12 <u>Guaranty</u>. PIA Assets, on behalf of itself and each of the other PIA Companies, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, to Employee the due and punctual performance, observance and discharge of each term, provision, duty, covenant and agreement of Five Star and Double Eagle contained in, and the due and punctual payment (when and as the same may become due and payable) of each amount which Five Star or Double Eagle is or may become obligated to pay pursuant to this Agreement. PIA Assets, on behalf of itself and each of the other PIA Companies, hereby waives promptness, diligence and notice as to the obligations and covenants contained herein, and waives any other circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or that might otherwise limit the obligations of PIA Assets and the other PIA Companies under this Agreement. PIA Asset's and the other PIA Companies' guaranties hereunder are a guaranties of payment, performance and compliance and not of collection, and PIA Assets and the other PIA Companies waive any right to require that any action be brought against Five Star.

PC000822

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

2.13    Effectiveness.    This Agreement will only become binding and effective upon: (a) its execution and delivery by all parties, and (b) the execution and delivery of the Note in form and substance satisfactory to Employee.


[remainder of page intentionally left blank]

PC000823

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Employment Agreement as of the date first written above.

PIA ASSETS, LLC,
a Missouri limited liability company, on behalf of itself and each of the other PIA Companies (as defined herein)

FIVE STAR LIFESTYLES, LLC,
A Missouri limited liability company

DOUBLE EAGLE BUILDERS, LLC,
a Missouri limited liability company

By: _____

Cliff Illig, as authorized signatory of PIA Assets, LLC, Five Star Lifestyles, LLC, Double Eagle Builders, LLC and all other PIA Companies

Date: _____


_____
James S. Allen, Jr., in his individual capacity

Date: February 5, 2010

<u>Exhibit A</u>
Computation of Profit

"**Cost of Goods Sold**" means the cost, as reflected in the books and records of Double Eagle, of all real estate and other inventory sold during the applicable calendar year, including the interest on the indebtedness of Double Eagle directly attributable to its operations, determined on a cash basis using the accepted accounting principles consistently applied by PIA Companies in the three calendar years preceding the Effective Date (the "Accounting Principles").

"**Gross Income**" means all revenues received, or to be recognized according to the Accounting Principles from all operations or sales, transfers or other dispositions of real estate by Double Eagle of the developments commonly known as "The National" or "Loch Lloyd", including, without limitation all real estate commissions accruing through such activities.

"**Overhead**" means the administrative expenses, as reflected in the books and records of Double Eagle, attributable to the operations of Double Eagle to be recognized in a given calendar year, as determined in accordance with the Accounting Principles.

PC000825

# EXHIBIT C

**Karen Virgillito**

| | |
|---|---|
| **From:** | Deborah Smeltzer <IMCEAEX-_O=FIRST+20ORGANIZATION_OU=EXCHANGE+<br>20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29<br>_CN=RECIPIENTS_CN=DEBORAH+20SMELTZER845342F4@pandicapital.com> |
| **Sent:** | Wednesday, April 25, 2012 9:13 AM |
| **To:** | Maureen Evans |
| **Subject:** | $817K Note from PIA to Jim Allen |
| **Attachments:** | 1785_001.pdf |

Maureen,

We wrote the note in late October 2010 and had Cliff sign it.   Cliff asked us to hold it as he did not want to ask Jim to sign at the time.  Attached is what we have.

Deborah

DEPOSITION
EXHIBIT
139
PENGAD 800-631-6989

1

PC000849

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

## Summary of Promissory Note
## Note from PIA Assets to James S. Allen, Jr.
## $817,585 Promissory Note Dated January 1, 2010

### Note Summary

Promissory Note of $817,585 is issued from PIA Assets, LLC to James S. Allen, Jr. as of January 1, 2010.

This is a new note for amounts loaned to PIA Assets from James S. Allen, Jr.

### Interest Rate and Maturity Date

Interest on note is calculated at 20% IRR and note matures January 1, 2013.

### Promissory Note Signatures:

Clifford W. Illig, on PIA Assets, LLC     Date Signed: _12 | 15 | 2010_

James S. Allen, Individual     Date Signed: _____

### Limited Guaranties on Note:

There are no guaranties associated with this note.

*Not Executed by CWI mus To Hold.*

*12/2010 - Cliff Wants to hold as he does not want to ask Jim to sign at the time*

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

# PROMISSORY NOTE

$817,585.00                                                          January 1, 2010

     For value received, the undersigned, **PIA Assets, LLC**, a Missouri limited liability company ("**Borrower**"), promises to pay to the order of **James S. Allen, Jr.,** an individual resident of the State of Missouri ("**Lender**"), the principal sum of Eight Hundred Seventeen Thousand Five Hundred Eighty-Five and No/100 Dollars ($817,585.00) (the "**Principal**"), with interest thereon at the Interest Rate (as hereinafter defined), and to be payable as follows:

     A.    Borrower shall pay all accrued and outstanding interest at the Interest Rate on the Maturity Date;

     B.    Borrower shall pay all outstanding principal and accrued interest together with the IRR True Up (defined below) and all other amounts owed pursuant to this note (the "**Note**") on the third anniversary of the date hereof (the "**Maturity Date**"), unless earlier accelerated pursuant to the terms of this Note.

     All payments to be made by Borrower to Lender shall be deemed received by Lender only upon Lender's actual receipt of the same.

     **1.**    **Interest.**  Interest shall accrue at the Interest Rate on the outstanding Principal balance at the end of each day on which any amount is outstanding under this Note.  Interest shall be calculated on a daily basis (computed on the actual number of days elapsed over a year of 360 days), commencing on the date of this Note, and shall be based upon the outstanding Principal balance at the end of each day.

     **2.**    **Definitions; and Construction.**

     (a)    When used in this Note, the following terms have the following meanings (terms defined in the singular have the same meaning when used in the plural and vice versa):

     "**Excess Cash Flow**" means the net amount of cash flow (after debt-service) generated by Borrower determined by Borrower's accountants based on earnings before interest, taxes, depreciation and amortization.

     "**Interest Rate**" means a rate equal to the IRR True Up.

     "**IRR True Up**" means an amount necessary such that, after the payment of which, as of such date, Lenders' internal rate of return (as calculated using Microsoft Excel's XIRR function) on the Loan will be 20%.

     "**Loan**" means the loan evidenced by this Note.

981957

PC000851

"Usury Law" means any law or regulation of any governmental authority having jurisdiction, limiting the amount of interest that may be paid for the loan, use or detention of money.

(b)     An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender.

**3.     Usury.**  All agreements contained in this Note are expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid by or on behalf of Borrower to Lender for the use, forbearance or detention of money exceed the highest lawful rate permissible under any applicable Usury Law.  If, from any circumstances whatsoever, compliance with this Note, at the time performance thereunder shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable thereto, then, *ipso facto*, the obligations to be fulfilled shall be reduced to the limit of such validity.  If from any circumstance, Lender shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due under this Note and not to the payment of interest. This provision shall control every other provision of all agreements between Borrower and Lender; provided, however, that there shall be no automatic reduction of such payments or obligations as to any party barred by law from availing itself in any action or proceeding of the defense of usury, or any party barred or exempted from the operation of any Usury Law, or in the event and to the extent the Loan, because of its amount or purpose or for any other reason, is exempt from the operation of the Usury Law.

**4.     Prepayment.**

(a)     Voluntary Prepayment.   This Note may be prepaid in whole or in part at any time.

(b)     Mandatory Prepayment.   On the fifteenth day (15th) day of February, May, August and December, Borrower shall prepay this Note in the amount of all Excess Cash Flow for the three calendar months ended December, 31, March 31, June 30 and September 30, respectively.

(c)     Application of Prepayments.   All prepayments will be allocated as determined by Lender.

**5.     Conditions of Lending.**  Lender shall not be obligated to continue to make the Loan under this Note unless the following statements shall be true:  (i) the representations and warranties of Borrower contained herein are correct on and as of the date of the Loan, and (ii) there exists no Event of Default as of such date, nor would any Event of Default result from the making of the Loan requested by Borrower.

**6.     Representations and Warranties.**

(a)     Organization, Existence and Corporate Names.   Borrower (i) is duly formed, validly existing and in good standing under the laws of the Kansas, (ii) is in good standing in all other jurisdictions in which it is required to be qualified to do business as a

2

PC000852

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

foreign entity, and (iii) has obtained all licenses and permits and has filed all registrations necessary to the operation of its business (except where the failure to so qualify or to obtain such licenses or permits would not materially and adversely affect the actual or prospective business, financial condition or operations of Borrower).

(b)     Authorization.  The execution, delivery and performance by Borrower of this Note: (i) are within Borrower's organizational powers; (ii) have been duly authorized by all necessary action; and (iii) do not contravene any Borrower's certificate formation or operating agreement or any law or contractual restriction binding on or affecting Borrower or its properties.

7.     Covenants.  So long as any amounts remain unpaid under this Note or Lender shall have any commitment to extend credit to or for the benefit of Borrower, unless otherwise consented to in writing by Lender, Borrower covenants to Lender as follows:

(c)     Compliance with Laws.  Borrower shall comply in all material respects with all applicable laws, rules, regulations and orders affecting Borrower or its properties.

(d)     Reporting Requirements.  Borrower shall furnish to Lender:

(i)     Year-End Statements.  As soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year financial statements including statements of income and stockholders' or members' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and for such year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification, except for the effects of reporting depreciation based on rates and lives for tax purposes rather than as required by GAAP as set forth therein; and

(ii)     Other.  Such other information respecting the condition or operations, financial or otherwise, of the Borrowers as Lender may request from time to time.

All financial statements as to which GAAP is applicable shall be complete and fairly present in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein and except as qualified for the effects of reporting depreciation based on rates and lives for tax purposes rather than as required by GAAP).

8.     Default.

(a)     Events of Default.  Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Note:

(i)     Borrower fails to timely pay the Principal under this Note in accordance with the terms of this Note; or

981957

PC000853

(ii) Borrower fails to timely pay any interest under this Note in accordance with the terms of this Note and such failure continues more than five (5) days after such interest was due and payable; or

(iii) Borrower fails or neglects to timely perform, keep, or observe any other term, provision, condition, covenant, or agreement contained in this Note; or

(i) Borrower breaches any other agreement with Lender or fails or neglects to timely perform, keep, or observe any other term, provision, condition, covenant, or agreement contained therein; or

(ii) Borrower defaults in any material respect on any other indebtedness of Borrower; or

(iv) Borrower makes an assignment for the benefit of creditors or is unable to pay its debts and obligations generally as they become due, or an order, judgment, decree or injunction is entered adjudicating Borrower bankrupt or insolvent or requiring the dissolution or split up of Borrower or preventing Borrower from conducting all or any part of its business; or any order for relief with respect to any Borrower is entered under Title 11 of the United States Code (as amended, modified, supplemented or replaced from time to time); or

(v) Borrower petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of Borrower, or of any substantial part of the assets of Borrower, or commences any proceeding relating to Borrower under any bankruptcy reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar laws of any jurisdiction now or hereafter in effect; or any such petition or application is filed, or any such proceeding is commenced, against Borrower and either (i) Borrower by any act indicates its approval thereof, consent thereto or acquiescence therein or (ii) such petition, application or proceeding is not dismissed within 60 days.

(b) **Acceleration upon Event of Default.** Upon the occurrence of any Event of Default (whether or not Lender has knowledge that such Event of Default exists), then the Loan shall, at the option of Lender immediately become due and payable without demand and without notice to Borrower or any other person or entity. Notwithstanding the foregoing, upon the occurrence of an Event of Default described in Section 8(a)(iv) or (v), the debt shall be immediately due and payable automatically without presentment, demand, protest or notice of any kind.

9. **Lender's Rights and Remedies.**

(a) **Rights and Remedies.** Upon the occurrence, and during the continuation, of an Event of Default: (i) Lender shall have all rights and remedies available to it at law or equity for collection of the amounts due under this Note; (ii) Lender shall have all rights, powers and remedies available to it under any applicable law or as otherwise provided at law or in equity; (iii) Borrower shall pay to Lender, in addition to the sums stated above, the reasonable costs of collection, regardless of whether litigation is commenced, including any reasonable attorneys' (and any other consultants' or experts') fees, expenses and other costs, to the extent not prohibited by law; and (iv) notwithstanding any other provision of this Note,

4

PC000854

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

during the period of existence of such Event of Default, interest on the Loan evidenced by this Note shall accrue and be paid, not at the Interest Rate, but at the lesser of (A) the Default Rate, or (B) the maximum lawful rate of interest under the applicable Usury Law, if any. "**Default Rate**" shall mean, a rate per annum equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) five percent (5.0%) above the applicable Interest Rate.

(b)     **Remedies Cumulative.** Lender's rights and remedies under this Note and all other agreements related to this transaction shall be cumulative. Lender shall have all other rights and remedies not inconsistent with this Note as provided by law or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

(c)     **Borrower's Approvals, Ratifications, and Waivers.**

(i)     Except as expressly set forth in this Note, to the fullest extent permitted by applicable law, Borrower, for itself, and its successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and any and all other notices, demands and consents in connection with the delivery, acceptance, performance, default or enforcement of this Note, and hereby further waives stay of execution and all suretyship defenses to payment generally. No release of any security held for the payment of this Note, or extension of any time periods for any payments due under this Note, and no alteration, amendment or waiver of any provision of this Note, shall modify, waive, extend, change, discharge, terminate or affect the liability of Borrower under this Note.

(ii)     No delay or omission on the part of Lender or any holder of this Note in exercising its rights under this Note, or course of conduct relating thereto, shall operate as a waiver of such rights or any other right of Lender or any holder of this Note, nor shall any waiver by Lender, or any holder of this Note, of any such right or rights on any one occasion be deemed a bar to, or waiver of, the same right or rights on any future occasion.

(iii)     Borrower covenants and agrees that it is liable with respect to all of the obligations under the Note. Upon the occurrence of any Event of Default and at any time thereafter, Borrower covenants and agrees that Lender may, in its sole and absolute discretion, proceed directly against Borrower or any other person or entity liable for the payment or performance of the Note, or any or all of the collateral, or other security for the Note, and/or any combination of the foregoing, in one or more claims, actions or proceedings, whether or not any such claims, actions or proceedings are instituted simultaneously or at different times.

10.     **Revival and Reinstatement of Note.** To the extent that any payment to Lender in reduction of the Loan is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to Borrower (or Borrower's successor) as a debtor-in-possession, or to a receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then the portion of the Loan intended to have been satisfied by such payment or proceeds shall remain due and payable and shall continue in full force and effect as if such payment or proceeds had never been received by Lender whether or not this

981957

PC000855

Note has been marked "paid" or otherwise canceled or satisfied and/or has been delivered to Borrower, and in such event Borrower shall immediately return the original Note to Lender and any marking of "paid" or other similar marking shall be of no force and effect.

**11.** **Lender's Fees, Expenses and Costs.** Borrower shall pay to Lender, upon demand, all expenses, costs, charges, disbursements, and reasonable attorneys' fees incurred by Lender in connection with the underwriting, origination, making, documentation, administration, enforcement and/or collection of the Loan, and all such amounts incurred by Lender shall be part of the Loan.

**Statutory Language; Oral Agreements**

(a)    THIS IS THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN BORROWER AND LENDER, AND THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR ORAL AGREEMENT OR OF A CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER.

(b)    BORROWER AND LENDER ACKNOWLEDGE THAT ALL NONSTANDARD TERMS OF THIS AGREEMENT AND ALL PRIOR ORAL AGREEMENTS AND CONTEMPORANEOUS ORAL AGREEMENTS BETWEEN THEM ARE SUFFICIENTLY SET FORTH HEREIN EXCEPT (IF NONE, WRITE "NONE"):

NONE.

BORROWER AND LENDER FURTHER ACKNOWLEDGE THAT THE ABOVE SPACE IS SUFFICIENT FOR DISCLOSURE OF TERMS AND AGREEMENTS, IF ANY, NOT SET FORTH IN THIS AGREEMENT.

(c)    BORROWER AND LENDER AFFIRM THAT NO UNWRITTEN ORAL AGREEMENT BETWEEN THEM EXISTS.

BORROWER'S INITIALS: _____
LENDER'S INITIALS: _____

**12.** **Governing Law; Consent to Forum.** THIS NOTE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MISSOURI WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULES THEREOF.  AS PART OF THE CONSIDERATION FOR NEW VALUE THIS DAY RECEIVED, BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE AND FEDERAL COURTS LOCATED WITHIN THE STATE OF MISSOURI, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED OR REGISTERED MAIL AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT THEREOF.  BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED AGAINST IT AS PROVIDED IN THIS NOTE AND AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE.

6

981957

BORROWER FURTHER AGREES NOT TO ASSERT AGAINST LENDER (EXCEPT BY WAY OF A DEFENSE OR COUNTERCLAIM IN A PROCEEDING INITIATED BY LENDER) ANY CLAIM OR OTHER ASSERTION OF LIABILITY WITH RESPECT TO THIS NOTE, LENDER'S CONDUCT OR OTHERWISE IN ANY JURISDICTION OTHER THAN THE FOREGOING JURISDICTIONS. NOTWITHSTANDING THE FOREGOING, LENDER HAS THE RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN ANY COURTS OF ANY OTHER JURISDICTION LENDER DEEMS NECESSARY OR APPROPRIATE.

**13. Waiver of Jury Trial and Counterclaims.** TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION TO LENDER, BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY (WHICH LENDER ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR OTHERWISE RELATING TO THIS NOTE, THE OBLIGATIONS, THE COLLATERAL, OR LENDER'S CONDUCT IN RESPECT OF ANY OF THE FOREGOING. TO EFFECTUATE THE FOREGOING, LENDER IS HEREBY GRANTED AN IRREVOCABLE POWER OF ATTORNEY TO FILE, AS ATTORNEY-IN-FACT FOR BORROWER, A COPY OF THIS NOTE IN ANY KANSAS COURT, AND THE COPY OF THIS NOTE SO FILED SHALL CONCLUSIVELY BE DEEMED TO CONSTITUTE BORROWER'S WAIVER OF TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR OTHERWISE RELATING TO ANY OF THE CREDIT DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR LENDER'S CONDUCT IN RESPECT OF ANY OF THE FOREGOING.

**14. Miscellaneous.**

(a) Time is of the essence in this Note.

(b) Any provision of this Note that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Note in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

(c) This Note: (i) constitutes the final expression of the agreement between Borrower and Lender; (ii) contains the entire agreement between Borrower and Lender respecting the matters set forth in this Note; and (iii) may not be contradicted by evidence of any prior or contemporaneous oral agreements or understandings between Borrower and Lender. Neither this Note nor any of the terms of this Note may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

(d) If there is a conflict between or among the terms, covenants, conditions or provisions of this Note and any other document, any term, covenant, condition and/or provision that Lender may elect to enforce from time to time so as to enlarge the interest of Lender in its security for the Note, afford Lender the maximum financial benefits or security for the Note, and/or provide Lender the maximum assurance of payment of the Loan in full shall control.

981957

PC000857

BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN PROVIDED WITH SUFFICIENT AND NECESSARY TIME AND OPPORTUNITY TO REVIEW THE TERMS OF THIS NOTE WITH ANY AND ALL COUNSEL IT DEEMS APPROPRIATE, AND THAT NO INFERENCE IN FAVOR OF, OR AGAINST, LENDER OR BORROWER SHALL BE DRAWN FROM THE FACT THAT EITHER SUCH PARTY HAS DRAFTED ANY PORTION OF THIS NOTE.

(e)     Borrower hereby acknowledges the receipt of a copy of this Note, and further acknowledges that they have had sufficient opportunity to review this Note with legal counsel.

(f)     Borrower represents and warrants to Lender that Borrower is making this Note and borrowing the Loan on Borrower's own behalf, and not as nominee, designee, or agent for another, nor is Borrower acting for another in so borrowing the Loan. Borrower agrees that it will use the proceeds of the Loan for "business purposes" and not for personal, family or household purposes.

981957

PC000858

Electronically Filed - Platte - October 04, 2016 - 08:13 AM

IN WITNESS WHEREOF, each Borrower has executed and delivered this Note to Lender and Lender has accepted this Note from Borrower as of the day and year first above written.

**PIA ASSETS, LLC**
a Missouri limited liability company

By: _____
Name: Clifford W. Illig
As authorized signatory of PIA Assets, LLC

Lender:

**James S. Allen**
an individual

By: _____
Name: James S. Allen

981957

PC000859

# EXHIBIT D

Electronically Filed - Platte - October 04, 2016 - 08:13 AM



Redacted

CONFIDENTIAL

Redacted

-----Original Message-----
From: Stueve, Pat [mailto:stueve@stuevesiegel.com]
Sent: Saturday, April 06, 2013 9:02 AM
To: Goldstein, Scott J.
Cc: Funk, Andrew
Subject: Confidential settlement proposal

Scott: I am prepared to send to you a confidential settlement proposal. Can you confirm that your clients will keep it confidential and used solely for the purpose of attempting to resolves pending and potential litigation as we discussed at our meeting on Monday.  My client will treat any response by your clients as confidential as well.  Thanks.  Pat.

Sent from my iPad

**From:** Goldstein, Scott J.
**Sent:** Monday, April 08, 2013 12:22 PM
**To:** Maureen Evans
**Cc:** Hertel, Richard; Weems, Douglas M.
**Subject:** RE: bank strategy

This works for us as well.  Please use call in number:

1-888-857-4042

Code 816-292-8218.  Thanks,  sjg

**From:** Maureen Evans [mailto:mevans@pandicapital.com]
**Sent:** Monday, April 08, 2013 12:11 PM
**To:** Goldstein, Scott J.
**Subject:** RE: bank strategy
**Importance:** High

2

2:00 this afternoon works for us.

**From:** Goldstein, Scott J. [mailto:sgoldstein@spencerfane.com]
**Sent:** Monday, April 08, 2013 11:42 AM
**To:** Maureen Evans; Cliff Illig; karen@tifec.com
**Cc:** Hertel, Richard; Weems, Douglas M.
**Subject:** RE: bank strategy

Yes. Give me a time you and Karen are available. sjg

> **From:** Maureen Evans [mailto:mevans@pandicapital.com]
> **Sent:** Monday, April 08, 2013 11:50 AM
> **To:** Goldstein, Scott J.; Cliff Illig; karen@tifec.com
> **Cc:** Hertel, Richard; Weems, Douglas M.
> **Subject:** RE: bank strategy
>
> Scott,
>
> I just talked to Cliff and he is not available today or tomorrow. Do you want to get on the phone later this afternoon with Karen and I to go through the list and see what we can keep moving along? We can probably get Cliff on a call sometime Wednesday if we determine we still need that.
>
>
> Thanks,
> Maureen
>
> Maureen M. Evans | Chief Financial Officer | Pandi Capital, LLC | office 816-265-6114 | cell 913-269-5810 | fax 816-265-6115 | mevans@pandicapital.com
>
>
> > **From:** Goldstein, Scott J. [mailto:sgoldstein@spencerfane.com]
> > **Sent:** Monday, April 08, 2013 11:08 AM
> > **To:** Cliff Illig; karen@tifec.com; Maureen Evans
> > **Cc:** Hertel, Richard; Weems, Douglas M.
> > **Subject:** RE: bank strategy
> >
> > Here is a list of items I would like to discuss today, which includes Maureen's question below about dealing with the Banks.
> >
> > 1. Follow-up regarding Stueve—confidential discussions solely for the purpose of attempting to resolve pending and potential litigation—they will treat as confidential.
> >
> > 2. Making sure all resolutions ,notes, minutes, corporate documents have been signed, are organized and we have copies of same.
> >
> > 3. Bank follow-up:
> >
> > Completion of document gathering on loan documents.
> >
> > Karen/Cliff to work on script to be delivered by Pete.

CONFIDENTIAL

Pete is communicator—does not want Cliff or Neal to be involved—will need to harmonize obligation of PIA to indemnify with keeping Allen on guaranties.

Goals: Allen stays on guaranties—no more Banks providing two sets of documents; Neal and Cliff don't sign any new or additional guaranties or reaffirmations of guaranties; Banks allow Pandi to take a subordinate lien on assets; longer term alternatives, but for now need to deal with first three items.

Meet with Pete later this week to get this underway.

4. Lawsuit by Pandi Capital/Development to protect our rights:

Notes—changes to same as necessary.

Draft Petition.

Additional fact gathering.

Tax issues/implications.

5. PIA/Corporate Governance Misc.:

Indemnity agreement Pete is working on

Five-Star meetings for appointment of officers—construct resolutions for officers/positions-quarterly reports may be limit of Boards' involvement.

6. Current cash needs request form Dale.

Please let me know if there is anything else to discuss. Karen, Maureen, can you let me know a good time and whether Cliff is available? Thanks, sjg

---

**From:** Maureen Evans [mailto:mevans@pandicapital.com]
**Sent:** Monday, April 08, 2013 6:43 AM
**To:** Goldstein, Scott J.
**Subject:** bank strategy

Scott,

When we talk on Monday, can we also address the next steps we are taking with the Banks. Neal wants to know why we haven't approached the Banks and gotten them to go after Jim Allen's guaranty. He says that was our strategy when we got this thing started and he wants to know why we haven't done any of that yet.

It is going to be hard for me to get him to sign off on this next capital call for Wednesday if I can't explain what we are doing next.

4

Thanks,
Maureen

Maureen M. Evans|Chief Financial Officer|Pandi Capital, LLC|office 816-265-6114|cell 913-269-5810|fax 816-265-6115|mevans@pandicapital.com

CONFIDENTIAL